Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue, New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151

- and -

Peter O'Driscoll
Orrick, Herrington & Sutcliffe LLP
25 Old Broad Street
London EC2N 1HQ
DX: 557 London/City
United Kingdom
Telephone: 011 44 20 7562 5000
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

|  |  |
|---|---|
| **TELENOR EAST INVEST AS,** | 07 CV 4829 (DC)(DCF) |
| Plaintiff, | ECF Case |
| -against- | **FIRST AMENDED COMPLAINT** |
| **ALTIMO HOLDINGS & INVESTMENTS LIMITED, ECO TELECOM LIMITED, CTF HOLDINGS LIMITED, CROWN FINANCE FOUNDATION and RIGHTMARCH LIMITED.** | |
| Defendants. | |

------------------------------------------------------------ x

Plaintiff Telenor East Invest AS ("Telenor East") alleges, upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, by its undersigned attorneys, for its first amended complaint against Defendants, as follows:

## INTRODUCTION

1.     This action arises out of Defendants' actions in violation of the securities laws of the United States with regard to the securities of Open Joint Stock Company "Vimpel-Communications" ("VimpelCom"), a company whose shares and American Depositary Shares ("ADSs") are registered pursuant to the securities laws of the United States. VimpelCom's ADSs are traded on the New York Stock Exchange.

2.     Since August 29, 2006, Defendants have acquired at least 11.1% of VimpelCom's issued and outstanding voting shares, increasing their ownership of VimpelCom's voting shares to at least slightly in excess of 44.00%. During that time, Defendants have made a series of materially false and misleading statements regarding their purchases of VimpelCom shares, including in their filings with the United States Securities and Exchange Commission (the "SEC"); have purchased VimpelCom shares and ADSs while in possession of material non-public information; have engaged in an unlawful tender offer for VimpelCom shares and ADSs; and have violated the rules relating to "going private" transactions. Defendants' action have harmed and continue to harm Telenor East and the other shareholders of VimpelCom.

3.     The declaratory and equitable relief sought herein is necessary to provide holders of VimpelCom securities with all the information to which they are entitled under the United States securities laws, to restore the integrity of the market, and to prevent Defendants from profiting from their wrongful conduct. Absent such relief, there is a substantial likelihood that holders of VimpelCom shares and ADSs will take actions (including selling shares of ADSs to Defendant Eco Telecom Limited or its agents) that they would not otherwise take with the benefit of accurate information, and that, as a consequence of their illegal purchases of VimpelCom shares, Defendants will be able to exercise control over VimpelCom in violation of United States law.

4.      In addition to corrective disclosures, injunctive relief is necessary to remedy the harm already caused by Defendants' unlawful conduct. That harm cannot be cured merely through corrective disclosure. Defendants should be barred from acquiring more VimpelCom shares and ADSs, and should be barred from voting all VimpelCom shares and ADSs acquired in the course of their illegal activities, and should be ordered to offer withdrawal rights to the VimpelCom shareholders from whom they purchased shares and/or ADSs in their unlawful tender offer, or to dispose of such shares and ADSs to unaffiliated third parties. Defendants would otherwise be able to profit from their failure to comply with the United States securities laws, to the detriment of Telenor East and other holders of VimpelCom securities.

## JURISDICTION AND VENUE

5.      This action arises under Section 13(d), Section 13(e), Section 14(d) and Section 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78m(d), 78m(e), 78n(d) and (e), and the rules and regulations of the SEC promulgated thereunder.

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. § 78aa.

7.      Venue in this district is proper under 28 U.S.C. §§ 1391(b)(2) and 1391(d), and 15 U.S.C. § 78aa.

## THE PARTIES

### I.      PLAINTIFF

8.      Telenor East is, and at all times relevant herein, has been, a corporation duly organized and existing under the laws of the Kingdom of Norway, with its principal place

of business in Fornebu, Norway.  It is an indirect wholly-owned subsidiary of Telenor ASA

("Telenor"), also a Norwegian corporation.  Telenor is the largest provider of

telecommunications services in Norway.  Through its various subsidiaries and affiliates, Telenor

has mobile telecommunications operations in 12 countries, with over 50 million subscribers.

53.97% of Telenor's issued and outstanding shares are held by the Ministry of Trade and

Industry of the Kingdom of Norway; the remainder are publicly held.  Telenor's shares are listed

in Norway on the Oslo Stock Exchange.  The company has over 40,000 shareholders.

     9.     For many years, Telenor has invested in, and developed strategic

partnerships with, mobile telecommunications companies located outside of Norway.  As of

December 2006, Telenor and its affiliates in Europe and Asia had over 80 million mobile

subscribers, making Telenor the twelfth largest mobile telephone company in the world.

Measured by the value of its investments, Telenor is the second largest foreign investor in

Russia.

## II.    <u>DEFENDANTS</u>

     10.     The Alfa Group Consortium (the "Alfa Group") is one of Russia's largest

privately owned financial-industrial groups, with interests in oil and gas, commodities trading,

commercial and investment banking, insurance, retail trade and telecommunications.  The group

was founded and is controlled by, among others, Mikhail Fridman and Peter Aven.

     11.     Altimo Holdings & Investments Limited ("Altimo"), formerly known as

Alfa Telecom Limited, is, and at all times relevant herein, has been, a corporation organized and

existing under the laws of the British Virgin Islands.  Altimo is wholly owned by the Alfa Group,

and acts as a holding company for the Alfa Group's telecommunications assets.

     12.     Eco Telecom Limited ("Eco Telecom") is, and at all times relevant herein,

has been, a corporation organized and existing under the laws of Gibraltar.  Eco Telecom is

wholly owned by Altimo, and acts as a holding company for Altimo's holdings of VimpelCom's shares. As of the date of this first amended complaint, according to documents filed with the SEC, Eco Telecom beneficially owns approximately 44.00001% of VimpelCom's voting shares.

13.    CTF Holdings Limited ("CTF") is, and at all times relevant herein, has been, a corporation organized and existing under the laws of Gibraltar, with a controlling interest, directly or indirectly, in Altimo.

14.    Crown Finance Foundation ("Crown") is, and at all times relevant herein, has been, a foundation organized and existing under the laws of Lichtenstein, and is the sole shareholder of CTF.

15.    Rightmarch Limited ("Rightmarch") is and at all times relevant herein, has been, a corporation organized and existing under the laws of the Republic of Cyprus. Rightmarch is a wholly-owned subsidiary of Altimo.

III.    **VIMPELCOM**

16.    VimpelCom is the second largest mobile telecommunications company in Russia and holds licenses to operate in all eight regions in Russia. In 1996, VimpelCom became the first Russian company to list its shares on the New York Stock Exchange since 1903. By the end of December 2006, VimpelCom had approximately 55.1 million subscribers, including 7.0 million subscribers in countries other than Russia that were formerly part of the Soviet Union. On April 20, 2007, VimpelCom disclosed in a filing with the SEC on Form 6-K that it had been awarded one of the three 3G mobile licenses in Russia.

17.    The current average volume for VimpelCom's ADSs on the New York Stock Exchange for the last three months is approximately 825,000 ADSs per day. VimpelCom's ADS price, as of the last business day before the date of this first amended

complaint, was approximately $110 per ADS. The market capitalization of VimpelCom as of that date exceeded $22,000,000,000.

18.     The Bank of New York ("BONY") acts as depositary for VimpelCom's ADSs. BONY is located within the Southern District of New York.

19.     VimpelCom is, and at all times herein has been, subject to the reporting provisions of the Exchange Act, 15 U.S.C. §§ 78(a) et seq., applicable to foreign private issuers.

## FACTUAL ALLEGATIONS

### I.     BACKGROUND

20.     In December 1998, Telenor East purchased approximately 25.7% of the voting capital stock of VimpelCom. As of the date of this first amended complaint, Telenor East owns approximately 29.9% of the voting capital stock of VimpelCom.

21.     As of May 30, 2001, both Eco Telecom and Telenor East were shareholders of VimpelCom. On that date Telenor East and Eco Telecom entered into a shareholders agreement (the "Shareholders Agreement") which governs, among other things, the parties' right to nominate candidates for election to VimpelCom's Board of Directors (the "Board"). The Shareholders Agreement gives each of Telenor East and Eco Telecom the right to nominate four candidates for election to the Board (which has nine members), with one candidate being nominated by each party required to be an Independent (as such term is defined in the Shareholders Agreement). The Shareholders Agreement provides, inter alia, that if Telenor East or Eco Telecom owns more than 44% but not more than 50% of the voting capital stock of VimpelCom, a status referred to in the Shareholders Agreement as a "Plurality Shareholder", then the requirement that one of the four candidates be an Independent does not apply. The Shareholders Agreement also gives Telenor East the right to nominate one additional

candidate for election to the Board, who must also be an Independent, and must be approved by Eco Telecom.

22.　　On or about November 5, 2001, Eco Telecom purchased over five million newly issued common shares of VimpelCom for $130 million, pursuant to agreements dated as of May 31, 2001. Eco Telecom thereafter increased its ownership of VimpelCom's voting stock so that, as of August 29, 2006, before the events described herein, Eco Telecom owned approximately 32.9% of VimpelCom's voting stock.

## II.　　**THE RIGHTMARCH TRANSACTION**

23.　　According to an article in *Vedomosti*, Russia's leading business daily, on or about August 9, 2006, Peter Aven, the President of Alfa Bank and a member of the Supervisory Board of Alfa Group, met with Russian President Vladimir Putin and expressed Alfa Group's interest in creating a large multinational communications company, of which Altimo would be the leading shareholder.

24.　　On August 15, 2006, VimpelCom provided a detailed summary of its second quarter 2006 financial results, first to members of the Board's Finance Committee, and then to all Board members. Oleg Malis, an Altimo Senior Vice President, and one other individual from Altimo were included as addressees of an August 15, 2006 email to Finance Committee members from VimpelCom that included such financial results. Mr. Fridman, the Chairman of the Supervisory Board of Alfa Group, Alexey Reznikovich, the CEO of Altimo and a member of the Supervisory Board of Alfa Group, and Mr. Malis, were included as addressees of an August 22, 2006 email to Board members from VimpelCom attaching those financial results.

25.　　During the eight trading days between August 29, 2006 and September 8, 2006, a total of 16,135,400 ADSs (representing 6.99% of VimpelCom's outstanding voting

shares and 17.78% of its free float) were traded, far in excess of VimpelCom's average trading volume. During that same period, the VimpelCom ADS closing price increased from $50.26 to $59.90. In comparison, during the preceding eight trading days, ending August 28, 2006, only 7,035,800 ADSs (representing 3.0% of VimpelCom's outstanding voting shares and 7.75% of its free float) were traded.

26.    On September 6, 2006, Defendants Eco Telecom, Altimo, CTF and Crown Finance (collectively, the "Alfa Reporting Persons") filed Amendment No. 22 (the "September 6 13D/A") to their filing on Schedule 13D with the SEC.

27.    The September 6 13D/A disclosed a transaction between Jam Holding Asset Management Ltd., reportedly an affiliate of Deutsche Bank AG ("Jam"), and Rightmarch, under a Master Confirmation dated August 30, 2006 (the "Master Confirmation"). That transaction (the "Rightmarch Transaction") was designed to appear to be an ordinary derivatives transaction and, in particular, a cash-settled security future pursuant to which none of the Alfa Reporting Persons would actually acquire the VimpelCom securities in question, and the disclosures in the Alfa Reporting Persons' September 6 13D/A were drafted to create that impression.

28.    Because cash-settled security futures are not considered "equity securities" for purposes of Rule 13d-1, the securities underlying a cash-settled security future are not counted for purposes of the beneficial ownership reporting requirements of Rule 13d. However, a security future that requires or permits physical settlement within 60 days, like the ostensible future in the Rightmarch Transaction, is considered an equity security for purposes of Rule 13d-1, and therefore is counted for beneficial ownership purposes. See SEC Interpretation: Commission Guidance on the Application of Certain Provisions of the Securities Act of 1933,

the Securities Exchange Act of 1934, and Rules Thereunder to Trading in Securities Future

Products, Release Nos. 33-8107; 34-46101; File No. S7-23-02 (June 27, 2002).

29.    In reality, the Rightmarch Transaction was not a cash-settled derivative.

Rather, it was an open-ended series of forward purchases of VimpelCom ADSs, which

Rightmarch had a contractual obligation to physically settle--that is, to pay for and take delivery,

and should, therefore, have been promptly disclosed on Schedule 13D.

30.    In Item 6 of their September 6 13D/A, the Alfa Reporting Persons stated

that:

> On August 30, 2006, Rightmarch Limited, a wholly-owned subsidiary of
> Altimo ... entered into a [swap agreement] with Jam Holding Asset
> Management Limited ... relating to certain share forward transactions in
> respect of American Depositary Receipts of VimpelCom ... Under each
> Swap Transaction, Rightmarch ... will ... be entitled to require [Jam] to
> deliver to Rightmarch ... ADRs ... on any date elected by Rightmarch
> which falls between 26 October 2006 and 1 January 2007.

Neither the September 6 13D/A nor the Master Confirmation disclosed the number of ADSs

Rightmarch intended to purchase from Jam pursuant to such forward purchase transactions or the

price of such purchases, or that Jam intended to purchase ADSs and shares in the market, nor did

the September 6 13D/A disclose the purpose of the Rightmarch Transaction, all in violation of

Regulation 13d.

31.    Despite their respective roles in the Rightmarch Transaction, neither

Rightmarch nor Jam joined the Alfa Reporting Persons in filing the September 6 13D/A,

although they were both required by law to do so.  Nor did the September 6 13D/A disclose

Jam's ownership or affiliations, or indicate that Rightmarch, Jam and the Alfa Reporting Persons

were a group formed for the purpose of acquiring VimpelCom shares and ADSs, although they

were, in fact, members of such a group.

32.    On August 30, 2006, the alleged date on which Rightmarch entered into the Master Confirmation with Jam, neither Rightmarch nor any of the other Alfa Reporting Persons was able, under the then-applicable Russian antimonopoly law, to acquire any VimpelCom ADSs or shares in excess of the 32.9% of VimpelCom's voting shares then held by Eco Telecom.

33.    Although not disclosed in the September 6 13D/A, the reason the Master Confirmation permitted Rightmarch to take delivery of the ADSs acquired by Jam beginning only on October 26, 2006 was that October 26, 2006 was the date on which the new Russian antimonopoly law became effective, which would allow the Alfa Reporting Persons to acquire up to 50% of VimpelCom's voting shares without the need to obtain a new approval from the Russian Federal Antimonopoly Service (the "FAS"). The forward purchase nature of the Rightmarch Transaction permitted Jam, a purportedly independent third party, to acquire and hold the ADSs prior to the effective date of the new antimonopoly law, with Rightmarch having the contractual obligation to take delivery of the ADSs after the new Russian antimonopoly law became effective. In effect, the Rightmarch Transaction was simply a stock parking transaction that allowed Eco Telecom to acquire VimpelCom ADSs prior to the effective date of the new law.

34.    On September 1, 2006, VimpelCom released to the public its second quarter 2006 financial results, which had previously been disclosed to Defendants on August 15, 2006, as described above. Those results included a 44.8% year-on-year increase in subscribers, a 45.7% year-on-year increase in revenues, and a 22.7% year-on-year increase in net income. As a consequence, the price of VimpelCom ADSs rose from $54.03 on August 31, 2006 to $57.59 on September 1, 2006, a new record high. As described above, through Alfa Group's nominees on

the Board, one of whom is the Chairman of Alfa Group's Supervisory Board and two of whom are senior executives of Altimo, Rightmarch, Eco Telecom and the other Alfa Reporting Persons were aware of such favorable material non-public information during the period when Jam was purchasing VimpelCom ADSs for the account and benefit of Rightmarch, beginning no later than August 30, 2006.  Following the public disclosure of those results, the price of VimpelCom shares and ADSs steadily rose.  The purchases made by Jam on the instructions of Rightmarch during that period were made while the Defendants were in the possession of material non-public information.

35.    On October 10, 2006, the Alfa Reporting Persons purported to cure certain of the deficiencies in their false and misleading September 6 13D/A by filing a new 13D/A (the "October 10 13D/A") in which they reported an increase of 1,649,475 in the number of VimpelCom shares beneficially owned by the Alfa Reporting Persons and stated that Eco Telecom beneficially owned "approximately 35.8% of [VimpelCom's] voting capital stock", a 2.9% increase in the percentage of VimpelCom shares which they reported as being beneficially owned by the Alfa Reporting Persons in their September 6 13D/A.  That amendment also alluded to the stock-parking nature of the Rightmarch Transaction by misleadingly stating that "[p]rior to the effectiveness of the new Anti-monopoly law, the Reporting Persons have entered into the [Rightmarch Transaction] through a wholly-owned affiliate to attempt to assure the availability of additional Common Shares in VimpelCom should the Reporting Person seek to acquire such shares as a result of the effectiveness of the new Anti-monopoly law."  (emphasis added)  Because Rightmarch was obligated by the terms of the Master Confirmation to physically settle all transactions thereunder on or prior to January 1, 2007, and intended at all times to do so, the

references to the Reporting Person "attempt[ing] to assure the availability of additional [shares]" and possibly "seek[ing] to acquire such shares" are false and misleading.

36.    In fact, when Rightmarch entered into the Master Confirmation and when the Alfa Reporting Persons filed their September 6 13D/A and their October 10 13D/A, the Defendants had no intention other than to cause Eco Telecom to purchase all of the VimpelCom ADSs Jam could accumulate, thereby acquiring control of VimpelCom.  The press immediately reported that the Rightmarch Transaction was the first step in a coordinated campaign by the Alfa Reporting Persons and Rightmarch to acquire control of VimpelCom.  See  The Hunt is On for VimpelCom Shares – Alfa has the Hounds Out Again, *Kommersant*, Sept. 7, 2006; Alfa Group Looks to Raise Stake in VimpelCom, *Dow Jones Emerging Markets Report*, Sept. 6, 2006; Julie Tolkachaeva, Alfa says to buy VimpelCom shares from market, *Reuters*, Sept. 7, 2006.

37.    On November 22, 2006, the Alfa Reporting Persons filed Amendment Number 24 to their Schedule 13D (the "November 22 13D/A").  That amendment revealed that, on November 15, 2006, Eco Telecom had taken delivery, through physical settlement of the relevant forward purchase contracts, of 6,597,900 VimpelCom ADSs, equivalent to 1,649,475 common shares, accumulated by Jam.  However, in violation of SEC Rule 13d-2(a) and the information disclosure requirements contained in Schedule 13D and the instructions thereto (SEC Rule 13d-101), the Alfa Reporting Persons' November 22 13D/A did not specify the prices at which Jam had acquired such ADSs or the price at which Eco Telecom acquired such ADSs from Jam.

38.    By virtue of the Alfa Reporting Persons' ownership stake in VimpelCom, the fact that four of Eco Telecom's nominees are members of the Board and the current

Chairman of the Board was nominated by Eco Telecom in 2005, and the fact that the Alfa

Reporting Persons have access to all of VimpelCom's financial information and data,

Rightmarch and the Alfa Reporting Persons are, and at all times relevant herein, have been,

"affiliates" of VimpelCom, as such term is defined in SEC Rule 13e-3(1).

39.     On May 26, 2005, the Alfa Reporting Persons filed Amendment No. 10 to

their filing on Schedule 13D (the "May 26, 2005 13D/A"), disclosing that they had filed an

application with the FAS in which they had requested approval to acquire up to 60% plus one

share of VimpelCom.  However, as set forth below, shortly thereafter, the Alfa Reporting

Persons purported to publicly disclaim any intent to acquire such an interest in VimpelCom.

40.     Under new Russian tender offer rules that became effective on July 1,

2006, an acquirer of more than 50% of the voting shares of a Russian open joint stock company

must make a tender offer for 100% of the shares of the company.  If the Alfa Reporting Persons

were to cross the 50% threshold, under the Russian tender offer rules, they would be required to

make a tender offer for 100% of the voting shares of VimpelCom.  Despite that fact, the Alfa

Reporting Persons failed to file a Schedule 13E-3 with the SEC or distribute such Schedule 13E-

3 to holders of VimpelCom's shares and ADSs at least 30 days prior to entering into the open-

ended Rightmarch Transaction.

## III.     DEFENDANTS FURTHER VIOLATE THE TENDER OFFER RULES AND CONTINUE TO ENGAGE IN INSIDER TRADING

41.     On March 2, 2007, the Alfa Reporting Persons filed Amendment Number

26 to their Schedule 13D, (the "March 2 13D/A").  The March 2 13D/A disclosed that Eco

Telecom had entered into a "share forward transaction" with Deutsche Bank AG, London Branch

("Deutsche Bank") on March 1, 2007, with a purported "trade date" of February 28, 2007,

pursuant to which Eco Telecom had agreed to acquire 140,300 VimpelCom ADSs. The settlement date of that transaction was March 14, 2007. The March 2 13D/A also disclosed that Eco Telecom had entered into a forward purchase agreement with Deutsche Bank on March 2, 2007, with a purported "trade date" of March 1, 2007, pursuant to which Eco Telecom had agreed to acquire an additional 1,300,000 VimpelCom ADSs, with a settlement date of March 14, 2007.

42.    The "trade dates", which are one day preceding the date on which Eco Telecom entered into the so-called "share forward transactions" with Deutsche Bank that were disclosed in the March 2 13D/A, show that Deutsche Bank was accumulating VimpelCom ADSs in the market no later than the day preceding the date of each such forward purchase agreement, solely for the purpose of transferring such ADSs to Eco Telecom on the following day. Deutsche Bank could only have been undertaking such activity pursuant to instructions from, or by agreements or arrangements with, Eco Telecom and/or one or more other of the Alfa Reporting Persons. However, there is no disclosure in the March 2 13D/A of any such instructions, agreement or other arrangement. Instead, the Alfa Reporting Persons falsely represented in Item 6 of their March 2 13D/A that:

> "[e]xcept as provided in the documents described in the Statement on Schedule 13D and Amendments Nos. 1 through 25 hereto (inclusive), or as set forth herein, neither Eco Telecom, Altimo, CTF Holdings or Crown Finance, nor to the best of Eco Telecom's, Altimo's, CTF Holdings' or Crown Finance's knowledge, any of the individuals named in Item 2 hereof has entered into any contracts, arrangements, understandings or relationships (legal or otherwise) with any person with respect to any securities of VimpelCom, including, but not limited to, transfer or voting of any securities, finder's fees, joint ventures, loan or option arrangements, puts or calls, guarantees of profits, division of profits or losses, or the giving or withholding of proxies."

43.    The March 2 13D/A also disclosed that on December 21, 2006, despite the provision in the Master Confirmation stating that "no Supplemental Confirmation will be entered into after October 26, 2006", Rightmarch had acquired a further 1,253,800 VimpelCom ADSs, representing 313,450 shares (approximately 0.6% of VimpelCom's shares). In violation of SEC Rule 13d-2(a) and SEC Rule 13d-101, the prices at which those shares were acquired were not disclosed in the March 2 13D/A.   Neither Rightmarch nor the Alfa Reporting Persons had previously disclosed this purchase; there was no mention in the March 2 13D/A of whether the Master Confirmation had been amended; and Rightmarch did not join in the filing of the March 2 13D/A, although it was required to do so.  As a result of that purchase and the other purchases reported in the March 2 13D/A, Eco Telecom's percentage of VimpelCom's voting shares increased to 36.9%.

44.    On March 7, 2007, the Alfa Reporting Persons filed Amendment Number 27 to their Schedule 13D.  That amendment disclosed that, on March 5 and March 6, 2007, Eco Telecom entered into three forward purchase transactions with Deutsche Bank, pursuant to which Eco Telecom acquired an additional 1,774,700 VimpelCom ADSs, as a result of which its percentage of VimpelCom's voting shares increased to 37.7%.  Each such forward purchase transaction had a "trade date" that preceded the date on which Eco Telecom entered into the relevant forward purchase agreement with Deutsche Bank, again demonstrating the existence of undisclosed instructions, agreements or arrangements between Eco Telecom and/or another Alfa Reporting Person and Deutsche Bank, and an undisclosed scheme to acquire control of VimpelCom.

45.    On March 8, 2007, the Alfa Reporting Persons filed Amendment Number 28 to their Schedule 13D.  That amendment disclosed that on March 7 and 8, 2007,  Eco

Telecom had entered into two further forward purchase transactions with Deutsche Bank in respect of an additional 168,750 VimpelCom ADSs, pursuant to which Eco Telecom's percentage of VimpelCom's voting shares increased to 38.4%. As before, each such forward purchase agreement had a "trade date" that preceded the alleged date of the relevant agreement. In Item 6 of that amendment, the Alfa Reporting Persons again made the same false representation as they had made in prior amendments to their Schedule 13D concerning the absence of any other agreements or arrangements relating to VimpelCom securities.

46.     On March 9, 2007, the Alfa Reporting Persons filed Amendment Number 29 to their Schedule 13D. That amendment disclosed that on March 9, 2007, Eco Telecom had entered into a forward purchase transaction with Deutsche Bank with regard to 205,900 VimpelCom ADSs, increasing Eco Telecom's percentage of VimpelCom's voting shares to 39.5%. Again, the "trade date" of the transaction preceded the date of the relevant agreement.

47.     On March 13, 2007, the Alfa Reporting Persons filed Amendment Number 30 to their Schedule 13D (the "March 13 13D/A"). The March 13 13D/A disclosed that Eco Telecom had issued $1.5 billion of Series A floating rate bonds, which were guaranteed by Altimo and secured by a pledge and escrow arrangement with respect to Eco Telecom's holdings of VimpelCom shares and ADSs (the "Bonds"). The Bonds were sold to Deutsche Bank, Deutsche Bank acted as collateral agent and calculation agent, and an affiliate of Deutsche Bank, Deutsche International Corporate Services Limited, acted as trustee under the bond indenture.

48.     The March 13 13D/A stated that Eco Telecom had pledged 9,349,999 shares of VimpelCom common stock "or security entitlements in respect thereof" to Deutsche Bank as security for the Bonds, and delivered to BONY as escrow agent for the Bonds an additional 6,426,600 shares of VimpelCom preferred stock, 15,209,134 VimpelCom ADSs

(equivalent to 3,802,283 shares of common stock), and an additional 3,212,783 shares of common stock. Under the terms of the bond indenture and collateral and escrow agreements, Eco Telecom agreed to pledge to Deutsche Bank or deliver to BONY as escrow agent an aggregate of 16,366,065 shares of VimpelCom common stock (including those shares represented by ADSs). However, as set forth on page 3 of the March 13 13D/A, the Alfa Reporting Persons stated that they beneficially owned only 15,137,265 shares of VimpelCom common stock, thereby confirming either that the Alfa Reporting Persons had made unreported purchases of, or had entered into agreements to purchase, at least 1,228,800 shares of VimpelCom common stock (or ADSs representing such shares) as of that date.

49.    Item 3 of the March 13 13D/A regarding the source and amount of funds or other consideration for the share purchases described therein, stated "No material change." Item 4 of the March 13 13D/A (Purpose of Transaction) provided a minimal description of the agreements pursuant to which the Bonds were issued and secured. Item 4 incorporated by reference the text of the bond indenture (the "Indenture") and collateral agreement and escrow agreement for the Bonds, but did not disclose any additional information concerning the use of proceeds of the Bonds.

50.    Section 3.18 (Use of Proceeds) of the Indenture, as filed with the SEC, states that:

> The Issuer shall use the funds received from any sale of the Securities issued hereunder to (i) repay its Indebtedness, (ii) make loans to companies under common control with the Guarantor that are to be used to acquire assets to be held by such companies and (iii) acquire assets in the telecommunications sector.

51.    On March 14, 2007, Altimo issued a press release headed "Altimo Borrows $1.5 billion to Develop Projects in Eurasia". The press release stated that:

> Altimo ... and Deutsche Bank have entered into an agreement to
> provide Altimo with a two year, $1.5 billion loan .... Altimo
> intends to use the funds to develop its investment projects in
> emerging mobile communications markets in Eurasia. In
> particular, Altimo has made clear its intention to enter the rapidly
> growing markets in South and South East Asia such as India,
> Indonesia and Vietnam.

Neither the March 13 13D/A nor Altimo's press release disclosed any intention by Altimo or Eco

Telecom to use the proceeds of the Bonds to purchase VimpelCom shares or ADSs, although, as

set forth below, that was Altimo's actual intent in issuing the Bonds.

52.    Deutsche Bank itself subsequently confirmed that a significant portion of

the proceeds of the Bonds were in fact intended to be used to purchase VimpelCom shares. On

June 30, 2007, FOXNews.com published an article concerning Altimo and Mr. Fridman's

activities in the telecom sector in Iran, which stated that:

> Germany's Deutsche Bank is Altimo's top lender. In March,
> Altimo announced it had raised $1.5 billion in a bond-issuance
> deal organized by Deutsche Bank. The proceeds, said Altimo at
> the time, would finance its expansion in Europe and Asia. A
> spokesman for Deutsche tells FOX News that $350 million of
> those bank funds were for "refinancing Altimo's own debt" –with
> "the rest" going to buy more shares in VimpelCom. One internal
> document obtained by FOX News, however, suggested that "part"
> of the Deutsche Bank proceeds could be used on the Iran project.

Richard Behar, <u>As the West Pushes Economic Sanctions Against Tehran, Russian Billionaire</u>

<u>Dials Up Iran Telecom Play</u>, *FOXNews.com*, June 30, 2007.

## IV.    **THE 2007 INSIDER TRADING**

52.    On March 16, 2007, VimpelCom emailed to its Board members, including

Messrs. Fridman, Reznikovich and Malis, an extremely detailed board package, including

VimpelCom's final financial results for the fourth quarter and full year 2006. Those results

showed dramatically higher numbers of subscribers, revenues and profits. The materials

distributed to the VimpelCom Board members on March 16 also included (a) a proposal for

payment of a dividend on shares of VimpelCom common stock for the first time in

VimpelCom's history; (b) preliminary financial results for the first two months of 2007, which

showed that VimpelCom was exceeding its plan and (c) a detailed discussion of various strategic

options for VimpelCom, including various proposed acquisitions. Such financial results,

dividend proposal and discussion of strategic options were material non-public information and,

to the extent that such options and possible acquisitions have not been disclosed, they remain

material non-public information. Because that Board meeting agenda and materials were

distributed to Messrs. Fridman, Reznikovich and Malis, all of the Alfa Reporting Persons,

including Eco Telecom, were in possession of such information. Moreover, although Eco

Telecom was the purchaser of the VimpelCom ADSs and shares in the transactions described

herein, the purchases were actually directed by Altimo.

      53.    The proposal to pay a dividend was publicly disclosed in a Form 6-K

VimpelCom filed with the SEC on March 28, 2007, in which VimpelCom stated that "the Board

also recommended that the Shareholders Meeting approve annual dividends of RUR 166.88 per

ordinary share of VimpelCom stock (or approximately $1.60 per American Depositary Share

("ADS") based on the Russian Central Bank exchange rate as of March 28, 2007) for the 2006

fiscal year, amounting to a total of RUR 8.6 billion (or approximately $330.5 million based on

the Russian Central Bank exchange rate as of March 28, 2007), to be payable within 60 days of

the approval at the Shareholders Meeting."

      54.    On March 21, 2007, the Alfa Reporting Persons filed Amendment Number

31 to their Schedule 13D (the "March 21 13D/A"). That amendment revealed that on March 20,

2007, Eco Telecom acquired 4,915,200 VimpelCom ADSs, equivalent to 1,228,800 shares of

common stock of VimpelCom, through previously disclosed forward purchase transactions with

Deutsche Bank; an additional 1,630,100 ADSs through Eco Telecom's own open market purchases between March 15 and March 20; and 5,125,347 ADSs, equivalent to 1,688,862 shares of common stock, "purchased in brokered transactions from other significant shareholders of VimpelCom," between March 19 and 20. As a result, Eco Telecom's reported percentage of VimpelCom's voting stock increased to 42.4%. The prices at which such "brokered transactions" took place were not disclosed, and have not been disclosed as of the date of this first amended complaint.

55.    Eco Telecom's acquisition, through Deutsche Bank and on its own, of an additional 8.2% of VimpelCom's voting shares during the period between February 28, 2007 and June 25, 2007 was made through an unlawful tender offer. Deutsche Bank, acting on behalf of Eco Telecom, reportedly again "swept the Street", as it had in connection with the Rightmarch Transaction, seeking to purchase as many VimpelCom ADSs as possible for the account of the Alfa Reporting Persons, from holders based in the United States and Europe.

56.    During the period between February 28, 2007 and March 20, 2007, Deutsche Bank, acting on behalf of the Alfa Reporting Persons, made offers to hedge funds and other holders of large blocks of VimpelCom shares and ADSs, offering to purchase such holders' entire holdings of VimpelCom shares and ADSs, at premiums to the market ranging from $0.50 to $10.00. Such offers were made on a "take or leave it" basis, with holders being given a brief period, generally less than 24 hours, to accept such offers.

57.    The Alfa Reporting Persons' purchases again were open-ended. None of the Alfa Reporting Persons' 13D/A filings made between March 2, 2007 and March 21, 2007 disclosed the number of VimpelCom ADSs and shares that the Alfa Reporting Persons sought to acquire.

58.     On June 13, 2007, following the filing of Telenor East's original complaint, the Alfa Reporting Persons filed Amendment No. 32 to their Schedule 13D/A (the "June 13, 2007 13D/A").  Among other things, that amendment disclosed that, on May 11, 2007, Rightmarch acquired 2,168,020 ADSs from Jam pursuant to the purported swap arrangement under the Master Confirmation, and an additional 998,174 ADSs on June 8, 2007.  The Alfa Reporting Persons did not disclose when Jam acquired such ADSs or when and by whom it was instructed to do so.

59.     In addition, in their June 13, 2007 13D/A, the Alfa Reporting Persons attempted to correct  two of the disclosures they failed to make in prior amendments to their Schedule 13D (as identified in Telenor East's original complaint) by purporting to "supplement" the Alfa Reporting Persons' November 22 13D/A and March 2 13D/A by disclosing the prices at which Jam, Rightmarch and Eco Telecom acquired certain of the ADSs referred to in those amendments.  The Alfa Reporting Persons did not make any other corrective disclosures in their June 13, 2007 13D/A.

60.     On June 26, 2007, the Alfa Reporting Persons filed Amendment No. 33 to their Schedule 13D/A (the "June 26, 2007 13D/A").  That amendment disclosed that, pursuant to the Master Confirmation between Jam and Rightmarch, Rightmarch acquired a further 473,290 VimpelCom ADSs on June 25, 2007, and transferred such ADSs to Eco Telecom on that date, bringing Eco Telecom's holdings of VimpelCom's voting shares slightly above 44%.

61.     The June 26, 2007 13D/A also disclosed for the first time that Rightmarch and Jam have purported to waive the expiration of the Master Confirmation, thereby confirming that the arrangement between Rightmarch and Jam constitutes, in fact, an open-ended

arrangement pursuant to which Jam has acquired (and may in future acquire) VimpelCom shares and ADSs in the open market for the benefit of the Defendants.

62.     Once again, in connection with the purchases of VimpelCom ADSs and shares made by the Alfa Reporting Persons during the period between March 2, 2007 and June 25, 2007, none of the Alfa Reporting Persons followed any of the rules applicable to tender offers for equity securities registered under the Exchange Act, although they were engaged in a tender offer and were obligated to do so.  None of them filed a Schedule TO with the SEC or provided any information contemplated by Schedule TO to holders of VimpelCom ADSs and shares, as required by SEC Rule 14d-3; with respect to the Alfa Reporting Persons' acquisitions of VimpelCom shares and ADSs between March 2, 2007 and March 21, 2007, they did not leave their offer open for at least 20 U.S. business days, as required by SEC Rule 14e-1; as described in more detail below, they acquired VimpelCom shares and ADSs while in possession of material non-public information relating to both VimpleCom and their offer, in violation of SEC Rule 14e-3; and they did not offer tendering holders of ADSs and shares withdrawal rights (that is, the right to withdraw during the initial offer period any shares or ADSs tendered), as required by SEC Rule 14d-7.

63.     In addition to violating the tender offer rules, the Alfa Reporting Persons failed to file a Schedule 13E-3 with the SEC and distribute such Schedule 13E-3 to holders of VimpelCom's shares and ADSs at least 30 days prior to February 28, 2007, the date on which Eco Telecom commenced its open-ended purchase program.

64.     All purchases of VimpelCom ADSs and shares made by Eco Telecom during the period beginning on March 16, 2007, when VimpelCom disclosed its fourth quarter and annual financial results for 2006 to members of its Board (including Messrs. Fridman,

Reznikovich and Malis), and continuing through the date of this first amended complaint, were made while the Defendants were in possession of material non-public information.

65.   The Defendants' concealment of their true intent to acquire control of VimpelCom and their insider trading scheme described in this first amended complaint were inextricably linked.  By concealing their intent to acquire control of VimpelCom and not making any filings with the SEC concerning their tender offer, the Defendants, acting through Rightmarch and  Eco Telecom, were able to acquire their additional stake in VimpelCom at substantially lower prices than would have been the case had they made such disclosures, because the disclosure of their intent would have increased the price of VimpelCom ADSs and shares.  Similarly, by purchasing ADSs and shares while in possession of material non-public information, the Defendants were able to acquire such ADSs and shares at a substantially lower price than would have been the case once the investing public became aware of such information.

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS CONCERNING THEIR INTENTIONS WITH RESPECT TO VIMPELCOM

66.   The Alfa Reporting Persons have a long history of false and misleading statements with respect to their intentions with respect to VimpelCom and, in particular, their desire to take control of VimpelCom.

67.   In their May 26, 2005 13D/A, the Alfa Reporting Persons stated:

> On May 23rd, 2005, Eco Telecom filed an application with the [FAS] in which Eco Telecom requested that the FAS approve an increase in Eco Telecom's permitted ownership of voting capital stock of VimpelCom.  As Eco Telecom would like to obtain control of VimpelCom, Eco Telecom has, in such application, requested that the FAS grant Eco Telecom an approval to own up to 60% plus one share of the voting capital stock of VimpelCom.

> \*\*\* While the Reporting Persons currently intend to gain control
> of VimpelCom they may, from time to time, and reserve the right
> to, change their plans or intentions and take any and all actions that
> they deem appropriate to maximize the value of their investments
> in VimpelCom.   (emphasis added)

As of the date of this first amended complaint, Eco Telecom's application to acquire up to 60%

plus one share of the voting capital stock of VimpelCom remains on file with the FAS, awaiting

the FAS's response.

68.    Several weeks later, in a letter to VimpelCom shareholders filed as an

exhibit to Amendment No. 11 to their filing on Schedule 13D, filed on June 14, 2005, the Alfa

Reporting Persons purported to clarify the statement they made in their May 26, 2005 13D/A,

and disclaimed having the intention to take control of VimpelCom, stating:

> In addition, we know there has been some concern about filings
> made to the [FAS] in Russia and the subsequent filing with the
> SEC in the United States regarding the intention declared by Alfa
> Telecom to increase its shareholding in VimpelCom to 60%.  We
> want to reiterate our position that this was a defensive move to
> neutralize similar applications by Telenor.  \*\*\* We want to
> reiterate that we only intend to pursue majority control in
> VimpelCom if Telenor begins to build their own stake with a view
> to them taking control of the company in this way . . . . (emphasis
> added)

69.    In Amendment No. 16 to their filing on Schedule 13D, filed on August 30,

2005, the Alfa Reporting Persons stated that "in a July 7, 2005 article in the *Financial Times*,

Mikhail Fridman made the extent of the Alfa Group's ambitions clear.  He stated: 'We want to

be part of a global telecoms company, a Eurasian Vodafone. We want to convert all our stakes in

different telecoms providers into one company – be it Telenor, TeliaSonera or any other

international player,' Mr. Fridman told the FT."  A copy of the relevant article was attached as

Exhibit 99.6 to such amendment.

70.    In a presentation to Institutional Shareholder Services made on June 5, 2006 and attached as Exhibit 99.2 to Amendment No. 20 to their filing on Schedule 13D, filed on June 5, 2006, the Alfa Reporting Persons stated "Altimo is a financial investor, seeking capital gains, not control or consolidation".

71.    On August 9, 2006, Peter Aven, the President of Alfa Bank and a member of the Supervisory Board of Alfa Group, met with Russian President Vladimir Putin and, as was widely reported in the media following the meeting, told him that Alfa "would like to 'create a large telecommunications company' with its main assets in Russia, where Alfa would also be 'the leading shareholder.'" See "What Alfa Wants," *Vedomosti*, August 10, 2006.

72.    On September 7, 2006, immediately after the Alfa Reporting Persons had filed their false and misleading September 6 13D/A with the SEC in respect of the Rightmarch Transaction, Altimo issued the following press release (which was not filed with the SEC):

> An Altimo subsidiary has executed an agreement with a subsidiary of Deutsche UFG, an international investment bank, which provides that ADRs issued by the Russian mobile operator VimpelCom may be purchased on the open market.
>
> This agreement is seen by Altimo as an arrangement that will allow Altimo to invest in VimpelCom, which shows steady growth.  Such arrangement is expected to make Altimo's business more profitable and will help increase VimpelCom's market capitalization.
>
> Altimo once again confirms that it does not intend to increase its shareholding to a controlling stake [in VimpelCom] and, thus, secure operational control of VimpelCom.
>
> Altimo vice-president Kirill Babaev stated that "Financial investment in major companies on the growing telecommunications markets of CIS countries and in Asia is Altimo's strategic priority.  We, as a financial investor, are interested in VimpelCom's independent management and believe that VimpelCom's shareholder structure should remain well-balanced and without a controlling shareholder. (emphasis added)

73.     Each of the 13D/As filed by the Alfa Reporting Persons during March 2007 contained the following vague statement concerning their intentions with respect to VimpelCom:

> Item 4 is hereby supplemented as follows:
>
> The Reporting Persons are increasing their ownership of VimpelCom's Common Shares to increase their influence over the corporate actions to be taken by VimpelCom, but may, from time to time, and reserve the right to, change their plans or intentions and take any and all actions that they deem appropriate to maximize the value of their investment in VimpelCom.

74.     On March 13, 2007, following the Alfa Report Persons' disclosure of their accumulation of additional VimpelCom ADSs in the second phase of their unlawful tender offer, Mr. Babaev, stated in an interview with *Bloomberg* published in *The Moscow Times* that "[t]he 40% gives us the opportunity to ensure our shareholder rights and a structural control over the company."

75.     On March 22, 2007, an article in *Vedomosti*, stated that:

> A source familiar with Alfa's plans said in mid-March that the group would stop buying upon the acquisition of 40% of VimpelCom. He explained that such shareholding would be sufficient for Alfa to have four representatives plus one independent director appointed to VimpelCom's board of directors. However, Altimo's vice-president, Kirill Babaev, stated that Altimo would be able "to protect its shareholder rights" and "provide structural control" over VimpelCom only if Altimo owns at least a 42% interest, as is indicated by the history of participation by shareholders in VimpelCom's shareholders meetings.

76.     On March 22, 2007, Mr. Babaev told *RBC Daily*, a Russian business publication, that "[r]aising the stake to 42.4% enables us to fully protect our shareholders and obtain structural control over VimpelCom."

77.    Under the Shareholders Agreement, Eco Telecom is allowed to nominate only four candidates to the VimpelCom Board.  On November 19, 2005, Telenor East commenced an arbitration in Geneva, Switzerland under the UNCITRAL Arbitration Rules against Eco Telecom, CTF and Eco Holdings Limited to enforce that provision of the Shareholders Agreement.  In response, Eco Telecom asserted that that provision was unenforceable, and that it had the unwaivable right to nominate nine candidates for election to the VimpelCom Board.

78.    On January 25, 2007, the arbitration tribunal in the Geneva arbitration (the "Tribunal") rendered its award (the "January 25, 2007 Award"), ruling that Eco Telecom could nominate no more than four candidates at the Board meeting called to set the agenda for VimpelCom's 2007 annual general meeting of shareholders (the "AGM").  This year, that Board meeting was held on March 28, 2007.

79.    On March 27, 2007, counsel for Eco Telecom wrote to the Tribunal, stating that Eco Telecom intended to nominate five, not four, candidates at the March 28 meeting.  In that letter, Eco Telecom's counsel stated that:

> We are advised that Eco Telecom recently has been increasing its interest in VimpelCom, which interest, as of the date of this letter, has reached 42.4% of the total outstanding voting stock of VimpelCom (see most recent Schedule 13D/A filed by Eco Telecom with the SEC on March 20 2007).  Eco Telecom likely may continue the process of share purchase to give it a greater than 44% interest in VimpelCom, which process likely may be completed sometime after March 28 but before the Board election later this year. (emphasis added)

As of the date on which this action was filed, none of the Alfa Reporting Persons had filed a 13D/A disclosing their intention to acquire a "greater than 44% interest in VimpelCom" prior to the AGM.

80.    On March 27, 2007, Telenor East requested the Tribunal to convene a hearing to determine the most appropriate and effective means of bringing Eco Telecom into compliance with its obligations under the January 25, 2007 Award and the Shareholders Agreement.  On April 2, 2007, the Tribunal convened a hearing for April 14, 2007 in London (the "April 14 Hearing").

81.    On  April 10, 2007, Eco Telecom sent to the Tribunal and Telenor East Eco Telecom's statement of position and supporting affidavits in connection with the April 14 Hearing, including the Statement of Oleg Malis dated April 10, 2007.  In his statement, Mr. Malis said:

> For the reasons set forth herein, <u>Eco Telecom believes it is likely to meet the forty-four percent threshold in advance of the June 29, 2007 Board election</u> and, therefore, withdrew only three nominees so as to preserve its ability to nominate four non-Independent candidates. *** While it is true that Eco Telecom took measures to increase its VimpelCom shareholding beginning last fall, Eco Telecom did not believe that it could become a Plurality Shareholder [that is, holding more than 44% but less than 50%] until much more recently.  It was not until the price of VimpelCom's stock dropped sharply (against the backdrop of the more general Asian stock crisis) <u>at the end of February that Eco Telecom … stepped up its efforts to acquire VimpelCom stock and first suspected that it stood a chance of becoming a Plurality Shareholder in advance of the Board election</u>. *** As of this date, Eco Telecom owns 42.2 percent of VimpelCom's voting stock.  I am advised that Eco Telecom may likely meet the greater-than-44% threshold well before the Board election scheduled for June 29, 2007. (emphasis added)

Despite Mr. Malis' testimony that the Alfa Reporting Persons intended to acquire more than 44% of VimpelCom's voting shares as early as the end of February 2007 – a figure that, as set forth

above, would alter the governance structure of VimpelCom and give Altimo "operational" control of VimpelCom – none of the Alfa Reporting Persons' 13D/As filed between March 2, 2007 and March 21, 2007 disclosed any intention by the Alfa Reporting Persons to acquire more than 44% of VimpelCom's voting shares, or their purpose in acquiring such shares, in violation of SEC Rule 13d-2(a) and SEC Rule 13d-101 requiring the disclosure of a reporting person's "plans and proposals" with respect to the acquisition of additional securities of an issuer.

82.     Mr. Malis' statements were made on April 10, 2007 in the non-public arbitration proceeding.  In contrast, on April 12, 2007, two days before the April 14 Hearing, Mr. Teijo Pankko, Altimo's Chief Financial Officer, in a public interview with Bloomberg, said "Altimo is 'quite happy' with its investment in VimpelCom [which was then publicly reported by the Alfa Reporting Persons to be 42.4%] and has no immediate plans to increase its stake." See Altimo Plans Acquisition in Vietnam or Indonesia, Lyubov Pronina, *Bloomberg.com*, April 12, 2007.  None of the Alfa Reporting Persons' 13D/As reflect the substance of either Mr. Malis or Mr. Pankko's statements.

83.     In fact, on May 11, 2007, six days before Mr. Pankko stated that Altimo had no plans to acquire additional VimpelCom shares, Eco Telecom had acquired 2,168,020 VimpelCom ADSs, although no amendment to the Alfa Reporting Persons' Schedule 13D disclosing that transaction was filed until June 8, 2007, after this action was commenced.

84.     On April 17, 2007, Alexey Reznikovich, Altimo's CEO, held a press conference in which he was widely quoted as stating that "Altimo is looking for opportunities to combines its emerging market assets with those of a leading European telecom company to create a company similar in size to Vodafone".  See Altimo looks to combine with major

European teleco, Ercan Ersoy, *Reuters*, April 18, 2007; Altimo Sets Itself Merger Objective, *Reuters News*, April 18, 2007.

85.    On May 14, 2007, Eco Telecom withdrew one of its non-independent candidates for election to the VimpelCom Board, stating that it had not acquired 44% of VimpelCom's voting stock by that date.  However, on May 16, 2007, counsel for Eco Telecom wrote to the Tribunal and volunteered the following statement:

> We note, however, that Telenor East improperly suggests (in Mr. Sills' May 14th letter) that Eco Telecom has not increased its stake in VimpelCom following the April 14, 2007 hearing before the Tribunal.  Telenor East is well aware that a shareholder's obligations to disclose its acquisition of additional shares is triggered only when that increased stake exceeds a certain percentage of the issuer's outstanding voting shares.  Although Eco Telecom did not trigger a disclosure requirement, it <u>did</u> increase its beneficial ownership. (emphasis added)

As shown by their June 13, 2007 13D/A and their June 26, 2007 13D/A, the Alfa Reporting Persons continued their purchase of VimpelCom shares and/or ADSs after the filing of their March 21 13D/A.  However, they failed to promptly report the  2,168,020 ADSs increase in their beneficial ownership of VimpelCom shares and ADSs that occurred on May 11, 2007, as is required by law, and instead made false public statements that they were no longer acquiring shares or interested in acquiring shares.

86.    On May 17, 2007, Mr. Pankko, Altimo's Chief Financial Officer, gave an interview to a Reuters correspondent in which he was quoted as saying "We are not considering it (further share purchases) at the moment.  I think we have confidence the stake we have now is enough to give us influence over the company."   See Altimo says happy with VimpelCom stake for now, Kirstin Ridley, *Reuters*, May 17, 2007.  Despite this statement, as described in the Alfa Reporting Persons' June 13, 2007 13D/A, only six days before, Eco Telecom had made an undisclosed purchase of 2,168,000 VimpelCom ADSs, and on June 8, 2007, acquired a further

998,174 VimpelCom ADSs. As described in the Alfa Reporting Persons' June 26, 2007 13D/A,

on June 25, 2007, Eco Telecom acquired the 473,290 VimpelCom ADSs that took it over the

44% threshold.

87.     On June 14, 2007, Altimo held a press conference in Ukraine at which Mr.

Babaev said that because Altimo "had already consolidated 'a controlling stake' in VimpelCom,"

Telenor should pay Altimo a premium if Telenor were to purchase Altimo's VimpelCom shares.

## VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS CONCERNING THE FINANCING OF THEIR ACQUISITION OF VIMPELCOM SHARES AND ADSs

88.     At the April 14 Hearing, Yuri Musatov, Altimo's General Counsel, stated

the following:

> In past years there was no situation where we could actually cross
> that 44 per cent.  You must understand that it's only one per cent
> or something before the threshold, and this situation has never
> arisen before in prior years, and it has become a very actual
> situation in this particular year.

A member of the Arbitration Tribunal then asked Mr. Musatov "How much money are we

talking about for the company to obtain the additional one per cent of shares that it needs to cross

44 per cent at the current price of the shares?"  The following exchange then occurred:

> MR. MUSATOV:          Three hundred million.
>
> THE ARBITRATOR:       Additional funds to achieve more than 44 per cent.
>
> MR. MUSATOV:          Absolutely.  As you've probably seen on the record
>                       that Eco Telecom has achieved additional funding
>                       in the amount of 1.5 billion dollars just recently, it
>                       shouldn't be a problem for us.

89.     On May 17, 2007, the same day on which Mr. Pankko, Altimo's Chief

Financial Officer, stated publicly that Altimo was not considering further purchases of

VimpelCom shares, Altimo announced that it had borrowed $750 million from Credit Suisse.

secured by a pledge of Altimo's 43.5% stake in Ukrainian mobile operator Closed Joint Stock

Company "Kyivstar G.S.M." and intended to use the proceeds to increase Altimo's stake in

VimpelCom or for overseas acquisitions. That borrowing was in addition to the $1.5 billion of

Bonds secured by Eco Telecom's holdings of VimpelCom shares and ADSs referred to above.

The Credit Suisse loan was reported in the Russian media. See RBC Daily, May 17, 2007;

"Altimo uses Kyivstar shares as collateral against loans," novecon.ru, May 18, 2007. As of the

date of this first amended complaint, none of the Alfa Reporting Persons has filed an amendment

to their Schedule 13D disclosing that intent or that use of borrowed funds, either with respect to

the borrowings secured by the Kyivstar shares or the borrowings secured by the VimpelCom

shares and ADSs, described above.

## COUNT I
### Violation of Section 13(d) of the Exchange Act (15 U.S.C. §§ 78m(d)) and SEC Rules Promulgated Thereunder

90.     Plaintiff repeats and repleads each allegation set forth in Paragraphs 1

through 89, inclusive, and incorporates them by reference herein.

91.     The amendments to Schedule 13D filed by the Alfa Reporting Persons

described above are materially false and misleading in that, as described above, they misstate

and/or omit material information required to be disclosed by law, including, without limitation,

(a) the intent of the Alfa Reporting Persons to acquire control of VimpelCom, (b) their intent to

use borrowed funds to acquire VimpelCom ADSs and shares, and (c) the fact that VimpelCom

ADSs and shares were purchased while Eco Telecom and the other  Defendants were in

possession of VimpelCom's undisclosed financial results.

92.     The Alfa Reporting Persons and Rightmarch are obligated to correct the

foregoing material misstatements and omissions so that VimpelCom shareholders have a full and

accurate understanding of the Alfa Reporting Persons and Rightmarch's actions and intentions as promptly as possible. In the absence of such a correction and appropriate interim relief, Telenor East and VimpelCom's other shareholders will be irreparably harmed. Telenor East has no adequate remedy at law.

93.     The Alfa Reporting Persons have purported to correct certain, but not all, of the misstatements in the amendments to their Schedule 13D identified in this first amended complaint, but the amendments to the Schedule 13D filed by the Alfa Reporting Persons remain false and misleading, and Rightmarch has never made any required filings. However, amendment of Defendants' filings at this time so as to be accurate and complete would not provide adequate relief. Rather, the Court should enjoin Defendants from voting the shares acquired without correct and timely disclosure, and otherwise grant appropriate equitable relief to prevent Defendants from profiting by their wrongful conduct.

**COUNT II**
**Violation of Section 14(d) of the Exchange Act (15 U.S.C. § 78n(d))**
**and SEC Rules Promulgated Thereunder**

94.     Plaintiff repeats and repleads each allegation set forth in Paragraphs 1 through 89, inclusive, and incorporates them by reference herein.

95.     By reason of the foregoing, the Alfa Reporting Persons and Rightmarch, acting in concert, have conducted and are conducting a tender offer for VimpelCom shares (the "Tender Offer").

96.     The Alfa Reporting Persons and Rightmarch have engaged in fraudulent, deceptive and manipulative acts in connection with the Tender Offer, and have failed to make filings requested by law with the SEC in accordance with the SEC's rules.

97.    The Alfa Reporting Persons and Rightmarch are obligated to file all required filings and documents for the Tender Offer with the SEC so that VimpelCom shareholders have a full and accurate understanding of the Alfa Reporting Persons' and Rightmarch's actions and intentions as soon as possible.  In the absence of full disclosure regarding such an offering, Telenor East and VimpelCom's other shareholders will be irreparably harmed.  Telenor East has no adequate remedy at law.

**COUNT III**
**Violation of Section 13(e) of the Exchange Act (15 U.S.C. § 78m(e))**
**and SEC Rules Promulgated Thereunder**

98.    Plaintiff repeats and repleads each allegation set forth in Paragraphs 1 through 89, inclusive, and incorporates them by reference herein.

99.    By reason of the foregoing, the Alfa Reporting Persons and Rightmarch are engaged in a "going private transaction".

100.    The Alfa Reporting Persons and Rightmarch have engaged in fraudulent, deceptive and manipulative acts in connection with the "going private transaction", and have failed to file a Schedule 13E-3 with the SEC in accordance with the SEC's rules.

101.    The Alfa Reporting Persons and Rightmarch are obligated to file a complete and accurate Schedule 13E-3 with the SEC so that VimpelCom shareholders have a full and accurate understanding of the Alfa Reporting Persons and Rightmarch's actions and intentions as soon as possible.  In the absence of full disclosure regarding that transaction, Telenor East and VimpelCom's other shareholders will be irreparably harmed.  Telenor East has no adequate remedy at law.

## COUNT IV
### Violation of Section 14(e) of the Exchange Act (15 U.S.C. § 78m(e)) and SEC Rules Promulgated Thereunder

102.    Plaintiff repeats and repleads each allegation set forth in Paragraphs 1 through 89, inclusive, and incorporates them by reference herein.

103.    By reason of the foregoing, the Alfa Reporting Persons and Rightmarch violated Section 14(e) of the Exchange Act and SEC Rule 14e-3, by purchasing VimpelCom shares and ADSs during a tender offer while in possession of material non-public information.

104.    By reason of the foregoing, the Alfa Reporting Persons and Rightmarch should be enjoined from voting all VimpelCom shares acquired while in possession of such information, and should be required to offer to rescind all such purchases at the price at which each such purchase was made.

## COUNT V
### Violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78m(e)) and SEC Rules Promulgated Thereunder

105.    Plaintiff repeats and repleads each allegation set forth in Paragraphs 1 through 89, inclusive, and incorporates them by reference herein.

106.    By reason of the foregoing, the Alfa Reporting Persons and Rightmarch violated Section 10(b) of the Exchange Act and SEC Rule 10b-5, by purchasing VimpelCom shares and ADSs while in possession of material non-public information.

107.    By reason of the foregoing, the Alfa Reporting Persons and Rightmarch should be enjoined from voting all VimpelCom shares and ADSs acquired while in possession of such information, and should be required to offer to rescind all such purchases at the price at which each such purchase was made.

WHEREFORE, Telenor East demands judgment against the Alfa Reporting Persons and Rightmarch, as follows:

(a)    declaring that the Schedule 13D, and Amendment Nos. 22 through 33 thereof (inclusive) (collectively, the "Amendments"), filed by the Alfa Reporting Persons violate Section 13(d) of the Exchange Act, and the rules and regulations promulgated thereunder;

(b)    declaring that the Schedule 13D and the Amendments filed by the Alfa Reporting Persons violate Section 14 of the Exchange Act, including Section 14(d) and the rules and regulations promulgated thereunder, and Section 14(e);

(c)    declaring that the Alfa Reporting Persons have engaged and are engaging in a tender offer and a going private transaction;

(d)    ordering that the Alfa Reporting Persons and Rightmarch, and their respective officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them:

   (i)    correct by appropriate public means their material misstatements and omissions, including by filing with the SEC and sending to VimpelCom, complete and accurate disclosures and other filings required by Sections 13 and 14 of the Exchange Act;

   (ii)   be enjoined from purchasing or making any arrangement to purchase, whether through a forward contract or otherwise, any VimpelCom securities until such time as they have filed with the SEC accurate and complete disclosures and other filings required by Sections 13(d), 13(e) and 14(d) of the Exchange Act and the rules and regulations promulgated thereunder and the market has had adequate time to process and reflect that new information, and complied in all other respects with the requirements for persons conducting tender offers and going private transactions;

   (iii)  offer to rescind the purchase (or arrangement to purchase) of, or sell any VimpelCom securities they acquired (or arranged to acquire) (a) after the filing of the first false and misleading Amendment and up until such time as they have filed with the SEC and sent to VimpelCom accurate disclosures required by Section 13(d) and Section 13(e) of the Exchange Act and the market has had adequate time to process and reflect that new information, or (b) while in possession of material non-public information;

(iv)    be enjoined from voting any VimpelCom securities they acquired between August 29, 2006 and such time as they have filed with the SEC and sent to VimpelCom accurate disclosures required by Sections 13(d), 13(e) and 14(d) of the Exchange Act, and the rules and regulations promulgated thereunder; and

(v)    be enjoined from making any further material misstatements or omissions in connection with VimpelCom securities; and

(e)    granting such other, further and different relief as the Court may deem just and proper.

Dated: New York, New York
       July 11, 2007

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____

Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151

Peter O'Driscoll
ORRICK, HERRINGTON & SUTCLIFFE LLP
Tower 42, Level 35
25 Old Broad Street
London EC2N 1HQ
DX: 557 London/City
United Kingdom
Telephone: 011 44 20 7562 5000

Attorneys for Plaintiff
Telenor East Invest AS