UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TELENOR EAST INVEST AS,

Plaintiff,

-against-

ALTIMO HOLDINGS & INVESTMENTS
LIMITED, ECO TELECOM LIMITED, CTF
HOLDINGS LIMITED, CROWN FINANCE
FOUNDATION, and RIGHTMARCH LIMITED,

Defendants.

07 Civ. 4829 (DC)
ECF ACTION

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR STAY
OF ALTIMO HOLDINGS & INVESTMENTS LIMITED, CROWN FINANCE
FOUNDATION, AND RIGHTMARCH LIMITED**

Ronald S. Rolfe
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

*Attorneys for Defendants Altimo Holdings &
Investments Limited, Crown Finance
Foundation, and Rightmarch Limited*

August 27, 2007

## Table of Contents

Page

Table of Authorities ............................................................................................. ii

Preliminary Statement..........................................................................................1

I.    APPLICABLE LEGAL STANDARDS .................................................3

II.   TELENOR'S 13(d) DISCLOSURE CLAIMS FAIL ..............................5

      A.    The Intent Claim Is Moot...........................................................5

      B.    Defendants Adequately Disclosed Their Financing. ...................7

      C.    The "Insider Trading" Disclosure Claim Is a Red Herring..........8

      D.    The Remaining Disclosure Claims Fail. .....................................9

            1.    Defendants Disclosed All Agreements with Deutsche Bank...........9

            2.    The Rightmarch Transaction and Purchases Thereunder
                  Have Been Adequately Disclosed..................................10

            3.    As a Matter of Law, There Was No 13(d) "Group" with
                  Jam. ..............................................................12

III.  TELENOR FAILS TO STATE A CLAIM UNDER SECTION 10(b) .................13

      A.    Telenor Has No Standing to Pursue an Insider Trading Claim .................13

      B.    Telenor Fails to Meet the Heightened Pleading Standard .........................14

IV.   TELENOR FAILS TO STATE A CLAIM UNDER SECTION 14......................19

      A.    Telenor Fails to Allege the Existence of a Tender Offer. ..........................19

      B.    Telenor's Section 14(e) Claim Fails as a Matter of Law ..........................22

V.    TELENOR FAILS TO STATE A CLAIM UNDER SECTION 13(e).................23

VI.   THIS CASE SHOULD BE STAYED IN FAVOR OF ARBITRATION .............24

Conclusion ........................................................................................................25

i

## Table of Authorities

Page(s)

**Cases**

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ................................. 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, --F.3d--, 2007 WL 1989336 (2d Cir. July 11, 2007) .................................................................................. 4, 18

*Azurite Corp. v. Amster & Co.*, 844 F. Supp. 929 (S.D.N.Y. 1994), *aff'd*, 52 F.3d 15 (2d Cir. 1995) ............................................................................ 15

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ........................................ 4

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) ........................ 13

*Brascan Ltd. v. Edper Equities Ltd.*, 477 F. Supp. 773 (S.D.N.Y. 1979) ................... 19, 22

*Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462 (S.D.N.Y. 2006) ....................................................................................................... 4

*Chock Full O'Nuts Corp. v. Finkelstein*, 548 F. Supp. 212 (S.D.N.Y. 1982) ................... 7

*Condec Corp. v. Farley*, 573 F. Supp. 1382 (S.D.N.Y. 1983) ............................ 8

*Cowin v. Bresler*, 741 F.2d 410 (D.C. Cir. 1984) ............................................ 13

*Double Alpha, Inc. v. Mako Partners, L.P.*, No. 99 Civ. 11541, 2000 WL 1036034 (S.D.N.Y. July 27, 2000) .............................................................. 15

*D-Z Inv. Co. v. Holloway*, Fed. Sec. L. Rep. ¶ 94,771, No. 74 Civ. 2379, 1974 WL 440 (S.D.N.Y. Aug. 23, 1974) ............................................................... 10

*Energy Ventures, Inc. v. Appalachian Co.*, 587 F. Supp. 734 (D.Del. 1984) ................... 22

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ................................. 4

*Gas Natural v. E.ON A.G.*, 468 F. Supp. 2d 595 (S.D.N.Y. 2006) ...................... 23

*Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d Cir. 1985) ............................ 19, 20, 21

*Kaufman & Broad v. Belzberg*, 522 F. Supp. 35 (S.D.N.Y. 1981) ...................... 19

*Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195 (2d Cir. 1978) ...................................................................................................... 19

**Table of Authorities**
(continued)

Page(s)

*Kolbeck v. LIT America, Inc.*, 923 F. Supp. 557 (S.D.N.Y. 1996), *aff'd*, 152
F.3d 918 (2d Cir. 1998) ............................................................................................ 15

*Lewis v. McGraw*, 619 F.2d 192 (2d Cir. 1980) ................................................................ 22

*Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545 (11th Cir. 1984)............... 14

*Mgmt. Assistance Inc. v. Edelman*, 584 F. Supp. 1016 (S.D.N.Y. 1984) ......................... 12

*Mgmt. Assistance Inc. v. Edelman*, 584 F. Supp. 1021 (S.D.N.Y. 1984) ........................... 8

*Orange Chicken, L.L.C. v. Nambé Mills, Inc.*, No. 00 Civ. 4730, 2000 WL
1858556 (S.D.N.Y. Dec. 19, 2000) .............................................................................. 24

*Packer v. Yampol*, 630 F. Supp. 1237 (S.D.N.Y. 1986) .................................................... 14

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ........................................................ 4, 17

*Rosenberg v. XM Ventures*, 274 F.3d 137 (3d Cir. 2001)................................................. 12

*Sea Spray Holdings, Ltd. v. P.I. Fin. Group*, 269 F. Supp. 2d 356 (S.D.N.Y.
2003) ............................................................................................................................. 24

*SEC v. Carter Hawley Hale Stores*, 587 F. Supp. 1248 (C.D. Cal. 1984)....................... 21

*Sharp v. Coopers & Lybrand*, 649 F.2d 175 (3d Cir. 1981) ............................................ 14

*Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157
(2d Cir. 1999)....................................................................................................... 4, 13, 14

*Standard Metals Corp. v. Tomlin*, 503 F. Supp. 586 (S.D.N.Y. 1980)............................ 14

*Stromfeld v. Great Atl. & Pac. Tea Co.*, 484 F. Supp. 1264 (S.D.N.Y.), *aff'd*,
646 F.2d 563 (2d Cir. 1980) ........................................................................... 15, 19, 20

*Stromfeld v. Great Atl. & Pac. Tea Co.*, 496 F. Supp. 1084 (S.D.N.Y.), *aff'd*,
646 F.2d 563 (2d Cir. 1980). ....................................................................................... 22

*Telenor East Invest AS v. Eco Telecom Ltd. et al.*, No. 05 Civ. 7584, 2005 WL
2239999 (S.D.N.Y. Sept. 7, 2005)................................................................................. 1

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) .......................... 5, 16

*Trans World Corp. v. Odyssey Partners*, 561 F. Supp. 1315 (S.D.N.Y. 1983)............... 12

*Treadway Cos. v. Care Corp.*, 638 F.2d 357 (2d Cir. 1980) ............................................. 6

**Table of Authorities**
(continued)

Page(s)

*Wellman v. Dickinson*, 475 F. Supp. 783 (S.D.N.Y. 1979), *aff'd*, 682 F.2d 355
(2d Cir. 1982)................................................................................................ 20

*Wright v. Heizer Corp.*, 411 F. Supp. 23 (N.D. Ill. 1975), *aff'd in part, rev'd
in part*, 560 F.2d 236 (7th Cir. 1977)............................................................ 14


**Statutes & Rules**

Securities and Exchange Act of 1934, 5 U.S.C. § 78m(e)................................. 23

Fed. R. Civ. P. 12(b)(6)....................................................................................... 1

Fed. R. Civ. P. 9(b) ............................................................................................. 1

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)...... 1, 4


**Rules and Regulations Under the Securities and Exchange Act of 1934**

17 C.F.R. § 240.13d-101 ..................................................................................... 8

17 C.F.R. § 240.13d-2 ....................................................................................... 10

17 C.F.R. § 240.13d-3 ....................................................................................... 12

17 C.F.R. § 240.13e-3 ....................................................................................... 23

17 C.F.R. § 240.14e-3 ....................................................................................... 23


**Other Authorities**

*Tender Offers*, Exchange Act Release No. 34-17120 ...................................... 23

Defendants Altimo Holdings & Investments Limited ("Altimo"), Crown Finance Foundation ("Crown"), and Rightmarch Limited ("Rightmarch") respectfully submit this memorandum in support of their motion to dismiss the Amended Complaint ("Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4(b)(1)-(3), or, in the alternative, to stay the action in favor of arbitration as provided for in a 2001 Shareholders Agreement (the "Shareholders Agreement") between Plaintiff Telenor East Invest AS ("Telenor") and codefendants Eco Telecom Limited ("Eco Telecom") and CTF Holdings Limited ("CTF").

## Preliminary Statement

This is a business dispute disguised as a securities case. It pits one minority shareholder of Open Joint Stock Company Vimpel-Communications ("VimpelCom"), a Russian telecommunications company listed on the New York Stock Exchange, against another.[1] At the time of the Original Complaint, Telenor owned approximately 26.6% of the voting stock of VimpelCom and Eco Telecom owned approximately 42.4%. (Orig. Compl. ¶¶ 2, 19.) Telenor brought this suit to prevent Eco Telecom from increasing its VimpelCom holdings to 44%, a level that, as described below, carries certain rights under the Shareholders Agreement. That plan failed, however, and at the time of the Amended Complaint Telenor owned approximately 29.9% of the voting stock and Eco Telecom owned approximately 44.0001%. (Compl.

---

[1] This is Telenor's second attempt to use the securities laws to resolve VimpelCom business disputes with Altimo. *See Telenor East Invest AS v. Eco Telecom Ltd. et al.*, No. 05 Civ. 7584, 2005 WL 2239999 (S.D.N.Y. Sept. 7, 2005) (denying Telenor's preliminary injunction motion because no likelihood of success on any of its § 13(d) claims).

¶¶ 12, 20.) Telenor now seeks to prevent Eco Telecom from voting those shares and exercising its contractual rights.

The Shareholders Agreement governs the relationship of Telenor and Eco Telecom as VimpelCom shareholders, including their rights to nominate candidates for VimpelCom's nine-person Board of Directors. (Compl. ¶ 21.) Each of the parties has the right to nominate four candidates, one of whom must be independent. (*Id.*) However, if a party holds more than 44%, but not more than 50%, of VimpelCom's voting stock, the requirement that one nominee be independent does not apply. (*Id.*) For the final Board seat, Telenor has the right to nominate an independent candidate, subject to approval by Eco Telecom. (*Id.*)

On November 19, 2005, Telenor commenced an arbitration alleging that Eco Telecom had nominated more candidates than it was entitled to under the Shareholders Agreement. (Compl. ¶ 77.) In January 2007, the arbitral panel issued an interim award setting forth a nomination process for upcoming elections and directing both parties to nominate no more than four candidates, one of whom was to be independent. (*Id.* ¶ 78.) When Eco Telecom withdrew all but five candidates, one of whom was independent, Telenor returned to the arbitral panel. The panel recognized that Eco Telecom would be able to nominate four non-independent candidates for the June 29, 2007 election if it obtained more than a 44% interest in VimpelCom, and gave Eco Telecom 30 days to achieve that threshold. After Telenor complained to the panel of "securities law violations", the panel advised that, should Eco Telecom seek to reach a

44% interest, Telenor should not—as it had threatened—use the securities laws to disrupt Eco Telecom's legitimate business pursuits.[2]

By filing this meritless lawsuit Telenor attempts just the type of disruption the panel hoped to avoid.[3]

The Amended Complaint contains five counts under the Securities Exchange Act of 1934. Telenor alleges that Defendants: (1) violated Section 13(d) by filing incomplete or false and misleading 13Ds; (2) violated Section 10(b) and Rule 10b-5 by purchasing VimpelCom shares while in possession of non-public information; (3) violated Section 14(d) by conducting an illegal tender offer; (4) violated Section 14(e) and Rule 14e-3 by purchasing VimpelCom shares during a tender offer while in possession of non-public information; and (5) violated Section 13(e) by conducting an illegal "going private" transaction. Each of the claims should be dismissed. Moreover, as explained in the Motion to Dismiss or, in the alternative, to Compel Arbitration filed by Eco Telecom and CTF, this litigation was brought in contravention of a broad arbitration clause in the Shareholders Agreement. If not dismissed, this case should be stayed in favor of arbitration.

## I.    APPLICABLE LEGAL STANDARDS

On a motion to dismiss a securities case, a court may consider statements or documents incorporated into the complaint by reference, public disclosures filed with

---

[2] On May 14, 2007, Eco Telecom withdrew one of its non-independent candidates because it had not acquired 44% of VimpelCom's voting stock. (Compl. ¶ 85.)

[3] Telenor immediately used this suit as propaganda for the June 29 election, publishing its complaint on the Internet and broadcasting its "insider trading" suit in a presentation to shareholders. (*See* Exhibits 23 and 24 to the August 27, 2007 Declaration of Ronald S. Rolfe ("Rolfe Decl.").)

the SEC, and documents known to the plaintiff and upon which it relied in bringing the

suit. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, __ F.3d __, 2007 WL 1989336, at *5 &

n.2 (2d Cir. July 11, 2007); *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166-67

(2d Cir. 2000) (on motion to dismiss, court may take judicial notice of market prices of

publicly traded securities).  To survive dismissal, a plaintiff must allege facts sufficient

"to raise a right to relief above the speculative level". *Bell Atl. Corp. v. Twombly*, 127 S.

Ct. 1955, 1965 (2007); *see also ATSI*, 2007 WL 1989336, at *5.

        To the extent a securities claim sounds in fraud, a plaintiff must meet

heightened pleading standards. *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).

Securities fraud plaintiffs must comply with Federal Rule of Civil Procedure 9(b) and

"state[] with particularity" the circumstances constituting the fraud.  A complaint must,

among other things, explain why the statements (or omissions) are fraudulent. *Camofi*

*Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 482 (S.D.N.Y. 2006) (Chin, J.).

        Securities plaintiffs must also meet the heightened standards of the

Private Securities Litigation Reform Act of 1995 ("PSLRA").  The PSLRA requires

plaintiffs to state alleged misstatements or omissions with particularity, 15 U.S.C. § 78u-

4(b)(1), and "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind".  15 U.S.C. § 78u-4(b)(2); *see also*

*Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 172-73

(2d Cir. 1999) (applying PSLRA scienter requirement to 10b-5 claim for injunctive

relief).  A court deciding a motion to dismiss "must consider plausible nonculpable

explanations" and must dismiss the claim unless "a reasonable person would deem the

inference of scienter cogent and at least as compelling as any opposing inference".

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007).

## II.    TELENOR'S 13(d) DISCLOSURE CLAIMS FAIL

Defendants have disclosed all that is required to be disclosed under

Section 13(d). Each of the disclosure claims contained in Count I must be dismissed.

### A.    The Intent Claim Is Moot.

Telenor alleges that Defendants violated Section 13(d) by failing to

disclose their intent in purchasing VimpelCom shares. (Compl. ¶¶ 65, 91.) Specifically,

Telenor alleges that Defendants' 13Ds filed during March 2007 contained only a "vague

statement" of intent and failed to disclose any intention "to acquire more than 44% of

VimpelCom's voting shares, or their purpose in acquiring such shares". (*Id.* ¶¶ 73, 81.)

To support its claim, Telenor primarily relies on distortions of statements

in confidential arbitration proceedings. Telenor does not, however, explain how the cited

statements show that Defendants' 13Ds were incomplete, false or misleading when they

were filed. For example, Telenor cites an April 10, 2007 statement that Eco Telecom

"first suspected" at the end of February that it could acquire a 44% interest, and alleges

that Eco Telecom should have disclosed, at the end of February, that it "intended" to

acquire such an interest, which Telenor claims would give Eco Telecom "operational

control" of VimpelCom. (Compl. ¶ 81.) Telenor misconstrues the reference to a first

suspicion as proof of an undisclosed plan or decisive intent as of the end of February.

Such distortion does not add up to a proper 13(d) claim.[4]

---

[4] Telenor makes similar distortions to support its argument that Defendants "made false public statements that they were no longer acquiring shares or interested in acquiring shares" of VimpelCom. (Compl. ¶ 85.) For example, Telenor cites an April 12

In any event, the intent claim is moot. Although Eco Telecom's intent vis-à-vis VimpelCom was adequately disclosed prior to this lawsuit, to avoid any doubt, in Amendment No. 32, filed June 13, 2007, Defendants disclosed that Eco Telecom intended to acquire more than 44%, but less than 50%, of VimpelCom's voting shares. (Exhibit 14 to the August 27, 2007 Declaration of Ronald S. Rolfe ("Rolfe Decl.").) The amendment also fully disclosed the impact of Eco Telecom acquiring such an interest.[5] Thus, Amendment No. 32 cures any alleged omission and moots Telenor's claim on the issue of intent. *See Treadway Cos. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir. 1980) (once subsequent filing cures alleged omissions, § 13(d) claim alleging omissions must be dismissed as moot).

In the Amended Complaint, Telenor makes the conclusory allegation that Amendment No. 32 is inadequate and itself "false and misleading" (Compl. ¶ 93) but does not identify what more was required to be disclosed concerning Eco Telecom's

---

Bloomberg interview that quotes Altimo's CFO as saying that Defendants had no "immediate plans" to increase their stake in VimpelCom; ignores the word "immediate"; and attempts to impeach the April 12 statement by pointing to Eco Telecom's acquisition of shares on May 11 (twenty-nine days after the April 12 statement, not "six days before" as alleged). (*Id.* ¶¶ 82-83.)

[5] Amendment No. 32, in relevant part, states:

The Reporting Persons are increasing their ownership of VimpelCom's Common Stock to increase their influence over the corporate actions to be taken by VimpelCom. The Reporting Persons intend to acquire more than 44% but less than 50% of VimpelCom's voting shares but may, from time to time, and reserve the right to, change their plans or intentions and take any and all actions that they deem appropriate to maximize the value of their investment in VimpelCom. An ownership interest of more than 44% of VimpelCom's voting shares eliminates the requirement under the VimpelCom Shareholders Agreement that one of Eco Telecom's nominated directors to the VimpelCom board of directors be independent of Eco Telecom.

As disclosed in Amendment No. 33, Eco Telecom now owns 44.0001%. (Rolfe. Decl. Ex. 15.)

6

intent. Such a claim does not meet Telenor's pleading obligations. To the extent that Telenor is alleging that Defendants should have disclosed that a 44% interest gives Eco Telecom "operational control" over VimpelCom, that argument fails. The phrase "operational control" is neither explained nor defined by Telenor. Nor does it appear in either Section 13 or the Shareholders Agreement. Defendants need not label or characterize the disclosed fact that Eco Telecom has the right to nominate four non-independent candidates for election to the VimpelCom Board. If, as Telenor would have it, a plaintiff could demand that a 13D adopt its characterization, a court could never dismiss a Section 13(d) claim. That is not the law. *See Chock Full O'Nuts Corp. v. Finkelstein*, 548 F. Supp. 212, 218 (S.D.N.Y. 1982) (finding no § 13(d) violation "so long as the relevant underlying facts are disclosed"). Thus, the intent claim must be dismissed.

**B.    Defendants Adequately Disclosed Their Financing.**

Telenor alleges that Defendants violated Section 13(d) by failing to disclose their plans to use, and their actual use of, borrowed funds to acquire VimpelCom ADSs. (Compl. ¶¶ 89, 91.) The Amended Complaint cites a March 2007 bond offering, underwritten by Deutsche Bank and secured by VimpelCom shares, that was disclosed in Amendment No. 30 (*id.* ¶ 47) and a May 2007 Credit Suisse loan that was not disclosed in a VimpelCom 13D (*id.* ¶ 89). Telenor cites a Russian newspaper article discussing the Credit Suisse loan (*id.*) that includes a statement from Altimo's CFO that the funds would not be used for VimpelCom shares. (Rolfe Decl. Ex. 25).

Telenor does not, and cannot, cite any regulation that required Defendants to disclose their future plans as to how they might use the proceeds of any loan.[6] Schedule 13D requires disclosure of plans to acquire additional shares, 17 C.F.R. § 240.13d-101 (Item 4(a)), and Defendants have disclosed all such plans. Schedule 13D also requires reporting persons to indicate, once they disclose a purchase, any borrowing for that purchase. 17 C.F.R. § 240.13d-101 (Item 3). Telenor's suggestion that reporting persons must disclose borrowings that may be used to finance future acquisitions goes too far. If Eco Telecom acquires VimpelCom shares with funds borrowed for that specific purpose, Defendants will make the appropriate disclosure. In the meantime, Telenor's claim must be dismissed. *See Mgmt. Assistance, Inc. v. Edelman*, 584 F. Supp. 1021, 1029-30 (S.D.N.Y. 1984) (no § 13(d) requirement to disclose corporate loans for conducting ongoing business or acquiring stock generally).

### C.    The "Insider Trading" Disclosure Claim Is a Red Herring.

Telenor alleges that Defendants engaged in an "insider trading scheme" (Compl. ¶ 65) and violated Section 13(d) by failing to disclose that scheme (*id.* ¶ 91). The securities laws do not require Defendants to accuse themselves of "insider trading" or any other illegal conduct. *See Condec Corp. v. Farley*, 573 F. Supp. 1382, 1386 (S.D.N.Y. 1983) (rejecting § 13(d) claim when plaintiff sought "'confession of

---

[6] Telenor's claim as to the Deutsche Bank bond proceeds fails on the publicly available facts as well. The intended use of the proceeds was disclosed in Section 3.18 of the Indenture, which was filed as an exhibit to Amendment No. 30, and incorporated therein. (Rolfe Decl. Ex. 12.) Section 3.18 (Use of Proceeds) states: "The Issuer shall use the funds . . . to (i) repay its Indebtedness, (ii) make loans to companies under common control with [Altimo] that are to be used to acquire assets to be held by such companies and (iii) acquire assets in the telecommunications sector." Once the bond was disclosed, shareholders were fully informed that the proceeds were part of Defendants' funds available to purchase VimpelCom shares.

judgment', *i.e.* an admission [of alleged facts]"). Moreover, as discussed below at pages 14-18, the "insider trading" claim is not valid.

### D.    The Remaining Disclosure Claims Fail.

#### 1.    Defendants Disclosed All Agreements with Deutsche Bank.

Telenor speculates that Defendants failed to disclose "agreements" or "arrangements" with Deutsche Bank in connection with the brokered transactions between Eco Telecom and Deutsche Bank AG, London Branch (the "Deutsche Bank Transactions"). (Compl. ¶ 42.) All agreements and arrangements with Deutsche Bank relating to VimpelCom purchases were fully disclosed when Defendants filed the Confirmations for each of the Deutsche Bank Transactions as exhibits to Amendment Nos. 26, 27, 28 and 29. (Rolfe Decl. Exs. 8-11.) The allegation of undisclosed agreements is based solely on Telenor's misreading of those Confirmations.

Telenor notes that the "trade date" listed in the Confirmations precedes the date of the Confirmations themselves. Telenor then speculates that the earlier trade date shows "that Deutsche Bank was accumulating VimpelCom ADSs in the market no later than the day preceding the date of each such forward purchase agreement, solely for the purpose of transferring such ADSs to Eco Telecom on the following day" and thus must have been acting pursuant to some hidden agreement. (Compl. ¶¶ 42, 44-46.) Telenor's speculation is unfounded. The "trade date" listed in the Confirmation *is* the date the parties reached agreement on the purchase terms (*i.e.*, the "Transaction"). The Confirmation simply memorializes that agreement, and is issued after the trade date. Each Confirmation states:

> "The purpose of this letter agreement (this 'Confirmation') is to confirm
> the terms and conditions of the transaction entered into between us on the

9

Trade Date specified below (the 'Transaction'). . . . This Confirmation
evidences a complete and binding agreement . . . as to the terms of the
Transaction to which this Confirmation relates." (Rolfe Decl. Ex. 8.)

Thus, Telenor's claim is without merit.

### 2.    The Rightmarch Transaction and Purchases
Thereunder Have Been Adequately Disclosed.

Telenor alleges that the agreement (the "Rightmarch Transaction")

between Rightmarch and Jam Holding Asset Management Ltd., a third party unaffiliated

with Defendants, was a "stock parking" transaction that Defendants failed to disclose

"promptly" or describe adequately. (Compl. ¶¶ 29-30, 33.) Defendants disclosed the

Rightmarch Transaction in Amendment No. 22 and attached the Master Confirmation as

an exhibit (Rolfe. Decl. Ex. 5) four business days after it was executed—well within the

period considered to be a timely filing. *See D-Z Inv. Co. v. Holloway*, Fed. Sec. L. Rep. ¶

94,771, No. 74 Civ. 2379, 1974 WL 440, at *3 (S.D.N.Y. Aug. 23, 1974) (holding 13D/A

filed July 9 for acquisitions made from June 3 through July 3 was timely).[7]

Telenor alleges that Defendants failed to disclose the number of ADSs

Rightmarch intended to purchase from Jam and the price of such purchases. (Compl. ¶

30.) Again, Telenor is speculating. There is no support for the suggestion that when the

Rightmarch Transaction was first disclosed Rightmarch intended to purchase a set

number of ADSs at a particular price. The Master Confirmation contained no minimum

---

[7] Telenor also alleges that Rightmarch's acquisition of 2,168,020 ADSs on May 11,
2007, which was disclosed in Amendment No. 32, was not "promptly" reported.
(Compl. ¶ 85.) That argument fails. A reporting person is required to file "promptly" an
amendment to Schedule 13D only when there is a "material change" in the facts set forth
in the Schedule 13D. 17 C.F.R. § 240.13d-2(a). Additional acquisitions are deemed
"material" only when they equal or exceed 1% of the relevant class of securities. *Id.* The
May 11 acquisition did not meet that 1% threshold of VimpelCom voting shares. Thus,
there was no obligation to file an amendment until Eco Telecom acquired additional
VimpelCom ADSs on June 8. (*See* Rolfe Decl. Ex. 14.)

share requirement or specific price term. (Rolfe Decl. Ex. 5.)  When Rightmarch

acquired VimpelCom ADSs from Jam, Defendants disclosed the number of ADSs

acquired and the prices paid for the ADSs.  That is all that is required.

Telenor's claims that Defendants failed to disclose that Jam intended to

purchase the ADSs in the open market (Compl. ¶ 30),[8] when Jam acquired certain ADSs,

and "when and by whom it was instructed" to do so (*id.* ¶ 58) also fail.  Telenor provides

no basis for its suggestion that Defendants were obligated to make such disclosures—nor

does any basis exist.

Telenor's argument (Compl. ¶ 30) that Defendants failed to disclose the

purpose of the Rightmarch Transaction also fails.  The disclosed purpose of the

Rightmarch Transaction was the acquisition of VimpelCom shares.  Moreover,

Defendants specifically explained in Amendment No. 23 that the Rightmarch Transaction

was first executed to assure the availability of VimpelCom shares in response to the

Russian anti-monopoly law that went into effect October 26, 2006.  (Rolfe Decl. Ex. 6.)

As Telenor alleges (Compl. ¶ 33), that law allows Eco Telecom to acquire up to 50% of

VimpelCom's voting shares without prior approval from the Russian Federal

Antimonopoly Service.

Finally, Telenor's allegations that Defendants failed to disclose the prices

paid for two purchases under the Rightmarch Transaction (Compl. ¶¶ 37, 43) are moot in

---

[8] As Telenor alleges (Compl. ¶ 72), the day after the Rightmarch Transaction was disclosed, Altimo issued a press release stating that, pursuant to the agreement, Jam may acquire VimpelCom shares in the open market.

light of Amendment No. 32, which provides an average price of the ADSs purchased in both transactions identified in the Amended Complaint. (Rolfe Decl. Ex. 14.)[9]

### 3. As a Matter of Law, There Was No 13(d) "Group" with Jam.

Telenor alleges that, "through their respective roles in the Rightmarch Transaction", Rightmarch, Jam and the "Alfa Reporting Persons" (referring to Eco Telecom, CTF, Altimo and Crown) were a "group" under Section 13(d). (Compl. ¶ 31.)

Telenor's conclusory "group" allegation fails. *See Trans World Corp. v. Odyssey Partners*, 561 F. Supp. 1315, 1323 (S.D.N.Y. 1983) (dismissing claim based on conclusory allegation that defendants were a "group" as a result of "interrelationships and contracts, agreements and understandings"); *Mgmt. Assistance Inc. v. Edelman*, 584 F. Supp. 1016, 1018-19 (S.D.N.Y. 1984) (allegation that defendant "is a member of a group" is insufficient). There is no allegation—nor could there be—that Defendants agreed with Jam to "act together" as a "group" within the meaning of Section 13(d). Eco Telecom's beneficial ownership of all shares acquired under the Rightmarch Transaction has been disclosed, *see* 17 C.F.R. § 240.13d-3, and Jam could be a member of a Section 13(d) group with Defendants only if Jam itself was a beneficial owner of VimpelCom shares during the relevant time. *See Rosenberg v. XM Ventures*, 274 F.3d 137, 144-47, 148 (3d Cir. 2001) ("each member of a section 13(d) group must hold beneficial ownership of the shares of the issuing entity prior to becoming a section 13(d) group member"); *Mgmt. Assistance,* 584 F. Supp. at 1019. No such allegation has been made.

---

[9] Telenor also alleges that Defendants failed to disclose the purchase price for VimpelCom ADSs that Eco Telecom acquired in brokered transactions between March 19 and March 20, 2007. (Compl. ¶ 54.) Amendment No. 31 states that those ADSs were purchased "for an average price of 92.1799" per ADS. (Rolfe Decl. Ex. 13, at Item 5.)

Moreover, the transaction with Jam was a standard swap agreement executed in an arms-length, buyer-seller relationship. If, as Telenor alleges, Jam was part of a Section 13(d) group, then any broker who acquires securities on a reporting person's behalf would face the risk of being liable for the contents of a 13D.

## III.   TELENOR FAILS TO STATE A CLAIM UNDER SECTION 10(b)

In Count V, Telenor alleges that Defendants engaged in an "insider trading scheme" in violation of Section 10(b) and Rule 10b-5. (Compl. ¶¶ 65, 106.) Telenor lacks standing to bring such a claim and, even if it did have standing, Telenor fails to meet the heightened pleading standard that applies.

### A.   Telenor Has No Standing to Pursue an Insider Trading Claim.

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731 (1975), the Supreme Court held that a plaintiff must buy or sell securities in reliance on the alleged fraud to bring a damages claim under Rule 10b-5. Telenor did not sell VimpelCom shares during the relevant period and concedes it would not have standing to seek damages. (*See* Letter from Robert L. Sills to the Hon. Denny Chin, June 20, 2007, at 3.) Nor does it have standing to seek injunctive relief.

Courts have extended the *Blue Chip* buyer-seller requirement to claims for injunctive relief. *See, e.g., Cowin v. Bresler*, 741 F.2d 410, 424-25 (D.C. Cir. 1984) (rejecting an injunctive relief exception to *Blue Chip*). This Circuit has not decided whether to do so. *Simon*, 186 F.3d at 170-71 (vacating Rule 11 sanctions imposed on tender offeror plaintiff who asserted standing, but reserving question of whether standing exists). As the D.C. and Third Circuits have recognized, however, the Supreme Court's rationale in *Blue Chip* applies as much to an action for injunctive relief as to one for damages. *See Cowin*, 741 F.2d at 424-25; *Sharp v. Coopers & Lybrand*, 649 F.2d 175,

13

186 n.15 (3d Cir. 1981) (dicta); *Wright v. Heizer Corp.*, 411 F. Supp. 23, 34 (N.D. Ill.

1975), *aff'd in part, rev'd in part*, 560 F.2d 236 (7th Cir. 1977); *see also Liberty Nat'l*

*Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 558-59 (11th Cir. 1984) (rejecting

injunctive relief exception using different rationale).

   Even if an exception could be found, Telenor still lacks standing because

it has failed to plead a direct injury caused by the purchases in question.  Courts

contemplating an injunctive relief exception to *Blue Chip* have always held that to obtain

standing a plaintiff would be required to plead and prove both that it had suffered some

direct injury and that there was a causal connection between the violations alleged and its

injury. *See, e.g.*, *Simon*, 186 F.3d at 173-74; *Packer v. Yampol*, 630 F. Supp. 1237, 1242-

43 (S.D.N.Y. 1986) (denying standing to seek injunction when plaintiff could not show

"that the alleged violation will cause him harm"); *Standard Metals Corp. v. Tomlin*, 503

F. Supp. 586, 598-600 (S.D.N.Y. 1980) (same).  Telenor has pleaded no fact that could

meet either requirement.[10]

## B.  Telenor Fails to Meet the Heightened Pleading Standard.

   Telenor does not adequately plead the basic facts constituting the alleged

"insider trading" violations.  The Amended Complaint contains no detail beyond the

unremarkable fact that three of Eco Telecom's nominees elected to the VimpelCom

Board received non-public information from VimpelCom on August 15, 2006 and on

---

[10] Telenor alleges that "the Defendants were able to acquire [VimpelCom shares] at a substantially lower price than would have been the case once the investing public became aware of [the non-public] information".  (Compl. ¶ 65.)  Such a claim, even if it were true, does not allege an injury to Telenor that would allow it to have standing to seek an injunction.  *See Packer*, 630 F. Supp. at 1241-43 (rejecting conclusory allegation of irreparable harm; "plaintiff requesting injunctive relief must demonstrate that the continuation of past and present practices will injure *him*") (emphasis in original) (citation omitted).

March 16, 2007.  (Compl. ¶¶ 24, 52.)  Telenor jumps straight from alleging that those

directors were in possession of non-public information to asserting that "[t]he purchases

made by Jam on the instructions of Rightmarch [between August 30, 2006 and September

1, 2006] were made while the *Defendants* were in the possession of material non-public

information" (*id.* ¶ 34 (emphasis added)), and that all of Eco Telecom's VimpelCom

purchases between March 16, 2007 and July 11, 2007 "were made while the *Defendants*

were in possession of material non-public information" (*id.* ¶ 64 (emphasis added)).

        Telenor relies on the assumption, but no factual allegation, that the

VimpelCom directors who allegedly possessed the non-public information disclosed it to

the individuals responsible for making the purchases at issue or to someone else, or,

while in possession of the information, directed the share purchases in violation of their

fiduciary duties.  Telenor cannot ignore critical elements of its claim.  *See Double Alpha,*

*Inc. v. Mako Partners, L.P.*, No. 99 Civ. 11541, 2000 WL 1036034, at *3 (S.D.N.Y. July

27, 2000) (Chin, J.) (dismissing § 10(b) claim for failure to distinguish among multiple

defendants and "alleg[e] specific acts of wrongdoing as to each one of them"); *Kolbeck v.*

*LIT America, Inc.*, 923 F. Supp. 557, 569 (S.D.N.Y. 1996) ("Broad allegations that

several defendants participated in a scheme, or conclusory assertions that one defendant

controlled another, or that some defendants are guilty because of their association with

others . . . do not satisfy Rule 9(b)."), *aff'd*, 152 F.3d 918 (2d Cir. 1998); *Stromfeld v.*

*Great Atl. & Pac. Tea Co.*, 484 F. Supp. 1264, 1270 (S.D.N.Y.) (dismissing complaint

for failure to specify which defendant "used what information in breach of what

obligations"), *aff'd*, 646 F.2d 563 (2d Cir. 1980). *Cf. Azurite Corp. v. Amster & Co.*, 844

F. Supp. 929, 936-37 (S.D.N.Y. 1994) (to avoid summary judgment plaintiff must

"demonstrate that defendants traded stock on the basis of non-public information obtained from an insider and with knowledge that the insider breached its fiduciary duty to the company"), *aff'd*, 52 F.3d 15 (2d Cir. 1995).

Telenor's pleading sweeps too broadly. Under Telenor's theory, any entity that is a shareholder of a company and has a representative on the board of that company is *ipso facto* precluded from buying or selling shares in the company without disclosing confidential information known to its representative. Telenor, like Eco Telecom, has nominees on the VimpelCom Board and made purchases while the VimpelCom Board members were in possession of non-public information.[11]

Indeed, Telenor's allegations do not establish a strong inference of an intent to defraud. In *Tellabs*, 127 S. Ct. at 2509-10, the Supreme Court held that, in determining whether a plaintiff has adequately established a "strong inference" of scienter under the PSLRA, courts must consider the complaint in its entirety and consider competing inferences of innocence.

Here, the Amended Complaint shows that Eco Telecom has made steady efforts to increase its stake in VimpelCom. Exhibit 26 shows that Eco Telecom engaged in a regular buying program and that all of the alleged "insider trading" purchases were made as part of that program. No inference of "insider trading" can be drawn from the

---

[11] On May 11, 2007, Telenor took possession of more than 7 million VimpelCom ADSs from ING Bank N.V., London Branch ("ING"). (Rolfe. Decl. Ex. 22.) Those ADSs were acquired by ING pursuant to an earlier agreement between ING and Telenor ASA under which ING acquired VimpelCom ADSs during the period June 2, 2006 to September 30, 2006. (*Id.* Ex. 21.) Thus both the initial purchases by ING and Telenor's May 11 acquisition could be characterized as "insider trading" under Telenor's theory. (*See* Compl. ¶ 34 (discussing VimpelCom Board's possession of non-public information from August 15, 2006 to September 1, 2006); *Id.* ¶ 52 (discussing non-public information emailed to VimpelCom Board on March 16, 2007, some of which remains non-public).

purchases in question because those purchases were consistent with Eco Telecom's ongoing efforts and not "unusual". *See generally Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (to show scienter, plaintiff must allege "unusual" trading out of line with prior trading practices).

      The Rightmarch Transaction was one part of Eco Telecom's efforts to increase its stake in VimpelCom. (Compl. ¶ 33.) Telenor's conclusory suggestions that Rightmarch instructed Jam to acquire VimpelCom shares before September 1 to trade on non-public information is insufficient. *See Rombach*, 355 F.3d at 176 ("coupl[ing] a factual statement with a conclusory allegation of fraudulent intent" is insufficient). Moreover, given the fifteen-day lapse between August 15, when the VimpelCom directors allegedly received the non-public information, and August 30, when the Rightmarch Transaction was executed, the timing was hardly suspicious. Similarly, the prices paid are not suggestive of "insider trading". When Rightmarch first exercised its right to receive VimpelCom ADSs under the Rightmarch Transaction, it paid an average price of $60.4728 per ADS, at least $6.00 per share more than the August 30 closing market price of $54.45 and at least $10.00 per share more than the August 15 closing market price of $49.55. (Rolfe Decl. Ex. 26.) If there was a fraudulent intent to buy shares "on the cheap" before the disclosure of non-public information, one would expect that Rightmarch would have acted sooner rather than later. Telenor cannot rely on the generalized allegation that Rightmarch and Eco Telecom would have paid more if they had waited to make purchases until after the disclosure of the non-public information, because the prices of VimpelCom shares were steadily rising. (*Id.* Ex. 16.)

17

As for the so-called "2007 Insider Trading", based on information disclosed to the VimpelCom Board on March 16, 2007 (Compl. ¶¶ 52, 64), it is equally clear that Eco Telecom was simply continuing to make purchases consistent with its stated intent to increase its stake in VimpelCom. Again, the timing is hardly suspicious: as Telenor alleges, Eco Telecom began a "purchase program" in February 2007 and continued its purchases through June 25 to obtain a 44% interest prior to the June 29 board election. (*Id.* ¶¶ 63, 79.) That effort is the most plausible explanation for the timing of, and reason for, the purchases in question. And again, the prices paid by Eco Telecom are hardly suggestive of "insider trading". For example, with respect to the brokered transactions on March 19 and March 20, Eco Telecom paid an average price of $92.1799 per ADS, at least $4.00 more than the March 16 closing market price of $88.02. (Rolfe Decl. Ex. 26.) The additional delay between those purchases and the next purchase on May 11 for an average price of $95.8299 per ADS (*id.*) further undermines any inference of an "insider trading scheme".

Under the comparative analysis required, Telenor's allegations of "insider trading" fraud are not as compelling as the opposing innocent inference, namely that Eco Telecom was making regular purchases of VimpelCom stock over an extended period of time without regard to non-public information released to the VimpelCom Board. Thus, the "insider trading" claim must be dismissed. *See ATSI*, 2007 WL 1989336, at *11 (affirming dismissal of 10b-5 claim because nonculpable explanation for defendants' conduct was more likely than inference of intentional manipulation).

18

IV.    **TELENOR FAILS TO STATE A CLAIM UNDER SECTION 14**

    A.    **Telenor Fails to Allege the Existence of a Tender Offer.**

        In Count II, Telenor alleges that Defendants have launched a so-called "unconventional" tender offer for VimpelCom shares without following the tender offer rules and have "engaged in fraudulent, deceptive and manipulative acts" in doing so. (Compl. ¶¶ 95-96.) The tender offer claims fail because the alleged purchases do not resemble a tender offer. *See, e.g., Kaufman & Broad v. Belzberg*, 522 F. Supp. 35, 48-49 (S.D.N.Y. 1981) (dismissing illegal tender offer claim when facts alleged did not "resemble a tender offer scenario"); *Stromfeld*, 484 F. Supp. at 1272-73 (same). The only specific facts Telenor alleges in support of conferring tender offer status on Eco Telecom's purchases of VimpelCom shares are that:

> "Deutsche Bank, acting on behalf of Eco Telecom, reportedly again "swept the Street", as it had in connection with the Rightmarch Transaction, seeking to purchase as many VimpelCom ADSs as possible . . . from holders based in the United States and Europe.
>
> "Deutsche Bank . . . made offers to hedge funds and other holders of large blocks of VimpelCom shares and ADSs, offering to purchase such holders' entire holdings of VimpelCom shares and ADSs, at premiums to the market ranging from $0.50 to $10.00. Such offers were made on a 'take or leave it' basis, with holders being given a brief period, generally less than 24 hours, to accept such offers." (Compl. ¶¶ 55-56.)

        Telenor's allegations fail for at least two reasons. First, courts have consistently rejected efforts to confer tender offer status on privately negotiated block trading with sophisticated investors such as the "hedge funds and other holders of large blocks of VimpelCom shares" cited in the Amended Complaint. *See Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 56 (2d Cir. 1985); *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1206 (2d Cir. 1978); *Brascan Ltd. v. Edper Equities Ltd.*, 477 F. Supp. 773, 790 (S.D.N.Y. 1979) (Leval, J.). Second, the allegations about the contested

19

purchases do not come close to being a tender offer under the eight-factor test proffered

by the SEC and set forth in *Wellman v. Dickinson*, 475 F. Supp. 783, 823-24 (S.D.N.Y.

1979), *aff'd*, 682 F.2d 355 (2d Cir. 1982).

    ***Active and Widespread Solicitation of Public Shareholders***—There are

two components to this factor. First, there must be active and widespread solicitation.

Second, that solicitation must be of *public* shareholders. It is presumed sophisticated

shareholders do not need the protections of the Williams Act. *Hanson Trust*, 774 F.2d at

57. Here, neither element is satisfied. As the Amended Complaint acknowledges,

Deutsche Bank "made offers to hedge funds and other holders of large blocks of

VimpelCom shares and ADSs". (Compl. ¶ 56.) These are exactly the sophisticated

parties that do not need the protection of the disclosure laws.

    ***Solicitation for a Substantial Percentage of the Issuer's Stock***—There is

no specific allegation that Eco Telecom solicited a "substantial percentage" of

VimpelCom shares. The conclusory allegation that Deutsche Bank sought to "purchase

as many VimpelCom ADSs as possible" is insufficient and undermined by the fact that

Eco Telecom acquired only an "additional 8.2% of VimpelCom voting shares" during a

period of four months. (Compl. ¶ 55.) Since *Wellman*, no court has found that the

purchase of less than 15% of an issuer's stock constitutes a tender offer. Courts have

held that purchases of well above 20% did not amount to a tender offer. *See, e.g.*,

*Stromfeld*, 484 F. Supp. at 1272-73 (42%).

    ***Offer to Purchase at a Premium***—No allegation is made regarding a

specific premium for Eco Telecom's open-market purchases, on its own or through Jam.

Telenor alleges that Deutsche Bank offered premiums ranging from $0.50 to $10.00

(Compl. ¶ 56), but does not plead whether there was a real premium paid to more than a few shareholders. At any rate, the variability in price shows that these purchases were typical, privately negotiated purchases that the Williams Act was not intended to reach. *See Hanson Trust*, 774 F.2d at 56.

          ***Fixed Rather than Negotiable Terms***—Telenor alleges that the Deutsche Bank purchases were made on a "'take or leave it' basis". (Compl. ¶ 56.) That allegation is directly contradicted by Telenor's claim that the above-market premium varied from $0.50 to $10.00. (*Id.*) Telenor effectively concedes that the terms of the transactions were negotiable, given the variation in prices. When transactions are entered into at negotiable prices, no firm offer has been made. *See, e.g.*, *SEC v. Carter Hawley Hale Stores*, 587 F. Supp. 1248, 1254 (C.D. Cal. 1984) (finding that when transactions were entered into "at many different market prices" there was no "firm" offer).

          ***Contingent on the Tender of a Fixed Number of Shares***—There is no allegation that any purchase was contingent on the tender of a fixed number of shares. Accordingly, the purchases were "[u]nlike most tender offers". *See Hanson Trust*, 774 F.2d at 58.

          ***Offer Open for Only a Limited Period of Time***—Telenor alleges that Deutsche Bank's offers gave shareholders "a brief period, generally less than 24 hours, to accept". (Compl. ¶ 56.) There is not, however, an allegation that there was only a general time period during which Deutsche Bank would make purchases of VimpelCom stock. Because nothing would have prevented resumption of negotiations between the parties had the sellers declined the Deutsche Bank offers, the time limits here do not indicate a tender offer. *See Hanson Trust*, 774 F.2d at 58.

***Subject to Pressure to Sell*** —There is no allegation that any party was pressured to sell its stock to Deutsche Bank or to Eco Telecom. Moreover, because the only sellers identified by Telenor are "hedge funds" and other "significant" VimpelCom shareholders, any allegation of real "pressure" would ring hollow. *See Brascan,* 477 F. Supp. at 792 (doubting that "professional investors can be susceptible to 'pressure' in the sense in which the Williams Act is concerned").

***Public Announcement of a Purchasing Program Preceded or Accompanied by Rapid Accumulation***—Telenor does not allege any public announcement of a purchasing program in the manner typical of a tender offer. The only public disclosures concerning the purchases were contained in Defendants' 13Ds. Any publicity arising from those filings "cannot be considered 'illegal solicitations'". *Energy Ventures, Inc. v. Appalachian Co.,* 587 F. Supp. 734, 741 (D. Del. 1984).

### B.    Telenor's Section 14(e) Claim Fails as a Matter of Law.

In Count IV, Telenor alleges that Defendants violated Section 14(e) and Rule 14e-3 by purchasing VimpelCom shares during a tender offer while in possession of material non-public information. (Compl. ¶ 103.) Telenor has not adequately alleged the existence of a tender offer. When there is no tender offer, there can be no fraud "in connection with" a tender offer. *Lewis v. McGraw,* 619 F.2d 192, 195 (2d Cir. 1980); *see also Stromfeld v. Great Atl. & Pac. Tea Co.,* 496 F. Supp. 1084, 1088-89 (S.D.N.Y.) ("Section 14 is simply not applicable" when plaintiff is neither confronted with tender offer nor required to respond to one), *aff'd,* 646 F.2d 563 (2d Cir. 1980).

Even assuming that Telenor had adequately alleged the existence of a tender offer, Rule 14e-3 still would not apply. By its terms, Rule 14e-3 limits the obligation to disclose or abstain from trading while in possession of material, non-public

22

information "relating to" a tender offer to "any other person". 17 C.F.R. § 240.14e-3(a).
Telenor's claim is based on non-public information about VimpelCom, not information
"relating" to the alleged tender offer, and the SEC has stated that "any other person"
means "someone other than the [person making the tender offer]". *Tender Offers*,
Exchange Act Release No. 34-17120, at 5-6 & n. 34 (Sept. 4, 1980). Consistent with that
interpretation, the Rule does not apply to purchases by or on behalf of the offering
person. 17 C.F.R. § 240.14e-3(c). Thus even if, as Telenor asserts, Defendants engaged
in a tender offer, no Rule 14e-3 claim can be brought against them.

Finally, even setting aside the above pleading failures, Telenor fails to
meet the heightened pleading standards that apply. *Gas Natural v. E.ON A.G.*, 468 F.
Supp. 2d 595, 603 (S.D.N.Y. 2006) ("The heightened pleading standards of Rule 9(b) . . .
and the PSLRA apply to claims brought under Section 14(e)."). Telenor's Section 14(e)
claim is based on its allegations of "insider trading" and suffers from the same pleading
infirmities as its Section 10(b) claim. *See supra* at pp. 14-18.

## V.    TELENOR FAILS TO STATE A CLAIM UNDER SECTION 13(e)

In Count III, Telenor alleges that Defendants launched an illegal "going
private" transaction. *See* 15 U.S.C. § 78m(e). That claim also fails. The Rule defines a
"going private" transaction as one that has either a "purpose" or "reasonable likelihood"
of: (1) causing any covered class of equity securities of the issuer to be held by fewer
than 300 persons; or (2) causing any class of equity securities of an issuer that is listed on
a national securities exchange to be "neither listed on any national securities exchange
nor authorized to be quoted on an inter-dealer quotation system of any registered national
securities association". 17 C.F.R. § 240.13(e)-3(a)(3).

The Amended Complaint contains no allegation that Defendants had the purpose of causing either of those effects, or that Defendants' actions created a "reasonable likelihood" that either would occur. The only conceivably relevant allegation is that, "if" Defendants were to acquire more than 50% of VimpelCom's voting shares, they would be required to make a tender offer for 100% of the voting shares under the Russian tender offer rules and that, "[d]espite that fact", Defendants failed to file a Schedule 13E-3. (Compl. ¶ 40.) That hypothetical and speculative allegation does not state a claim for relief under Section 13(e), and the claim must be dismissed.

## VI.    THIS CASE SHOULD BE STAYED IN FAVOR OF ARBITRATION

If Telenor's claims are not dismissed, this litigation should be stayed in favor of an arbitration between Telenor and codefendants Eco Telecom and CTF, pursuant to this Court's inherent power to manage and control its docket.

As Eco Telecom and CTF have demonstrated in their Motion to Dismiss or Compel Arbitration, Telenor's claims against them are subject to arbitration pursuant to the arbitration clause in the Shareholders Agreement, and this litigation must be stayed as against them. Thus, judicial efficiency requires that the entire litigation be stayed. District courts have the inherent power to grant a stay requested by a nonsignatory to an arbitration agreement. *See Sea Spray Holdings, Ltd. v. P.I. Fin. Group*, 269 F. Supp. 2d 356, 365-66 (S.D.N.Y. 2003). Stays in favor of arbitration are "particularly appropriate" when they promote judicial economy, avoidance of confusion and possible inconsistent results. *Orange Chicken, L.L.C. v. Nambé Mills, Inc.*, No. 00 Civ. 4730, 2000 WL 1858556, at *8-*9 (S.D.N.Y. Dec. 19, 2000).

## Conclusion

For the foregoing reasons, Telenor's claims should be dismissed, or, in the alternative, this litigation should be stayed in favor of an arbitration.

August 27, 2007

CRAVATH, SWAINE & MOORE LLP,

by _____
Ronald S. Rolfe
Member of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

*Attorneys for Defendants Altimo
Holdings & Investments Limited,
Crown Finance Foundation, and
Rightmarch Limited*

25