Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue, New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151

- and -

Peter O'Driscoll
Orrick, Herrington & Sutcliffe LLP
25 Old Broad Street
London EC2N 1HQ
DX: 557 London/City
United Kingdom
Telephone: 011 44 20 7562 5000
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------- x
                                          :   07 CV 4829 (DC)(DCF)
TELENOR EAST INVEST AS,                   :
                                          :   ECF Case
                      Plaintiff,          :
                                          :
          -against-                       :
                                          :
                                          :
ALTIMO HOLDINGS & INVESTMENTS             :   Oral Argument Requested
LIMITED, ECO TELECOM LIMITED, CTF         :
HOLDINGS LIMITED, CROWN FINANCE           :
FOUNDATION and RIGHTMARCH LIMITED,        :
                                          :
                      Defendants.         :
------------------------------------------------------- x
```

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

    Defendants' Insider Trading Scheme.............................................................. 1

    Defendants' Unconventional Tender Offer ................................................... 3

    Defendants' Illegal Stock Parking - the Rightmarch Transaction .......................... 4

I.     ARGUMENT ...................................................................................................... 6

    A.    The Complaint Properly Pleads Numerous Violations of Section 13(d).................................................................................................... 7

        1.    Plaintiff Alleges Sufficient Facts regarding the Misstatements and Omissions in Alfa Reporting Group's Public Filings ................................................................. 7

            a.    Defendants' Disclosures Concerning Their Intentions to Acquire Control of VimpelCom Are False and Misleading, and Are Not Moot........................ 8

            b.    Defendants Failed to Make Proper Disclosures Concerning their Financing............................... 11

            c.    The Complaint Properly Alleges that Defendants Failed to Disclose Their Agreements with Deutsche Bank .................................................................... 12

            e.    The Complaint Fully Alleges the Deficiencies in the Disclosures Concerning the Rightmarch Transaction...... 12

        2.    Rightmarch Has Failed to Comply with its Disclosure Obligations................................................................. 13

        3.    Corrective Disclosures Alone Will Not Remedy Defendants' 13(d) Violations....................................... 15

    B.    The Complaint Properly Pleads the Section 10(b) Claim........................ 16

        1.    The "Purchaser and Seller" Requirement Does Not Apply to Plaintiff's Claim for Injunctive Relief...................................... 16

        2.    Plaintiff's Allegations Concerning Insider Trading Are Pled with the Requisite Specificity ...................................... 18

    C.    Plaintiff Has Pled the Requisite Facts to Support Its Section 14 Claims ................................................................................... 20

        1.    Plaintiff Has Pled an Unconventional Tender Offer under Section 14(d)............................................................ 20

        2.    Plaintiff's 14(e) Fraud Claim Alleges Sufficient Facts.............. 23

    D.    Plaintiff Has Pled Sufficient Facts to Allege that Defendants Are Conducting a "Going Private" Transaction under Section 13(e)............ 24

    CONCLUSION................................................................................................... 25

Plaintiff Telenor East Invest AS ("Plaintiff" or "Telenor") respectfully submits this memorandum in opposition to the motion to dismiss or stay filed by defendants Altimo Holdings & Investments Limited ("Altimo"), Crown Finance Foundation ("Crown") and Rightmarch Limited ("Rightmarch"), and the motion to dismiss or, in the alternative, to compel arbitration filed by defendants Eco Telecom Limited ("Eco Telecom") and CTF Holdings Limited ("CTF" and, together with defendants Altimo, Crown, Rightmarch and Eco Telecom, collectively the "Defendants").

**<u>Preliminary Statement</u>**

Telenor and Defendant Eco Telecom are the two largest shareholders of Open Joint Stock Company "Vimpel-Communications" ("VimpelCom").[1] Eco Telecom currently owns 44.0001% of VimpelCom's voting shares, and Telenor owns 29.9% of VimpelCom's voting shares.[2]

During the period between August 2006 and June 2007, Eco Telecom increased its ownership VimpelCom's voting shares from 32.9% to 44.0001%. First Amended Complaint ("Cmplt"), ¶¶2, 32). As set forth in the complaint, Eco Telecom has now obtained effective control of VimpelCom. Cmplt. ¶¶ 74-76, 86. Eco Telecom was able to achieve its control because Defendants flouted the disclosure requirements mandated by the federal securities laws, and purchased a substantial part of their new holdings while in possession of material inside information. Defendants' misconduct, as set out more fully in the Complaint, is summarized below.

<u>Defendants' Insider Trading Scheme</u>

To ensure compliance with the securities laws, shareholders whose representatives are members of the board of a publicly-traded corporation generally limit their trading in the

---

[1] VimpelCom is the second largest mobile telecommunications company in Russia and holds licenses to operate in all eight regions in that country. Cmplt. ¶ 16. In 1996, VimpelCom became the first Russian company to list its shares on the New York Stock Exchange since 1903. *Id.*

[2] Defendants Eco Telecom and Rightmarch are wholly-owned subsidiaries of Altimo. Altimo is, in turn, a subsidiary of CTF, and CTF is a subsidiary of Crown. Cmplt. ¶¶ 10-15. All the Defendants are members of the Alfa Group Consortium, one of Russia's largest privately owned financial-industrial groups. *Id.* ¶ 10.

1

securities of the corporation to the "window periods" following the corporation's disclosure of its quarterly and annual results. *See* Ralph C. Ferrara, Donna M. Nagy, and Herbert Thomas, *Ferrara on Insider Trading and the Wall*, § 7.02 (2007); New York Stock Exchange Listed Company Manual, at § 309.00. Here, as part of Defendants' insider trading scheme, Eco Telecom, a Gibraltar corporation wholly owned and controlled by Altimo, during at least two separate periods, purchased millions of VimpelCom ADSs prior to the release of VimpelCom's financial results and while Eco Telecom's nominees on VimpelCom's Board of Directors (the "VimpelCom Board") were in possession of material non-public information. *See* Cmplt. ¶¶ 52-60.

The first period of Defendants' insider trading occurred in August 2006. On August 15, 2006, VimpelCom sent a detailed summary of its second quarter 2006 financial results to the Finance Committee of the VimpelCom Board, including Oleg Malis, an Altimo Senior Vice President. Cmplt. ¶ 24. On August 22, 2006, VimpelCom emailed these results to all members of the VimpelCom Board, including Mr. Malis, Alexei Reznikovich, Altimo's CEO, and Mr. Fridman, a VimpelCom Board member and the Chairman of Alfa Group's Supervisory Board. *Id.* Rather than wait for the window period to open following VimpelCom's public disclosure of its second quarter 2006 financial statements, Defendant Rightmarch, a wholly-owned subsidiary of Altimo, entered into a Master Confirmation Agreement dated August 30, 2006 (the "Master Confirmation Agreement") with an affiliate of Deutsche Bank AG known as Jam Holding Asset Management Ltd. ("Jam"). *Id.* ¶ 27. That agreement provided for a series of open-ended forward purchases of VimpelCom ADSs by Jam for the benefit of Rightmarch. *Id.* at ¶ 29. VimpelCom disclosed its second quarter 2006 financial results on September 1, 2006, two days after Rightmarch had entered into the Master Confirmation Agreement with Jam and Jam had begun acquiring VimpelCom ADSs for Rightmarch. *Id.* at 34.

The second instance of Defendants' insider trading occurred in March 2007. On March 16, 2007, VimpelCom emailed to members of the VimpelCom Board, including Messrs. Fridman, Reznikovich and Malis, detailed results for VimpelCom's fourth quarter and full year

2006, preliminary (and highly favorable) results for January and February 2007, a proposal to pay a dividend for the first time in VimpelCom's history, and a detailed description of various strategic options and potential acquisitions. *Id.* ¶ 52.  Again, rather than waiting for the window period to open following disclosure of the relevant financial and other information by VimpelCom, the Defendants increased their reported ownership of VimpelCom's voting stock to approximately 42.4% while in possession of this material non-public information. *Id.* ¶¶ 52-64.

Defendants' Unconventional Tender Offer

As described below, a holder of 5% or more of the equity securities of an issuer is subject to the filing and disclosure obligations of the Williams Act, so that shareholders and the investing public can make informed decisions.  The Complaint contains numerous examples of Defendants' failures to make the proper disclosures concerning their intent to take control of VimpelCom and their concealed intent to use substantial borrowed funds to do so.  As soon as details of the transaction between Defendant Rightmarch and Jam (the "Rightmarch Transaction") were disclosed, the press immediately reported that the Rightmarch Transaction was the first step in a coordinated campaign by Defendants Altimo, Eco Telecom, CTF and Crown (the "Alfa Reporting Persons") and Rightmarch to acquire control of VimpelCom. Cmplt. ¶ 36.  In due course, the Alfa Reporting Persons filed an amendment to their filing on Schedule 13D denying any such intent. *Id.* ¶ 68.  At the same time they were making those denials, however, Defendants were telling others that they were purchasing shares in order to gain a controlling position in VimpelCom. *Id.* ¶¶ 69-72, 78-82.

In addition to the Rightmarch Transaction, the Complaint sets out other examples of Defendants' failure to make proper disclosures concerning their intent to acquire control of VimpelCom.  The Complaint alleges that Eco Telecom, through Deutsche Bank, was accumulating VimpelCom ADSs through so-called "share forward transactions" with Deutsche Bank AG, London Branch ("Deutsche Bank"). Cmplt.¶¶41-46.  As described in the complaint, Deutsche Bank was accumulating VimpelCom ADSs in the market no later than the day preceding the date of each such forward purchase agreement. *Id.* ¶ 42. Despite the fact that

Deutsche Bank could only have undertaken such activity under the direction of one or more of the Alfa Reporting Persons, the Alfa Reporting Persons represented in Item 6 of their March 2, 2007, Schedule 13 D/A that none of them had entered into "any contracts, arrangements, understandings or relationships (legal or otherwise) with any person with respect to any securities of VimpelCom…".

The Alfa Reporting Persons' Amendment Number 30 to their filing on Schedule 13D, filed on March 13, 2007 (the "March 13 13D/A"), purported to disclose a $1.5 billion bond issue arranged and underwritten by Deutsche Bank, and secured by Eco Telecom's holdings of VimpelCom shares and ADSs. *Id.* ¶ 47. The March 13 13D/A vaguely described the purpose of the bond issue, and a contemporaneous Altimo press release stated that the proceeds of the bonds would be used to develop "investment projects in emerging mobile communications markets in Eurasia." *Id.* ¶ 51. However, Altimo's general counsel disclosed in the course of an arbitration proceeding that all or part of the bond proceeds would be used to acquire VimpelCom shares, a purpose not even implied in the March 13 13D/A. *Id.* Moreover, the Alfa Reporting Persons borrowed $750,000,000, secured by their holdings in Closed Joint Stock Company "Kyivstar G.S.M.," a Ukrainian mobile telephone company, in order to purchase VimpelCom shares, but have never disclosed that fact in any filings with the SEC. *Id.* ¶¶ 58-59.

<u>Defendants' Illegal Stock Parking - the Rightmarch Transaction</u>

The Rightmarch Transaction is also a classic instance of "stock parking". *See* Cmplt. ¶¶ 23-40. Stock parking occurs when a party obligated to file a report of its acquisitions on Schedule 13D uses a third party to disguise their beneficial ownership of shares in a company and fails to disclose that beneficial ownership. *See, e.g., S.E.C. v. First City Financial Corp., Ltd.*, 688 F. Supp. 705 (D.D.C. 1988), *aff'd,* 890 F.2d 1215 (D.C. Cir. 1989). Here, Eco Telecom owned 32.9% of VimpelCom's outstanding voting shares, and was not permitted to own a higher percentage of shares under the Russian antimonopoly law that was then in effect. *Id.* at ¶ 32. However, the law was set to change on October 26, 2006, giving the Defendants the ability to acquire up to 50% of VimpelCom's voting shares without the need to obtain a new approval

4

from Russian Federal Antimonopoly Service (the "FAS"). *Id.* at ¶ 33. By parking VimpelCom shares and ADSs with Jam and not amending their filing on Schedule 13D to disclose the increase in their beneficial ownership of VimpelCom shares and ADSs, the Defendants were able to circumvent Russian law and increase their VimpelCom shareholding prior to the October 26, 2006 effective date of the new antimonopoly law. *Id.* However, in doing so, they violated United States securities laws.

The Master Confirmation Agreement between Rightmarch and Jam was deliberately designed to appear to be a derivatives transaction involving cash-settled security futures, in which the securities do not actually change hands, but a payment linked to changes in the market price of the underlying security is made by one party to the other. Cash-settled security futures are not considered "equity securities" for purposes of Rule 13d-1, and thus the securities underlying a cash-settled security future are not counted for purposes of beneficial ownership calculations under Rule 13d-1. *Id.* ¶ 28 (*citing* SEC Release Nos. 33-8101; 34-46101; File No. S7-23-02 (June 27, 2002)). In reality, however, the Master Confirmation Agreement was not a cash-settled security future; it was, by its express terms, a forward purchase transaction calling for physical settlement – that is, delivery of the underlying securities – within 60 days. *See id.* As such, all VimpelCom shares and ADSs acquired by Jam under the Master Confirmation Agreement were "equity securities" for purposes of Rule 13d-1, which required the Alfa Reporting Persons promptly to amend their filing on Schedule 13D. *See id.* However, after it entered into the Master Confirmation Agreement, Rightmarch did not join in the Alfa Reporting Persons' filing on Schedule 13D (and to this day has never made any filings with the SEC). *Id.* ¶ 31. Moreover, the Alfa Reporting Persons filed a Schedule 13D/A seven days later, on September 6, 2006, that deliberately treated the Master Confirmation Agreement as if it were a cash-settled security future and, critically, did not reflect an increase in the Defendants' beneficial ownership of VimpelCom shares and ADSs. Cmplt. at ¶ ¶ 26-33.

## ARGUMENT

When considering a motion to dismiss, a court must accept as true the facts presented in the complaint, draw inferences from those allegations in the light most favorable to the plaintiff, and construe the complaint liberally. *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (quotations omitted). To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, __ U.S. __, __, 127 S.Ct. 1955, 1965 (2007). The Second Circuit interprets the *Twombly* decision to mean that the Supreme Court is "requiring a flexible 'plausibility stand,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original). *See also Erickson v. Pardus*, __ U.S. __, __, 127 S. Ct. 2197, 2200 (2007) (citing *Twombly*, the Court noted, "[s]pecific facts are not necessary [to satisfy Rule 8(a)(2)]" as long as the statement "'give[s] the defendant fair notice of what the … claim is and the grounds upon which it rests.'") (quoting *Twombly's* quotation from *Conley v. Gibson*, 355 U.S. 41 (1957)). The "bottom-line principle" is that "'once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.'" *Roth*, 489 F.3d at 510 (quoting *Twombly*, 127 S.Ct. at 1968). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support its claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quotations omitted).

Where a securities complaint bases its claims on fraud, it is subject to heightened pleading requirements. First, a complaint alleging securities fraud must satisfy Rule 9(b), which requires "the circumstances constituting fraud … shall be stated with particularity." Fed. R. Civ. P. 9(b). Second, private securities fraud actions must also meet the pleading requirements of the Private Securities Litigation Reform Act (the "Reform Act") pleading requirements. *See* 15 U.S.C. § 78u-4(b)(1). In addition, the Reform Act imposes a heightened pleading standard for any action "in which the plaintiff may recover money damages only on proof that the defendant

acted with a particular state of mind. . . ." In determining whether the pleaded facts give rise to a "strong inference" of scienter, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc., v. Makor Issues & Rights, Ltd.,* __, U.S. __, __, 127 S.Ct. 2499, 2510 (2007). No monetary damages are sought in this action.

### A.    The Complaint Properly Pleads Numerous Violations of Section 13(d)

#### 1.    Plaintiff Alleges Sufficient Facts regarding the Misstatements and Omissions in Alfa Reporting Group's Public Filings

Defendants argue that all of the deficiencies outlined in the Complaint have been corrected by amendments to the Alfa Reporting Persons' filing on Schedule 13D, or, to the extent that disclosures have not been made, the Defendants were not under any obligation to disclose the omitted information. MTD at 5-12.[3] That is simply not true. The Complaint outlines numerous omissions and inconsistencies in the Alfa Reporting Persons' disclosures that have never even purportedly been corrected, and many of the "corrections" are themselves misleading. In addition, the Complaint pleads facts demonstrating that Rightmarch – which has *never made a single filing with the SEC* – has entirely failed to meet its disclosure obligations.

The Fourth Circuit's decision in *Dan River, Inc. v. Unitex Ltd.,*, 624 F.2d 1216 (4th Cir. 1980), is instructive. There, the plaintiff attacked the accuracy and completeness of the Schedule 13D and amendment filed by the defendants, and in particular the defendants' description of the purpose of the acquisition of the company's shares on its Schedule 13D. The Fourth Circuit reversed the District Court's grant of defendants' motion to dismiss, noting that:

> The key issue in this case is the defendants' motive and intent in buying Dan River stock. Dan River wants to know this, and the investing public has a right to know it as well. Yet only the defendants can clarify the confusion they have created on this point; the proof is in their hands. If Dan River is not allowed to obtain from the defendants through discovery the facts vital to prosecuting this action, the defendants are effectively freed from the obligation of filing a complete and accurate Schedule 13D for only they can publish their motives and intent as the law requires them

---

[3] Section 13(d) requires beneficial owners of more than five percent of specified categories of equity securities to disclose that fact to the SEC. 15 U.S.C. § 78m.

> to do. We believe that since the information crucial to this case is
> concentrated in the hands of the defendants, this is precisely the kind of
> litigation the Supreme Court said is inappropriate for the summary
> dismissal procedure it received.

*Dan River*, 624 F.2d at 1228. Here, too, the Complaint in this case raises substantial factual

questions concerning the accuracy and completeness of Defendants' disclosures that cannot

possible be resolved on a motion to dismiss.

In effect, the Defendants are moving for summary judgment in advance of discovery.

The rule is, of course, that a motion to dismiss "is not an occasion for the court to make findings

of fact". *Roth*, 489 F.3d at 10. That is, however, precisely what the Defendants' motion seeks,

with their claim that their filings are accurate. Moreover, as set forth below, the "corrections" to

their filings cited by the Defendants do not, on their face, cure the misstatements described in the

Complaint.

> **a.     Defendants' Disclosures Concerning Their Intention to
> Acquire Control of VimpelCom Are False and Misleading, and
> Are Not Moot**

Defendants first assert that none of their disclosures purporting to reveal their intentions

with respect to control of VimpelCom were misleading when filed. MTD at 5. The Motion to

Dismiss focuses on the Alfa Reporting Persons' statement in their March 13 13D/A, that they

were "increasing their ownership of VimpelCom's Common Shares to increase their influence

over the corporate actions to be taken by VimpelCom. . . ." Cmplt. ¶ 74. First, that statement

does not disclose any intent to acquire control of VimpelCom. *Id.* The Complaint alleges that

Defendants, by their own admission formulated a plan in February 2007 to obtain sufficient

shares of VimpelCom to seize control and that in March 2007, Eco Telecom entered into a $1.5

billion transaction with Deutsche Bank in part for the undisclosed purpose of acquiring

additional funds to purchase VimpelCom ADSs.[4] *Id.* ¶ 55. Those factual allegations create, at

the very least, a "plausible" inference that Defendants had a carefully calculated and orchestrated

---

[4] The parallel motion to compel arbitration filed by defendants Eco Telecom and CTF reveals that the Defendants
had secretly arranged to borrow an additional $500,000,000 from Deutsche Bank to purchase VimpelCom shares.
Discovery from Deutsche Bank is likely to confirm the timing and details of Defendants' scheme.

plan to obtain control of VimpelCom; indeed, in view of the complexity and breadth of Defendants' scheme, that plan must have been formulated well before February 2007. Likewise, Defendants' repetition in various public filings that they were interested only in protecting their investment is less plausible than the competing inference that they were in fact, seeking control. *See Dan River*, 624 F.2d at 1225 ("[i]t is highly unlikely that [the defendants] would be seeking control of another corporation at considerable cost to it, if its interests were solely for investment.").[5]    In any event, those questions create a triable issue of fact concerning Defendants' motive and intent in buying VimpelCom shares and ADSs. *See Kaufman and Broad, Inc. v. Belzberg*, 522 F. Supp. 35 (S.D.N.Y. 1981) (allegations that defendants failed to disclose intent to acquire control of issuer were sufficient to state a claim under Section 13(d)).

Next, Defendants argue that the question of their intent was mooted by Amendment 32 to their filing on Schedule 13D, filed on June 13, 2007, after the commencement of their action, because it disclosed that Eco Telecom intended to acquire more than 44%, but less than 50%, of VimpelCom's voting shares. MTD at 6. Whether that statement, filed long after the purchases in question were made – with each such purchase unaccompanied by an appropriate disclosure – fully and accurately discloses Defendants' present intention is again a question of fact that cannot be decided on the basis of these pleadings alone. In that regard, in addition to the allegations discussed above, Defendants' argument is contrary to the application filed by Defendants with the Russian anti-monopoly authorities – *which remains on file* – requesting permission to acquire 60% plus one share of VimpelCom's voting stock. Cmplt. ¶ 67. Moreover, as described below, acquiring control without disclosure, then filing an after-the-fact amendment acknowledging the prior intent to acquire control, does not satisfy the statute or its implementing regulations.

---

[5] The Alfa Reporting Persons' belated hedging language to the effect that they *"may"* seek to acquire control is not sufficient, particularly when they have made such contradictory and confusing disclosures. *See Dan River*, 624 F.2d at 1226 (stockholders of target corporation are "entitled to know what kind of 'long term relationship' with [the target] the defendants sought to acquire by their purchases").

Finally, Defendants' assertion that they had no obligation to disclose that their planned share purchase amounted to a control stake because they "need not label or characterize" their rights  (MTD at 7) is simply incorrect.  Item 4 of Schedule 13D requires disclosure of any "plans or proposals which result in or relate to extraordinary corporate transactions. . . ."  SEC Exchange Act Release Nos. 33-5925, 34-14692, IC-10212.  The Second Circuit has held that the definition of "control" for purposes of Item 4 includes the indirect power to cause the direction of a corporation's policies.  *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 696-97 (2d Cir. 1973).  *See also Dan River*, 624 F.2d at n.9.  A party holding less than 50% of an issuer's shares may have control, as Defendants' after-the-fact statements to the media claiming control – particularly the Russian media – make clear.  Such plans to obtain control do need to be characterized, and do need to be disclosed on Schedule 13D.  Moreover, Defendants' assertion that they need not file a public disclosure with the SEC concerning their control stake is particularly troublesome in light of the repeated public statements by their representatives that they have acquired "structural control."  *See* Cmplt. ¶¶ 74-76.

As Judge Cote recently observed:

> Control is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 240.12b-2.  This definition applies to "statements and reports filed pursuant to" Section 13(d). . . .  Whether a purchase of shares reflects an intention to seek control of a corporation is subject to a fact-intensive inquiry.

*E.ON AG v. Acciona, S.A.*, 2007 WL 316874, at *8, 2007 U.S. Dist. Lexis 7771, at *28 (S.D.N.Y. Feb. 5, 2007) (citations omitted);[6]  *See Dan River*, 624 F.2d at 1228 (where "key issue" is the defendants' "motive and intent in buying [the target corporation's] stock" dismissal before plaintiffs have had opportunity to conduct discovery is inappropriate).

---

[6] In *E.ON*, as here, the defendant, made a belated and inadequate disclosure of its intent to acquire control.  *See E. ON*, 2007 WL 316874, at *7-9.

Here, too, the "fact-intensive inquiry" raised by the Complaint cannot be determined on a motion to dismiss.

### b.    Defendants Failed to Make Proper Disclosures Concerning their Financing

Defendants' argument that they were not required to disclose their "*future* plans as to how they might use the proceeds of any loan" mischaracterizes Plaintiff's allegations. *See* MTD at 8 (emphasis added). The Complaint does not allege that Defendants were hiding their "future" plans; it alleges, clearly and unambiguously, that Defendants failed to disclose the present intention they had to use their borrowings to increase their VimpelCom holdings at the time they entered into the financings, and instead, falsely claimed that the borrowings were intended to invest in new telecommunications ventures in Eurasia. Cmplt. ¶ 51. *See also* Cmplt. ¶¶ 88, 89. Moreover, none of the Alfa Reporting Persons has amended its filing on Schedule 13D to disclose that they borrowed $750 million from Credit Suisse secured by a pledge of shares of Closed Joint Stock Company "Kyivstar G.S.M.", in addition to the $1.5 billion of bonds secured by Eco Telecom's holdings of VimpelCom shares and ADSs. Cmplt. ¶ 89. Such borrowings certainly support an inference that Defendants had formed a present intention to acquire substantial additional VimpelCom shares, and concealed that intention from the public. At the very least, Defendants' failure to disclose the true purpose of those financial arrangements raises questions of fact that cannot be resolved on a motion to dismiss, and certainly not on the bland denial in Defendants moving papers. *See Kaufman*, 522 F. Supp. at 42 (omission of financial arrangements was not a "mere technical violation"). *See also ICN*, 2 F.3d at 489 ("[a]ny effort to change or affect control of [the company] may be enjoined pending the completion of required Schedule 13D filings"); *Hallwood Realty Partners L.P. v. Gotham Partners*, 95 F. Supp. 2d 169 (S.D.N.Y. 2000) (denying motion to dismiss; defendant failed to disclose its intent to seek control and plan for realizing value in the event it succeeded).

> **c.    The Complaint Properly Alleges that Defendants Failed to Disclose Their Agreements with Deutsche Bank**

Defendants' claim that all agreements and arrangements with Deutsche Bank have been fully and properly disclosed (MTD at 9-10) is refuted by the Complaint's particularized allegations concerning material omissions. The Complaint charges that Deutsche Bank (through Jam) entered into an improper "stock parking" transaction designed to allow Rightmarch and the Alfa Reporting Persons to acquire additional VimpelCom shares and ADSs in circumvention of Russian law. Cmplt. ¶ 27. It further alleges Deutsche Bank's participation in a series of "share forward transactions" undertaken by Deutsche Bank pursuant to an undisclosed agreement or set of instructions from one or more of the Defendants. *Id.* ¶¶ 42-56. It alleges that Jam, an affiliate of Deutsche Bank, entered into an agreement with Rightmarch allowing Rightmarch to acquire more VimpelCom shares and ADSs while Altimo was contemporaneously denying in a press statement any intent to acquire control of VimpelCom. *Id.* ¶ 72. The Complaint describes a $1,500,000,000 bond issue made by Deutsche Bank, with the proceeds to be used to purchase VimpelCom shares, accompanied by a false filing as to the bond issue's purpose. Finally, the Complaint lays out in full detail the participation of Deutsche Bank in Defendants' tender offer, including its actions to "sweep the Street" for VimpelCom shares and ADSs. *Id.* ¶ 55.

> **d.    The Complaint Fully Alleges the Deficiencies in the Disclosures Concerning the Rightmarch Transaction**

Defendants claim that they made all necessary disclosures concerning the Rightmarch Transaction (MTD at 10), but once again they ignore the litany of omissions and inaccuracies laid out in the Complaint. *See, e.g.*, Cmplt. ¶¶ 91. At a minimum, Defendants failed to disclose that the Rightmarch Transaction was part of a concerted effort to obtain control of VimpelCom. The Complaint is replete with allegations that raise questions of fact as to when Defendants' intentions were first formed. Indeed, if Defendants did not intend to acquire control of VimpelCom at the time of the Rightmarch Transaction, there would have been no reason to enter into such an elaborate plan timed to take advantage of a change in Russian law allowing the Alfa Reporting Persons to dramatically increase their VimpelCom stake. That inference is heightened

by Defendants' failure to disclose *at the time of the transaction* the number of shares they acquired, the prices at which such shares were acquired, and how many shares they sought, all based on their deliberately misleading characterization of the "share forward transaction" between Jam and Rightmarch as a cash-settled security future. Cmplt. ¶¶ 21-35. Indeed, the press reported that the Rightmarch Transaction was the first step in a campaign to gain control of VimpelCom. Cmplt. ¶ 36. These questions are more than sufficient to raise issues that should be probed through discovery and resolved at trial.

### 2.    Rightmarch Has Failed to Comply with its Disclosure Obligations

Defendants' argument that Rightmarch has no obligation to make disclosures under the federal securities laws is simply incorrect. *See* MTD at 12-13. Under the terms of the Master Confirmation Agreement, Rightmarch was the purchaser of the VimpelCom shares and ADSs acquired by Deutsche Bank under the so-called "share forward" transactions. Cmplt. at ¶¶ 27, 29. By its terms, the Master Confirmation Agreement required Rightmarch to pay for and take delivery of the VimpelCom shares and ADSs acquired by Deutsche Bank within 60 days. *Id.* at ¶ 28, 29.   Rule 13d-3(d)(1)(i) under the Securities Exchange Act of 1934 states:

> A person shall be deemed to be the beneficial owner of a security, subject to the provisions of paragraph (b) of this rule, if that person has the right to acquire beneficial ownership of such security … within sixty days, including but not limited to any right to acquire:  (A) through the exercise of any option, warrant or right …."

Applying this definition to the actual Master Confirmation Agreement, as opposed to Defendants' description of it, there is no question that Rightmarch was the beneficial owner of the VimpelCom shares and ADSs being acquired by Deutsche Bank under the Master Confirmation Agreement.  However, as part of the Defendants' effort to create the illusion that the Rightmarch Transaction was a cash-settled security future that did not require an increase in the number of VimpelCom shares and ADSs reported as being beneficially owned by the Alfa Reporting Persons, Rightmarch did not join in Amendment No. 22  (or any subsequent

amendment)[7] to the Alfa Reporting Persons' filing on Schedule 13D, nor did Rightmarch, Jam and the Alfa Reporting Persons indicate in Amendment No. 22 (or any subsequent amendment) that they were a group formed for the purpose of acquiring VimpelCom shares and ADSs. *See* Cmplt. at ¶¶ 26 -31. Rightmarch's failure to join in the Alfa Reporting Persons' filing on Schedule 13D is an ongoing and current violation of Section 13(d).

With respect to the determination of whether Rightmarch, Jam and the Alfa Reporting Persons were a "group" for purposes of Section 13(d), the key inquiry is whether they "agree[d] to act together for the purpose of acquiring, holding, voting or disposing of" VimpelCom shares and ADSs. *See Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 124 (2d Cir. 2001).[8]

Here, the Alfa Reporting Persons and Rightmarch have demonstrated a "common objective and concerted conduct" and thus constitute a "group" for Section 13 purposes.[9] The Complaint alleges that Rightmarch is a wholly-owned subsidiary of Altimo, a part of the chain of shell corporations that comprise the Alfa Reporting Persons, and through which Alfa Group holds its VimpelCom shares. It is implausible that those self-described holding companies are not acting together with respect to the purchase of VimpelCom shares. The same inference is appropriate for Rightmarch, a Cyprus shell evidently organized and maintained by an offshore services company.[10] Cmplt. ¶¶ 10, 11, 15. The Complaint also contains detailed allegations

---

[7] Rightmarch did not even join in the 13D/A filing made by the Alfa Reporting Persons on October 10, 2006 in which they belatedly attempted to cure certain of the deficiencies in Amendment No. 22 by reporting an increase in the number and percentage of VimpelCom's shares beneficially owned by the Alfa Reporting Persons. In that 13D/A, the Alfa Reporting Persons did, however, refer to the fact that Rightmarch was a "wholly-owned affiliate". Cmplt. at ¶ 35.

[8] The SEC defines beneficial ownership by a "group" as [w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer . . ." 17 C.F.R. § 240.13d-5(b)(1) (2000). Such an agreement may be formal or informal, "may be proved by direct or circumstantial evidence", and the group members "need not be committed to acquiring, holding voting or disposing of equity securities on certain specified terms, but rather they need only have combined to further a common objective regarding one of the just-recited activities." *Morales*, 249 F.3d at 124 (quotations omitted). *See also Roth*, 489 F.3d at 507-08.

[9] According to House and Senate Reports, Section 78m(d)(3) was designed to "obtain full disclosure of the identify of any person or group obtaining the benefits of ownership by reason of any contract, understanding, relationship, agreement or other arrangement." S. Rep. No. 550, 90th Cong., 1st Sess. 8 (1967); H.R. Rep. No. 1711, 90th Cong., 2d Sess. 8-9 (1968), *reprinted in* (1968) U.S. Code Cong. & Admin. News 2811, 2818 (emphasis added).

[10] The Master Confirmation between Jam and Rightmarch, which is annexed to the Alfa Reporting Persons' October 10, 2006 13D/A, provides that notice is to be given to Rightmarch, a Cyprus company with its address in Nicosia, Cyprus, by sending a facsimile to Altimo's number in Gibraltar, where Eco Telecom is organized. The person to whose attention such facsimiles are to be sent is one Franz Wolf, identified in that filing as a director of Altimo and

concerning how the Alfa Reporting Persons used Rightmarch as a vehicle to acquire

VimpelCom shares and ADSs. *See, e.g.,* Cmplt. ¶ 23-40. Given those undisputed factual

allegations, there can be no doubt that Plaintiff has met its pleading burden. *See Morales,* 249

F.3d at 124 ("[w]hether the requisite agreement exists is a question of fact").[11]

### 3. Corrective Disclosures Alone Will Not Remedy Defendants' 13(d) Violations

The Second Circuit has recognized that additional injunctive relief is required where it is

clear that "corrective disclosure would not address all the securities law violations." *See ICN,* 2

F.3d at 491. Particularly when a party seeks or obtains control in part through insider trading,

"[i]t would certainly fall within the parameters of traditional injunctive relief to preclude

[Defendants] from voting any illegally acquired stock in a contest for control of [the target]" or,

"[i]n a proper case, divestiture of illegally acquired shares might be directed". *Id.* (citing cases);

*See also Clearfield Bank & Trust Co. v. Omega Financial Corp.,* 65 F. Supp. 2d 325, 346 (W.D.

Penn. 1999); *S-G Sec., Inc. v. Fuqua Inv. Co.,* 466 F. Supp. 1114, 1123-8 (D. Mass. 1979) (court

required rescission upon issuance of preliminary injunction for violations of §§ 13 and 14).

Given the blatant and repeated securities laws violations involved here, more is required to

prevent permanent irreparable injury to both VimpelCom and its current shareholders (including

Telenor) than a "corrective" disclosure after Defendants have accomplished their goal of

obtaining corporate control, although prompt and accurate disclosure should be ordered.

Defendants should be required to correct their material misstatements and omissions, by filing

with the SEC, complete and accurate disclosures required by Sections 13 and 14; Rightmarch

should be required to join in the Alfa Reporting Persons' filing on Schedule 13D; Defendants

---

CTF. The 13D/A itself provides for notices and communications to be sent to Mr. Wolf in Gibraltar and to Mr. Reznikovich, Altimo's chairman, at his office in Moscow.

[11] *See also GAF,* 453 F.2d at 717 (four shareholders who collectively owned 10.25% of an outstanding class of securities and alleged agreed to pool their holdings to effect a takeover constituted a "group"); *Roth,* 489 F.3d at 510 (allegations regarding a loan to make purchases, an agreement to "work together" at the target company states a claim under Rule 8(a)); *General Aircraft Corp v. Lampert,* 556 F.2d 90, 95 (1st Cir. 1977) (finding a group for Section 13(d) purposes); *Champion Parts Rebuilders, Inc. v. Cormier Corp,* 661 F. Supp. 825, 850 (N.D. Ill. 1987) ("finding substantial likelihood that Section 13(d) group existed based on, among other things, "a common plan and goal", a "pattern of parallel and continued purchases over a relatively short and essentially concurrent time period", and "correlation of defendants' activities and intercommunications").

should be enjoined from purchasing any additional VimpelCom securities until their filings with the SEC are complete and accurate; Defendants should be enjoined from voting any VimpelCom securities they acquired since August 29, 2006 until they have filed accurate and complete disclosures; and Defendants should be enjoined from making any further material misstatements or omissions in connection with VimpelCom securities. *See E.ON, supra*, 2007 U.S. Dist. Lexis at *28 (granting injunction against further violations of Section 13d in light of belated and misleading disclosure of intent to acquire control).

**B.    The Complaint Properly Pleads a Section 10(b) Claim**

      **1.    The "Purchaser and Seller" Requirement Does Not Apply to Plaintiff's Claim for Injunctive Relief**

      Defendants argue that Plaintiff lacks standing to bring its Section 10(b) claim because it did not allege that it "purchased or sold" any VimpelCom stock or ADSs in reliance on material misrepresentations or omissions. MTD at 13-14. The Second Circuit has noted recently that the application of the purchaser-seller requirement to a 10(b) claim for injunctive relief is an open question of law. *See Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157 (2d Cir. 1999) (holding that "an external competitor seeking only injunctive relief" arguably had standing to bring a 10(b) claim where he had not made a "purchase" or "sale"). Defendants' argument also ignores *Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540, 546-47 (2d Cir. 1967) where the Second Circuit permitted a corporation's shareholders to seek injunctive relief under Rule 10b-5. Following *Mutual Shares*, which had originated the purchaser-seller rule, several Courts in this District have noted that there is "well-established" Second Circuit precedent holding that the purchase and sale requirement does not apply when a plaintiff seeks only injunctive relief. *See Langer v. Brown*, 913 F. Supp. 260, 270 (S.D.N.Y. 1996) (citing *Mutual Shares*); *Fuchs v. Swanton Corp.*, 482 F. Supp. 83, 89 (S.D.N.Y. 1979) ("[i]t has long been held in this Circuit that a suit for injunctive relief under Section 10(b) of the Exchange Act may be maintained by plaintiffs who are not actual purchasers or sellers of the securities in

connection with the challenged transactions"); *E.ON AG v. Acciona, S.A.*, 468 F. Supp. 2d 537, 553 (S.D.N.Y. 2006) (tender offeror has standing to assert 10(b) claim for injunctive relief).[12]

That result comports with the policy behind the securities laws, because the rationale for the purchaser-seller rule in Section 10(b) suits for damages does not apply to actions for injunctive relief.[13] In *Blue Chip Stamps*, the Supreme Court indicated a concern that a stringent standing rule was necessary to prevent a torrent of meritless "strike" suits, involving only plaintiffs who sue for "intangible economic injury". *Blue Chip*, 421 U.S. at 734. In a suit for injunctive relief, a plaintiff must demonstrate that he will be injured by the continuation of past and present wrongdoing. Thus, the concerns driving the *Blue Chip* decision are not present. Likewise, the Court in *Blue Chip* expressed a concern that there was a danger of vexatious litigation resulting from a widely expanded class of plaintiffs under 10(b)-5 without a purchaser-seller requirement. *Blue Chip,* 421 U.S. at 739. Such widened classes of plaintiffs could lead to suits that required settlement to dispose of prior to trial. *Id.* at 742. The dangers associated with bringing suit solely for settlement value are not present in suits for injunctive relief.

While proof that a plaintiff who has neither purchased nor sold would have bought or sold but for some action on the part of the defendant is both speculative and virtually irrebuttable, a claim for injunctive relief raises no such issues. *Fuchs*, 482 F. Supp. at 90. Instead, a plaintiff seeking injunctive relief must demonstrate that the past and present practices will in fact injure him – a question "which will not hang wholly on subjective evidence." *Id.* Accordingly the policies served by the securities laws will be furthered by offering injured shareholders standing to bring suits to enjoin wrongful acts. *See Kahan v. Rosentiel*, 424 F.2d 161, 173 (3d Cir. 1970) (minority shareholder, though not purchaser or seller, had standing to

---

[12] Defendants' Motion fails to address the *Genesco* decision. *See* Mtd. at 13-14. It instead relies upon case law from Courts in the District of Columbia and Third Circuits. *Id.* However, the Third Circuit has held that resolution of the application of the purchaser-seller rule to injunctive actions "must await yet another day." *Trump Hotels 7 Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 486 (3d Cir. 1998).

[13] In *Blue Chip*, 421 U.S. 723, 725 (1975), the Supreme Court expressly limited its holding to private suits for monetary damages. ("[t]his case requires us to consider whether the offerees of a stock offering … may maintain a private cause of action for <u>money damages</u> where they allege that the offeror has violated the provisions of Rule 10b-5 of the Securities and Exchange Commission, but where they have neither purchased nor sold any of the offered shares.") (emphasis added)

seek injunctive relief to stop directors of corporation from misrepresenting and disclosing material facts in a tender offer because the director-defendant's actions, if continued, would deprive shareholder of more favorable disposition of his shares); *Granada Investments, Inc. v. DWG Corp.*, 717 F. Supp. 533, 535-536 (N.D. Ohio 1989).

Defendants' argument that even assuming an exception to the *Blue Chip* rule is available, Plaintiff still lacks standing because it has failed to plead a direct injury cased by the purchases in question, is unavailing. MTD at 14.[14] To the contrary, Plaintiff's Complaint alleges that, through their deceptive actions and by ignoring the need to file public disclosures, Defendants were able to acquire control of VimpelCom to the detriment of all other shareholders, including Telenor East. *See* Cmplt. ¶¶ 2-4, 65. Likewise, Plaintiff has alleged that, by purchasing VimpelCom ADSs and shares while in possession of material non-public information, Defendants were able to acquire these ADSs and shares at an artificially low price, without the control premium that defendants would have been required to pay had proper disclosure been made. Cmplt. ¶65. *See Paramount Communications, Inc. v. QVC Inc.*, 637 A.2d 34, 42-43 (Del. 1994) ("The acquisition of majority stakes and the consequent privilege of exerting the powers of majority ownership come at a price. That price is usually a control premium. . . ."). Those allegations of "past and present practices" are more than sufficient to allege a claim for injunctive relief. *See Genesco*, 384 F.2d at 547 (quoting *Fuchs*, 482 F. Supp. at 90).[15]

## 2. Plaintiff's Allegations Concerning Insider Trading Are Pleaded with the Requisite Specificity

Defendants' attack on Plaintiff's insider trading claims mischaracterizes the facts as pleaded in the Complaint, and attack those allegations through factual representations in the

---

[14] On a motion to dismiss, this Court must construe the complaint in plaintiff's favor and thus the allegation that Defendants caused Plaintiff's injury should be sufficient. *See Foster Wheeler Corp. v. Edelman*, No. CIV. No. 87-4346 (GEB), 1987 WL 61446 (D.N.J. Dec. 9, 1987) (denying motion to dismiss 10(b) claim for injunctive relief).

[15] Defendants cite *Packer v. Yampol*, 630 F. Supp. 1237 (S.D.N.Y. 1986) for the proposition that the Complaint's allegations are not sufficiently particular to Plaintiff to support this claim. *See* MTD at 14 n.10. However, the *Packer* complaint alleged that the "investing public" would be misled. *Packer*, 630 F. Supp. at 1243. Here, Plaintiff has alleged specific harms it has suffered by loss of value for its holdings.

Opposition that can only be fleshed out and tested during discovery. For each of the reasons below, Defendants' arguments fail.

Defendants' first argument, that the Complaint fails to distinguish the specific role of each Defendant, is unavailing. *See* MTD at 13. The Complaint identifies the link between VimpelCom's forwarding the material non-public information to VimpelCom Board members, the relationships of those Board members to the Defendants, and the role each Defendant played in each transaction. *See, e.g.,* Cmplt. ¶¶ 27. Such allegations are more than sufficient to raise triable issues of fact.[16] Furthermore, other courts addressing claims based on "scheme" liability have held that a Section 10(b) claim meets the Reform Act's pleading hurdle where it "includes particularized allegations that each of the Individual Defendants knowingly implemented the [] scheme through their actions." *Steiner v. Medquist Inc.,* No. 04-5487 (JBS), 2006 WL 2827740 (D.N.J. Sept. 29, 2006) (denying motion to dismiss 10(b) claim).

Defendants go on to suggest that Rightmarch and Eco Telecom were independent actors, who lacked access to the inside information in the hands of Messrs. Reznikovich, Fridman and Malis, but that is an assertion of fact inappropriate for resolution on a motion to dismiss. Moreover, given that Rightmarch and Eco Telecom (a self-described holding company) are offshore shells administered by service companies without operations or personnel, the reasonable inference to be drawn is that their purchases were made at Altimo's direction while in possession of the inside information disclosed to Altimo's senior officers. That influence is strengthened by the fact that Mr. Reznikovich's name appears on the cover page of the Alfa Reporting Persons' 13D/As as one of two persons to whom notices and communications should be sent, and that the signatories to those 13D/As are mere administrators of the Alfa Group's web of offshore companies.

---

[16] Defendants cite several cases that purport to stand for the proposition that Section 10(b) requires a plaintiff to distinguish among several defendants, but these cases do not identify the role of each entity in the purported scheme as Plaintiff has done here. For example, in *Double Alpha, Inc. v. Mako Partners, L.P.,* No. 99 Civ. 11541, 2000 WL 1036034, at *3 (S.D.N.Y. July 27, 2000), multiple investment funds had been sued as defendants but there were *no* allegations to distinguish between them. In contrast, the Complaint here provides specific allegations concerning the role of each Defendant.

Finally, Defendants argue that Plaintiff's allegations lead to the "competing inference" that Defendants' purchases were made as part of a "regular buying program." *See* MTD at 15-16. First, Defendants' suggestion that their 2007 purchases were part of a "regular buying program" prior to the June 29, 2007, board election ignores the fact that no such "buying program" was ever disclosed in any of the amendments to the Alfa Reporting Persons' filing on Schedule 13D; although, if such a program did exist it most certainly would have been required to be disclosed. At a minimum, Defendants' suggestion of a "regular buying program" is inconsistent with the suspiciously-timed trades made in connection with the Rightmarch Transaction and in March 2007. *See* Declaration of Robert L. Sills, Exhibit 34 (stock price chart). Moreover, any undisclosed "regular buying program" would lend substantial support to the Complaint's description of Defendants' unfiled tender offer. In any event, the Master Confirmation Agreement entered into by Rightmarch and Jam does not call upon Jam to purchase shares "regularly" – it requires Jam to purchase on the instructions of Rightmarch. Moreover, there is no regular pattern in any of Defendants' purchases either as to timing or amount. As the Complaint alleges, the whole point of the Rightmarch Transaction was (1) to buy up VimpelCom shares and ADSs before the financial results and other inside information became public, and (2) to have a delivery date after the new Russian antimonopoly law went into effect. *See* Cmplt. ¶ 33. Accordingly, Plaintiff's allegations have raised the necessary "strong inference of scienter."

### C.      Plaintiff Has Pled the Requisite Facts to Support Its Section 14 Claims

#### 1.      Plaintiff Has Pled an Unconventional Tender Offer under Section 14(d)

Defendants' illegal program of purchases of VimpelCom shares and ADSs through which they acquired what they now call "structural control" of VimpelCom fall squarely within the parameters of Section 14(d). Congress "deliberate[ly]" did not define the term "tender offer" for fear that a "rigid definition would be evaded." *Hanson Trust PLC v. SCM Corp.*, 774 F. 2d 47,

56 (2d Cir. 1985).[17]  The Second Circuit has cautioned against application of a "litmus test" and instead has instructed district courts to be guided by the purpose of the Williams Act.[18]  The question then becomes, whether

> viewing the transaction *in the light of the totality of the circumstances*, there appears to be a likelihood that unless the pre-acquisition filing strictures of that statute are followed there will be *a substantial risk that solicitees will lack information* needed to make a carefully considered appraisal of the proposal put before them.

*Id.* (emphasis added).

The transactions in question are the type of "tender offers" that Congress intended to target in enacting the Williams Act.  The allegations in the Complaint demonstrate that, through a widespread and continuing effort to conceal information from VimpelCom shareholders, Defendants have failed to provide VimpelCom's shareholders, including the numerous individual shareholders involved in the "street sweeps" in question, with the information needed to make "considered appraisal."  Defendants – time and again – have failed to disclose their true intention with respect to acquiring control of VimpelCom.  Indeed, Defendants adamantly denied that they were seeking control until *after* they had acquired that very control.  *See* Cmplt. ¶¶ 79, 81.

Defendants assert that their purchases, contrary to the express allegations in the complaint, were all "privately negotiated block trades."  MTD at 19-22.  As discussed above, this factual assertion is not the basis for a motion to dismiss.  Moreover, applying the "totality of circumstances" test relating to the majority of the *Wellman* factors leads to the same result.  The relevant facts include the following:

---

[17] *Hanson Trust* is factually distinguished from this case.  In *Hanson Trust*, the Second Circuit found that no tender offer had occurred "under the circumstances" for various reasons, including *inter alia* that the sales were made to professionals who were "well aware of the essential facts".  *Hanson Trust,* 774 F.2d at 58.  In stark contrast, Defendants did not make adequate disclosures to potential sellers.

[18] Factors that courts look to in making this determination include: (1) active and widespread solicitation of public shareholders; (2) the solicitation was made for a substantial percentage of the issuer's stock; (3) the offer was made at a premium over the prevailing market price; (4) the terms of the offer are firm rather than negotiable; (5) the offer is contingent on the tender of a fixed number of shares; (6) the offer is open only for a limited period of time; (7) the offeree is subjected to pressure to sell; and (8) the public announcements of a purchasing program concerning the target company precede or accompany rapid accumulation of a large amount of the target's securities.  *See Wellman v. Dickinson,* 475 F. Supp. 783, 823-25 (S.D.N.Y. 1979), *aff'd on other grounds,* 682 F.2d 355 (2d Cir. 1982).

- Eco Telecom, through Deutsche Bank, "swept the Street," seeking to purchase VimpelCom shares and ADSs (Cmplt. ¶ 55);

- Eco Telecom, through Deutsche Bank, sought to purchase "as many VimpelCom ADSs as possible" for the Alfa Reporting Persons (Cmplt. ¶ 55);

- Eco Telecom offered to pay a premium to the market value for VimpelCom shares and ADSs ranging from $0.50 to $10.00 (Cmplt. ¶ 56);

- Those offers were made on a "'take [it] or leave it'" basis, and holders were generally given less than 24 hours to accept (Cmplt. ¶ 56); and

- Between February 28, 2007, and June 25, 2007, Defendants managed to acquire 8.2% of the voting stock of VimpelCom (Cmplt. ¶ 55).

Defendants' charge that Plaintiff's allegations do not meet the *Wellman* factors misses the mark. For example, Defendants state that solicitation for 8.2% is not a substantially significant percentage of solicitation, yet *Stromfeld v. Great Atl. & Pac. Tea Co.*, 484 F. Supp. 1264 (S.D.N.Y.), *aff'd*, 646 F.2d 563 (2d Cir. 1980), cited by Defendants for this proposition, is inapposite. *Stromfeld* does not address the situation where, as here, insiders, with knowledge of a plan to acquire control, purchased stock from unsuspecting shareholders. 484 F. Supp. at 1271 ("the facts at bar involve a situation where shareholders who already owned large blocks of stock sold these shares to a buyer at a premium price"). Moreover, there is nothing in the complaint to indicate that Defendants intend to halt their holdings at 44%.[19] Indeed, as noted above, Defendants have a pending application before Russian regulators for approval to increase their holdings to 60%. Next, Defendants' suggestion that the terms were not "fixed" but rather were "negotiable" contradicts the Complaint's allegations that the offers were made on a "take-it-or-leave-it" basis. Such contradictions in factual allegations cannot be resolved on a motion to dismiss, but rather are questions of fact to be determined after discovery. *See E.ON AG v. Acciona, S.A.*, 468 F. Supp. 2d 559, 585 (S.D.N.Y. 2007) (whether or not securities purchases constituted an unconventional tender offer a question of fact); *Clearfield Bank & Trust Co.* 65 F. Supp. 2d at 337-38.

---

[19] As described in paragraphs 82 and 83 of the Complaint, Altimo's chief financial officer stated in press interviews with Reuters that defendants had no intention of increasing their stake in Altimo at the same time that Defendants were making undisclosed purchases of VimpelCom stock.

### 2.    Plaintiff's 14(e) Fraud Claim is Properly Pleaded

Defendants' assertion that Rule 14e-3 would not apply misconstrues and mischaracterizes Plaintiff's argument. *See* MTD at 22. The Complaint alleges that the "material non-public information" in dispute, *i.e.*, VimpelCom's undisclosed financial results and future plans, relate to the tender offer because, if known, the price for VimpelCom's shares would increase substantially as, in fact, the stock price did once VimpelCom's results were made public. Cmplt. ¶ 65. Thus, Defendants' assertion that "no Rule 14e-3 claim can be brought against them" (MTD at 23) fails.

Defendants' argument that Plaintiff has failed to plead sufficient facts to allege that they are liable under Section 14(e) (MTD at 22-23) ignores the series of particularized allegations leveled against them in the Complaint.[20] A plaintiff seeking injunctive relief under Section 14(e) must allege: (1) the defendant made misstatements or omission of material fact; (2) with scienter; (3) in connection with a tender offer. *See Clearfield Bank & Trust Co.* 65 F. Supp. 2d at 343.[21] Here, each of these elements have been alleged with the requisite specificity. First, the Complaint details numerous misstatements and omissions relating to the tender offer as described above. Accordingly, Defendants' motion to dismiss the Section 14(e) claim should be denied. *See Skydell v. Ares-Serona S.A.*, 892 F. Supp. 498 (S.D.N.Y. 1995) (denying motion to dismiss Section 14(e) claim against tender offeror).[22] *See also Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d at 687 (affirming grant of preliminary injunction enjoining consummation of tender offer); *Millionerrors Investment Club v. General*

---

[20] Section 14(e) provides that it is "unlawful … to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading… in connection with any tender offer …" 15 U.S.C. § 78n(e). Bidders are prohibited under this section "from engaging in fraudulent acts involving misrepresentation or nondisclosure…." *Gas Natural v. E.ON AG et al.*, 468 F. Supp. 2d 595, 610 (S.D.N.Y. 2006) (quotations omitted). The SEC has promulgated Rule 14e-3 pursuant to Section 14(e), which prohibits insider trading in connection with a tender offer. Rule 14e-3 is "a disclosure provision" and "creates a duty in those traders who fall within its ambit to abstain or disclose…." *Id.*

[21] A plaintiff seeking a permanent injunction as relief for a Section 14(e) violation is not required to plead and prove reliance and/ or causation. *See Clearfield Bank & Trust Co.*, 65 F. Supp. 2d at 340.

[22] In *Skydell*, the Court upheld the claim against the tender offeror under Rule 9(b), noting that "Rule 9(b) does not require plaintiffs to set forth their evidence in the complaint" and "[t]o satisfy the requirements of Rule 9(b), the complaint need only give particulars regarding the fraudulent content of the speech, the time and place at which the statements were made, and the identify of the party responsible for the fraudulent statements." At 501-02.

*Electric Co. PLC, et al.,* No. Civ. A. 99-781, 2000 WL 1288333, *9 (W.D. Pa. March 21, 2000) (denying motion to dismiss Section 14(e) claim alleging incomplete and inadequate disclosures in connection with a tender offer).

### D.    Plaintiff Has Pled Sufficient Facts to Allege that Defendants Are Conducting a "Going Private" Transaction under Section 13(e)

The Complaint contains numerous allegations supporting the "going private" claim.[23] The Complaint alleges the Alfa Reporting Persons filed an application with the FAS, requesting approval to own up to "60% plus one share" of VimpelCom, and that under Russia's tender offer laws, acquiring "60% plus one share" would require Defendants to make an offer for all of the outstanding shares of VimpelCom. Cmplt. ¶ 33. That application remains on file. *Id.* The Complaint properly alleges that Rightmarch and the Alfa Reporting Persons are "affiliates" of VimpelCom under Rule 13e-(3)(1). *Id.* ¶ 38.[24] The Complaint alleges detailed allegations concerning the unconventional tender offer and insider trading patterns of Defendants from March 2, 2007 and June 25, 2007. *Id.*  ¶¶ 62-63. Because the tender offer discussed above is made on behalf of an affiliate of the issuer, it constitutes a going private transaction, and states a valid claim.

---

[23] Rule 13e-3 of the Exchange Act of 1934 governs "going private" transactions. Rule 13e-3 applies to (1) purchases of equity securities by an issuer or an affiliate; (2) the issuer's securities are subject to registration under Section 12 of the Exchange Act; and (3) the transaction has a reasonable likelihood or purpose of causing termination of the registrant's SEC reporting obligations by bringing the number of record holders below 300. *See* 17 C.R.R. § 240.13e-3(a)(3)(ii)(A) (2000). Rule 13e-3 requires detailed disclosures and waiting periods before a going private transaction can start. The detailed Schedule 13E-3 disclosures protect investors facing squeeze-outs by ensuring that they have sufficient information to make informed, intelligent decisions about a transaction's fairness. *See* Regulation of Takeovers and Security Holder Communications, Exchange Act Release No. 33-7760, 64 Fed. Reg. 61,408 (S.E.C. Nov. 10, 1999).

[24] Defendants do not deny that they are "affiliates" of VimpelCom under 13(e). *See* 17 C.F.R. § 240.13e-3(a)(1) (defining "affiliate" as "a person that directly or indirectly … controls, is controlled by, or is under common control with such issuer."). *See Dowling v. Narragansett Capital Corp.,* 735 F. Supp. 1105, 1122 (D. R.I. 1990) (denying motion to dismiss where same individuals controlled both acquirer and target); *Brewer,* 148 F. Supp. 2d at 811 (holding genuine issue of material fact existed regarding whether terms of tender offer were the result of arm's-length negotiation with target corporation); *Radol v. Thomas,* 556 F. Supp. 586, 592 (S.D. Ohio 1983), *aff'd,* 772 F.2d 244 (6th Cir. 1985).

## CONCLUSION

For the reasons laid out above, Plaintiff respectfully requests that this Court deny

Defendants' motion to dismiss.

Dated: New York, New York
       October 5, 2007

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____

Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151

Peter O'Driscoll
ORRICK, HERRINGTON & SUTCLIFFE LLP
Tower 42, Level 35
25 Old Broad Street
London EC2N 1HQ
DX: 557 London/City
United Kingdom
Telephone: 011 44 20 7562 5000

Attorneys for Plaintiff
Telenor East Invest AS