# EXHIBIT  A

# IN THE MATTER OF ARBITRATION

# UNDER THE UNICTRAL RULES BETWEEN:

TELENOR EAST INVEST AS                          **Claimant**
Snarøyveien 30
N-1331 Fornebu
Norway


-AND-


ECO TELECOM LIMITED,                            **Respondents**
ECO HOLDINGS LIMITED and
CTF HOLDINGS LIMITED
10/8 International
Commercial Centre
Casemates Square
Gibraltar

# INTERIM AWARD OF THE TRIBUNAL

# TABLE OF CONTENTS

**PART I - JURISDICTIONAL BASIS AND PROCEDURAL HISTORY** ....................3

  A.   The Contractual Basis for Arbitral Jurisdiction.................................................3

  B.   The Course of the Proceedings ........................................................................4

**PART II - STATEMENT OF FACTS** ..............................................................................8

  A.   The Parties .......................................................................................................8

  B.   The Initial Acquisition by Telenor of an Interest in VimpelCom....................9

  C.   The Acquisition by Eco Telecom of an Interest in VimpelCom .......................10

  D.   The Initial Implementation of Section 4.01 of the Agreement ............................12

  E.   Difficulties in the Nomination Process in 2005.............................................14

  F.   The Process of Nomination and Election in 2006 .............................................16

**PART III - THE TRIBUNAL'S DETERMINATIONS ON THE ISSUES
PRESENTED**...............................................................................................18

  A.   Eco Telecom's Unreasonable Disapproval of a Given Telenor Nominee..........20

  B.   Eco Telecom's Unreasonable Disapproval of Any and All Telenor
Nominees .......................................................................................................24

  C.   The Implications of Russian Law ......................................................................32

**PART IV - THE TRIBUNAL'S INTERIM AWARD** ..............................................34

  A.   The Implementation of Section 4.01 of the Agreement....................................36

  B.   The Endorsement of the Guarantee Agreement..............................................37

  C.   The Continuing Jurisdiction of the Tribunal....................................................37

  D.   Costs................................................................................................................38

* * * * *

# INTRODUCTION

This important and bitterly-contested dispute concerns the interpretation and proper mode of implementation of a Shareholders Agreement dated May 30, 2001 (hereinafter, "the Agreement") between, on the one hand, Telenor East Invest AS ("Telenor", or "the Claimant") and, on the other, Eco Telecom Limited ("Eco Telecom"), Eco Holdings Limited and CTF Holdings Limited (hereinafter collectively "the Respondents"), concerning their cohabitation and collaboration as the two largest shareholders of Open Joint Stock Company Vimpel-Communications ("VimpelCom", or "the Company"), the second-largest mobile telephone operator in the Russian Federation. Specifically at issue, as described more fully hereinunder, are the provisions of Section 4.01 of the Agreement, dealing with the nomination and election of the nine (9) members of the Board of Directors ("the Board") of VimpelCom.

The present Interim Award will provide the parties with the guidance and direction of the Tribunal as to the proper implementation of Section 4.01 of the Agreement, in anticipation of the forthcoming submission, on or before January 30, 2007, of their respective nominations of candidates for election to the Board. The Tribunal intends and expects that the parties in respect of such nominations will proceed in accordance with the guidance and direction thus provided. The Tribunal shall maintain its jurisdiction over this matter throughout the process of nomination of candidates for election to the Board, and, upon application of either party, will order appropriate relief, in the event the instructions given by the present Interim Award are not fully and faithfully followed.

This Interim Award comprises four parts. Part I recalls the basis of the jurisdiction of the Tribunal over this matter, and briefly recapitulates the several formal steps of these proceedings. Part II sets forth a Statement of Facts, derived by the Tribunal from the

documentary and testimonial record before it and from the pleadings of the parties thereon. Part III states the determinations of the Tribunal on the issues presented, and discusses the grounds therefor. Part IV, in light of such determinations, articulates the dispositive Order and Instruction of the Tribunal.

\* \* \* \* \*

# PART I - JURISDICTIONAL BASIS AND PROCEDURAL HISTORY

A.   The Contractual Basis for Arbitral Jurisdiction

The Agreement provides as follows:

### 6.13    *Arbitration; Waiver of Sovereign Immunity*

*(a)    Any and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration by a panel of three (3) arbitrators under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules then in force (the "UNCITRAL Rules") in accordance with the following terms and conditions:*

*(i)    In the event of any conflict between the UNCITRAL Rules and the provisions of this Agreement, the provisions of this Agreement shall prevail.*

*(ii)    The place of the arbitration shall be Geneva, Switzerland.*

*(iii)    Where there is only one claimant party and one respondent party, each shall appoint one arbitrator in accordance with the UNCITRAL Rules, and the two arbitrators so appointed shall appoint the third (and presiding) arbitrator in accordance with the UNCITRAL Rules within thirty (30) days from the appointment of the second arbitrator. In the event of an inability to agree on a third arbitrator, the appointing authority shall be the International Court of Arbitration of the International Chamber of Commerce, acting in accordance with such rules as it may adopt for this purpose. Where there is more than one claimant party, or more than one respondent party, all claimants and/or all respondents shall attempt to agree on their respective appointment(s). In the event that all claimants and all respondents cannot agree upon their respective appointment(s) within thirty (30) Business Days of the date of the notice of arbitration, all appointments shall be made by the Chairman of the International Court of Arbitration of the International Chamber of Commerce.*

*(iv)    The English language shall be used as the written and spoken language for the arbitration and all matters connected to the arbitration.*

- 3 -

(v)    The arbitrators shall have the power to grant any remedy or relief that they deem just and equitable and that is in accordance with the terms of this Agreement, including specific performance, and including, but not limited to, injunctive relief, whether interim or final, and any such relief and any interim, provisional or conservatory measure ordered by the arbitrators may be specifically enforced by any court of competent jurisdiction. Each party hereto retains the right to seek interim, provisional or conservatory measures from judicial authorities and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(vi)    The award of the arbitrators shall be final and binding on the parties to this Agreement.

(vii)    The award of the arbitrators may be enforced by any court of competent jurisdiction and may be executed against the person and assets of the losing party in any competent jurisdiction.

B.    The Course of the Proceedings

1.    Pursuant to the foregoing provisions, and in accordance with Article 3 of the UNCITRAL Rules ("the Rules"), the Claimant on November 14, 2005 served a Notice of Arbitration and Statement of Claim upon the Respondents.

2.    Pursuant to Article 7(1) of the Rules, the Claimant appointed Gerald Aksen, Esq. as Arbitrator, the Respondents appointed Bénédict Fontanet, Esq. as Arbitrator, and the two Arbitrators designated Charles C. Adams, Jr., Esq. as Chairman of the Tribunal. Mr. Adams accepted the said designation by e-mail to the parties and to the co-Arbitrators dated February 26, 2006.

3.    By letter dated March 3, 2006, pursuant to Article 10 of the Rules, the Claimant challenged Mr. Adams' designation as Chairman on the ground of an alleged conflict of interest, and requested that he withdraw. By letter dated March 7, 2006, Mr. Adams explained that in fact no conflict of interest existed. While indicating a willingness to withdraw forthwith at the request of either party, he offered to remain as Chairman should the

- 4 -

parties re-affirm their invitation that he serve in such capacity. By letter dated March 10, 2006, the Claimant's challenge to Mr. Adams' designation as Chairman was withdrawn, and, by letter of the same date, the Respondents advised that they had no objection of their own to such designation.

4.    The Tribunal on March 15, 2006 issued its Procedural Order No. 1, with respect to, *inter alia*, the scheduling of dates for Organizational Hearing and for the filing of the Claimant's Amended Notice of Arbitration and the Respondents' Statement of Defense and Counterclaim.

5.    The Claimant's Amended Notice of Arbitration was filed on March 31, 2006, and the Respondents' Statement of Defense and Counterclaim on May 1, 2006.

6.    An Organizational Hearing was held in Geneva on May 9, 2006, wherein the Claimant was represented by Robert L. Sills, Esq. and Peter O'Driscoll, Esq. of Orrick Herrington & Sutcliffe LLP, and by Mr. Bjorn Hogstad of Telenor; and the Respondents by Joe Cyr, Esq. of Lovells. Vanessa Liborio, Esq. of Hogan & Hartson LLP acted as Secretary of the Tribunal.

7.    On May 16, 2006, pursuant to leave of the Tribunal, the Respondents filed their Amended Statement of Defense and Counterclaim.

8.    On May 22, 2006, the Tribunal issued its Procedural Order No. 2, memorializing the dates agreed upon for the successive onward stages of the proceedings.

9.    On June 19, 2006, the Claimant forwarded to the Tribunal its Memorandum in Support of Claimant's Objection to Request for Production of Documents on Grounds of Relevance, a copy of which had been served on the Respondents on June 13, 2006; and the Respondents on June 21, 2006 filed their Memorandum in Opposition to the foregoing, with supporting legal authorities. The Tribunal on August 3, 2006 issued to the parties an advisory ruling thereon.

- 5 -

10.    Pursuant to such advisory ruling, the Claimant on August 12, 2006 informed the Tribunal of the deletion of certain allegations in the Claimant's Amended Statement of Claim; whereupon the Respondents, by letter dated August 18, 2006, withdrew their counterclaim and the corresponding elements of their document production request.

11.    On September 27, 2006, the Respondents filed a Motion to Dismiss the Claimant's claim on the ground of mootness, or, in the alternative, a Motion to Stay such claim pending the scheduled January 30, 2007 nominations to the VimpelCom Board. The Claimant responded in opposition to the said Motions on October 3, 2006, and the Respondents on October 9, 2006 commented on the Claimant's opposition.

12.    On October 16, 2006, the Claimant submitted the Witness Statements of Henrik Torgersen and Tron Østby and exhibits thereto, along with a CD-Rom, agreed with the Respondents, containing a full set of transaction documents; and the Respondents submitted the Witness Statements of Oleg Malis, Alexei Rezkinovich and Vladimir Golosov and exhibits thereto, and the Expert Opinion of Boris Karabelnikov.

13.    By letter dated October 25, 2006, the Tribunal issued a ruling denying the Respondents' above-referenced Motion to Dismiss or to Stay.

14.    On October 26, 2006, the parties filed their respective Pre-Hearing Memoranda, accompanied by legal authorities.

15.    The Hearing on the Merits in this matter, having been rescheduled by agreement of the parties to accommodate a calendar conflict of the Tribunal, was held at the offices of Hogan & Hartson LLP in London on Monday, November 20, 2006. The Claimant was represented by Robert L. Sills, Esq., Peter O'Driscoll, Esq., Maysie Anderson, Esq., and Lev Soloviev, Esq. of Orrick, Herrington & Sutcliffe LLP, and by Mr. Bjorn Hogstad of Telenor; and the Respondents were represented by Edward T. Schorr, Esq., Lisa Fried, Esq., and Eric Chang, Esq. of Lovells, and by Ms. Alyona Antonova of Eco Telecom. James S.G. Hargrove,

Esq. of Hogan & Hartson LLP acted as Secretary of the Tribunal. After opening statements from Mr. Sills for the Claimant and Mr. Schorr for the Respondents, the Tribunal heard testimony from the Claimant's witnesses Henrik Torgersen and Tron Østby; and, the witness statements of Messrs. Malis and Reznikovich having been withdrawn, from the Respondents' witness Vladimir Golosov (by video conference from the Moscow office of Hogan & Hartson LLP) and their expert witness Boris Karabelnikov.

16.    On December 21, 2006, the parties filed their respective Post-Hearing Briefs with exhibits and legal authorities.

17.    On December 23, 2006, the Claimant made a submission, to which the Respondents responded on December 28, 2006, concerning certain questions of fact posed by the Tribunal at the Hearing on the Merits. After a further round of submissions on these questions, by the Claimant on January 5, 2007 and by the Respondents on January 12, 2007, the record in this matter was deemed to be closed.

18.    The parties' respective statements of costs and fees were duly received by the Tribunal on January 16, 2007.

19.    The Tribunal's deliberations, from the conclusion of the Hearings on the Merits forward to the date hereof, in person and via telephone conference, have led to the present unanimous Interim Award.

*  *  *  *  *

**PART II - STATEMENT OF FACTS**

The following sets forth the Tribunal's summary of the factual context of the matter before it, as drawn from the submissions of the parties and the documentary and testimonial record.

A.  The Parties

1.    Claimant Telenor is a company organized under the laws of Norway, with its principal place of business in Fornebu.  Telenor is a wholly-owned subsidiary of Telenor ASA, Norway's largest telecommunications services provider.  Through its subsidiary Telenor Mobile Communications AS, Telenor ASA is a leading operator of international mobile telephony networks.  In December 1998, under circumstances further discussed hereunder, Telenor acquired 25.7% of the voting stock of VimpelCom.  As of the date of commencement of the instant proceedings, Telenor beneficially held 29.9% of the common stock and 26.6% of the voting stock of VimpelCom.

2.    Respondent Eco Telecom is a company organized under the laws of Gibraltar, the shares of which are wholly owned by Altimo Holdings & Investments Limited, formerly known as Alfa Telecom Limited ("Alfa Telecom"), a company organized under the laws of the British Virgin Islands.  Respondent CTF Holdings Limited, which indirectly owns a majority of the shares of Alfa Telecom, is a company organized under the laws of Gibraltar. Respondent Eco Holdings Limited is likewise a company organized under the laws of Gibraltar.  Each of the Respondents is a member of the Russian financial and industrial conglomerate known as the Alfa Group Consortium ("the Alfa Group"), the principal beneficial owner of which is Mr. Mikhail Fridman.  As of the date of commencement of the

instant proceedings, Eco Telecom held 24.5% of the common stock and 32.9% of the voting stock of VimpelCom.

3.     VimpelCom, the nomination and election to the Board of Directors of which is the subject of the parties' dispute, is an Open Joint Stock Company organized under the laws of the Russian Federation. VimpelCom is now the second-largest mobile telephone operator in Russia. At the end of December 2004, VimpelCom had approximately 7.48 million subscribers in Moscow and 18.25 million in the rest of Russia, representing market shares of 44% and 33%, respectively. Through its subsidiary Closed Joint Stock Company "VimpelCom-Region", the Company holds mobile telephony operating licenses in several Russian cities outside of Moscow. The total market capitalization of VimpelCom is approximately $12.8 billion.

B.  The Initial Acquisition by Telenor of an Interest in VimpelCom

4.     On December 1, 1998, pursuant to a Primary Agreement between itself and VimpelCom, Telenor agreed to purchase a number of shares representing 25.7% of the voting capital stock of the Company. On the same day, Telenor and the existing shareholders of the Company, notably including VimpelCom's founder, Dr. Dmitri Borisovich Zimin, entered into a Shareholders Agreement ("the 1998 Shareholders Agreement"), a recital to which declared that "it is in the best interests of the Company that provision be made for the continuity and stability of the business and management of the Company." Article 5 of the 1998 Shareholders Agreement set forth certain undertakings of the parties with respect to the nominations and election of the members of the Company's Board of Directors. More specifically, it was agreed that Telenor would nominate no more than three (3) candidates for election to the Board, at least one of whom would be a Russian citizen, and that Telenor and Dr. Zimin would vote a sufficient number of their respective shares to ensure the election of Telenor's nominees. It was further provided, however, that if any shareholder of the

Company other than Telenor or Dr. Zimin nominated any person to the Board, then Dr. Zimin would have the right to approve one of the two non-Russian nominees of Telenor to the Board, "which approval shall not unreasonably be withheld"; and that Telenor would use its best efforts to ensure that any director designated by it for nomination to the Board be "an individual having such knowledge, technical expertise or know-how relating to the telecommunications industry and related sectors as may be reasonably requested by Dr. Zimin." The Tribunal has taken note of these provisions of the 1998 Shareholders Agreement in respect of the nomination and election of directors for such light as they may shed, by contrast and comparison, on the understanding and construction of the counterpart provisions, hereinunder described, of the Agreement at issue in the matter at hand.

### C. The Acquisition by Eco Telecom of an Interest in VimpelCom

5.    On May 30, 2001, pursuant to a Primary Agreement by and among VimpelCom, Telenor and Eco Telecom, Eco Telecom agreed to purchase 6,426,600 shares of preferred stock and 5,263,102 shares of common stock of VimpelCom, representing 25% plus two (2) shares of the voting capital stock of the Company. Of those shares, the 6,426,600 of preferred stock and 16,362 of common stock were acquired by Eco Telecom pursuant to a Share Purchase Agreement dated May 30, 2001 with Overture Limited ("Overture"), a Bermuda corporation beneficially owned by Dr. Zimin; and 5,150,000 shares of common stock were to be acquired by increase in the charter capital of the Company, through the issuance of shares in a closed subscription to Eco Telecom. On the same day, pursuant to its own Share Purchase Agreement with Overture, Telenor agreed to purchase such number of Overture's shares of VimpelCom as would give Telenor, in combination with its existing shareholding. a total of 11,689,773 shares of the Company, representing 25% plus thirteen (13) shares of its voting capital stock.

6.     Likewise on May 30, 2001, Telenor and Eco Telecom entered into the Agreement here at issue, a recital to which declared, just as in the 1998 Shareholders Agreement, that "it is in the best interests of the Company that provision be made for the continuity and stability of the business and management of the Company." Section 4 of the Agreement set forth certain undertakings of the parties with respect to the nomination and election of the members of the Company's Board of Directors. More specifically, Section 4.01 (a) and (b) of the Agreement provided as follows:

> 4.01 <u>Nomination of Directors</u>
>
> *From and after the occurrence of the Closing:*
>
> (a) *So long as the Telenor Shareholders and the Eco Shareholders each beneficially own at least the Specified Percentage of Shares, then the Telenor Shareholders and Eco Shareholders shall each nominate up to four (4) candidates for election to the Board, with at least one (1) candidate in each such group of four (4) candidates being an Independent; provided that if either the Telenor Shareholders or the Eco shareholders beneficially own more than forty-four percent (44%) but not more than fifty percent (50%) of the voting capital stock of the Company (a "Plurality Shareholder"), none of the candidates nominated by such Plurality Shareholder is required to be an Independent. In the event of an Eco Telecom Contribution Default, Eco Telecom shall cause such number of the four (4) directors nominated for election to the Board by Eco Telecom to resign from the Board with immediate effect so that Eco Telecom's remaining nominees on the Board will be only those whom it could elect based on cumulative voting at such time (without taking into account any extraordinary rights).*
>
> (b) *So long as the Telenor Shareholders beneficially own at least the Specified Percentage of Shares, then the Telenor Shareholders shall nominate one (1) additional candidate for election to the Board, who shall be an Independent and who shall, so long as the Eco Shareholder beneficially own at least the Specified Percentage of Shares, be approved by Eco Telecom.*

- 11 -

Various other ancillary agreements and undertakings were entered on May 30, 2001, by and among the parties, the Company and certain third parties, in the effectuation of the transaction contemplated by the Primary Agreement.  One was a Guarantee Agreement whereby CTF Holdings Limited as limited guarantor and Eco Holdings Limited as general guarantor guaranteed to Telenor, VimpelCom and VimpelCom-Region ("the Beneficiaries") the due performance by Eco Telecom of its obligations under the Primary Agreement and the Shareholders Agreement.  The Guarantee Agreement obligated CTF Holdings to cause any transferee of Eco Holdings' direct or indirect interest in VimpelCom or VimpelCom-Region to execute and deliver, to each Beneficiary, an Endorsement in the form of an exhibit to the Guarantee Agreement.  Another ancillary agreement was a Letter of Undertaking from Dr. Zimin to Eco Telecom, confirming that neither he nor any of his controlled affiliates would nominate any directors to the Board of Directors of VimpelCom, so long as Eco Telecom retained its ownership of at least 25% plus one (1) share of the voting stock of the Company.

### D.   The Initial Implementation of Section 4.01 of the Agreement

7.    At the Extraordinary General Meeting of the Shareholders of VimpelCom held on July 31, 2001, the first such meeting after the closing of the above-described May 30, 2001 transaction, the then-incumbent Board of Directors of VimpelCom was terminated, and a new Board of Directors was elected in its stead in conformity with Section 4.01 of the Shareholders Agreement.  Telenor and Eco Telecom nominated the four individuals each had listed in Schedule 1.01 (B) to the Primary Agreement, namely Motten Karlsen Sørby, Bjørn Kopperud, Henrik Torgersen and Terje Thon (identified as an "Independent" in Schedule 3 to the Shareholders Agreement) for Telenor; and Mikhail Fridman, Gleb Fetisov, Stanislav Shekshnia and Yevgeny Yasin (the record does not disclose which of those four was the requisite "Independent") for Eco Telecom.  It appears that Telenor's fifth (and second "Independent") nominee, duly approved by Eco Telecom, was Augie Fabella, a holdover

from the prior Board. The record does not suggest that any controversy attended the nomination and election of directors to this first post-transaction Board of the Company.

8.     The nomination and election of directors to the Board of VimpelCom also went forward without controversy in the years 2002, 2003 and 2004. It is common ground between the parties that, on or before January 30 in each of those years – – that is to say, within 30 days of the close of the Company's fiscal year, in accordance with Article 53.1 of the Russian Joint Stock Company Law ("JSC Law") – – Telenor and Eco Telecom would nominate more candidates than permitted to each under Section 4.01(a) of the Agreement, *i.e.*, five (5) and four (4), respectively, and that, between January 30 and the date of the Board's approval of the agenda for the Annual General Meeting of Shareholders, typically in the Spring of the year, each party would effect the withdrawal of the appropriate number of candidates required to place itself in compliance with Section 4.01. (Claimant's Post-Hearing Brief at 7; Respondents' Pre-Hearing Brief at 5)

9.     In January 2004, for example, Telenor by letters to Eco Telecom initially nominated six (6) candidates, including two (2) Independents, for Telenor's five allocated seats on the Board, and requested Eco Telecom's approval of the Independent nominees (whether of one or the other or of both is not clear). (Torgersen Witness Statement, Exhibit F; Torgersen, Tr. 55:14-58:5) Eco Telecom, for its part, nominated five (5) candidates, including one Independent, for its four allocated seats on the Board, expressly noting in its letter of nomination,

> *For the avoidance of doubt, we hereby confirm that in compliance with Article 4.01 of the Shareholders' Agreement of 30 May 2001 among Telenor East Invest AS, Eco Telecom Ltd and other shareholders of VimpelCom, pursuant to the terms of this notice, only four candidates are nominated by Eco Telecom Ltd to the Board of Directors of VimpelCom (including one person nominated as an independent director) and only one candidate is nominated by Eco Telecom Ltd to the Audit Commission of VimpelCom.*

- 13 -

(Torgersen Witness Statement, Exhibit G) (An identical declaration is set forth in Eco Telecom's letters of nomination in 2003 and 2005, (Torgersen Witness Statement, Exhibits E and J) The slate of candidates formally approved by the Board at its February 2004 meeting for submission to the vote of the shareholders at the 2004 Annual General Meeting duly included only nine (9) names, five (5) drawn from the nominees of Telenor and four (4) from the nominees of Eco Telecom, Telenor's fifth, Independent, nominee thus having been approved by Eco Telecom. (Protocol of the Board dated February 4, 2004, Exhibit F to the Claimant's letter to the Tribunal dated December 28, 2006)

E.    Difficulties in the Nomination Process in 2005

10.    The process of nomination and election of directors to the Board of VimpelCom did not go smoothly in 2005. The record suggests that the collaborative relationship between Telenor and Eco Telecom had begun to fray as early as October 2004, with the parties' disagreement as to the merits of VimpelCom's proposed acquisition of an Ukrainian mobile telephone company known as WellCom, but the particular genesis of the dispute is of little moment here. Suffice it to say that on January 30, 2005, consistent with their past practice as above-described, both parties over-nominated candidates for election to the Board, with Telenor putting forward six (6) names, including those of three "Independents" (Alexander Sozonov, Terje Thon and Jo Lunder), and Eco Telecom seven (7) names, including four "Independents" (Peter Wotsen, Alexander Sozonov, David Haines and Natalia Tsukanova). (As above noted, Eco Telecom's letter of nomination again set forth the declaration, "[in] compliance with Article 4.01 of the Agreement, pursuant to the terms of this notice, only four (4) candidates are nominated by Eco Telecom Ltd. to the Board of Directors of VimpelCom...") By letters dated January 30, 2005 (Claimant's letter to the Tribunal dated December 22, 2006, Exhibit E) and April 20, 2005 (Claimant's Pre-Hearing Memorandum, Exhibit E), Telenor pursuant to Section 4.01(b) of the Agreement requested Eco Telecom's

approval of Mr. Lunder's nomination. When such approval was not forthcoming, Telenor by letter dated April 21, 2005 nominated Terje Thon as an Independent candidate in Mr. Lunder's stead. (Claimant's Pre-Hearing Memorandum, Exhibit F)

11.    Contrary, however, to what had occurred in previous years, Telenor and Eco Telecom did not pare their lists down to five (5) and four (4) candidates, respectively, in advance of the Board meeting at which the slate of nominees was to be approved for presentation to the annual shareholders' meeting.    Telenor attempted to withdraw the candidacy of Mr. Sozonov; the latter demurred, as it was apparently his right under the JSC Law to do, even though his name was, in any event, on the Eco Telecom list. Eco Telecom, for its part, refused to withdraw any of its candidates, despite having been summoned by Telenor to bring itself into compliance with Section 4.01 of the Agreement. The result was that the Board of Directors, at its meeting of April 22, 2005, approved a slate of twelve (12) candidates for nine (9) seats on the successor Board, of whom five (5) candidates (not counting Mr. Sozonov) were nominees of Telenor and seven (7) were nominees of Eco Telecom. (Protocol No. 1 of the Board Meeting of April 22, 2005, Exhibit G to Claimant's letter to the Tribunal dated December 22, 2006).

12.    By letter dated June 22, 2005, Telenor protested the failure of Eco Telecom either to have approved one of Telenor's designated Independent candidates for the Board, or to have withdrawn a sufficient number of its own nominees so as to bring itself within the limitation of four nominees stipulated in Section 4.01 (a) of the Agreement. (Claimant's Pre-Hearing Memorandum, Exhibit G)    Telenor urged Eco Telecom to cumulate its votes for directors, at the Shareholders Meeting to be held that same day, in such a manner as to achieve the result which Telenor maintained was mandated by the Agreement.

13.    This Eco Telecom did not do, and at the Annual General Meeting five (5) of Eco Telecom's candidates were elected as against four (4) of Telenor's, thus giving Eco Telecom

for the first time, notwithstanding the provisions of Section 4.01 of the Agreement, a majority on the VimpelCom Board. The newly-elected Directors held their first meeting on July 11, 2005, whereupon David Haines, one of Eco Telecom's Independent nominees, was elected Chairman of the Board.

14.    The instant proceedings were initiated by Telenor's Notice of Arbitration dated November 14, 2005, alleging a breach by Eco Telecom, by reason of the events above described, of Section 4.01 of the Agreement.

F.    The Process of Nomination and Election in 2006

15.    Difficulties were again experienced in 2006 in the process of nomination and election of candidates to the Board of Directors of VimpelCom. On January 11, 2006, Telenor nominated Larry Zielke as an Independent candidate, and requested his approval by Eco Telecom. (Claimant's Pre-Hearing Memorandum, Exhibit J) Having interviewed Mr. Zielke in London on January 25, 2006, Eco Telecom, by letter dated January 28, 2006, objected to his nomination, on the grounds of his alleged affiliation with one of Telenor's counsel and lack of telecommunications experience. (*Id.*, Exhibit N) (The parties are in dispute as to whether or not this notice of objection to the nomination of Mr. Zielke was received in time for his name to be withdrawn, and for another candidate to be designated by Telenor in his stead.) On January 30, 2006, the parties submitted their respective formal nominations to the Board. Telenor's nominees were five (5) in number, namely Messrs. Johansen, Torgersen, Rusten, Lunder and Zielke; and Eco Telecom's were also five (5), namely Messrs. Fridman, Reznikovich, Novoselsky, Malis and Leibov, again notwithstanding the limitation of Eco Telecom to four nominees pursuant to Section 4.01(a) of the Agreement. (Claimant's Pre-Hearing Memorandum, Exhibit J) Also on January 30, 2006, three letters were received from third-party minority shareholders nominating David Haines, the incumbent Chairman of the Board (and an Eco Telecom nominee in 2005) and Alexander

- 16 -

Izosimov, the Chief Executive Office of VimpelCom, as candidates for election to the Board. (*Id.*, Exhibits Q, R and S)  Telenor maintains, and Eco Telecom denies, that the aforesaid nominations were made pursuant to collusive arrangements between the third-party minority shareholders and Eco Telecom, in contravention of Section 4.03(a) of the Agreement.

16.    At the annual General Meeting of VimpelCom's shareholders, held in Moscow on June 23, 2006, Messrs. Johansen, Torgersen, Rusten, Lunder, Fridman, Reznikovich, Malis, Novoselsky and Haines were elected to the Board.  (*Id.*, Exhibit V)  Telenor's nominees thus held four (4) seats on the Board, Eco Telecom's nominees likewise held four (4), and the ninth and the tie-breaking seat was held by Mr. Haines, an Eco Telecom nominee from the year before.

17.    Nominations for the 2007 elections to the VimpelCom Board are due to be submitted on or before Tuesday, January 30, 2007.   The present Interim Award is communicated by the Tribunal to the parties with the intention and directive that it be taken into due account, in the parties' respective forthcoming submissions of nominations to the Board.

* * * * *

## PART III - THE TRIBUNAL'S DETERMINATIONS ON THE ISSUES PRESENTED

The issue before the Tribunal in these proceedings does not concern the propriety *vel non* of the actions of either party in the submission of nominations for the 2005 and 2006 elections to the Board; nor does it concern the validity of the elections resulting therefrom. The Respondents, in the Tribunal's view, were correct to argue, in their Motion to Dismiss or to Stay the instant proceedings, that the 2005 and 2006 elections are at this point entirely moot, and beyond revisiting by the Tribunal at the instance of either party.  The Tribunal accordingly expresses no view on those aspects of the 2005 and 2006 elections which gave rise contemporaneously to disputation between the parties – – in 2005, for example, whether Mr. Sozonov was or was not the *de facto* Telenor nominee duly "approved" by Eco Telecom, and whether Telenor, by nominating an "unapproved" candidate in Mr. Sozonov's stead, could be said to have waived its right to enforce Section 4.01 of the Agreement; or, in 2006, whether or not Eco Telecom's withholding of approval in respect of Telenor's nomination of Mr. Zielke was timely communicated, and whether Telenor's maintenance of such nomination in the face of such objection amounted to a breach of Section 4.01(b), thereby opening the door to Eco Telecom's nomination of more than four candidates of its own. These episodes in the history of the parties' relationship provide useful and informative insights into the origins of their present dispute, but the conduct of the parties in relation thereto is in no sense before the Tribunal for adjudication.  Instead, the mission of the Tribunal is to prescribe, in a forward-looking sense, the proper mode of implementation of Section 4.01 of the Agreement, in anticipation of the process of nomination and election of the members of the VimpelCom Board of Directors in 2007 and in subsequent years.

- 18 -

There does not appear to be any disagreement between the parties concerning the meaning of Section 4.01(a) of the Agreement, the wording of which is perfectly straightforward. The provision contemplates that each of Telenor and Eco Telecom is to nominate up to four (4) candidates for election to the Board, with at least one (1) candidate in each such group of four (4) candidates being an Independent, as that term is defined in Section 1.01 of the Agreement. As noted in the above Statement of Facts, Eco Telecom itself on several occasions acknowledged in writing that, pursuant to Section 4.01(a), "only four (4) candidates are nominated by Eco Telecom Ltd. to the Board of Directors of VimpelCom (including one (1) person nominated as an independent director)". To the extent – – which is disputed – – that Section 4.01(a) is enforceable in accordance with its terms, no difficulty arises with the particular mechanics of its implementation.

The central issue in these proceedings concerns rather, Section 4.01(b), and more specifically the directive that "the Telenor Shareholders shall nominate one (1) additional candidate for election to the Board, who shall be an Independent and who shall ... be approved by Eco Telecom". Both parties seek from the Tribunal injunctive and declaratory relief in respect of the proper mode of application of this provision. The Claimant has asked, *inter alia*, in the event of the nomination by Eco Telecom of a candidate above and beyond the four (4) allocated to it by Section 4.01(a), for an award "compelling Eco Telecom to withdraw its fifth nominees to the Board and to allocate its votes to ensure the election of candidates to the Board in a manner consistent with the Terms of the Shareholders Agreement" (Amended Statement of Claim at 21), and "restraining and enjoining Eco Telecom ... from violating, or causing or inducing any other person to violate, directly or indirectly, the provisions of Section 4.01 and Section 4.03 of the Shareholders Agreement". (Claimant's Post-Hearing Memorandum at 32) The Respondents, on the other hand, seek, *inter alia*, a declaration that "Section 4.01 of the Shareholders Agreement is not enforceable

- 19 -

in the absence of Eco Telecom's approval of Telenor's fifth proposed nominee (the ninth nominee)" (Amended Statement of Defense and Counterclaim at 18), and that, "in the event that Eco Telecom does not, on or before January 30 of a given year, approve of Telenor East's proposed Fifth Nominee, the parties may each nominate up to nine candidates for election to the Board." (Respondents' Post-Hearing Brief at 31)  These contrasting requests for relief crystallize the issues to be resolved by the Tribunal, insofar as the correct understanding of the Agreement by the parties is concerned.  Reduced to their simplest essence, those issues are the following:

1.  Pursuant to Section 4.01(b) of the Agreement, may Eco Telecom, for any reason or for no reason at all, withhold its approval of a given fifth nominee of Telenor, thereby forcing the withdrawal of this nomination?  If "Yes", then,

2.  Pursuant to Section 4.01(b) of the Agreement, may Eco Telecom, for any reason or for no reason at all, withhold its approval of any and all fifth nominees of Telenor, thereby rendering inoperative the entirety of Section 4.01 of the Agreement?

The Tribunal's answers to these questions are set forth below.

A.     Eco Telecom's Unreasonable Disapproval of a Given Telenor Nominee

It is unquestionably the case that, under Section 4.01(b) of the Agreement, Telenor's nomination of a fifth, Independent candidate for election to Board is subject to the discretionary approval of Eco Telecom.   The particular wording of the contractual formulation (the additional candidate "shall ... be approved by Eco Telecom", instead of, say, "shall be subject to the approval of Eco Telecom") might have lent itself to the argument that Eco Telecom's grant of approval of the Telenor nominee was intended to be mandatory, not discretionary.  This construction would fail, however, in the face of the stipulation in Section 4.01(b) that the requirement of Eco Telecom's approval applies only "so long as the Eco Shareholders beneficially own at least the Specified Percentage of Shares [25% plus 1 share]".  The formulation "Eco Telecom shall approve ..." states a benefit conferred upon it by virtue

- 20 -

of its holding of the Specified Percentage, and obviously not a burden or on obligation. Eco Telecom has the power to grant or to withhold approval from Telenor's nominee, and plainly is not obligated to approve such nominee in every case.

The issue, therefore, is whether, under Section 4.01(b), Eco Telecom may arbitrarily and capriciously withhold this requisite approval from any given Telenor nominee for any reason whatsoever, or, in most literal sense of the word "unreasonably", for no stated reason at all. The Respondents argue that indeed it may, there being no express restriction on the exercise of its discretion to grant or to withhold approval. The Claimant, while not addressing the issue in precisely these terms, does appear to suggest that Eco Telecom's approval of a given nominee may not unreasonably be withheld. The Claimant maintains, for example, that "Eco Telecom interfered in Telenor's rights under Section 4.01 of the Shareholders Agreement, and thereby violated Eco Telecom's duty to act in good faith ... by objecting to Telenor East's fifth candidate on the irrelevant ground that the fifth candidate was not a Russian..." (Claimant's Post-Hearing Memorandum at 25-26).

The Tribunal is of the view that the Respondents must prevail on this issue. New York law, which governs the Agreement, is very clearly to the effect that, in the absence of an express contractual injunction against the unreasonable withholding of approval, a party may withhold its approval for any reason or for no reason at all, and there exists no implied obligation of good faith which in any given case would limit such party's choice. *See* Teachers Ins. and Annuity Association of America v. Wometco Entreprises Inc., 833 F. Supp. 344, 349 (S.D.N.Y 1993), *citing* Collard v. Incorporated Village of Flower Hill, 52 N.Y. 2d 594, 603-604 (N.Y. 1981) *and* Dress Shirts Sales, Inc. v. Hotel Martinique Assocs., 12 N.Y. 2d 339, 342 (N.Y. 1963). A federal court applying New York law has recently explained,

> *[There is] no support for the proposition that an entity violates the implied covenant of good faith and fair dealing by acting in its own self-interest consistent with its rights under a contract. Indeed, courts*

> *have refused attempts to impose liability on a party that engaged in
> conduct permitted by a contract, even when such conduce is allegedly
> unreasonable.*

Suthers v. Amgen, Inc., 441 F. Supp. 2d 478, 485 (S.D.N.Y. 2006)  Numerous other cases

apply the New York rule that, absent contractual language to the contrary, consent may

perfectly well be arbitrarily and capriciously withheld.  *See, e.g.*, State Street Bank and Trust

Co. v. Inversiones Errazuriz Limitada, 374 F. 2d 158, 169-170 (2d Cir. 2004)  ("Where a

contract allows a bank to withhold consent for particular conduct and sets no express

restrictions on the bank's right to do so, the bank is not prohibited from unreasonably or

arbitrarily withholding such consent"); Dress Shirt Sales v. Hotel Martinique Assoc., 12

N.Y.2d 33 (N.Y. 1963) ("Unless the lease provides that the lessor's consent shall not be

unreasonably withheld, a provision against subleasing without the lessor's consent permits

the lessor to refuse arbitrarily or for any reason or no reason"); Sharma v. Chemical Bank,

723 F. Supp. 200 (S.D.N.Y. 1989) (terms of agreement would not be read to require

defendant to act in an objective, reasonable manner when considering granting plaintiff

approval of charter cruises longer than those allowed for by the terms of the agreement); *cf.*

Bonady Apartments Inc. v. Columbia Banking Federal Savings and Loan Assoc., 465 N.Y.S.

2d 150, 154 (N.Y. Supp. Ct. 1983) (conditioning grant of consent on agreement by the other

party to pay a higher interest rate does not violate implied covenant of good faith and fair

dealing).

Particularly apposite to this discussion is the case of Neuman v. Pike, 591 F. 2d 191 (2d.

Cir. 1979), wherein the Second Circuit applied the above-referenced principle of New York

law in a context very much analogous to that of the matter at hand.  Neuman and Pike each

acquired 26% of the voting stock of a corporation.  They thereafter entered into an agreement

to vote their respective shares in such a manner as to elect themselves and their attorney as

three out of the five members of the board of directors of the company.  The agreement was

silent as to whom Neuman and Pike would elect as the remaining two directors; and it provided that, in the event Neuman and Pike were unable to agree on the manner in which to vote their shares on any given issue, then none of their respective shares would be voted, and the shareholders of the remaining 48% of the stock would decide the issue instead. When Neuman subsequently attempted to nominate two candidates for the positions on the board not covered by the agreement, Pike objected to the nominees. Neuman sued, and the District Court, on the basis of "a finding that Pike had violated an implied covenant in the contract that he be reasonable", enjoined Pike from "unreasonably withholding his consent" to the nominee for one of the two open seats, and further required that Pike "agree to a nominee of Neuman unless there are explicit and valid grounds for disapproval." *Id.* at 193. The Second Circuit reversed, refusing to read into the agreement between Neuman and Pike an implied term that Pike had to be objectively reasonable in exercising his choice not to vote for Neuman's nominee, thereby divesting both himself and Neuman of a vote and enfranchising instead the holders of the remaining 48% of the shares. Said the Court,

> *In the instant case, it was the clearly expressed intention of the parties that when they disagreed, the forty-eight per cent minority interest would be given an opportunity to participate in corporate management. It is clear beyond cavil that this is what Pike wanted and intended when he prepared the written contract and that Neuman was fully aware of this fact when he signed it. Under such circumstances, a court should not redraft the agreement that they executed, nor should it add a term which the parties have not expressed because it may deem it reasonable. A promise by the defendant should be implied only of the court may rightfully assume that the parties would have included it in their written agreement had their attention been called to it. Any such assumption in this case would be completely unwarranted. Pike was unalterably opposed to Neuman's designation of a fourth director. It follows that Pike's subsequent exercise of his clearly expressed contractual right to oppose Neuman's designation of a fourth director does not violate the "good old rule that there is in every contract an implied covenant of fair dealing."*

*Id.* at 194-195 (citations omitted).

- 23 -

The same goes, in the Tribunal's view, for the putatively unreasonable withholding by Eco Telecom of its approval of a given Telenor fifth nominee. Significantly, Section 4.01(b) of the Agreement does not contain the formulation expressly requiring that Eco Telecom's approval not be unreasonably withheld – – even though Telenor was plainly aware of the import of this standard wording, having been at pains to insert it, as noted at ¶23 of the above Statement of Facts, in the 1998 Shareholders Agreement, in respect of Dr. Zimin's right of approval of one of Telenor's non-Russian nominees to the VimpelCom board. Furthermore, Telenor acknowledges that it tried but failed, in the negotiation of Section 4.01(b), to impose limitations on the right of Eco Telecom thereunder to withhold approval of Telenor's fifth nominee in any given case. (Witness Statement of T. Østby at ¶8) Under these circumstances, and in light of New York law as above stated, the Respondents are correct that, pursuant to Section 4.01(b), Eco Telecom is entitled to act wholly arbitrarily, for any reason or for no reason at all, in withholding its approval of any particular fifth nominee of Telenor. To revert to the instance cited by Telenor, involving Eco Telecom's refusal to approve a nominee on the assertedly "irrelevant" ground that he was not a Russian, this could not, in and of itself, have constituted the breach by Eco Telecom of an obligation of good faith: there simply cannot be read into Section 4.01(b) an obligation on the part of Eco Telecom to exercise good faith in the withholding of its approval of a particular nominee.

The Tribunal holds that, pursuant to Section 4.01 (b) of the Agreement, Eco Telecom is entitled, for any reason or for no reason at all, to refuse to approve a given fifth nominee of Telenor, whereupon such nomination must be withdrawn.

B.  Eco Telecom's Unreasonable Disapproval of Any and All Telenor Nominees

An entirely different question would be posed by Eco Telecom's unreasonable refusal not of an individual Telenor fifth nominee, but rather of an entire series of proposed fifth nominees, in such a manner as entirely to frustrate the workings of Section 4.01 of the

Agreement. The issue in this circumstance – – which has never thus far arisen in the dealings between the parties – – would be whether there exists in New York law an implicit covenant of good faith in the performance of contracts, and, if so, whether such covenant would be breached by a systematic refusal on the part of Eco Telecom, for no reason whatsoever, to approve <u>any</u> otherwise qualified Independent candidate whose name is put forward by Telenor.

New York law does impose an obligation on good faith on parties in the performance of contractual undertakings. As the New York Court of Appeals has held,

> *Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance. Encompassed within the implied obligation of good faith are "any promises which a reasonable person in the position of the nominee would be justified in understanding were included." This embraces a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion. The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that "would be inconsistent with other terms of the contractual relationship."*

<u>Dalton v. Educational Testing Service</u>, 87 N.Y. 2d 384, 389 (N.Y. 1995) (citations omitted). A party may be in breach of this implied duty of good faith and fair dealing, even if it is not in breach of any express contractual obligation, if it acts in such a manner as to "destroy or injure the right of another party to receive the benefits of the contract." <u>Chase Manhattan Bank, N. A. v. Keystone Distrib., Inc.</u>, 873 F. Supp. 808, 815 (S.D.N.Y. 1994); see also <u>CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.</u>, 2006 U.S. Dist. LEXIS 31395, *15 (S.D.N.Y. 2006) On the other hand, it is clear that the covenant of good faith "can only impose on obligation consistent with other mutually agreed upon terms in the contract", and

that it "does not add to the contract a substantive provision not included by the parties".
Broder v. Cablevision Systems Corp., 418 F. 3d 187, 198-99 (2d Cir. 2005).

In the matter at hand, the record is unambiguous that the right of one party to the nomination, of a fifth candidate to the board of directors of VimpelCom, subject to the approval of the other party, was a highly material issue in the negotiation of the Agreement between Telenor and Eco Telecom. The documentary evidence establishes that, as late as February 21, 2001, it was still unresolved in the negotiation which of the two parties would have the right to make the nomination, and which would be left with the lesser right to withhold its approval of any given nominee. (Witness Statement of T. Østby, Exhibit B; cf. Østby, Tr. 47:10-49:5) Only on or about February 27, 2001 was it ultimately agreed that it was Telenor which would have the right to nominate the fifth director and Eco Telecom which would have the right to approve the nominee, rather than the other way around. (Id.) Telenor's right to nominate the fifth director, subject to Eco Telecom's right to approval, was thus one of the key "fruits of the contract" which Telenor bargained to receive. Unless the Agreement expressly otherwise provides, Eco Telecom is under an obligation, by reason of the implied covenant of good faith and fair dealing in New York law, not to act in such a manner as to destroy or injure Telenor's aforesaid contractual right -- as such right plainly would be destroyed, were Eco Telecom systematically to refuse, for no good reason, to approve any candidate whatsoever out of a series of otherwise qualified Telenor proposed nominees. The Agreement, as above discussed, fully justifies Eco Telecom in withholding, however capriciously, its approval from a given individual Telenor proposed nominee, since Eco Telecom is nowhere expressly foreclosed from so doing. The question now, however, is whether the Agreement expressly negates any obligation on the part of Eco Telecom, arising from the implied covenant of good faith, to approve somebody as Telenor's fifth nominee,

lest the parties' carefully-wrought contractual scheme in respect of the nomination of directors altogether collapse.

It is common ground between the parties that the Agreement is conspicuously silent as to the way forward, in the eventuality – – which, again, has yet to occur – – of a systematic and unreasonable refusal by Eco Telecom to approve any of a multiplicity of Telenor candidates to become the fifth nominee. As accurately noted by the Respondents, "[T]he Agreement ... provides no guidance as to how the parties must proceed in the event that they cannot agree on the Fifth Nominee." (Respondents Post-Hearing Brief at 8) It follows that the Agreement, being silent, can contain no provision expressly inconsistent with an implied obligation on the part of Eco Telecom to do nothing unreasonably to deprive Telenor of the contractual fruits of its bargain. The Agreement is different in this crucial respect from the shareholders agreement at issue in the case of Neuman v. Pike, discussed hereinabove. There, as pointedly noted by the court, the agreement did expressly provide a mechanism to deal with Pike's systematic refusal to approve Neuman's director nominees, to wit, the forfeiture of the right of either shareholder to vote his shares, and, by default, the election of these directors by the holders of the remaining shares of the company. The shareholders agreement having thus expressly prescribed a means of resolving the impasse, it was not open to the court to imply into the agreement a term inconsistent with the parties' evident intent. (Neuman v. Pike, op. cit., 591 F. 2d at 194) Here, by contrast, the Agreement would leave the parties at a complete loss to chart their contractual course of action, were Eco Telenor to refuse to approve any of Telenor's Independent nominees. In these circumstances, it is the obligation of the Tribunal to fashion a remedy which fills this void, in a manner consistent with what the Tribunal can discern of the parties' underlying contractual intent.

The Tribunal is faced with two mutually exclusive reconstructions by the parties, based on competing parol evidence, as to their understanding and intent, at the time of signature of

- 27 -

the Agreement, in regard to the workings of Section 4.01. The Respondents have maintained, in effect, that the parties regarded the mechanism of Sections 4.01(a) and (b) as merely exhortatory, amounting to a general encouragement to the parties to agree on Telenor's fifth nominee. According to the Respondents, the parties understood that the entire contractual scheme for the nomination of directors would fall by the wayside in the event no agreement on Telenor's fifth nominee were forthcoming, thereby freeing the parties to make as many nominations as they wished to the VimpelCom Board. In this connection the Respondents have cited the Witness Statement and testimony of Mr. Golosov, with regard to what the latter recalls as his contemporaneous understanding that the relevant provisions of the Agreement "could only be enforceable if there were no conflicts between Telenor and Alfa Telecom in terms of nominating the candidates". (Golosov, Tr. 184:15-19)  By way of corroboration of the plausibility of Mr. Golosov's recall in this regard, the Respondents also point to the expert opinion and testimony of Mr. Karabelnikov, to the effect that, in the absence of any mechanism to ensure agreement on the fifth nominee, Section 4.01 of the Agreement would indeed be unenforceable under Russian law. (Expert Witness Statement of B. Karabelnikov, ¶¶13-19; Karabelnikov, Tr. 110:14-19) The Claimant, on the other hand, argues that the parties fully intended for the entirety of their agreements, specifically including Section 4.01 of the Agreement here at issue, to be workable, effective and enforceable, and they deny that there exists any extrinsic evidence which might suggest otherwise. The Claimant cites the testimony of Mr. Torgersen, as to the absence of any contemporaneous indication to him, whether by Mr. Fridman or any other representatives of Eco Telenor, that the limitation of Eco Telenor to four nominees, pursuant to Section 4.01(a), could be overcome by the simple device of Eco Telecom's disapproval of Telenor's fifth candidate, pursuant to Section 4.01(b). (Torgersen, Tr. 71 at 1-12) The record also reflects the recollection of Telenor's Mr. Østby as to "Alfa's assurances… that it would act

reasonably and in good faith with respect to approval of Telenor East's fifth nominee." (Witness Statement of T. Østby at ¶8)

The Tribunal prefers to disregard all of the foregoing elements of parol evidence as to the each party's asserted subjective understanding of the Agreement, and to look instead to the letter and spirit of the entire body of agreements whereby was effectuated the acquisition by Eco Telecom of an interest in VimpelCom. Having closely examined the record in this regard, the Tribunal is in a position to make the following observations:

- The various agreements constituting the Principal Agreements (the Primary Agreement, the Option Agreement, the Zimin Principal Agreements, the Eco Telecom Share Purchase Agreement, the VIP-R Primary Agreement, the VIP-R Shareholders Agreement, etc., in addition to the Shareholders Agreement at issue here) comprise a voluminous, elaborate, meticulous and carefully-drafted set of documents. Both parties (actually, all parties to the transaction) were represented by highly-skilled Russian and Western counsel, and the record reflects the fact that the provisions of all of the various agreements were the subject of detailed negotiation. Opinions of counsel to the respective parties were delivered at closing, certifying the validity and enforceability (to be sure, subject to any mandatory provisions of Russian and other applicable law) of the various obligations stated in the agreements. Like several others of the Principal Agreements, Section 2.02(b) of the Agreement here at issue sets forth formal recitals of Telenor and Eco Telecom that each provision thereof "constitutes the legal, valid and binding obligation of such Shareholder, enforceable against such Shareholder in accordance with its terms". In these circumstances, it is difficult for the Tribunal to credit the notion that, as suggested by Mr. Golosov in the case of the Zimin Letter of Undertaking (Golosov, Tr. 205:11-15), these were regarded by the parties as mere "gentlemen's agreements", to be either fulfilled or violated by them as they may have seen fit. Nor is the Tribunal inclined to believe that Eco Telecom could have

entered into a series of agreements as to which it entertained the belief that any provisions thereof were unenforceable in Russia as a matter of law, even as it was certifying to the full enforceability of these same provisions in the contractual representations and warranties. The Agreement was not designed as a trap for the unwary, and surely neither party could have regarded it as such.

- Insofar as Section 4.01 of the Agreement is concerned, the record establishes, as already noted, that the allocation to Telenor, and not to Eco Telecom, of the right to the nomination of the fifth director was the object of specific discussion and negotiation between the parties. Each party manifestly attached particular importance to this point, on which Telenor ultimately prevailed. In this connection, the Tribunal takes note of the fact that the transaction effectuated by the Principal Agreements was carefully calibrated, obviously by design, so as to yield to Telenor, at closing, a plurality in the voting capital stock in VimpelCom, 25% plus 13 shares for Telenor as opposed to 25% plus 2 shares for Eco Telecom. Whereas this plurality of 11 shares in favor of Telenor was obviously minute, it could make all the difference in the cumulative voting of shares for the election of directors to the Board. This, too, is suggestive of the emphasis placed by the parties, at the time of signature of the Agreement, on their respective degrees of control over the management of the Company. In these circumstances, it is scarcely conceivable that Section 4.01(b) of the Agreement, on the crucial matter of the nomination of the ninth director, was intended to be an illusory construct, which either party was at perfect liberty to ignore.

- Section 6.12 of the Agreement provides,

> *If any provision contained in this Agreement... is or shall become invalid, illegal or unenforceable in any jurisdiction, the invalidity, illegality or unenforceability of such provision in such jurisdiction shall not affect or impair the validity, legality or enforceability of (a) any other provision of this Agreement... in such jurisdiction, or (b) such provision or any other provision of this Agreement... in any other jurisdiction.*

Even supposing *arguendo*, therefore, that Section 4.01(b) were merely in the nature of an precatory "best efforts" clause, subject to vitiation at the whim of either party, this would not have the effect of displacing Section 4.01(a) of the Agreement, whereby provision is made for the nomination by each of Telenor and Eco Telecom of up to, but no more than, four candidates for election to the Board. The juxtaposition of the putative unenforceability of Section 4.01(b), on the one hand, and of the continuing validity of Section 4.01(a), on the other, would create an absolute deadlock as between Telenor and Eco Telecom, at four nominees each, without there being any contractual mechanism, such as that provided by the shareholders agreement in <u>Neuman</u>, whereby this impasse could be resolved. It does not appear plausible to the Tribunal that the parties could truly have intended this result, or that they could have intended to empower Eco Telecom to vitiate, at any time of its choosing, the agreed arrangement whereby Telenor was to nominate five candidates and Eco Telecom only four. The Tribunal is of the view, rather, that the parties intended in good faith for Section 4.01(a) to be workable, but that they failed to contemplate, and therefore provided no mechanism for, a situation in which Eco Telecom might unreasonably withhold approval not individually from one or more, but systematically from any and all, proposed fifth nominees of Telenor. It thus falls to the Tribunal, in the exercise of its authority under Section 6.13 of the Agreement, to supply the mechanism whereby Section 4.01(a) of the Agreement may be implemented, in accordance with what the Tribunal finds to be the parties' constructive intent.

The Tribunal accordingly holds, under New York law, that both parties are under an obligation to exercise good faith in their performance of their Agreement, and to refrain from any action whereby one might destroy or injure the right of the other to receive the fruits of the parties' bargain. As applied to Section 4.01(b) of the Agreement, the Tribunal holds that, whereas Eco Telecom may unreasonably withhold approval from any given Telenor fifth nominee, it may not unreasonably withhold such approval from any or all such nominees; nor,

by extension, may Eco Telecom itself nominate more than the four candidates allocated to it pursuant to Section 4.01(a). The Order of the Tribunal, as set forth in Part III hereunder, is crafted in light of these holdings.

### C. The Implications of Russian Law

The Respondents have suggested that the Tribunal is bound to agree with their proposition that Section 4.01(b) of the Agreement is purely precatory. According to the Respondents, any Award premised on the view that this provision is susceptible of effective implementation would run afoul of Russian law, thereby exposing the Award to unenforceability in the jurisdiction wherein is incorporated VimpelCom.

The Tribunal is unpersuaded by this contention. For one thing, the mission of the Tribunal, as it sees it, is to provide guidance to the parties (none of which, as it happens, is incorporated in Russia) as to the appropriate understanding of an Agreement governed by New York law. Even though the object of the Agreement, the parties' arrangements for the governance of VimpelCom, pertains to a Russian corporation, it is not at all clear why Russian law should enter into the Tribunal's appreciation of how the parties under the Agreement intended these arrangements to work. The Respondents do not, and could not, argue that their voluntary compliance with the Tribunal's Award would constitute any sort of illegal act in Russia. At most, the Respondents' argument is to be taken as a caution or warning to the Tribunal that it might be open to them, on the purported basis of an alleged incompatibility between the Tribunal's view of the Agreement and the dictates of Russian law, to seek a declaration of nullity of the Award from a Russian court.

Any party to international arbitration proceedings is of course at perfect liberty to challenge an award in any court of competent jurisdiction. In this instance, however, the Tribunal is unpersuaded that its Award, providing instruction to the parties as to the due

implementation of Section 4.01 of their Agreement, is at all likely to receive a hostile reception in a Russian (or any other) court. It has not been suggested by the Respondents themselves, or by their expert witness on Russian law, that anything in Section 4.01 is *per se* illegal or unenforceable in Russia. The argument, rather, is that the alleged unenforceability of this provision results from the absence of a mechanism therein whereby Eco Telecom's approval of a Telenor fifth nominee might be consensually assured. As Mr. Karabelnikov put the matter, "[A]s long as the Shareholders Agreement was in agreement to determine the procedure of election of the fifth nominee, I don't see anything contrary to Russian law there". (Karabelnikov, Tr. 148: 15-18)

The fact is that the parties <u>did</u> provide in the Agreement a mechanism to resolve any difference of view between them with respect to the procedure for the nomination of candidates to the VimpelCom Board. That mechanism is the arbitration clause of the Agreement, pursuant to which this Tribunal has authority to address "[a]ny and all disputes and controversies arising under or relating to or in connection with this Agreement", and to "grant any remedy or relief they [the arbitrators] deem just and equitable". The guidance to be provided to the parties by the arbitrators through the Award thus constitutes the mechanism expressly intended by the parties to form the consensual basis for the resolution of any difference of view between them concerning the Agreement, in this particular instance as to the proper mode of implementation of Section 4.01. Mr. Karabelnikov stated the obvious in confirming, as he did, that the Respondents' due compliance with the Tribunal's Award would involve on their part no violation whatsoever of Russian law. (Karabelnikov, Tr.166:18-22) This is the only ramification of Russian law which the Tribunal views as relevant, insofar as the formulation of its Order to the parties in the Award is concerned.

* * * * *

## PART IV - THE TRIBUNAL'S INTERIM AWARD

New York law vests arbitrators with plenary authority to apply their own sense of the law and of the facts in the resolution of disputes, and to fashion equitable remedies to do justice between the parties.  An arbitral tribunal in the application of New York law is specifically empowered to interpret and enforce contracts in a manner which reflects the spirit of the agreement between the parties, and, in so doing, the tribunal is at liberty to fill any voids which the strict language of the contract may have left.  In one of the leading cases referring to the power of an arbitrator, the New York Court of Appeals has held,

> He may do justice as he sees it, applying his own sense of law and equity to the facts as he finds them to be, and making an award reflecting the spirit rather than the letter of the agreement, even though the award exceeds the remedy requested by the party ... [H]is award will not be vacated even though the court concludes that his interpretation of the agreement misconstrues or disregards its plain meaning or misapplies the substantive rules of law, unless it is violative of a strong public policy, or totally irrational or exceeds a specifically enumerated limitation of his power.

In the Matter of Silverman, 61 N.Y.S. 2d 299, 308 (N.Y. 1984).  Much to the same effect is an Appelate Division decision which declared,

> Arbitrators may do justice and the award may well reflect the spirit rather than the letter of the agreement.  Stated otherwise, arbitration is analogous to a proceeding in equity, and the arbitrator, like the Chancellor, is not strictly limited to remedies requested by the parties but is empowered to reach a just result regardless of the technicalities.

Board of Education of the Dover Union Free School District v. Dover-Wingdale Teachers, 95 A. D. 2d 487, 502 (N.Y. App. Div. 2 1983)  (citations and internal punctuation omitted).  Cases are legion which apply this principle of the very wide discretion of arbitrators to craft a just award.  See, e.g., North Syracuse Central School District v. North Syracuse Education Association, 45 N.Y. 2d 195, 200 (N.Y. 1978)  (arbitrator empowered to "disregard

- 34 -

technicalities to achieve a just result"); In re Application of Solow Building Company, 6 A.D. 3d 356 (N.Y. App. Div. 1 2004) ("[A]rbitrators are not strictly tethered to substantive and procedural laws and may do justice as they see fit"); In the Matter of the Arbitration Between Recore and Chateaugay Central School District, 256 A. D. 2d 801, 802 (N.Y. App. Div. 3 1998 ("[A]n arbitrator's interpretation of the parties' agreement may disregard the apparent, or even the plain, meaning of the words of the contract before him and still be impervious to challenge") (citations and internal punctuation omitted); Pearlman v. Pearlman, 169 A. D. 2d 825, 826 (N.Y. App. Div. 2 1991) ("[A]n arbitrator's power to resolve a dispute is ordinarily plenary").

The Tribunal in the case at hand has no need of recourse to powers anywhere near as sweeping as these, since the Tribunal is in a position to fashion an Interim Award which does no violence to the letter of the Agreement even as it faithfully reflects its spirit, and which provides guidance to the parties in the implementation of the Agreement in a manner consistent with the parties' evident intent. As set forth hereinabove, the Tribunal has held that, pursuant to Section 4.01(a) of the Agreement, either party may nominate up to four, but no more than four, candidates for election to the Board, of which one in each group is to be an Independent; that, pursuant to Section 4.01(b), Telenor may nominate one additional candidate for election to the Board, who is also to be an Independent; that, in accordance with Section 4.01(b), Eco Telecom is entirely within its rights, notwithstanding any suggestion by Telenor to the contrary, in withholding its approval, for any reason or for no reason, from any individual Independent nominee of Telenor; but that Eco Telecom, in the exercise of its rights under Section 4.01(b), may not, by reason of the implied covenant of good faith in New York law, arbitrarily and unreasonably withhold approval from an entire universe of Telenor's proposed Independent nominees. The Tribunal accordingly issues the following ORDER AND INSTRUCTION to be implemented as the Tribunal's Interim Award:

- 35 -

A.  The Implementation of Section 4.01 of the Agreement

1.    On or before January 30, 2007, pursuant to Section 4.01(a) of the Agreement, each of Telenor and Eco Telecom shall submit its list of candidates for election to the Board, including in the list at least one (1) Independent as that term is defined in the Agreement. Consistent with their practice in years past, each of Telenor and Eco Telecom may list more nominees than the number of candidates for election to the Board allocated to them by the said Section 4.01(a) of the Agreement, *i.e.*, up to four (4), but no more than four (4), candidates each, including one (1) Independent. Each list shall carry on its face the legend,

> *In due compliance with Section 4.01(a) of the Shareholders Agreement between Telenor East Invest AS, on the one hand, and Eco Telecom Limited et al., on the other, only four (4) candidates are nominated by* [Telenor] [Eco Telecom] *to the Board of Directors of VimpelCom, including one (1) candidate nominated as an Independent. We hereby undertake to withdraw, or to cause to be withdrawn, on or before the meeting of the Board at which the ballot in respect of the election of directors is to be approved for submission to the vote of shareholders at the Annual General Meeting, as many nominations as may be required to bring* [Telenor] [Eco Telecom] *into compliance with Section 4.01(a) of the Agreement as aforesaid,*

and each party shall duly proceed, on or before the stipulated date, to withdraw all but four (4) of its nominees, of whom one (1) shall be an Independent.

2.    On or before January 30, 2007, pursuant to Section 4.01(b) of the Agreement, Telenor shall submit a separate list of not less than eight (8) proposed candidates for election to Board, all of whom shall be Independents as that term is defined in the Agreement. Within no less than thirty (30) days before the meeting of the Board at which the ballot in respect of the election of directors is approved for submission to the vote of the shareholders at the Annual General Meeting, Eco Telecom shall advise Telenor of its approval of one (1) nominee from this list, chosen at the discretion of Eco Telecom. On or before the date of the aforesaid meeting of the Board, Telenor shall withdraw or cause to be withdrawn all

nominations pursuant to Section 4.01(b), save that of the candidate who shall have been approved by Eco Telecom.

### B.   The Endorsement of the Guarantee Agreement

The Claimant has requested that the Respondents be ordered to comply with the obligation, as set forth in Sections 2.1 and 3.1(d) of the Guarantee Agreement, to deliver to the Claimant the endorsement of the said Guarantee Agreement by Alfa Telecom, successor-in-interest to Respondent Eco Holdings Limited as parent company of Eco Telecom. The Tribunal has taken note of the undertaking by the Respondents, as stated at page 14 of their Amended Statement of Defense and in their letter to the Tribunal dated September 27, 2006, to provide the said endorsement of Alfa Telecom at Telenor's request. Telenor having made such a request, the Respondents are hereby invited to comply, within thirty (30) days of the date hereof, with their aforesaid undertaking.

### C.   The Continuing Jurisdiction of the Tribunal

The present Interim Award is issued by way of order and instruction to the parties as to the due implementation of Section 4.01 of the Agreement, and, subsidiarily, as to the fulfilment by the Respondents of their undertaking to deliver Alfa Telecom's endorsement of the Guarantee Agreement. The Tribunal intends and expects that its order and instruction will be executed by the parties. To the end of ensuring, however, that such is the case, the Tribunal hereby declares the maintenance of its jurisdiction over this matter through the date of the next scheduled Annual General Meeting of the Shareholders of VimpelCom, in the summer of 2007, after which the Tribunal will issue a Final Award allocating the costs and fees of the proceeding pursuant to Articles 38 and 40(3) of the UNCITRAL Rules; rendering the accounting contemplated by Article 41(5) of the Rules; and divesting itself of any further jurisdiction herein. In the interim, the Tribunal shall remain available to the parties to deal

with such further matters, if any, as either or both of the parties may wish to put before it concerning the nomination and election of directors of VimpelCom, whether arising out of Section 1.01 ("Independent"), Section 4.01, Section 4.03, or any other provisions of the Agreement, and the Tribunal shall issue such further Interim or Supplemental Awards as may appear indicated in connection therewith.

### D.  Costs

The Tribunal's tentative inclination, insofar as the prospective allocation of costs and fees in the Final Award is concerned, is that each party be left to bear its own costs of the legal representation and assistance referred to Article 38 of the Rules, and that the parties share equally in the costs of the arbitration referred to in Article 39 of the Rules.  In coming to this inclination, the Tribunal has been mindful that, in the present forward-looking Interim Award, no findings have been made of any past misconduct, contractual failing or manifestation of bad faith on the part of either party, no such issues having been before the Tribunal for adjudication; that the parties were equally responsible, in the drafting of the Agreement, for the gaps in the workings of Section 4.01(b) which the Tribunal has been called upon to fill; and that these proceedings, involving important and difficult issues, have been conducted with diligence, skill and commendable equanimity by counsel and representatives on both sides.  Under these circumstances, by application of Articles 40(1) and 40(2) of the Rules, an equal apportionment of costs and fees strikes the Tribunal as eminently fair and reasonable.

The Tribunal reserves for its Final Award, however, a dispositive determination of this issue.  Should the present Interim Award be smoothly implemented by the parties in the forthcoming nomination and election of directors to the board of VimpelCom, then the tentative inclination of the Tribunal as to the allocation of costs and fees will very likely be confirmed.  If, on the other hand, difficulties and further disputations arise in this process,

necessitating at the instance of either party the further intervention of the Tribunal, then the entire issue of costs and fees, including costs and fees hitherto incurred, is subject to being revisited, with the Tribunal to make a possibly different determination thereon in its Final Award.

* * * * *

It is accordingly hereby ORDERED that the parties proceed in accordance with the present Interim Award. All other and inconsistent requests for relief of the parties are hereby dismissed. The allocation of costs and fees is reserved.

Done at Geneva, Switzerland

January 25, 2007

BY THE TRIBUNAL:


_____
Gerald Aksen
Co-Arbitrator

_____
Charles C. Adams, Jr.
Chairman

_____
Bénedict Fontanet
Co-Arbitrator

- 39 -