# EXHIBIT  G

**IN THE MATTER OF AN ARBITRATION UNDER
THE UNCITRAL ARBITRATION RULES BETWEEN:**

**TELENOR EAST INVEST AS,**

Claimant,

Snarøyveien 30
N-1331 Fornebu
Norway

-and-

**ECO TELECOM LIMITED,
ECO HOLDINGS LIMITED, and
CTF HOLDINGS LIMITED**

Respondents,

10/8 International
Commercial Centre
Casemates Square
Gibraltar

**AMENDED STATEMENT OF CLAIM**

Claimant Telenor East Invest AS, for its amended claim against Respondents Eco

Telecom Limited, Eco Holdings Limited and CTF Holdings Limited, states as follows:

## I.    THE PARTIES

1.    Claimant Telenor East Invest AS ("Telenor East") is a company organized and existing

under the laws of the Kingdom of Norway, with its principal place of business in Fornebu,

Norway.  Telenor East is a wholly-owned subsidiary of Telenor ASA ("Telenor"), a Norwegian

company, with over 46,000 shareholders.  Telenor is the largest provider of telecommunications

services in Norway, and, through its subsidiary, Telenor Mobile Communications AS ("Telenor

Mobile"), is a leading international mobile operator.  Telenor's shares are listed in Norway on

the Oslo Stock Exchange, and its American Depositary Shares are listed in the United States on

the Nasdaq National Market.

2.    For many years, Telenor Mobile has invested in, and developed strategic partnerships

with, mobile communications companies located outside of Norway.  As of December 2004,

Telenor Mobile and its affiliates in Europe and Asia had approximately 52.7 million subscribers,

making Telenor the twelfth largest mobile communications company in the world.

3.    Respondent Eco Telecom Limited ("Eco Telecom") is a company organized under the

laws of Gibraltar, with its principal place of business in Gibraltar.  Eco Telecom's stated purpose

is to act as a "holding company."  Eco Telecom beneficially owns 24.5% of the common stock,

but, through its ownership of 6,426,600 voting preferred shares, 32.9% of the voting stock, of

Open Joint Stock Company "Vimpel-Communications", a Russian mobile operator

("VimpelCom").  Eco Telecom is, in turn, wholly owned by Alfa Telecom Limited, a company

organized under the laws of the British Virgin Islands ("Alfa Telecom"), which now uses the

trade name "Altimo".  A majority of the shares of Alfa Telecom are indirectly owned by

Respondent CTF Holdings Limited, a company organized under the laws of Gibraltar ("CTF"). The sole shareholder of CTF is Crown Finance Foundation, a Lichtenstein foundation ("Crown Finance").

4.      Eco Telecom, Alfa Telecom, Eco Holdings Limited, CTF and Crown Finance are all members or affiliates of a Russian business entity known as the Alfa Group Consortium (the "Alfa Group"). Eco Telecom acts at the direction of members and affiliates of Alfa Group. The Alfa Group is controlled by, among others, Mikhail Fridman. Mr. Fridman is generally referred to in the press as one of Russia's "oligarchs" and is reputedly one of Russia's wealthiest men, with a personal fortune said to amount to billions of dollars.

5.      In the financial press, Mr. Fridman has described Alfa Group's global ambitions in telecommunications, stating "we want to convert all our stakes in different telecoms providers into one company—be it Telenor, TeliaSonera or any other international player." Arkady Ostrovsky, *Telecombative Oligarch Shares His Vision: Alfa's Mikhail Fridman Does Not Shrink From a Fight*, Financial Times, July 7, 2005.

6.      Alfa Group is widely known for its extremely aggressive business tactics, and has been involved in numerous bitter disputes and litigations with its ostensible partners. One leading telecommunications analyst recently stated that Alfa Group "appears to invite conflict with its partners in all areas of business." Goetz Partners, *The Russian Adventure, The Russian Telecommunications Services Market From a Foreign Investor's Perspective,* October 2005.

7.      Some of Alfa Group's tactics have gone beyond aggressiveness. For example, the Final Report on the Manipulation of the Oil-for-Food Programme, dated October 27, 2005, concludes that millions of dollars in illicit payments were made by Alfa-Eco, a member of the Alfa Group, in exchange for the allocation by the former Iraqi regime of over 106,000,000 barrels of Iraqi

crude oil. According to the Report, Alfa-Eco originally offered to "provide 'possible assistance on the matter'", but then failed to do so. A copy of the relevant pages of the report is annexed as Exhibit A.

8.      This case is yet another example of Alfa Group's unwillingness to respect the rights of its business partners, and to violate at will the express terms of the written agreements to which Alfa Group and its affiliates are parties.

## II.    THE FACTUAL BACKGROUND OF TELENOR EAST'S CLAIM

### The Shareholders Agreement between the Parties

9.      Telenor, through its subsidiaries, is one of the largest foreign investors in the Russian telecommunications industry. In December 1998, Telenor East agreed to purchase 25.7% of the voting capital stock of VimpelCom, now the second largest mobile telephone operator in Russia. At the end of December 2004, VimpelCom had approximately 7.48 million subscribers in Moscow and 18.25 million in the remainder of Russia, representing market shares of 44% and 33%, respectively.

10.     VimpelCom conducted an initial public offering of its American Depositary Shares ("ADSs") in 1996, becoming the first Russian company since 1903 to list its shares on The New York Stock Exchange. As of March 31, 2006, according to publicly available market data, VimpelCom had a market capitalization of approximately US$8.7 billion.

11.     On November 5, 2001, Eco Telecom purchased over five million newly issued common shares of VimpelCom for US$103 million, pursuant to agreements dated as of May 30, 2001. Eco Telecom also purchased 6,426,600 preferred shares and 113,102 common shares of VimpelCom from certain shareholders of VimpelCom, pursuant to agreements dated May 30,

2001. After giving effect to those purchases, Eco Telecom controlled 25% plus two shares of VimpelCom's voting capital stock.

12.    Simultaneously with its agreement to purchase common and preferred shares of VimpelCom, Eco Telecom entered into a Shareholders Agreement dated as of May 30, 2001 between Eco Telecom and Telenor East (the "Shareholders Agreement"), a copy of which is attached hereto as Exhibit B. The Shareholders Agreement governs, among other things, the nomination of candidates for election to VimpelCom's nine-member board of directors (the "Board").

13.    As part of the transactions contemplated by Eco Telecom's purchase of shares in VimpelCom in 2001, Respondent CTF and Respondent Eco Holdings Limited, a company organized under the laws of Gibraltar ("Eco Holdings"), entered into a Guarantee Agreement dated as of May 30, 2001 with Telenor East, VimpelCom and Closed Joint Stock Company "VimpelCom-Region" (the "Guarantee Agreement"), a copy of which is attached hereto as Exhibit C. Under the Guarantee Agreement, Eco Holdings, among other things, guaranteed the performance of all obligations of Eco Telecom under the Shareholders Agreement, including the nomination-related provisions in Section 4.01 thereof. In May 2001, when the Shareholders Agreement and Guarantee Agreement were executed, Eco Holdings was the parent company of Eco Telecom. However, pursuant to a Sale and Purchase Agreement dated August 19, 2004 among Alfa Telecom, Eco Holdings, CTF and Grand Financial Holdings S.A., a copy of which is attached hereto as Exhibit D, Eco Holdings sold to Alfa Telecom all of Eco Holdings' shares in Eco Telecom. Under Section 3.1(d) of the Guarantee Agreement, CTF and Eco Holdings agreed to "cause the transferee ... of [Eco Holdings'] entire direct or indirect interest ... in ... [VimpelCom] ... to execute and deliver to each Beneficiary an endorsement to [the Guarantee

Agreement] ... as a condition to any such transfer." No such endorsement has been delivered to Telenor in relation to Alfa Telecom's purchase of Eco Holdings' shares of Eco Telecom.

14.    Eco Telecom currently owns 32.9% of VimpelCom's voting stock and 24.5% of VimpelCom's common stock. Telenor East currently owns 26.6% of VimpelCom's voting stock and 29.9% of VimpelCom's common stock.

(1)    The Nomination Process under the Shareholders Agreement

15.    Under Article 53.1 of the Joint Stock Company Law of the Russian Federation (the "JSC Law"), a holder of 2% or more of the voting shares of a Russian joint stock company has the right to nominate such number of candidates for election to the board of directors of such company as does not exceed the total number of board seats. In the absence of the Shareholders Agreement, therefore, each of Eco Telecom and Telenor East would have the ability to nominate nine candidates for election to the Board. In the Shareholders Agreement, Telenor East and Eco Telecom agreed to voluntarily reduce the number of candidates each would otherwise be entitled to nominate for election to the Board, thereby increasing the likelihood that, in any election of Board members, no more than nine candidates for election to the Board are nominated, and that all board members would be nominees of the parties to the Shareholders Agreement.

16.    Under Article 66.4 of the JSC Law, members of the board of directors of a Russian joint stock company must be elected by cumulative voting. As provided in Article 66.4 of the JSC Law, in an election of board members conducted on a cumulative voting basis, the number of shares held by a shareholder must be multiplied by the number of persons to be elected to the board (in the case of VimpelCom, nine board seats), with the product being the total number of votes such shareholder may cast. A shareholder may cast all its votes for a single candidate or allocate its votes among two or more candidates. Article 9.2.4 of VimpelCom's charter (the "Charter") provides for the election of the members of the Board on a cumulative voting basis.

17.     The obligation to nominate only a specified number of candidates to the Board is one of the principal subjects of the Shareholders Agreement.  As set forth in the recitals to the Shareholders Agreement, "Telenor and Eco Telecom believe it is in the best interests of the Company that provision be made for the continuity and stability of the business and management of the Company."

18.     Accordingly, Section 4.01 of the Shareholders Agreement contains express provisions for the nomination of candidates for election to the Board.  In relevant part, it provides as follows:

    (a)     So long as the Telenor Shareholders and the Eco Shareholders each beneficially own at least the Specified Percentage of Shares, then the Telenor Shareholders and the Eco Shareholders shall each nominate up to four (4) candidates for election to the Board, with at least one (1) candidate in each such group of four (4) candidates being an Independent; provided that if either the Telenor Shareholders or the Eco Shareholders beneficially own more than forty-four percent (44%) but not more than fifty percent (50%) of the voting capital stock of the Company (a "Plurality Shareholder"), none of the candidates nominated by such Plurality Shareholder is required to be an Independent.  In the event of an Eco Telecom Contribution Default, Eco Telecom shall cause such number of the four (4) directors nominated for election to the Board by Eco Telecom to resign from the Board with immediate effect so that Eco Telecom's remaining nominees on the Board will be only those whom it could elect based on cumulative voting at such time (without taking into account any extraordinary rights).

    (b)     So long as the Telenor Shareholders beneficially own at least the Specified Percentage of Shares, then the Telenor Shareholders shall nominate one (1) additional candidate for election to the Board, who shall be an Independent and who shall, so long as the Eco Shareholders beneficially own at least the Specified Percentage of Shares, be approved by Eco Telecom.

"Independent" is defined in Section 1.01 of the Shareholders Agreement as "(a) any Person who is not any employee, officer, director or other Affiliate (but who may be a consultant and/or

former employee) of any Shareholder, any Controlling Person of such Shareholder or any

Controlled Affiliate of such Controlling Person or (b) any Person listed in Schedule 3."[1]

19.      At the time that Eco Telecom made its initial investment in VimpelCom, there were

extensive negotiations between Telenor and Alfa Group regarding the terms and conditions on

which Alfa Group would be permitted to make that investment.  The Shareholders Agreement

resulted from those negotiations.

20.      Section 4.01(b) of the Shareholders Agreement, providing Telenor East with the right to

nominate one director more than Eco Telecom, was a material – indeed, a critical – term for

Telenor East.  Without that provision, which was intended to protect Telenor East's investment,

by preventing a boardroom "coup" by Alfa Group, Telenor East would not have consented to

Alfa Group's investment in VimpelCom.

21.      Section 4.01(b) is reinforced by Section 4.03 of the Shareholders Agreement, which

prohibits either party from entering into agreements or arrangements with others to nominate

Directors to the Board.  Specifically, Section 4.03(a) provides in pertinent part:

> . . . [N]o shareholder shall grant any proxy or enter into or agree to be bound
> by any understanding, any voting trust with respect to any Shares, nor shall
> any Shareholder enter into any shareholder agreement or arrangement of any
> kind (whether written or oral) with any Person with respect to any Shares,
> including without limitation, any agreement, understanding or arrangement
> with respect to the nomination of any Director, or the acquisition, ownership,
> Transfer or other disposition or voting of Shares, nor shall any Shareholder
> act, for any reason, as a member of a group or in concert with any other
> Person in connection with the nomination of any Director, or the acquisition,
> Transfer, or other disposition or voting of Shares, in any manner which is
> inconsistent with any obligation of such Shareholder under this Agreement . . .

---

[1] Schedule 3 to the Shareholders Agreement lists only one individual, Mr. Terje Thon.

22.     Moreover, the Shareholders Agreement contains a waiver of defenses to the specific enforcement of the nomination-related provisions in Section 4.01, highlighting the importance of those provisions to the parties.  Section 6.01 of the Shareholders Agreement provides:

> The Shareholders hereby declare that it is impossible to measure in money the damages that will accrue to a party hereto by reason of a failure to perform any of the obligations under this Agreement.  Therefore, if any Shareholder shall, in accordance with Section 6.13, institute any proceeding to enforce specifically the provisions hereof, any Shareholder against whom such proceeding is brought hereby waives the claim or defense therein that the Shareholder instituting such proceeding has an adequate remedy at law or in damages, and the Shareholder against whom such proceeding is brought shall not urge in any such proceeding the claim or defense that such remedy at law or in damages exists.

23.     Accordingly, under Section 4.01 of the Shareholders Agreement, Telenor East has the right to nominate five candidates, and Eco Telecom has the right to nominate four candidates for election to the Board.  Two of Telenor East's nominees must be Independents, and one of Eco Telecom's candidates must be an Independent.  Only one of Telenor's Independent candidates must be approved by Eco Telecom.  The Shareholders Agreement remains in full force and effect, and has never been amended or modified.

24.     Section 2.1 of the Guarantee Agreement provides that Eco Holdings "hereby guarantees to . . . Telenor East Invest AS . . . the due, complete and timely performance and/or fulfillment by Eco Telecom of each and every obligation of Eco Telecom under each of the Transaction Agreements . . . ."  The term "Transaction Agreements" is defined in the recitals to the Guarantee Agreement, and includes the Shareholders Agreement.  The Guarantee Agreement remains in full force and effect, and has never been amended or modified.

> (2)     Eco Telecom's Efforts to Force the Acquisition of Closed Joint Stock Company "Ukrainian Radio Systems" ("WellCom")

25.     In October 2004, Eco Telecom began a campaign to take effective control of VimpelCom and to destroy Telenor East's rights in VimpelCom, without purchasing any additional shares.

Eco Telecom's assault on VimpelCom's corporate governance centered on Eco Telecom's efforts to force VimpelCom to acquire WellCom, a Ukrainian mobile operator, over the objections of Telenor East.

26.     WellCom is a minor participant in the Ukrainian mobile communications market, with limited operations. At the time of the proposed acquisition, it had a market share of approximately 1% of the Ukrainian market, total annual revenues of $3.6 million for 2004, a total of 47,000 subscribers, and substantial operating losses. By comparison, the two largest Ukrainian mobile operators possessed over 13.5 million subscribers – nearly 98% of all mobile subscribers in Ukraine – and their market penetration in the Ukrainian mobile market by the end of 2005 was expected to reach 50%.

27.     In October 2004, Alfa Telecom, the sole shareholder of Eco Telecom, began a campaign to cause VimpelCom to acquire WellCom for approximately $206 million, more than fifty-seven times WellCom's annual revenues. In that regard, it is noteworthy that, in 2004 and the first quarter of 2005, Mr. Alexey Reznikovich, now the Chief Executive Office of Alfa Telecom, attempted to broker a sale of WellCom to Golden Telecom ("Golden"), a Russian fixed-line operator in which Alfa Group and Telenor have an interest. The price for that proposed acquisition by Golden was $100,000,000 in cash, and the assumption of $23,500,000 in debt. A few months after Golden's board[2] rejected that proposal, Alfa Telecom and Mr. Reznikovich began aggressively to promote the sale of WellCom to VimpelCom for $206,500,000, without any material change in WellCom's business or prospects having occurred in the interim period.

28.     Under the terms of VimpelCom's Charter, negotiated between Eco Telecom and Telenor East, the affirmative votes of eight of the nine members of the Board were required to approve

---

[2] Golden is a Delaware corporation whose shares are traded on the New York Stock Exchange.

the acquisition. However, Telenor East's nominees all voted against the proposed acquisition of WellCom on grounds that the proposed price of $206,000,000 was grossly in excess of the value of the Company.

(3)    Efforts to Avoid the Minority Protections Held by VimpelCom

29.    In October 2004, a series of vexatious legal maneuvers aimed at undermining the minority protections in VimpelCom's Charter and the VimpelCom Shareholders Agreement began, all in an effort to cause the acquisition of WellCom to be approved in derogation of Telenor East's minority rights.

30.    First, in an "arbitrazh", or business court, in Russia's Krasnodar region, approximately 1,500 kilometers from Moscow, one Victor Makarenko, a 25 year old individual living in rural Temryuk, filed suit on October 27, 2004, requesting the court to allow the prospective acquisition of WellCom by VimpelCom by a simple majority of the Board.

31.    Although Mr. Makarenko held only two shares of VimpelCom common stock, the text of his claim reflected confidential information regarding WellCom that was available only to members of the Board and senior VimpelCom management. All members of the Board at that time had been nominated either by Eco Telecom or Telenor East.

32.    Despite his miniscule shareholding, Mr. Makarenko commenced three separate actions against VimpelCom. In one suit, Mr. Makarenko obtained a judgment in the Temryuk District Court that purported to invalidate the supermajority provisions of VimpelCom's Charter described above. Although VimpelCom was not properly served in that action, a default judgment was entered in Mr. Makarenko's favor on January 13, 2005. After a series of appeals, the order invalidating the supermajority provisions of the Charter was finally overturned by the Russian Supreme Court on June 29, 2005.

33.    Eco Telecom denies that it was involved in Mr. Makarenko's actions. However, on May 16, 2005, Eco Telecom filed an action in a Moscow court against VimpelCom and three of Telenor East's nominees to the Board seeking to void the minority protection provisions of VimpelCom's Charter and authorizing the acquisition of WellCom by a simple majority vote on essentially the same theory asserted in Mr. Makarenko's actions. That lawsuit was withdrawn by Eco Telecom on June 14, 2005.

        (4)    Eco Telecom Violates the Shareholders Agreement By Nominating Seven Candidates and Allocating its Votes to Elect Five of its Candidates as Directors

34.    Shortly after the various litigations aimed at voiding the minority protections in VimpelCom's Charter began, Eco Telecom sought to seize control of the VimpelCom Board, in violation of the Shareholders Agreement which governs the nomination of candidates for election as directors.

35.    Article 53.1 of the JSC Law requires any proposal for the nomination of candidates for election to the board of a joint stock company to be received by the company within thirty (30) days after the close of the company's fiscal year, unless a later date is specified in the company's charter. Article 7.5 of VimpelCom's Charter provides for VimpelCom's fiscal year to end on December 31, and the Charter does not provide for a later date for submission of proposals for the nomination of candidates for election to the Board. Accordingly, all nominations are required to be received by VimpelCom from Telenor East, Eco Telecom and any other holder of 2% or more of VimpelCom's voting stock no later than January 30.

36.    From the outset of their dealings with each other as shareholders of VimpelCom, neither Telenor East nor Eco Telecom had finalized its list of candidates for nomination to the Board as of January 30 of each year. As a consequence, the practice of the parties from January 2002 through January 2005 was initially to nominate more than the number of candidates permitted by

-11-

Section 4.01 of the Shareholders Agreement. Following consultations, and prior to the approval

by the Board of the agenda for VimpelCom's annual general meeting ("AGM") of shareholders

(which typically have occurred in April, May or June), Telenor East and Eco Telecom each

would withdraw the appropriate number of candidates (and cause the withdrawn candidates in

question to also personally withdraw their nominations), so that each party was in compliance

with its obligations under the Shareholders Agreement.

37.    In January 2005, Eco Telecom nominated seven candidates, four of whom were

Independents (as such term is defined in the Shareholders Agreement), and Telenor East

nominated six candidates, three of whom were Independents. One of Telenor East's Independent

candidates, Alexander Sozonoff, was also nominated by Eco Telecom.

38.    Before the April 22, 2005 Board meeting at which the agenda for VimpelCom's AGM

was scheduled to be approved, Telenor East wrote to Eco Telecom on two separate occasions,

seeking Eco Telecom's approval of Telenor East's Independent candidates. In a letter dated

April 20, 2005, Telenor East requested Eco Telecom's confirmation of Eco Telecom's approval

of Telenor East's nomination of Jo Lunder as an Independent candidate for election to the Board,

pursuant to Telenor East's initial nomination of Jo Lunder in January 2005. Because it received

no response from Eco Telecom to that letter, Telenor East sent Eco Telecom a letter dated April

21, 2005, in which Telenor East nominated Terje Thon as an Independent candidate for election

to the Board, specified that his nomination should supersede Telenor East's previous nomination

of Mr. Lunder and requested Eco Telecom's confirmation of approval of Mr. Thon as an

Independent candidate. As with the April 20 letter, Eco Telecom did not reply to that letter.

39.    To comply with its obligations under the Shareholders Agreement and to avoid

nominating more than five candidates for election to the Board, Telenor East also sent a letter to

VimpelCom withdrawing Telenor East's nomination of Mr. Sozonoff and requested Mr. Sozonoff, in writing, to withdraw himself as a Telenor East nominee by signing a notice of withdrawal. Mr. Sozonoff refused to sign such a notice of withdrawal.

40.     Despite its obligations under Section 4.01 of the Shareholders Agreement, Eco Telecom did not withdraw any of its seven nominees for election to the Board, and neither Eco Holdings nor any other Alfa Group affiliate took steps to cause Eco Telecom to perform Eco Telecom's obligations under the Shareholders Agreement. As a result, a total of twelve candidates were nominated for nine VimpelCom Board seats. As in preceding years, no other shareholders of VimpelCom nominated any additional candidates for election to the Board.

41.     During the period between April 22nd and June 22nd, 2005, which was the date of the AGM, Telenor East appealed to other holders of VimpelCom's shares and ADSs (the "VimpelCom Minority Shareholders"), and urged them to vote in favor of Jo Lunder and Terje Thon, Telenor East's Independent candidates for election to the Board. As part of that effort, Telenor East engaged a proxy agent, met with certain VimpelCom Minority Shareholders and distributed two letters and proxy cards to the VimpelCom Minority Shareholders.

42.     On June 22, 2005, Telenor East sent a final letter to Eco Telecom in which Telenor East demanded that Eco Telecom remedy its breach of the Shareholders Agreement by allocating its votes to ensure the election to the Board of Telenor East's two Independent candidates.

43.     Based on the voting results disclosed by VimpelCom, Eco Telecom did not allocate any of its votes to either of the Independent candidates nominated by Telenor East. Eco Holdings took no steps to cause Eco Telecom to allocate its votes in this manner, or otherwise to comply with its obligations under the Shareholders Agreement. Rather, Eco Telecom allocated its votes so as to elect five members of the Board, all of whom were candidates nominated by Eco

Telecom and two of whom were Independents.  Telenor East allocated its votes to elect four

members of the Board, all of whom were nominated by Telenor East and one of whom was an

Independent.

44.     On July 11, 2005, the newly-elected Board held its first meeting, and David Haines, an

Independent candidate nominated by Eco Telecom, was elected Chairman of the Board.  Under

VimpelCom's Charter, the Chairman of the Board has a casting vote in the event of a deadlock.

45.     Because VimpelCom's Charter required that an acquisition be approved by eight out of

nine directors, Eco Telecom's seizure of Board control still would not allow it to conclude the

proposed acquisition of WellCom.

> (5)     A Senior Executive From Alfa Telecom Becomes a
> Director of One of the Prospective Sellers of WellCom

46.     In an effort to bypass the Board and to circumvent the minority protections to which it

had agreed in the Charter and the Shareholders Agreement, and attempt to have the acquisition of

WellCom approved, Eco Telecom took steps to convene an extraordinary general meeting of

shareholders (the "EGM") to approve the acquisition of WellCom.

47.     On June 3, 2005, Eco Telecom caused Pavel Kulikov, an executive of Alfa Telecom and

a member of the VimpelCom Board, to become a director of Karino Trading Limited, a British

Virgin Islands company and, at the time, one of the proposed sellers of WellCom's stock

("Karino").  According to Eco Telecom, as a consequence of Mr. Kulikov's newly acquired

status as a director of Karino, the acquisition of WellCom would become an "interested party

transaction" requiring the approval of a disinterested majority of VimpelCom's voting shares.

48.     Eco Telecom took the position that, under Russian law, if the WellCom aquisition were

approved by a simple majority of VimpelCom's shareholders asked to vote on the "interested

party transaction," there was no requirement for the Board to approve the WellCom acquisition.[3]

Eco Telecom has never disputed that, absent the "conflict" manufactured by Mr. Kulikov's

appointment to the board of Karino, the approval of at least eight of the nine VimpelCom

directors would be required for the proposed acquisition of WellCom.  In effect, therefore, Eco

Telecom had taken steps to deprive its partner Telenor East of the minority protection in the

Charter which Eco Telecom had previously voted to approve.

49.      Prior to the acquisition, Karino held 240 shares of WellCom, out of a total of 845,630

shares issued and outstanding.  Karino's sole director prior to Mr. Kulikov's appointment was

Stavros Charalambous, a resident of Nicosia, Cyprus.[4]  Karino's registered office is at Craigmuir

Chambers in Roadtown, Tortola, BVI which is the address of "HWR Corporate Services." In or

before July 2005, shortly before the EGM, Karino transferred its shares in WellCom to a wholly-

owned subsidiary of Karino, Crayola Properties Limited ("Crayola").[5]  It is not clear whether or

not Mr. Kulikov is or was also a director of Crayola.

50.      Eco Telecom later confirmed that  Mr. Kulikov was appointed to Karino's board for the

express purpose of bypassing the requirement of board approval.  According to Eco Telecom's

amended filings with the Securities and Exchange Commission (the "SEC"): "the arrangements

for the appointment of Pavel Kulikov to the board of Karino Trading were put in place to have

the proposed acquisition be classified as an interested party transaction under Russian law with

---

[3] As noted below, Telenor disputes Eco Telecom's interpretation of Russian law.

[4] As set forth in one of the exhibits to Eco Telecom's filing with the Securities and Exchange Commission on Schedule 13D, dated July 18, 2005, Mr. Kulikov had no power to execute any document on behalf of the company of which he was a "director".  *See* Exhibit E.

[5] Certain other holders of WellCom shares apparently transferred them to Crayola at or about the same time.

the express purpose of letting shareholders decide on whether to proceed with the acquisition of WellCom."

51.    The shareholder vote was scheduled to take place on August 15, 2005. However, by August 11, 2005, it was clear from the tabulation of proxies that the proposed acquisition would fail to be approved. Eco Telecom then took the extraordinary step of absenting itself from the shareholders meeting it had called. The result was that a quorum was not present, and the meeting was adjourned for 30 days.

52.    Alfa Telecom then began an intensive campaign to solicit the votes of VimpelCom's institutional shareholders. As part of that campaign, Mr. Alexander Izosimov, the chief executive officer of VimpelCom, visited a number of institutional shareholders and urged them to vote in favor of the transaction. At the shareholders meeting held on September 14, 2005, approximately 51.15% of VimpelCom's issued and outstanding shares voted in favor of approving the WellCom acquisition as an interested party transaction.

53.    It was, and is, Telenor East's position that the shareholders vote only allowed the proposed interested party transaction to be considered by the Board, and that approval by the Board was still required. However, that question was never appropriately resolved. Instead, on November 10 or 11, 2005, Mr. Izosimov simply closed the acquisition of WellCom at a price of $254,000,000, an amount substantially in excess of that purportedly authorized by the shareholder vote.

54.    Beginning with the Board meeting held on November 16, 2005, at which Henrik Torgersen, one of Telenor East's nominees on the Board, demanded that VimpelCom publicly

disclose more information concerning its purchase of WellCom.  Telenor East's nominees on the Board have repeatedly requested VimpelCom's management to publicly disclose in a filing with the SEC the executed documents for the WellCom acquisition and identify the recipients of the purchase price proceeds.  A copy of the letter, dated December 12, 2005, that three of Telenor East's nominees on the Board sent to VimpelCom's Chairman, David Haines, requesting such disclosure, is annexed hereto as Exhibit F.  VimpelCom's management refused to make such disclosure; on information and belief, that refusal is at the direction of Eco Telecom and its corporate parents and affiliates.  On March 7, 2006, David Haines sent a letter to the other members of the Board in which he offered to permit them to review a written record of Mr. Izosimov's oral responses to the requests for information concerning the WellCom transaction made by certain of Telenor's nominees on the Board if the relevant Board member would first sign a confidentiality undertaking in which such Board member would agree not to disclose the contents of Mr. Izosimov's responses to Telenor East or Eco Telecom or their respective professional advisors.  Putting to one side the fact that Mr. Izosimov's oral responses did not address, in any meaningful way, the requests made by the Telenor nominees, this belated and limited offer is entirely inconsistent with VimpelCom's disclosure obligations to its shareholders under the United States securities laws.  A copy of Mr. Haines' March 7, 2006 letter together with his proposed confidentiality undertaking, is annexed hereto as Exhibit G.

(6)    Eco Telecom Again Violates the Shareholders Agreement By Nominating Five Directors and Arranging the Nomination of Two Other Directors

55.    In accordance with Section 4.01(b) of the Shareholders Agreement, on January 11, 2006, Telenor East informed Eco Telecom by letter that Telenor East intended to nominate Mr. Larry Zielke, an individual with wide experience as an executive in Russia, as an Independent

candidate for the 2006 election to the Board, and sought Eco Telecom's approval of Mr. Zielke's candidacy, in conformity with the Shareholders Agreement. A copy of the January 11, 2006 letter, requesting Eco Telecom's approval for Mr. Zielke's nomination by January 18, 2006, is annexed hereto as Exhibit H. The letter also sought Eco Telecom's written assurance that it would, consistent with its obligations under the Shareholders Agreement, only nominate four candidates for election to the Board.

56.     Eco Telecom responded by letter on January 18, 2006, requesting a personal interview with Mr. Zielke on January 25, 2006, a date selected by Eco Telecom. That letter did not address whether Eco Telecom would abide by its obligations under the Shareholders Agreement. A copy of the January 18, 2006 letter is annexed hereto as Exhibit I.

57.     By letter dated January 20, 2006, Telenor East again requested that Eco Telecom confirm that it would abide by its obligations under the Shareholders Agreement. On January 24, 2006, Eco Telecom stated by letter that it would abide by the terms of the Shareholders Agreement. A copy of the January 20, 2006 letter is attached hereto as Exhibit J. A copy of the January 24, 2006 letter from Eco Telecom is attached as Exhibit K.

58.     Final nominations to the Board were due on January 30, 2006. At that time, Telenor East nominated five candidates to the Board, including Mr. Zielke. A copy of Telenor East's January 30, 2006 letter to the Board is attached as Exhibit L.

59.     Despite the clear provisions of the Shareholders Agreement, and Eco Telecom's obligation to nominate only four candidates, Eco Telecom nominated five candidates to the Board. A copy of Eco Telecom's nomination letter and an English translation of that letter is attached as Exhibit M.

60.     Nominations to the Board were due on or before 5:00 p.m Moscow time on Monday,

January 30, 2006.  By letter to Mr. Ragnar Korsaeth, Chairman of Telenor East, incorrectly dated

January 28, 2006 (the "Objection Letter"), but actually sent by facsimile on January 30, 2006,

Eco Telecom purported to object to Mr. Zilke's nomination.  However, the facsimile numbers for

Mr. Korsaeth and for Bjorn Hogstad, Esq., the two Telenor East addressees to which that

facsimile was purportedly sent, were incorrect and inoperative, despite the fact that Eco Telecom

had sent two facsimiles concerning Mr. Zielke's nomination to Mr. Hogstad at his correct fax

number in the preceding two weeks.[6]  A copy of the Objection Letter was sent to Telenor East's

attorneys in New York in this matter, although that address is not one of notice addresses

provided for in the Shareholders Agreement.   Moreover, by the opening of business at 9:00 a.m.

in New York, it was already 5:00 p.m. in Moscow, which was the deadline for the submission of

nominations.  A copy of the Objection Letter is annexed hereto as Exhibit N.   The Objection

Letter did not claim that Mr. Zielke was not Independent within the meaning of the Shareholders

Agreement, or otherwise ineligible to serve on the Board.

(7)     The Additional Norminees to the VimpelCom Board

61.     In the five years since the execution of the Shareholders Agreement, no VimpelCom

shareholder other than Telenor East or Eco Telecom had ever nominated a candidate to the

Board.  However, on January 30, 2006, three additional letters were sent to the Board purporting

to nominate Mr. David Haines and Mr. Alexander Isozimov.  Mr. Haines was nominated by Eco

---

[6] The facsimile of the Objection Letter to Mr. Korsaeth was addressed to country code 42, the former prefix for
Czechoslovakia, rather than 47, the country code for Norway.  The number was otherwise correct.  Presumably, the
facsimile machine showed that no connection had been established.

Telecom in 2005, and Mr. Isozimov has uniformly sided with Eco Telecom in its attacks on Telenor East.

62.    The first letter was signed by several individual shareholders and seeks to nominate both Mr. David Haines and Mr. Alexander Isozimov to the Board. A copy of that letter is annexed hereto as Exhibit O.

63.    The second letter, which nominated only Mr. Isozimov, appears to be signed on behalf of several Cyprus shell companies. A copy of that letter is annexed hereto as Exhibit P.

64.    The third letter, which nominates Mr. Haines, is signed on behalf of a number of institutional investors, together with the same Cyprus shell companies that appear in the second letter. A copy of that third letter is annexed hereto as Exhibit Q.

65.    The identities of beneficial owners of the Cyprus shell companies are not known to Telenor East. However, many of those entities have the same address as Crayola. Those entities include Franklin Enterprises, Ltd., Lindsell Enterprises, Ltd., Reardon Enterprises, Ltd., Postland Enterprises, Ltd., Pruett Enterprises, Ltd. As set forth above, (i) Crayola was a shareholder of WellCom, and, to the best of Telenor's knowledge and belief, a seller of shares of WellCom, and (ii) Mr. Pavel Kulikov, an Alfa Group executive, was appointed a director of Karino in order to render the proposed acquisition an "interested party transaction"; Crayola is a wholly-owned subsidiary of Karino.

66.    Section 4.03 of the Shareholders Agreement prohibits Eco Telecom from acting in concert with any other individuals or entities to nominate or cause the nomination of candidates to the Board. Given the circumstances of the January 30 nominations, the Panel should direct Eco Telecom to disclose all agreements and communications concerning the nominations of directors with other persons or entities making such nominations, and allow Telenor East an

opportunity for appropriate discovery to determine if Eco Telecom has acted in violation of that provision.

(8)    Irreparable Injury To Telenor East

67.    The failure of Eco Telecom to adhere to the provisions of the Shareholders Agreement has caused, and continues to cause, real and irreparable injury to Telenor East's bargained-for right to maintain the continuity and stability of the business and management of VimpelCom.

68.    Unless ordered by the arbitrators to comply with its obligations under Section 4.01 and Section 4.03 of the Shareholders Agreement, Eco Telecom will continue to act in violation of those obligations, causing further harm to Telenor East.

69.    Telenor East is entitled to an award to such effect, as prayed for below.

## III.    POINTS AT ISSUE

1.    Did Eco Telecom violate the Shareholders Agreement between itself and Telenor East when Eco Telecom nominated candidates for election to the Board?

2.    Did Eco Holdings violate the Guarantee Agreement by failing to cause Eco Telecom to comply with its obligations under the Shareholders Agreement, and did CTF and Eco Holdings violate the Guarantee Agreement by failing to cause Alfa Telecom to execute and deliver to Telenor East an endorsement to the Guarantee Agreement at the time of Alfa Telecom's purchase of Eco Holdings' shares in Eco Telecom?

3.    Is Telenor East entitled to an award requiring Eco Telecom to comply with the nomination provisions of Section 4.01 and Section 4.03 of the Shareholders Agreement, and requiring CTF and Eco Holdings to comply with their respective obligations under the Guarantee Agreement?

## IV.    RELIEF SOUGHT

Telenor East seeks:

1.    An award (a) compelling Eco Telecom to withdraw its fifth nominee to the Board and to allocate its votes to ensure the election of candidates to the Board in a manner consistent with the terms of the Shareholders Agreement; (b) restraining and enjoining Eco Telecom, together with its officers, agents, servants and employees, and all persons in active concert or participation with them, from

without limitation, the delivery to Telenor East of Alfa Telecom's endorsement of the Guarantee Agreement; and (d) directing Eco Telecom to disclose all agreements and communications concerning the nominations of directors with other persons or entities making such nominations, and affording Telenor East appropriate discovery regarding the facts and circumstances concerning the nomination of David Haines and the attempted nomination of Alexander Izosimov on January 30, 2006;

2.   Its costs and disbursements in this action, including, without limitation, Telenor East's reasonable attorneys' and expert fees, in accordance with Article 38 of the UNCITRAL Arbitration Rules;

3.   Interest on the sums claimed in subparagraph (2) until paid; and

4.   Such other and further relief as the Arbitrators deem just and proper.

Dated:  March 31, 2006

By: _Robert L. Sills_ _____
Robert L. Sills
Adam S. Zimmerman
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
United States of America
Telephone: +1 212 506 5000
Facsimile: +1 212 506 5151

- and -

Peter O'Drisoll
ORRICK, HERRINGTON & SUTCLIFFE LLP
25 Old Broad Street
London EC2N 1HQ
DX: 557 London/ City
United Kingdom
Telephone: +44 20 7562 5000
Facsimile: +44 20 7628 0078

Attorneys for Claimant