# EXHIBIT  R



# OPEN JOINT STOCK CO VIMPEL COMMUNICATIONS (VIP)

10 12 8TH MARCH ST
MOSCOW RUSSIA, U2 125083
70959745888
http://www.vimpelcom.com/

# SC 13D/A

**SCHEDULE 13D/A**
**Filed on 08/30/2005**
File Number 005–48091



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# SCHEDULE 13D

Under the Securities Exchange Act of 1934
(Amendment No. 16)

**OPEN JOINT STOCK COMPANY
"VIMPEL–COMMUNICATIONS"**

(Name of Issuer)

Common Stock, 0.005 rubles nominal value

(Title of Class of Securities)

68370R109

(CUSIP Number)

Franz Wolf
Eco Telecom Limited
Suite 2
4 Irish Place
Gibraltar
(350) 41977

(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

August 26, 2005

(Date of Event which Requires Filing of this Statement)

With a Copy to:

Alexey Reznikovich
OOO Alfa Telecom
21 Novy Arbat
121019 Moscow, Russia
(7–095) 981 4449

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d–1(e), 13d–1(f) or 13d–1(g), check the following box. ☐

Note:  Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d–7 for other parties to whom copies are to be sent.

* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No. 68370R109                                        13D

1. Name of Reporting Person:

   Eco Telecom Limited
   I.R.S. Identification No. of Above Persons (Entities Only):
   000—00—0000

2. Check the Appropriate Box If a Member of a Group
   (a) ☐
   (b) ☒

3. SEC Use Only

4. Source of Funds

   AF; OO

5. Check Box If Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e).     ☐

   N/A

6. Citizenship or Place of Organization:

   Gibraltar

| | | |
|---|---|---|
| | 7. Sole Voting Power | |
| | | 12,563,782 Common Stock* |
| Number of Shares Beneficially Owed By Each Reporting Person With | 8. Shared Voting Power | |
| | | 0 |
| | 9. Sole Dispositive Power | |
| | | 12,563,782 Common Stock* |
| | 10. Shared Dispositive Power | |
| | | 0 |

11. Aggregate Amount Beneficially Owned by Each Reporting Person

    12,563,782 Common Stock*

12. Check Box If the Aggregate Amount in Row (11) Excludes Certain Shares:     ☐

13. Percent of Class Represented By Amount in Row (11)

    24.5% of Common Stock*

14. Type of Reporting Person

    00; HC

\*  Eco Telecom is also the direct beneficial owner of 6,426,600 (100%) shares of the Issuer's type—A voting preferred stock, which, together with the total number of shares of the Issuer's common stock owned by Eco Telecom represents approximately 32.9% of the Issuer's outstanding voting capital stock. See Item 5.

CUSIP No. 68370R109                                **13D**

1. Name of Reporting Person:
   **Alfa Telecom Limited**
   I.R.S. Identification No. of Above Persons (Entities Only):
   000–00–0000

2. Check the Appropriate Box If a Member of a Group
   (a) ☐
   (b) ☒

3. SEC Use Only

4. Source of Funds
   OO

5. Check Box If Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e):          ☐

6. Citizenship or Place of Organization:
   British Virgin Islands

| Number of Shares Beneficially Owed By Each Reporting Person With | | |
|---|---|---|
| | 7. Sole Voting Power | 12,563,782 Common Stock* |
| | 8. Shared Voting Power | 0 |
| | 9. Sole Dispositive Power | 12,563,782 Common Stock* |
| | 10. Shared Dispositive Power | 0 |

11. Aggregate Amount Beneficially Owned by Each Reporting Person
    12,563,782 Common Stock*

12. Check Box If the Aggregate Amount in Row (11) Excludes Certain Shares          ☐

13. Percent of Class Represented By Amount in Row (11)
    24.5 % of Common Stock*

14. Type of Reporting Person
    OO; HC

\*   The Reporting Person may be deemed to beneficially own 6,426,600 (100%) shares of the Issuer's type–A voting preferred stock, which, together with the total number of shares of the Issuer's common stock that the Reporting Person may be deemed to beneficially own, represents approximately 32.9% of the Issuer's outstanding voting capital stock. See Item 5.

CUSIP No. 68370R109                                    13D

1. Name of Reporting Person:
   CTF Holdings Limited
   I.R.S. Identification No. of Above Persons (Entities Only):
   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

2. Check the Appropriate Box If a Member of a Group
   (a) ☐
   (b) ☒

3. SEC Use Only

4. Source of Funds
   AF; OO

5. Check Box If Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e)          ☐

6. Citizenship or Place of Organization:
   Gibraltar

| | | |
|---|---|---|
| | 7. Sole Voting Power | 12,563,782 Common Stock* |
| Number of Shares Beneficially Owed By Each Reporting Person With | 8. Shared Voting Power | 0 |
| | 9. Sole Dispositive Power | 12,563,782 Common Stock* |
| | 10. Shared Dispositive Power | 0 |

11. Aggregate Amount Beneficially Owned by Each Reporting Person
    12,563,782 Common Stock*

12. Check Box If the Aggregate Amount in Row (11) Excludes Certain Shares          ☐

13. Percent of Class Represented By Amount in Row (11)
    24.5% Common Stock

14. Type of Reporting Person
    00; HC

* The Reporting Person may be deemed to beneficially own 6,426,600 (100%) shares of the Issuer's type-A voting preferred stock, which, together with the total number of shares of the Issuer's common stock that the Reporting Person may be deemed to beneficially own, represents approximately 32.9% of the Issuer's outstanding voting capital stock. See Item 5.

CUSIP No. 68370R109                                        13D

| | |
|---|---|
| 1. | Name of Reporting Person:<br>**Crown Finance Foundation**<br>I.R.S. Identification No. of Above Persons (Entities Only):<br>000–00–0000 |
| 2. | Check the Appropriate Box If a Member of a Group<br>(a) ☐<br>(b) ☒ |
| 3. | SEC Use Only |
| 4. | Source of Funds<br>AF; OO |
| 5. | Check Box If Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e)    ☐ |
| 6. | Citizenship or Place of Organization:<br>Liechtenstein |

| Number of Shares Beneficially Owed By Each Reporting Person With | 7. | Sole Voting Power<br>12,563,782 Common Stock* |
|---|---|---|
| | 8. | Shared Voting Power<br>0 |
| | 9. | Sole Dispositive Power<br>12,563,782 Common Stock* |
| | 10. | Shared Dispositive Power<br>0 |

| | |
|---|---|
| 11. | Aggregate Amount Beneficially Owned by Each Reporting Person<br>12,563,782 Common Stock* |
| 12. | Check Box If the Aggregate Amount in Row (11) Excludes Certain Shares    ☐ |
| 13. | Percent of Class Represented By Amount in Row (11)<br>24.5% of Common Stock* |
| 14. | Type of Reporting Person<br>OO |

\*  The Reporting Person may be deemed to beneficially own 6,426,600 (100%) shares of the Issuer's type–A voting preferred stock, which, together with the total number of shares of the Issuer's common stock that the Reporting Person may be deemed to beneficially own, represents approximately 32.9% of the Issuer's outstanding voting capital stock. See Item 5.

**Item 1. <u>Security and Issuer</u>**

This Amendment Number 16 (the "Amendment") to the Statement on Schedule 13D relates to the common stock, 0.005 rubles nominal value (the "Common Stock"), of Open Joint Stock Company "Vimpel–Communications" ("VimpelCom"), a Russian open joint stock company. The initial Statement on Schedule 13D as previously filed jointly by Eco Telecom Limited ("Eco Telecom"), Eco Holdings Limited, CTF Holdings Limited ("CTF Holdings") and Crown Finance Foundation ("Crown Finance") on June 11, 2001, as amended and supplemented by Amendment Numbers 1 through 15 (collectively, the "Statement") is hereby amended and supplemented with respect to the items set forth below. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Statement.

**Item 2. <u>Identity and Background</u>**

This Amendment is being filed on behalf of each of the following persons (collectively, the "Reporting Persons"):

      (i)    Eco Telecom;

      (ii)   Alfa Telecom Limited ("Alfa Telecom");

      (iii)  CTF Holdings; and

      (iv)  Crown Finance.

This Statement relates to the shares of Common Stock held for the account of Eco Telecom.

The Reporting Persons

Eco Telecom is a Gibraltar company, with its principal business address at 10/8 International Commercial Centre, Casemates Square, Gibraltar. The principal business of Eco Telecom is to function as a holding company. Current information concerning the identity and background of the directors and officers of Eco Telecom is set forth in Annex A hereto, which is incorporated by reference in response to this Item 2.

Alfa Telecom is a British Virgin Islands company, with its principal address at P.O. Box 3339, Geneva Place, Second Floor, 333 Waterfront Drive, Road Town, Tortola, British Virgin Islands. The principal business of Alfa Telecom is to function as a holding company. Alfa Telecom is the sole shareholder of Eco Telecom and, in such capacity, may be deemed to be the beneficial owner of the Common Stock held for the account of Eco Telecom. Current information concerning the identity and background of the directors and officers of Alfa Telecom is set forth in Annex A hereto, which is incorporated by reference in response to this Item 2.

CTF Holdings is a Gibraltar limited liability company with its principal address at Suite 2, 4 Irish Place, Gibraltar. The principal business of CTF Holdings is to function as a holding company. CTF Holdings indirectly owns a majority of the shares of Alfa Telecom and, in such capacity, may be deemed to be the beneficial owner of the Common Stock held for the account of Eco Telecom. Current information concerning the identity and background of the directors and officers of CTF Holdings is set forth in Annex A hereto, which is incorporated by reference in response to this Item 2.

Crown Finance is a Liechtenstein foundation with its principal address at Am Schragen Weg 14, P.O. Box 1618, FL–9490, Vaduz, Liechtenstein. The principal business of Crown Finance is investment and management of the assets and capital of the foundation. Crown Finance is the sole shareholder of CTF Holdings and, in such capacity, may be deemed to be the beneficial owner of the Common Stock held for the account of Eco Telecom. Current information concerning the identity and background of the directors and officers of Crown Finance is set forth in Annex A hereto, which is incorporated by reference in response to this Item 2.

The "Supervisory Board" coordinates the strategic development of a group of affiliated entities, often referred to as the "Alfa Group Consortium," which group includes the Reporting Persons. In certain instances, the Supervisory Board issues recommendations regarding strategic business decisions to the

entities that are members of the Alfa Group Consortium. Current information regarding the identity and background of the members of the Supervisory Board is set forth in Annex A hereto, which is incorporated by reference in response to this Item 2.

During the past five years, none of the Reporting Persons and, to the best of the Reporting Persons' knowledge, no other person identified in response to this Item 2 has been (a) convicted in a criminal proceeding or (b) a party to any civil proceeding of a judicial or administrative body of competent jurisdiction as a result of which it or he or she is subject to a judgment, decree, or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws, or finding any violation with respect to such laws.

### Item 3. Source and Amount of Funds or Other Consideration

No material change.

### Item 4. Purpose of Transaction

Item 4 is hereby supplemented as follows:

On August 26, 2005, Telenor East Invest AS ("Telenor") filed a complaint against the Reporting Persons in the United States District Court for the Southern District of New York seeking an injunction to prevent Eco Telecom and all persons in active concert with it from voting or causing to be voted any of the common or preferred shares of VimpelCom beneficially owned by Eco Telecom at the extraordinary general meeting of shareholders scheduled for September 14, 2005 (the "EGM") or in the alternative to prevent Eco Telecom and all persons in active concert with it from voting any common or preferred shares of VimpelCom by proxy or otherwise until certain corrective disclosure is made (the "Complaint"). The Complaint is filed as Exhibit 99.2 hereto.

In particular the Complaint alleges, among other things, that Amendments 12, 13 and 15 contain material misstatements and omissions. As the Reporting Persons wish to avoid any doubt concerning their desire to provide full and adequate disclosure, their responses to these allegations are set out below.

Paragraph 59 of the Complaint alleges that the letter sent by Alfa Telecom's CEO to VimpelCom's shareholders on July 13, 2005 (the "July 13 Letter") was inadequate because it stated that Alfa Telecom has no financial interest in the sellers of WellCom but did not discuss any financial interest in the sellers held by other members of the Alfa Group. For the avoidance of doubt, the Reporting Persons hereby confirm that no Reporting Person, nor any of their officers, directors, subsidiaries, shareholders, beneficial owners or affiliates (as defined in Rule 501(b) of the Securities Act of 1933, as amended), nor, to the best knowledge of the Reporting Persons, any employee of the Reporting Persons, their subsidiaries or affiliates, has any financial interest in the sellers of WellCom.

Paragraph 63 of the Complaint alleges that Alfa Telecom failed to disclose its minority stake in Closed Joint Stock Company "Kyivstar G.S.M." in which Telenor possesses a 56.5% ownership interest. This information was disclosed in a press release dated August 23, 2005 and is available on the Alfa Telecom website at http://www.alfa-telecom.ru/index.php?path[]=en&path[]=publication-2005-08-23-14-03-24. This press release is attached as Exhibit 99.3 hereto.

Paragraph 65 of the Complaint alleges that Alfa Telecom did not disclose its 29.5% interest in Golden Telecom, Inc. in the July 13 Letter, and thereby its indirect interest in Golden Telecom Ukraine. Golden Telecom, Inc. is registered with the SEC and Alfa Telecom's shareholding is disclosed in the Schedule 14A filed by Golden Telecom, Inc. on May 19, 2005 (incorporated by reference as Exhibit 99.4 hereto).

Paragraph 66 of the Complaint asserts that a loan from Alfa Telecom to Turkey's Cukurova Group is alleged to be convertible into shares of Turkcell, which has an indirect interest in DCC, a 100% owned Ukrainian subsidiary of Turkcell. Contrary to what is asserted by Telenor, none of the Reporting Persons is a party to the Turkcell transaction. While there are Alfa entities who are parties to the Turkcell transaction, that transaction is itself subject to a number of conditions precedent including a number of regulatory approvals, and there is no assurance that all of these conditions will be satisfied.

With respect to the claims made in paragraphs 63, 65 and 66 of the Complaint, the Reporting Persons would emphasize that they seek to maximize the value of their investment in VimpelCom and believe that this can best be accomplished through expansion in the Ukraine – regardless of whether VimpelCom competes with other entities in which Alfa Telecom has a direct or indirect interest. As was stated in the July 13 Letter with respect to the proposed acquisition of WellCom: "Alfa Telecom believes the acquisition will create value for the shareholders of VimpelCom and will define the future success of VimpelCom. It will allow VimpelCom to compete effectively against other mobile phone operators that are working to develop their networks in the Ukraine and take advantage of the growth there."

Paragraph 70 of the Complaint alleges that the "independent research report" referred to in the July 13 Letter (the "Report") is not in fact independent because Brunswick UBS has advised VimpelCom with respect to the proposed acquisition of WellCom. While the Reporting Persons believe that Brunswick UBS has acted as an advisor to VimpelCom and is producing a fairness report in relation to the Proposed Acquisition, the Report was produced by Brunswick UBS's Global Equity Research division, not the investment banking division which advised VimpelCom and was not produced at the request of VimpelCom or the Reporting Persons.

To the best of the Reporting Persons' knowledge, there is no relationship between the Reporting Persons and Brunswick UBS except that within the last year Brunswick UBS has acted as an underwriter for Alfa Bank, an affiliate of the Reporting Persons, in connection with the placement of commercial paper. To the best knowledge of the Reporting Persons any contact between them and Brunswick UBS prior to the last year would have been infrequent and similar in nature to the role described in the preceding sentence.

Paragraph 72 of the Complaint alleges that the valuation disclosed in the Report is not an "equity valuation". As the Report says that the $296 million figure it provides is an "equity valuation", the Reporting Persons do not understand the basis for this claim.

Paragraph 73 of the Complaint alleges that the Report sets forth a "best case scenario". The Report in fact sets forth a "base case scenario".

Paragraphs 74 and 75 of the Complaint allege that the Report should have been filed as part of Amendment 12 or otherwise been made publicly available. The Report was prepared for the clients of Brunswick UBS Global Equity Research and the Reporting Persons do not control its publication. However, the Reporting Persons were able to get approval to publish the two paragraphs of the Report dealing directly with the WellCom acquisition, which state:

"In conclusion, since the issue of the WellCom acquisition might still become the crunch point in the conflict between Alfa Group and Telenor – and since minority shareholders might have to decide on the merits of potential investment in this company – we thought it would be helpful to present the sensitivity of WellCom's valuation to key assumptions (see Appendix 1).

Our base–case scenario yields an equity valuation of $296m for the company, assuming 16% market share by 2012 (VimpelCom achieved 19% market share in St Petersburg in just over a year since launching there), $840m in cumulative capex through 2012 (implying cumulative capex/sub and capex/sales profiles similar to the Russian wireless operators), a terminal EBITDA margin of 43%, WACC of 13% and a terminal growth rate of 3%."

Paragraph 76 of the Complaint states that the other investment banks who reached conclusions similar to Brunswick UBS should be identified. The statements made in the July 13 Letter regarding other banks reaching similar conclusions were based on discussions with VimpelCom's management and the manner in which the proposed acquisition was received in the Russian market.

Paragraph 80 of the Complaint alleges that the circumstances under which Pavel Kulikov was appointed to the board of Karino were not adequately disclosed. The Reporting Person believe these circumstances were adequately disclosed in the July 13 Letter which provided:

"This EGM is being called because the URS transaction is an interested party transaction. The acquisition is an interested party transaction because Pavel Kulikov, a member of the Board of Directors of VimpelCom, is also a director of Karino Trading Ltd., one of the sellers. This arrangement is a legitimate method to enfranchise shareholders on this issue. Alfa Telecom does not want to change the Charter of VimpelCom, as has been suggested by Telenor, but it does want to protect VimpelCom's future through a straightforward decision of shareholders on expansion into the Ukraine. This is the most pragmatic way to give all shareholders the opportunity to vote directly on this issue." For the avoidance of any doubt the arrangements for the appointment of Pavel Kulikov to the board of Karino Trading were put in place to have the proposed acquisition be classified as an interested party transaction under Russian law with the express purpose of letting shareholders decide on whether to proceed with the acquisition of WellCom.

Paragraph 83 of the Complaint alleges that the July 13 Letter falsely stated that the VimpelCom management had "done full due diligence". It is the understanding and belief of the Reporting Persons that full due

diligence had been performed and that the General Director of VimpelCom would be in a position to consummate a purchase of WellCom in a short period of time if shareholder approval was obtained and the sellers of WellCom were willing to make the sale. We note that in paragraphs 86 and 89 the Complaint alleges that the due diligence in the acquisition was "supervised" by Akin Gump Strauss Hauer & Feld ("Akin Gump"). While the Reporting Persons do not know what was intended by Telenor with respect to the word "supervised" the actual due diligence on WellCom in the Ukraine was conducted by the law firm Squire, Sanders & Dempsey LLP ("Squire Sanders"). In addition Squire Sanders advised the Reporting Persons in connection with the acquisition of their stake in Kyivstar. While Akin Gump is advising the VimpelCom board on the proposed acquisition of WellCom, Baker Botts LLP is also advising the VimpelCom board on the proposed acquisition in connection with corporate approvals and the convening of the EGM.

Paragraph 85 of the Complaint alleges that the Reporting Persons should have disclosed that the Option Agreement had expired and that approval was being sought for VimpelCom to exercise an option that had expired. The Reporting Persons believe this allegation to be based on a misreading of the Notice on Convocation dated July 13, 2005 (the "July 13 Notice on Convocation"). As was disclosed in the July 13 Notice on Convocation filed, the Option Agreement merely set out the terms to be offered to the sellers of WellCom – no attempt was being made to exercise the expired option. The July 13 Notice on Convocation provided:

"Please note that the Meeting is not being called to approve or ratify the Option Agreement. The majority shareholder vote in favour of the resolution will require the General Director, pursuant to Article 11.1 of the Charter, to negotiate the Acquisition at the price described in paragraph 19 of this Notice and on the other material terms and conditions set out in Schedule 3.1 to the Option Agreement."

The July 13 Notice on Convocation is incorporated by reference herein as Exhibit 99.5.

Paragraph 91 of the Complaint alleges that the Alfa Group has not adequately disclosed its global ambitions. In a July 7, 2005 article in the Financial Times, Mikhail Fridman made the extent of the Alfa Group's ambitions clear. He stated:

"'We want to be part of a global telecoms company, a Eurasian Vodafone. We want to convert all our stakes in different telecoms providers into one company – be it Telenor, TeliaSonera or any other international player,' Mr Fridman told the FT."

This article is attached hereto as Exhibit 99.6.

Paragraph 111 of the Complaint alleges that the August 19 letter from the Alfa Telecom CEO to VimpelCom shareholders falsely claimed that "technical difficulties" required the postponement of the August 14, 2005 extraordinary general meeting of shareholders. The Reporting Persons hereby confirm that they were informed by Georgeson Shareholder Communications Inc that software problems, beyond the control of the Reporting Persons, had created difficulties for a substantial number of holders of ADSs from submitting their proxies and that the number of proxies submitted was lower than anticipated.

This Item 4 contains forward–looking statements that involve risks and uncertainties. Such forward–looking statements include, without limitation, statements relating to (1) the implementation of strategic initiatives, (2) the results or consequences of any meeting of shareholders of VimpelCom, (3) the consequences of certain proposed transactions involving VimpelCom, (4) statements relating to VimpelCom's future business development and economic performance and (5) other statements regarding matters that are not historical facts. The words "believe", "expect", "will", "may", "should", "would" and similar expressions identify certain of these forward–looking statements.

Readers are cautioned not to put undue reliance on forward–looking statements because actual events and results may differ materially from the expected results described by such forward–looking statements. Many factors may influence VimpelCom's actual results and cause them to differ materially from expected results as described in such forward–looking statements. The Reporting Persons disclaim any intention or obligation to update and revise any forward–looking statements, whether as a result of new information, future events or otherwise.

**Item 5. <u>Interest in Securities of the Issuer</u>**

Item 5 is hereby supplemented as follows:

(a) No material change.

(b) No material change.

(c) To the best of the Reporting Persons' knowledge, there have been no transactions effected with respect to shares of Common Stock during the past 60 days by any of the persons named in response to Item 2, other than the transactions described in this Amendment.

(d) No material change.

(e) Not applicable.

**Item 6. <u>Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer</u>**

No material change.

**Item 7. <u>Material to be Filed as Exhibits</u>**

The Exhibit Index is incorporated herein by reference.

SIGNATURES

After reasonable inquiry and to the best of my knowledge and belief, each of the undersigned certifies that the information set forth in this Statement is true, complete and correct.

Date: August 30, 2005

ECO TELECOM LIMITED

By:   /s/ Pavel Volitskiy

Pavel Volitskiy
Director

Date: August 30, 2005

ALFA TELECOM LIMITED

By:   /s/ Franz Wolf

Franz Wolf
Director

Date: August 30, 2005

CTF HOLDINGS LIMITED

By:   /s/ Franz Wolf

Franz Wolf
Director

Date: August 30, 2005

CROWN FINANCE FOUNDATION

By:   /s/ Franz Wolf

Franz Wolf
Attorney-in-Fact

## ANNEX A

### Directors and Officers of Eco Telecom Limited

| Name/Title/Citizenship | Principal Occupation | Business Address |
| --- | --- | --- |
| Pavel Volitskiy, Director (Russia) | Manager, CTF Holdings Limited | Suite 2, 4 Irish Place, Gibraltar |

### Directors and Officers of Alfa Telecom Limited

| Name/Title/Citizenship | Principal Occupation | Business Address |
| --- | --- | --- |
| Geoffrey Piers Hemy, Director (United Kingdom) | Director, Grand Financial Holding S.A. | 11 Boulevard Royale, L–2449 Luxembourg |
| Georgia Karydes, Director (Cypriot) | Director, Feldmans Management (Overseas) Ltd. | 6, Nikou Georgiou street, Block C, office 704, Nicosia 1098, Cyprus |
| Alla Kudryavtseva, Director (Russia) | Director of CTF Holdings Limited | Suite 2, 4 Irish Place, Gibraltar |
| Alexey Reznikovich, Acting Chief Executive Officer (Russia) | Acting Chief Executive Officer, Alfa Telecom Limited | 21 Novy Arbat Street 121019 Moscow, Russia |
| Pavel Volitskiy, Director (Russia) | Manager, CTF Holdings Limited | Suite 2, 4 Irish Place, Gibraltar |
| Franz Wolf, Director (Germany) | Director of CTF Holdings Limited | Suite 2, 4 Irish Place, Gibraltar |

### Directors and Officers of CTF Holdings Limited

| Name/Title/Citizenship | Principal Occupation | Business Address |
| --- | --- | --- |
| Alla Kudryavtseva, Director (Russia) | Director of CTF Holdings Limited | Suite 2, 4 Irish Place, Gibraltar |
| Franz Wolf, Director (Germany) | Director of CTF Holdings Limited | Suite 2, 4 Irish Place, Gibraltar |

### Directors and Officers of Crown Finance Foundation

| Name/Title/Citizenship | Principal Occupation | Business Address |
| --- | --- | --- |
| Christian Rosenow, Director (Switzerland) | Financial Adviser | Talacker 35, 8001 Zurich, Switzerland |

| | | |
|---|---|---|
| Dr. Norbert Seeger, Director, (Liechtenstein) | Attorney, Arcomm Trust Company | Am Schragen Weg 14, P.O. Box 1618 FL–9490 Vaduz, Liechtenstein |
| Dr. Christian Zangerle, Director, (Austria) | Attorney, Law Office of Dr. Norbert Seeger | Am Schragen Weg 14, P.O. Box 1618 FL–9490 Vaduz, Liechtenstein |

### Directors of the Supervisory Board of Alfa Group Consortium

| Name/Title/Citizenship | Principal Occupation | Business Address |
|---|---|---|
| Peter Aven, Director (Russia) | President of OJSC Alfa Bank | 11 Mashy Poryvaevoy Street 107078 Moscow, Russia |
| Alexandr Fain, Director (Russia) | Chief Executive Officer of LLC Alfa Eco | 21 Novy Arbat Street 121019 Moscow, Russia |
| Mikhail Fridman, Director (Russia) | Chairman of the Board of Directors of OJSC Alfa Bank | 9 Mashy Poryvayevoy Street 107078 Moscow, Russia |
| Michail Gamzin, Director (Russia) | Director General, OAO Russian Technologies | 3rd Golutvinsky Pereulok, 10 Building 6 109180 Moscow, Russia |
| German Khan, Director (Russia) | Executive Director of TNK–BP Management | 18/2, Schipok Street 115093 Moscow, Russia |
| Alexander Kosiyanenko, Director (Russia) | Chief Executive Officer of JSC Perekrestok | 14817 Moscow Region District of Mytischy Paveltsevo Village, Russia |
| Alexey Kuzmichev, Director (Russia) | Chairman of Board of Directors of Alfa Eco Group | 21 Novy Arbat Street 121019 Moscow, Russia |
| Nigel John Robinson, Director (United Kingdom) | Director of Corporate Development, Finance and Control for Alfa Group | 6 Sechenovskiy Pereulok, Building #3, Floor #3 119034 Moscow, Russia |
| Alexey Reznikovich, Director (Russia) | Acting Chief Executive Officer, Alfa Telecom Limited | 21 Novy Arbat Street 121019 Moscow, Russia |
| Alexander Savin, Director (Russia) | Chief Executive Officer, Alfa Eco Group | 12 Krasnopresenskaya Nab. World Trade Center 2, Entrance 7 123610 Moscow, Russia |

To the best of the Reporting Persons' knowledge:

(a) None of the above persons hold any Shares.

(b) None of the above persons has any contracts, arrangements, understandings or relationships with respect to the Shares.

**Index to Exhibits**

| | |
|---|---|
| Exhibit 24.1 | A conformed copy of the Power of Attorney authorizing Franz Wolf to sign this amendment on behalf of Crown Finance Foundation incorporated herein by reference to Exhibit 24.1 to Amendment Number 14 to the Statement on Schedule 13D filed by Eco Telecom Limited, inter alios, with the Securities and Exchange Commission on August 17, 2005 |
| Exhibit 99.1 | A conformed copy of the joint filing agreement by and among the Reporting Persons, *inter alios*, dated August 19, 2004, incorporated herein by reference to Exhibit 99.1 to Amendment Number 7 to the Statement on Schedule 13D filed by the Reporting Persons, *inter alios*, with the Securities and Exchange Commission on August 23, 2004 |
| Exhibit 99.2 | Complaint filed on August 26, 2005 by Telenor East Invest AS against the Reporting Persons |
| Exhibit 99.3 | August 23, 2005 press release issued by Alfa Telecom |
| Exhibit 99.4 | Schedule 14A filed on May 19, 2005 by Golden Telecom, Inc (incorporated by reference) |
| Exhibit 99.5 | Notice on convocation of the Meeting dated July 13, 2005, with attachments incorporated herein by reference to Exhibit 99.2 to Amendment Number 12 to the Statement on Schedule 13D filed by Eco Telecom Limited, inter alios, with the Securities and Exchange Commission on July 19, 2005 |
| Exhibit 99.6 | July 7, 2005 article in the Financial Times |



# OPEN JOINT STOCK CO VIMPEL COMMUNICATIONS (VIP)

10 12 8TH MARCH ST
MOSCOW RUSSIA, U2 125083
70959745888
http://www.vimpelcom.com/

# EX-99.2

**COMPLAINT FILED ON AUGUST 26, 2005 BY TELENOR EAST INVEST AS**
**SC 13D/A Filed on 08/30/2005**
File Number 005-48091



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 99.2

# United States District Court

## SOUTHERN DISTRICT OF NEW YORK

TELENOR EAST INVEST AS,

                    Plaintiff,

       −against−

ECO TELECOM LIMITED, ALFA TELECOM LIMITED, CTF
HOLDINGS LIMITED, and CROWN FINANCE FOUNDATIONS,

                    Defendants.

**SUMMONS IN A CIVIL CASE**

05 CV

**TO:**

Alfa Telecom Limited
P.O. Box 3339
Geneva Place, Second Floor
333 Waterfront Drive
Road Town, Tortola
British Virgin Islands

Eco Telecom Limited
10/8 International Commercial Centre
Casemates Square, Gibraltar

CTF Holdings Limited
Suite 2
4 Irish Place
Gibraltar

Crown Finance Foundations
Am Schragen Weg 14
P.O. Box 1618
FL−9490
Vaduz, Liechtenstein

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY:

Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, New York 10103

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If
you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of
this Court within a reasonable period of time after service.

_____

CLERK

_____

(BY) DEPUTY CLERK

AUG 26 2005

DATE

Robert L. Sills (RS 8896)
Adam S. Zimmerman (AS 3738)
David M. Powers (DP 8557)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue, New York, New York 10103
Telephone: (212) 506–5000
Facsimile: (212) 506–5151
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**TELENOR EAST INVEST AS,**

<table>
<tr><td></td><td>Plaintiff,</td><td></td></tr>
<tr><td>–against–</td><td></td><td>05 Civ.</td></tr>
<tr><td colspan="2">**ECO TELECOM LIMITED, ALFA TELECOM LIMITED, CTF HOLDINGS LIMITED, and CROWN FINANCE FOUNDATION,**</td><td>**COMPLAINT**</td></tr>
<tr><td></td><td>Defendants.</td><td></td></tr>
</table>

Plaintiff Telenor East Invest AS ("Telenor East Invest"), by its undersigned attorneys, for its Complaint against defendants Eco Telecom Limited ("Eco Telecom"), Eco Holdings Limited, CTF Holdings Limited, and Crown Finance Foundation (collectively the "Defendants"), states as follows:

## I. INTRODUCTION

1. Plaintiff Telenor East Invest, brings this action for an Order (a) restraining Eco Telecom Limited ("Eco Telecom"), Eco Holdings Limited, CTF Holdings Limited and Crown Finance Foundation (collectively the "Defendants") from voting or causing to be voted any of the common or preferred shares of OAO Vimpel–Communications ("VimpelCom") beneficially owned by Eco Telecom in connection with the approval of the acquisition by VimpelCom of

Closed Joint Stock Company "Ukrainian Radiosystems" ("WellCom") at the extraordinary general meeting of shareholders (the "EGM") scheduled for September 14, 2005, or, in the alternative (b) restraining the Defendants from voting or causing to be voted any of the common or preferred shares of VimpelCom (and any American Depository Shares ("ADSs") representing such shares) beneficially owned by Eco Telecom at the EGM, until the Defendants correct the material misstatements and omissions made in Amendment No. 12, Amendment No. 13 and Amendment No. 15 to the Defendants' filing on Schedule 13D and the materials sent by the Defendants to VimpelCom's shareholders to solicit their votes for the only issue on the agenda for the EGM, the proposed acquisition of WellCom.

2. The EGM was called and then rescheduled by Eco Telecom as part of an ongoing campaign by Defendants to force VimpelCom, a Russian mobile phone company whose ADSs are listed on the New York Stock Exchange, to acquire WellCom, a small Ukrainian wireless telecommunications company that operates under the brand name WellCom. The proposed purchase price for WellCom is set at over $206 million (subject to certain adjustments), which is more than fifty–seven times WellCom's 2004 revenues of $3.6 million. The acquisition by VimpelCom of WellCom (the "Proposed Acquisition") has been aggressively promoted by the Defendants. However, in their communications with shareholders of VimpelCom concerning the Proposed Acquisition, the Defendants have failed to disclose many of the material terms of the Proposed Acquisition, including whether any of Eco Telecom's beneficial owners, shareholders or affiliates, or any of its or their respective officers, directors, employees or subsidiaries, has any financial interest in, or relationship with, the sellers of WellCom.

3. The EGM was originally scheduled for Monday, August 15, 2005. However, by Friday, August 12, 2005, a day after the ADS holders were required to submit their proxies, it

2

was clear that the sole agenda item – Eco Telecom's motion to approve the acquisition of WellCom – would not receive the requisite number of votes to pass. To avoid losing the vote it had sought, Eco Telecom then took the extraordinary step of refusing to attend and vote at the meeting it had called for August 15, 2005.

4. Under Russian law and VimpelCom's charter, the result of Eco Telecom's absence was that the EGM scheduled to be held on August 15, 2005 was cancelled due to lack of quorum, and a new meeting with the same agenda is required to be held within 30 days of such cancellation. On August 15, 2005, Eco Telecom notified VimpelCom's shareholders that the rescheduled EGM would be held on September 14, 2005.

5. As described below, amendments to Defendants' filings on Schedule 13D, which the Defendants filed with the Securities and Exchange Commission (the "SEC") on July 19, 2005, August 10, 2005 and August 19, 2005, including several letters to shareholders of VimpelCom in which the Defendants solicit shareholders' proxies for the EGM, materially misrepresent the underlying facts of the Proposed Acquisition. In addition, a letter from Eco Telecom dated August 19, 2005—which was filed with Amendment No. 15 to the Defendants filing on Schedule 13D—materially misstates the basis upon which the EGM was rescheduled.

## II. THE PARTIES

### A.   Telenor

6. Telenor East Invest is, and at all times relevant herein, has been, a corporation duly organized and existing under the laws of the Kingdom of Norway, with its principal place of business in Oslo, Norway. It is an affiliate of Telenor Mobile, a Norwegian corporation, and an indirect subsidiary of Telenor ASA ("Telenor"), also a Norwegian corporation. Telenor is the largest provider of telecommunications services in Norway, and, through Telenor Mobile, has a

3

substantial international presence in the mobile telephone industry. Telenor's shares are listed in Norway on the Oslo Stock Exchange, and in the United States on NASDAQ; the company has over 46,000 shareholders.

7. For many years, Telenor Mobile has invested in, and developed strategic partnerships with mobile communications companies located outside of Norway. As of December 2004, Telenor Mobile and its affiliates in Europe and Asia had approximately 52.7 million subscribers, making Telenor the twelfth largest mobile telephone company in the world. Telenor is one of the largest foreign investors in the Russian telecommunications industry.

**B.     Eco Telecom and Alfa Group**

8. Upon information and belief, Eco Telecom is, and at all times relevant herein, has been, a corporation duly organized and existing under the laws of Gibraltar, with its principal place of business in Gibraltar. Eco Telecom's stated purpose is to act as a "holding company." Eco Telecom beneficially owns 32.9% of VimpelCom's voting stock.

9. Upon information and belief, the record owner of Eco Telecom's common and preferred shares in VimpelCom (and any ADSs representing such shares) is BNY Clearing International Nominees Limited ("BNY").

10. Upon information and belief, Alfa Telecom Limited ("Alfa Telecom") is, and at all times relevant herein, has been, a British Virgin Islands company and the sole shareholder of Eco Telecom.

11. Upon information and belief, CTF Holdings Limited ("CTF") is, and at all times relevant herein, has been, a Gibraltar corporation with controlling interest, directly or indirectly, in Alfa Telecom.

12. Upon information and belief, Crown Finance Foundation ("Crown") is, and at all times relevant herein, has been, a Lichtenstein foundation and the sole shareholder of CTF.

4

13. Eco Telecom, Alfa Telecom, CTF and Crown are all part of a Russian business entity known as the Alfa Group Consortium (the "Alfa Group"). The Alfa Group is controlled by, among others, Mikhail Fridman.

14. The Alfa Group also controls, among other businesses, Alfa Bank, Alfa Capital and 50% of TNK–BP. Mr. Fridman is generally referred to in the press as one of Russia's "oligarchs" and is reputedly one of Russia's wealthiest men, with a personal fortune said to amount to billions of dollars. Alfa Group is known for its extremely aggressive business tactics.

### III. JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C § 78m.

### IV. RELEVANT FACTS

**A.   VimpelCom**

16. VimpelCom is the second largest mobile telephone operator in Russia. At the end of December 2004, VimpelCom had approximately 7.48 million subscribers in Moscow and 18.25 million in the rest of Russia, representing market shares of 44% and 33%, respectively.

17. In 1996, VimpelCom became the first Russian company to list its ADSs on the New York Stock Exchange. The Bank of New York ("BONY"), the parent of BNY, acts as depositary for VimpelCom's ADSs, and the current average volume for VimpelCom ADSs on the New York Stock Exchange is approximately 1,000,000 per day.

18. VimpelCom is, and at all times herein, has been subject to the reporting provisions of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78(a), et seq.

**B.   Telenor East Invest and Eco Telecom's Interests in VimpelCom**

19. In December 1998, Telenor East Invest purchased 25.7% of the voting capital stock of VimpelCom.

20. On November 5, 2001, Eco Telecom purchased over five million newly–issued common shares of VimpelCom for $103 million, pursuant to agreements dated as of May 31, 2001.

21. Eco Telecom purchased 6,426,600 preferred shares and 113,102 common shares of VimpelCom from certain shareholders of VimpelCom, also pursuant to agreements dated May 31, 2001.

22. Over time, Eco Telecom increased its ownership of VimpelCom's capital stock so that today, it owns 32.9% of VimpelCom's voting stock and 24.5% of VimpelCom's common stock.

23. Telenor East Invest currently owns 26.6% of VimpelCom's voting stock and 29.9% of VimpelCom's common stock.

24. As the two largest shareholders in VimpelCom, Telenor East Invest and Eco Telecom entered into a Shareholders Agreement dated as of May 31, 2001 (the "Shareholders Agreement") which governs, among other things, the nomination of candidates for election to VimpelCom's nine–member board of directors (the "Board").

**C.    Eco Telecom Attempts To Take effective Control Of VimpelCom**

25. In October 2004, Eco Telecom began a campaign to take effective control of VimpelCom and to destroy Telenor East Invest's rights in VimpelCom, without purchasing any additional shares. Eco Telecom's assault on VimpelCom's corporate governance has centered on Eco Telecom's efforts to force VimpelCom to acquire WellCom over the objections of Telenor East Invest.

**D.    The WellCom Transaction**

26. WellCom is a small and relatively new entrant into the Ukrainian mobile communications market. WellCom possesses very limited operations, with a market share of

6

approximately 1% of the Ukrainian market, total annual revenues of $3.6 million in 2004, a total of 47,000 subscribers, and substantial operating losses. By comparison, the two largest Ukrainian mobile operators already possess over 13.5 million subscribers – close to 98% of all mobile subscribers in Ukraine – and their market penetration in the Ukrainian mobile market by the end of 2005 is expected to reach 50%.

27. In October 2004, the sole shareholder of Eco Telecom, Alfa Telecom, announced plans to cause VimpelCom to acquire WellCom for approximately $206 million, more than fifty– seven times WellCom's annual revenue.

28. On February 18, 2005, VimpelCom entered into an Option Agreement (the "Option Agreement") with the prospective sellers of the shares of WellCom, and paid an option fee of $5 million to Karino Trading Ltd, a British Virgin Island company identified in the Option Agreement as a prospective seller, and the recipient of the option fee on behalf of all the prospective sellers.

29. The Proposed Acquisition is predicated on projections by Eco Telecom of revenues and increased mobile subscribers in the Ukraine. Telenor informed Eco Telecom that Telenor believed these projections to be grossly exaggerated and unrealistic.

30. Under the terms of VimpelCom's charter, eight of the nine members of the Board are required to approve an acquisition. However, in light of Telenor's expressed opposition to the Proposed Transaction, Eco Telecom could not garner the votes necessary for the Board's approval. Accordingly, the Proposed Acquisition could not proceed without the support of Telenor East Invest's three nominees to the Board.

**E.    <u>Vexatious Litigation</u>**

31. In October 2004, a series of vexatious legal maneuvers aimed at undermining the minority protections in VimpelCom's charter began, all in an effort to cause the Proposed

7

Acquisition to be approved in derogation of Telenor East Invest's minority rights. These actions generally sought to reduce the voting thresholds under VimpelCom's charter by which strategic Board decisions, including acquisitions, are made.

32. The first of the four attempts to undermine Telenor East Invest's rights began in an "arbitrazh", or business court, in southern Russia's Krasnodar region, approximately 1,500 kilometers from Moscow. A 25 year old individual living in rural Temryuk, one Victor Makarenko, filed suit on October 27, 2004, requesting the court to endorse the validity of the Proposed Acquisition by VimpelCom.

33. Although Mr. Makarenko allegedly held only two shares of VimpelCom common stock, the text of his claim reflected confidential information regarding WellCom that was available only to members of the Board and senior VimpelCom management. All members of the Board at that time had been nominated either by Eco Telecom or Telenor East Invest.

34. Despite holding only two shares, Mr. Makarenko commenced three separate actions against VimpelCom.

35. In his second suit, Mr. Makarenko obtained a default judgment in the Temryuk District Court that purported to invalidate the supermajority provisions of VimpelCom's charter described above. Although VimpelCom was not properly served in that action, a default judgment was entered in Mr. Makarenko's favor on January 13, 2005.

36. The district court's judgment specifically referred to the potential acquisition by VimpelCom of WellCom, and stated that any resolution on that matter should be approved by a simple majority of the Board who were present and eligible to vote on the issue, despite the supermajority provisions of the charter.

8

37. After a series of appeals, the order invalidating the supermajority provisions of the charter was finally overturned by the Russian Supreme Court on June 29, 2005.

38. Mr. Makarenko filed his third suit against VimpelCom with the Arbitration Court of the Krasnodar Region on March 12, 2005. In that lawsuit, Mr. Makarenko asked the court to recognize Telenor East Invest's nominees to the Board as being interested in blocking VimpelCom's decision to acquire shares of WellCom, and to prohibit those Board members from participating in a Board decision regarding that transaction. Mr. Makarenko also sought the invalidation of the supermajority provisions of VimpelCom's charter. As part of his initial claim, Mr. Makarenko requested injunctive relief to prohibit Telenor East Invest's nominees on the Board from voting on the Proposed Acquisition. The Arbitration Court denied Mr. Makarenko's request for an injunction. That third lawsuit was withdrawn by Mr. Makarenko on June 14, 2005.

39. Eco Telecom denies that it was involved in Mr. Makarenko's actions.

On May 16, 2005, however, Eco Telecom filed an action in a Moscow court against VimpelCom and three of Telenor East Invest's nominees to the Board seeking to suspend the minority protection provisions of VimpelCom's charter and authorizing the acquisition of WellCom by a simple majority vote on essentially the same theory asserted in Mr. Makarenko's actions.

That lawsuit was withdrawn by Eco Telecom on June 14, 2005.

**F.    Eco Telecom Violates the Shareholder Agreement and Takes Control of the VimpelCom Board**

40. Shortly after the various litigations aimed at voiding the minority protections in VimpelCom's charter began, Eco Telecom sought to seize control of the VimpelCom Board, in

9

violation of the Shareholders Agreement which governs the nomination of candidates for election as directors.

41. Under Section 4.01 of the Shareholders Agreement, subject to certain conditions, Telenor East Invest has the right to nominate five candidates. Eco Telecom has the right to nominate four candidates. The Shareholders Agreement requires two of Telenor East Invest's nominees to be Independent, as such term is defined in the Shareholders Agreement, and one of Eco Telecom's candidates to be Independent. Under the terms of the Shareholders Agreement, one of Telenor East Invest's Independent candidates must be approved by Eco Telecom.

42. Under Russian law, absent the Shareholders Agreement, each of Telenor East Invest and Eco Telecom would have the right to nominate nine candidates for election to the nine-member Board.

43. At the AGM on June 22, 2005, in violation of the shareholder Agreement, Eco Telecom allocated its votes so as to elect five members of the Board, all of whom were nominated by Eco Telecom and two of whom were Independents nominated by Eco Telecom. Telenor East Invest allocated its votes to elect four members of the Board, all of whom were nominated by Telenor East Invest and one of whom was an Independent.

44. On July 11, 2005, the newly-elected Board held its first meeting, and David Haines, an Independent candidate nominated by Eco Telecom, was elected Chairman of the Board. Under VimpelCom's charter, the Chairman of the Board has a casting vote in the event of a deadlock.

45. However, because VimpelCom's charter requires that an acquisition be approved by eight out of nine directors, Eco Telecom's seizure of Board control would not allow it to conclude through the Proposed Acquisition.

10

**G.     A Senior Executive From Alfa Telecom Becomes a Director of one of the Prospective Sellers of WellCom**

46. In an effort to bypass the Board and attempt to have the Proposed Acquisition approved, Eco Telecom also took steps to call the EGM.

47. On June 3, 2005, Pavel Kulikov, a senior executive of Alfa Telecom and a member of the VimpelCom Board, became a director of Karino, a British Virgin Islands company and one of the proposed sellers of WellCom's stock.

48. Upon information and belief, a wholly-owned subsidiary of Karino, Crayola Properties Limited ("Crayola"), now holds the shares of WellCom previously held by Karino. Schedule 5.4 of the Option Agreement indicates that Karino holds 240 shares of WellCom, out of a total of 845,630 shares issued and outstanding. Mr. Kulikov's statement to the VimpelCom Board of July 22, 2005 indicates that Crayola owns 20% or more of WellCom's stock. Karino's sole director prior to Mr. Kulikov's appointment was Stavros Charalambous, a resident of Nicosia, Cyprus. Karino's registered office is at Craigmuir Chambers in Roadtown, Tortola, BVI – the address of "HWR Corporate Services"– and its business address, according to the WellCom Contract, is in Dniepropetrovsk, Ukraine.

49. According to Eco Telecom, by virtue of Mr. Kulikov having become a director of Karino, the acquisition of WellCom would therefore be an "interested party transaction" requiring the approval of a disinterested majority of VimpelCom's voting shares.

50. Eco Telecom took the position that, under Russian law, if the Proposed Acquisition were approved by a simple majority of VimpelCom's shareholders, there was no requirement for the Board to approve the Proposed Acquisition. Telenor East Invest disputes that interpretation of Russian law.

11

51. There is no question that, before the conflict manufactured by Mr. Kulikov's Karino directorship, Board approval would be required for the Proposed Acquisition.

52. In a letter dated July 6, 2005 from Herbert Smith, counsel to Eco Telecom, addressed to BONY (the "July 6, 2005 Letter"), Eco Telecom stated that it would convene an EGM on August 15, 2005 to approve the acquisition by VimpelCom of WellCom as an "interested party transaction."

53. The July 6, 2005 Letter requested complete records of VimpelCom's American Depository Receipts ("ADRs") holders deposited with the BONY. The letter noted that the purpose of this demand was to enable Eco Telecom to:

[C]ommunicate with ADR shareholders regarding the issues relating to the meeting and... to request ADR holders to solicit their proxies in connection with the Meeting for the acquisition of [VimpelCom] of 100% of [WellCom].

54. The July 6, 2005 Letter also stated that the interested party transaction was warranted because the asset value of WellCom was in excess of 2% of the balance sheet value of the assets owned by WellCom.

**V. ECO TELECOM FILES ITS MISLEADING AMENDMENT NO. 12 TO ITS FILING ON SCHEDULE 13D WITH THE SEC**

55. On July 19, 2005, Eco Telecom filed with the SEC Amendment No. 12 to its filing on Schedule 13D. The filing contained several exhibits, including a notice convening an EGM and, most importantly, a letter dated July 13, 2005 addressed to VimpelCom's shareholders from the CEO of Alfa Telecom (the "July 13th letter").

56. That filing is replete with material omissions and misstatements that will taint voting in the EGM. Its principal deficiencies are outlined below.

12

**A.    Failure To Identify Interested Parties**

57. Eco Telecom's notice of the EGM fails to identify, in any meaningful way, the sellers of WellCom.

58. Eco Telecom's notice of the EGM indicates that the sellers of WellCom include a variety of offshore entities, including entities with "addresses" in the British Virgin Islands, the Channel Islands and Bermuda, and/or their affiliates and/or subsidiaries (depending on the structure of ownership of the shares in WellCom)(the "Sellers").

59. The July 13th letter states, at the bottom of page 1, that "Alfa Telecom can also assure shareholders that it has no financial interest in the sellers of [WellCom]." That carefully-worded disclaimer makes no mention of any other members of the Alfa Group, nor of their beneficial owners or shareholders, or any of their respective officers, directors, employees, subsidiaries or affiliates.

60. Because the Sellers include a large number of shell corporations located in offshore tax havens, it is impossible for a VimpelCom shareholder asked to vote at the EGM to determine whether the Proposed Acquisition involves any self-dealing by Eco Telecom or any of its beneficial owners, shareholders, or any of their respective officers, directors, employees, subsidiaries or affiliates.

**B.    Misrepresentations Concerning Conflicts of Interest**

61. The July 13th letter makes misleading statements regarding claimed conflicts of interest on the part of Telenor East Invest.

62. The July 13th letter states that Telenor is conflicted from investing in a Ukrainian enterprise like WellCom because Telenor possesses a 56.5% ownership interest in Closed Joint Stock Company "Kyivstar G.S.M.", another Ukrainian mobile communications operator ("Kyivstar").

13

63. The July 13th letter does not disclose that Kyivstar's other shareholder, Storm LLC, is in fact wholly–owned by Alfa Telecom, and that Alfa Telecom is therefore the beneficial owner of a 43.5% equity interest in Kyivstar.

64. Upon information and belief, Alfa Telecom has significant influence over two other mobile operators in Ukraine, neither of which is disclosed in the July 13th letter.

65. Through its 29.5% ownership interest in Golden Telecom, Inc., Alfa Telecom has an indirect interest in Golden Telecom Ukraine.

66. Through its recent loan to Turkey's Cukurova Group which is alleged to be convertible into shares of Turkcell, Alfa Telecom has an indirect interest in DCC, a 100% owned Ukrainian subsidiary of Turkcell.

67. If the Proposed Acquisition were completed, Alfa Telecom would, through VimpelCom, in effect, be competing with those two other Alfa–related entrants in the Ukrainian mobile market.

68. The July 13th letter is silent as to how Alfa proposes to deal with that situation.

**C.     Misstatements and Omissions Regarding Valuation**

69. The July 13th letter also claims that "in an independent research report" Brunswick UBS "has produced an equity valuation of USD $296 million" for WellCom.

70. However, Brunswick UBS is not independent – it is VimpelCom's regular investment banker, and has advised VimpelCom concerning the Proposed Acquisition.

71. Upon information and belief, Brunswick UBS has acted as an underwriter for Alfa Bank, a member of the Alfa Group.

72. Moreover, the Brunswick UBS report is not, in fact, a valuation.

73. Rather, the report sets forth a "best case scenario" of WellCom's projected value, based on a series of assumptions that Brunswick UBS does not itself adopt.

14

74. That report was not filed by Eco Telecom as part of Amendment No. 12 to its filing on Schedule 13D nor otherwise generally made available to VimpelCom shareholders.

75. Upon information and belief, the Brunswick UBS report is not a public document.

76. The Alfa Telecom Letter also states that "other" investment banks "have reached a similar conclusion" as the Brunswick UBS report, but does not identify those banks, or the valuations of WellCom, if any, that they have made.

77. Upon information and belief, all other available research reports on the Proposed Acquisition have concluded that the acquisition of WellCom at the contract price would reduce shareholder value for VimpelCom.

78. In effect, the Alfa Telecom Letter is a projection of WellCom's prospects, but omits virtually all of the facts a reasonable shareholder would require to evaluate it, including the qualifications of the reviewer, the extent of the review and the relationship between the reviewer and the registrant.

79. For example, according to an April 2005 Dun & Bradstreet information report, as confirmed by WellCom management, WellCom had an operating loss of over UAH60,305,400 (equal to $11 million) in the first nine months of 2004 and a net worth of UAH537,264,800 (equal to $107,452,960). That same report characterized the financial strength of the company as "negative" based on the net worth of WellCom, and found the overall condition of the company poor because of the "significant level of risk."

**D.    Origins of the "Interested Party" Transaction**

80. The July 13th letter states that the EGM was called because the WellCom acquisition represented an "interested party transaction" under Russian law, noting that "Pavel Kulikov, a member of the Board of Directors of VimpelCom, is also a director of Karino Trading

15

Ltd., one of the sellers." The letter does not mention the circumstances under which Mr. Kulikov was appointed to the board of Karino.

81. As noted above, Mr. Kulikov, a senior official of Alfa Telecom, was nominated to his Karino position on June 3, 2005, solely for the purpose of manufacturing an "interested party transaction" so that the EGM could be called.

E.    Misstatements and Omissions In The Projections of WellCom's Value

82. The Alfa Telecom Letter also states that "[m]anagement has done full due diligence on the opportunity and believes it is a highly beneficial and strategically important move for VimpelCom" and that Alfa Telecom believes "the acquisition will create value for the shareholders of VimpelCom and will define the future success of VimpelCom [because it] will allow VimpelCom to compete effectively against other mobile phone operators that are working to develop their networks in the Ukraine and take advantage of the growth there."

83. While VimpelCom management has performed some due diligence, it has not performed "full" due diligence. In fact, Telenor East Invest brought to VimpleCom's management's attention two lawsuits and an ongoing criminal investigation concerning WellCom that were not mentioned in the due diligence report on WellCom distributed to the Board by VimpelCom's management.

84. Moreover, the Option Agreement expressly provides, in Article 4.2, for due diligence following approval of the Proposed Acquisition and a possible change in price following due diligence

85. It also appears that the Option Agreement has expired by its own terms. Under Article 7.1 of that agreement, as filed with the SEC, the Option Agreement expired in July 2005. No notice has ever been provided that the term of the Option Agreement has been extended or, if

16

it has, on what terms and conditions. Alfa Telecom's disclosures should include the fact that it is seeking approval for VimpelCom to exercise an option that has expired.

86. The July 13th letter fails to mention that what due diligence that was performed by VimpelCom's management was supervised by Alfa Telecom's own lawyers, Akin Gump Strauss Hauer & Feld ("Akin Gump").

87. The law firm of Akin Gump continues to advise VimpelCom's Board about the Proposed Acquisition.

88. Akin Gump is also currently defending the Alfa Group Consortium against a civil racketeering lawsuit now pending in the United States District Court for the Southern District of New York. *See Norex Petroleum Limited v. Access Industries Inc.,* — F. 3d —, 2005 WL 1705293 (2d Cir. July 21, 2005).

89. Especially given the almost total lack of transparency in the Proposed Acquisition, a reasonable shareholder would certainly wish to know that due diligence, to the extent it took place, had been supervised by Alfa Telecom's own lawyers.

90. The July 13th letter does not describe any of the various legal proceedings, criminal and civil in which WellCom is involved.

**F.    Failure to Describe Alfa's Long-Term Goals**

The Defendants' filing on Schedule 13D fails to disclose Alfa Telecom's ultimate plans, of which the Proposed Acquisition is merely a part. Alfa Telecom's efforts to force VimpelCom to acquire WellCom is not an end in itself, but in part of its larger strategy to form a single transactional telecommunications concern.

91. VimpelCom's shareholders are entitled to know that their votes are being solicited as a step on the road to Alfa Group Consortium's global ambitions, and not merely to acquire a small Ukrainian telecommunications carrier.

17

92. Recent Ukrainian litigation involving Kyivstar show the lengths to which Alfa Telecom will go in pursuit of its telecommunications strategy. On August 22, 2005—the day before Ukraine's national holiday—Kyivstar was served with two injunctions, both granted ex parte, prohibiting Kyivstar's president and the Board from carrying out virtually any of their management functions. Strikingly, the plaintiff in the first of those cases was the same Pavel Kulikov who created the "conflict" between VimpelCom and Karino, this time in his capacity as a director of Kyivstar.

93. Alfa Telecom's theory appears to be that, as a minority shareholder, it has been excluded from management. However, far from attempting to participate in management, Kyivstar has boycotted both Board and shareholder meetings, preventing company business from being transacted. Moreover, Storm agreed precisely to the terms to which it now objects in a shareholders agreement, dated September 2001. Storm's previous attack on that shareholders agreement in the Ukrainian courts failed.

94. Thus, at the same time that Alfa Telecom is asserting to VimpelCom's shareholders that Telenor's role in Kyivstar creates a conflict with Kyivstar, Alfa Telecom has taken aggressive steps to enhance its control over Kyivstar through litigation.

95. VimpelCom's shareholders are entitled to know that their votes are being solicited as.a step on the road to Alfa Group Consortium's global ambitions, and not merely to acquire a small Ukrainian carrier, albeit at an exorbitant price.

## VI. ECO TELECOM FILES ITS MISLEADING AMENDMENT NO. 13 TO ITS FILING ON SCHEDULE 13D WITH THE SEC

96. On August 10, 2005, Eco Telecom filed with the SEC Amendment No. 13 to its filing on Schedule 13D. The filing contained several exhibits, including a letter on Eco Telecom

18

letterhead dated August 5, 2005 signed by the CEO of Alfa Telecom that also addressed VimpelCom's shareholders (the "August 5th letter").

97. That letter repeats many of the same misstatements Alfa Telecom made in its July 13, 2005 letter.

98. The August 5th letter repeats the misrepresentation that VimpelCom's management has "conducted full due diligence on the opportunity and believes it is a highly beneficial and strategically important move for VimpelCom."

99. As with the previous filings, those statements again ignore the cursory nature of the due diligence performed by VimpelCom's management, and omit any reference to the due diligence supervised by Alfa Telecom's own attorneys.

100. The August 5th letter, like its predecessor, also relies on what it characterizes as an "independent research report, produced by Brunswick UBS, [which] contains an equity valuation of URS of $296 million (US), based on their assumptions for the market."

101. The August 5th letter notes that "[o]ther independent investment banks have reached the same conclusion."

102. However, like the July 13th letter, the August 5th letter fails to identify those banks or any of the bases for the conclusions they allegedly reach.

103. The August 5, 2005 letter omits material information that any reasonable investor would require, including the identities and interests of the sellers, bases and limitations of the projected value of WellCom, the licenses and rights WellCom needs to conduct its business, any of Telenor East Invest's reasons for opposing the Proposed Acquisition, and most importantly, Alfa Telecom's long terms goals to use the Proposed Acquisition to form a single transnational telecommunications concern.

19

## VII. ECO TELECOM FAILS TO ATTEND THE EGM IT CONVENED

104. On August 12, 2005, the day after VimpelCom's ADSs were voted and counted, it was clear that Eco Telecom's motion to approve the Proposed Acquisition would not be carried at the EGM.

105. Rather than appear at the meeting it had called and allow the shareholders to vote, Eco Telecom did not attend the EGM.

106. Because Eco Telecom's absence from the EGM resulted in the lack of a quorum, the effect under Russian law was to reschedule the EGM within 30 days of the originally scheduled EGM.

107. On August 17, 2005, Defendants filed with the SEC Amendment No. 14 to their filing on Schedule 13D. That filing contained a new notice to VimpelCom's shareholders from Eco Telecom dated August 15, 2005 convening a rescheduled EGM to be held on September 14, 2005. The filing noted that the rescheduled meeting would "replace[] the extraordinary general meeting previously scheduled for August 15, 2005."

## VIII. ECO TELECOM FILES ITS MISLEADING AMENDMENT NO. 15 TO ITS FILING ON SCHEDULE 13D WITH THE SEC

108. On August 19, 2005, the Defendants filed with the SEC Amendment No. 15 to their filing on Schedule 13D.

109. That filing included a letter dated August 19, 2005 on Eco Telecom letterhead from the CEO of Alfa Telecom addressing VimpelCom's shareholders (the "August 19th letter") and soliciting proxies for the approval of the Proposed Acquisition at the newly rescheduled EGM.

110. The August 19th letter repeats many of the same misstatements Alfa Telecom made in its July 13th and August 5th letters, including the same misleading references to

20

"independent" valuations of WellCom, while omitting any description of the identities and interests of the sellers, bases and limitations of the projected value of WellCom, or Alfa Telecom's long term goals.

111. The August 19th letter contains additional inaccuracies. In particular, the August 19th letter states that Eco Telecom acted to postpone the EGM because of "technical difficulties in voting." That statement is false. There were no "technical difficulties" at the EGM.

112. The fact is that holders of a majority of VimpelCom's voting shared did not vote for Eco Telecom's proposal. That some shareholders expressed that preference by withholding their votes is not unusual or unexpected, given the statement in the July 13th letter and the August 5th letter that "[n]ot voting will count as a vote against the acquisition."

## IX. THE NEED FOR INJUNCTIVE RELIEF

113. An preliminary and permanent injunction is the only way to protect the integrity of the shareholder vote. If the Proposed Acquisition were to be approved and completed based on the Defendants' misleading filings and shareholder communications, there would be no adequate remedy at law.

114. Upon information and belief, there is a substantial risk that, in the event of a favorable vote, Alfa Telecom would attempt to close the transaction as quickly as possible, rendering any judgment meaningless.

115. Absent more information about WellCom and Eco Telecom and Alfa Telecom's interest in WellCom, no reasonable investor can determine whether the Proposed Acquisition would make sense.

116. If the Defendants are not restrained from voting or causing their shares in VimpelCom to be voted at the rescheduled EGM and the Defendants are not caused to correct the misleading statements filed in Amendment No. 12, Amendment No. 13, and Amendment No.

21

15 to their filing on Schedule 13D, the shareholder vote at the EGM will be irrevocably tainted and the Proposed Acquisition could be approved on spurious grounds and immediately consummated.

117. If that were to happen, Telenor East Invest's rights would be irrevocably lost, and we would be irreparably harmed.

### FIRST CLAIM FOR RELIEF

**Violation Of Section 13(d) Of The Securities
Exchange Act Of 1934, 15 U.S.C § 78m**

118. Defendants are and were, at all relevant times, the beneficial owners of more than five percent of the issued and outstanding shares of VimpelCom's stock.

119. Eco Telecom's Schedule 13D is replete with material omissions and misstatements, as set forth above. By filing that Schedule 13D, Eco Telecom has violated Section 13(d) of the Securities Act of 1934 and the rules and regulations promulgated thereunder, including Regulation S−K.

120. By reason of the foregoing, the Court should enjoin defendants from voting at the EGM unless and until Eco Telecom files an amended, truthful and accurate Schedule 13D, that contains all necessary, material facts, and until the shareholders have had sufficient time to review and evaluate such corrected statements, so as to enable VimpelCom's shareholders to make a fully−informed decision regarding Eco Telecom's proposed acquisition of WellCom by VimpelCom.

121. Absent an injunction, Telenor East Invest will be immediately and irreparably harmed. Telenor East Invest has no adequate remedy at law.

22

## SECOND CLAIM FOR RELIEF

### Common Law Fraud

122. Plaintiffs repeat and reallege each of the allegations of paragraphs 1 through 124 if fully set forth herein.

123. The Defendants made material misrepresentations to the shareholders of VimpelCom, including Plaintiffs, as described above in paragraphs

124. The Defendants made these false representations with the intent to deceive VimpelCom's shareholders in connection with the Proposed Acquisition.

125. Defendants made these false representations with the intent that VimpelCom's shareholders would rely to their detriment upon misleading information in order to effect the outcome of the EGM.

126. If Defendants cause VimpelCom's shareholders to justifiably rely upon their misrepresentations and concealment of material information the shareholder vote will be tainted.

127. Plaintiff justifiably relies on the integrity of the marketplace and the shareholder vote.

128. As a direct and proximate result of such reliance, Plaintiffs will be irreparably harmed in the pending vote at the EGM.

129. Telenor East Invest is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, jointly and severally as follows:

(a) requiring Defendants to correct and amend the Amendment No. 12. Amendment No. 13 and Amendment No. 15 to the Defendants' filing on Schedule 13D, filed with the Securities and Exchange Commission ("SEC") on or about July 17, 2005, August 10, 2005 and August 19, 2005, respectively, in accordance

23

with Section 13(d) of the Act, in order to the material misstatements and omissions concerning the proposed acquisition by OAO "Vimpel–Communications" ("VimpelCom") of ZAO "Ukrainian Radiosystems" ("WellCom") set forth therein; and

(b) restraining and enjoining Eco Telecom, in its capacity as the beneficial owner of common and preferred shares of VimpelCom (and any American Depositary Shares ("ADSs") representing any of such shares), and all persons in active concert from voting or causing to be voted any of such shares or ADSs in connection with the approval of the acquisition by VimpelCom of WellCom at the extraordinary general meeting of shareholders (the "EGM") now scheduled for September 14, 2005; or, in the alternative,

(c) restraining and enjoining Eco Telecom, and all persons in active concert from voting or causing to be voted at the EGM any common or preferred shares of VimpelCom (or any ADSs representing such shares), by proxy or otherwise, until the Defendants correct and amend the material misstatements and omissions made in Amendment No. 12, Amendment No. 13 and Amendment No. 15 to the Defendants' filing on Schedule 13D and the materials sent by the Defendants to VimpelCom's shareholders to solicit their votes for the only issue on the agenda of the EGM, the approval of the proposed acquisition by VimpelCom of WellCom; and

(d) awarding Plaintiff its costs and disbursements in this action, including without limitation, its reasonable attorneys fees; and

(e) awarding Plaintiff such other relief as the Court deems equitable and just.

Dated: New York, New York
     August 26, 2005

By: /s/ Robert L. Sills
    Robert L. Sills (RS 8896)
    Adam S. Zimmerman (AZ 3738)
    David M. Powers (DP 8557)
    ORRICK, HERRINGTON & SUTCLIFFE LLP
    666 Fifth Avenue
    New York, New York 10103
    Telephone: (212) 506–5000
    Facsimile: (212) 506–5151
    Attorneys for Plaintiff

24



# OPEN JOINT STOCK CO VIMPEL COMMUNICATIONS (VIP)

10 12 8TH MARCH ST
MOSCOW RUSSIA, U2 125083
70959745888
http://www.vimpelcom.com/

# EX–99.3

**AUGUST 23, 2005 PRESS RELEASE ISSUED BY ALFA TELECOM**
**SC 13D/A Filed on 08/30/2005**
File Number 005–48091



LIVEDGAR™ Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 99.3

**Press Release**

**23.08.2005**

**Alfa Telecom will defend its Kyivstar shareholder rights through the courts**

The current system of corporate governance in Kyivstar does not in major part comply with the current Ukrainian law. It also significantly violates Alfa Telecom's shareholder rights, since Alfa Telecom, a major shareholder in the company, has been fully removed from the corporate governance and decision-making processes in Kyivstar. Alfa Telecom owns a 43.5% stake in Kyivstar, while the remaining 56.5% is owned by Telenor.

Kyivstar's bylaws grant all corporate governance rights to Telenor; Kyivstar's charter allows Telenor to appoint its own nominee to the premier executive position of President of the company whilst other shareholders are forced to authorize their representatives to vote only for Telenor's nominee. The provisions of the charter regulating this mechanism contradict current Ukrainian legislation.

According to the current Management Service Agreement between Kyivstar and Telenor, all the key management positions in Kyivstar are occupied by Telenor's representatives. The fees paid by Kyivstar to Telenor under this Agreement are substantially higher than market norms, amounting to several million dollars annually.

The quality and level of management services delivered to Kyivstar by Telenor are not sufficient to justify such inflated fees.

Since acquiring its 43.5% stake in Kyivstar in 2004, Alfa Telecom has tried over a year to eradicate evident contradictions of Kievstar's bylaws with the Ukrainian law. However, all Alfa Telecom's attempts to resolve the situation through negotiation and corporate procedure, have been met with a wall of silence from Telenor. Numerous letters, sent to Telenor in an attempt to resolve contradictions with the law and the inequity amongst Kyivstar shareholders have been ignored.

In these circumstances, Alfa Telecom sees no other option than through the courts to resolve contradictions between the law and Kyivstar's charter and to defend its legitimate rights as a shareholder.

**For Further information, please contact:**

Vice-president for external relation
Babaev Kirill
Tel. +7 (095) 981-44-47



# OPEN JOINT STOCK CO VIMPEL COMMUNICATIONS (VIP)

10 12 8TH MARCH ST
MOSCOW RUSSIA, U2 125083
70959745888
http://www.vimpelcom.com/

# EX−99.6

**JULY 7, 2005 ARTICLE IN THE FINANCIAL TIMES**
**SC 13D/A Filed on 08/30/2005**
File Number 005−48091



LIVEDGAR Information Provided by Global Securities Information, Inc.
800-669-1154
www.gsionline.com

Exhibit 99.6

**Copyright 2005 The Financial Times Limited**
**Financial Times (London, England)**

**July 7, 2005 Thursday**
**London Edition 1**

SECTION: COMPANIES EUROPE; Pg. 26

LENGTH: 735 words

HEADLINE: Telecombative oligarch shares his vision: Alfa's Mikhail Fridman does not shrink from a fight. But as Arkady Ostrovsky reports, the ambitious Russian is aware that wars are rarely profitable

BYLINE: By ARKADY OSTROVSKY

BODY:

Mikhail Fridman, the head of Alfa Group and one of Russia's most ambitious businessmen, enjoys a good fight with an established western company.

In 1997 Alfa tussled with BP in a battle over oil assets. In the past month, Mr Fridman seems to have taken on the entire Scandinavian telecommunications industry.

Alfa has been in dispute with Norway's Telenor over the strategy of Vimpelcom, Russia's second-largest mobile phone operator, and has further alienated TeliaSonera, the leading telecoms operator in the Nordic and Baltic regions, by effectively ruining its deal to buy a controlling stake in Turkcell, Turkey's largest mobile operator.

But as one of Russia's richest oligarchs, Mr Fridman is aware that wars are rarely profitable. His high-profile tussle with BP ended in 2002 when Alfa sold half its stake in TNK, a Russian oil company, to BP, thereby creating the first Anglo-Russian oil major.

Mr Fridman is hoping his fights with TeliaSonera and Telenor will result in the creation of a new global telecoms company which would have a reach well beyond Russia or even the former Soviet Union.

"We want to be part of a global telecoms company, a Eurasian Vodafone. We want to convert all our stakes in different telecoms providers into one company — be it Telenor, TeliaSonera or any other international player," Mr Fridman told the FT.

Alfa's telecoms assets, worth about Dollars 8bn, are spread between several companies. These include a 32 per cent stake in Vimpelcom, 25 per cent of Megafon, Russia's number three mobile phone operator, and 45 per cent in Kiyivstar, the leading Ukrainian telecoms company. Its fellow shareholders in each of these companies are Telenor and TeliaSonera. Telenor owns 55 per cent of Kiyivstar and 26 per cent of Vimpelcom, while TeliaSonera has 44 per cent of Megafon.

At the centre of Alfa's fight with Telenor is the strategy of Vimpelcom. While Alfa believes Vimpelcom should expand to Ukraine to sustain its fast growth rate, Telenor is blocking the move.

Alfa says Telenor has a clear conflict of interest and is simply trying to protect its dominant position in the Ukrainian market. Telenor argues that Alfa is vying for control of Vimpelcom. Meanwhile Vimpelcom's management is in limbo, unsure how to develop the company.

A similar impasse has arisen in Alfa's relationship with TeliaSonera. Last month Alfa agreed to provide Dollars 3.3bn financing for Cukurova, a financially troubled Turkish conglomerate that owns a big stake in Turkcell. Part of the package consists of bonds convertible by Alfa into a 13 per cent stake in Turkcell. The move ruined TeliaSonera's agreed deal to buy 27 per cent of Turkcell which would have given it control.

Mr Fridman argues the only way out of the present deadlock is the creation of a global company based on the model of Vodafone or Orange. The most logical platform for such a company would be TeliaSonera or Telenor.

Yet, keen as Mr Fridman is on the creation of a global company, he doubts other minority investors would choose to consolidate their stakes into a Russian company.

"There are still too many risks in Russia and investors won't like that."

Swapping his stakes in Russian companies for a smaller stake in a Scandinavia−based company, on the other hand, would allow him to spread his risks at a time of mounting pressure from the Kremlin.

Selling half of Alfa's TNK stake to BP has already served this purpose. But reducing his stake in the oil company any further now seems politically impossible given the Kremlin's apparent desire to establish control over the energy sector. Mr Fridman hopes the Kremlin may be more lenient in the telecoms business.

To achieve his goal, Mr Fridman will have to convince not only the Kremlin, but the governments of Norway, Sweden and Finland which still control Telenor and TeliaSonera. The creation of a global company would dilute their stakes. "These countries have a unique chance to create a new Nokia in terms of its global reach," says Mr Fridman.

On their past experience, TeliaSonera and Telenor might find the idea unpalatable.

"Such industrial co−operation solutions are built on a basis of mutual trust, which first needs to be established," Borge Brende, Norway's minister of trade and industry, was quoted as saying by a Norwegian newspaper.

"I do not have that faith in the Alfa Group."

TeliaSonera said it could not comment since it saw no concrete proposal from Alfa.

LOAD−DATE: July 7, 2005