# EXHIBIT BB



# OPEN JOINT STOCK CO VIMPEL COMMUNICATIONS (VIP)

10 12 8TH MARCH ST
MOSCOW RUSSIA, U2 125083
70959745888
http://www.vimpelcom.com/

# SC 13D/A

**SCHEDULE 13D AMENDMENT NO. 30**
**Filed on 03/13/2007**
File Number 005−48091



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# SCHEDULE 13D

Under the Securities Exchange Act of 1934
(Amendment No. 30)*

---

OPEN JOINT STOCK COMPANY
"VIMPEL–COMMUNICATIONS"

(Name of Issuer)

---

Common Stock, nominal value 0.005 rubles per share

(Title of Class of Securities)

---

68370R109

(CUSIP Number)

---

Franz Wolf
Eco Telecom Limited
Suite 2
4 Irish Place
Gibraltar
+350 41977

(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

---

March 9, 2007

(Date of Event which Requires Filing of this Statement)

With a copy to:

Alexey Reznikovich
Altimo Holdings & Investments Limited
Str. Novy Arbat, build. 21
GSP–2
119992 Moscow, Russia
+7 (495) 981–4449

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d–1(e), 13d–1(f) or 13d–1(g), check the following box. ☐

Note:  Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See §240.13d–7 for other parties to whom copies are to be sent.

*   The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 (the "Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

1.  Name of Reporting Persons
    I.R.S. Identification Nos. of above persons (entities only)

    **Eco Telecom Limited**
    **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**

2.  Check the Appropriate Box if a Member of a Group
    (a) ☐
    (b) ☒

3.  SEC Use Only

4.  Source of Funds

    **AF; OO**

5.  Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e)                    ☐

6.  Citizenship or Place of Organization

    **Gibraltar**

| | | |
|---|---|---|
| | 7.  Sole Voting Power | |
| Number of Shares Beneficially Owned by Each Reporting Person With | | **15,137,265 shares of Common Stock\*** |
| | 8.  Shared Voting Power | |
| | | **0** |
| | 9.  Sole Dispositive Power | |
| | | **15,137,265 shares of Common Stock\*** |
| | 10. Shared Dispositive Power | |
| | | **0** |

11. Aggregate Amount Beneficially Owned by Each Reporting Person

    **15,137,265 shares of Common Stock\***

12. Check If the Aggregate Amount in Row (11) Excludes Certain Shares                    ☐

13. Percent of Class Represented by Amount in Row (11)

    **29.5% of Common Stock\***

14. Type of Reporting Person

    **OO, HC**

\*  Eco Telecom is also the direct beneficial owner of 6,426,600 (100%) shares of the Issuer's type–A voting preferred stock (the "Preferred Stock"), which, together with the total number of shares of the Issuer's common stock owned by Eco Telecom, represents approximately 37.4% of the Issuer's outstanding voting capital stock. See Item 5. Pursuant to the terms of certain forward transaction, Eco Telecom shall have the right to receive 1,228,800 shares of Common Stock in the Issuer, represented by 4,915,200 American Depositary Receipts of the Issuer on March 14, 2007. See Item 6 of the Reporting Person's Amendments 26, 27, 28 and 29 to Schedule 13D. Assuming the acquisition of the Common Stock described in Item 6, the Reporting Person would be, taking the Preferred Stock into account, the beneficial owner of 39.5% of the Issuer's outstanding voting capital stock.

| 1. Name of Reporting Persons |
| I.R.S. Identification Nos. of above persons (entities only) |

**Altimo Holdings & Investments Limited**
**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**

| 2. Check the Appropriate Box if a Member of a Group |
| (a) ☐ |
| (b) ☒ |

| 3. SEC Use Only |

| 4. Source of Funds |

**OO**

| 5. Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e)     ☐ |

| 6. Citizenship or Place of Organization |

**British Virgin Islands**

| Number of Shares Beneficially Owned by Each Reporting Person With | 7. Sole Voting Power |
| | **15,137,265 shares of Common Stock*** |
| | 8. Shared Voting Power |
| | **0** |
| | 9. Sole Dispositive Power |
| | **15,137,265 shares of Common Stock*** |
| | 10. Shared Dispositive Power |
| | **0** |

| 11. Aggregate Amount Beneficially Owned by Each Reporting Person |

**15,137,265 shares of Common Stock***

| 12. Check If the Aggregate Amount in Row (11) Excludes Certain Shares     ☐ |

| 13. Percent of Class Represented by Amount in Row (11) |

**29.5% of Common Stock***

| 14. Type of Reporting Person |

**OO, HC**

---

\* The Reporting Person may be deemed to beneficially own 6,426,600 (100%) shares of the Issuer's type–A voting preferred stock (the "Preferred Stock"), which, together with the total number of shares of the Issuer's common stock that the reporting Person may be deemed to beneficially own, represents approximately 37.4% of the Issuer's outstanding voting stock. See Item 5. Pursuant to the terms of certain forward transaction, Eco Telecom shall have the right to receive 1,228,800 shares of Common Stock in the Issuer, represented by 4,915,200 American Depositary Receipts of the Issuer on March 14, 2007. See Item 6 of the Reporting Person's Amendments 26, 27, 28 and 29 to Schedule 13D. Assuming the acquisition of the Common Stock described in Item 6, the Reporting Person would be, taking the Preferred Stock into account, the beneficial owner of 39.5% of the Issuer's outstanding voting capital stock.

1. Name of Reporting Persons
   I.R.S. Identification Nos. of above persons (entities only)

   **CTF Holdings Limited**
   **000–00–0000**

2. Check the Appropriate Box if a Member of a Group
   (a) ☐
   (b) ☒

3. SEC Use Only

4. Source of Funds

   **AF; OO**

5. Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e)   ☐

6. Citizenship or Place of Organization

   **Gibraltar**

| Number of Shares Beneficially Owned by Each Reporting Person With | |
|---|---|
| 7. Sole Voting Power | **15,137,265 shares of Common Stock\*** |
| 8. Shared Voting Power | **0** |
| 9. Sole Dispositive Power | **15,137,265 shares of Common Stock\*** |
| 10. Shared Dispositive Power | **0** |

11. Aggregate Amount Beneficially Owned by Each Reporting Person

    **15,137,265 shares of Common Stock\***

12. Check If the Aggregate Amount in Row (11) Excludes Certain Shares   ☐

13. Percent of Class Represented by Amount in Row (11)

    **29.5% of Common Stock\***

14. Type of Reporting Person

    **OO, HC**

---

\* The Reporting Person may be deemed to beneficially own 6,426,600 (100%) shares of the Issuer's type–A voting preferred stock (the "Preferred Stock"), which, together with the total number of shares of the Issuer's common stock that the reporting Person may be deemed to beneficially own, represents approximately 37.4% of the Issuer's outstanding voting capital stock. See Item 5. Pursuant to the terms of certain forward transaction, Eco Telecom shall have the right to receive 1,228,800 shares of Common Stock in the Issuer, represented by 4,915,200 American Depositary Receipts of the Issuer on March 14, 2007. See Item 6 of the Reporting Person's Amendments 26, 27, 28 and 29 to Schedule 13D. Assuming the acquisition of the Common Stock described in Item 6, the Reporting Person would be, taking the Preferred Stock into account, the beneficial owner of 39.5% of the Issuer's outstanding voting capital stock.

1. Name of Reporting Persons
   I.R.S. Identification Nos. of above persons (entities only)

   **Crown Finance Foundation**
   **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**

2. Check the Appropriate Box if a Member of a Group
   (a) ☐
   (b) ☒

3. SEC Use Only

4. Source of Funds

   **AF; OO**

5. Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e)                              ☐

6. Citizenship or Place of Organization

   **Liechtenstein**

| | | |
|---|---|---|
| Number of Shares Beneficially Owned by Each Reporting Person With | 7. Sole Voting Power | **15,137,265 shares of Common Stock*** |
| | 8. Shared Voting Power | **0** |
| | 9. Sole Dispositive Power | **15,137,265 shares of Common Stock*** |
| | 10. Shared Dispositive Power | **0** |

11. Aggregate Amount Beneficially Owned by Each Reporting Person

    **15,137,265 shares of Common Stock***

12. Check If the Aggregate Amount in Row (11) Excludes Certain Shares                              ☐

13. Percent of Class Represented by Amount in Row (11)

    **29.5% of Common Stock***

14. Type of Reporting Person

    **OO**

---

\* The Reporting Person may be deemed to beneficially own 6,426,600 (100%) shares of the Issuer's type-A voting preferred stock (the "Preferred Stock"), which, together with the total number of shares of the Issuer's common stock that the reporting Person may be deemed to beneficially own, represents approximately 37.4% of the Issuer's outstanding voting capital stock. See Item 5. Pursuant to the terms of certain forward transaction, Eco Telecom shall have the right to receive 1,228,800 shares of Common Stock in the Issuer, represented by 4,915,200 American Depositary Receipts of the Issuer on March 14, 2007. See Item 6 of the Reporting Person's Amendments 26, 27, 28 and 29 to Schedule 13D. Assuming the acquisition of the Common Stock described in Item 6, the Reporting Person would be, taking the Preferred Stock into account, the beneficial owner of 39.5% of the Issuer's outstanding voting capital stock.

**Item 1.    Security and Issuer.**

This Amendment No. 30 (this "Amendment") to the Statement on Schedule 13D relates to the common stock, nominal value 0.005 rubles per share (the "Common Stock"), of Open Joint Stock Company "Vimpel-Communications" ("VimpelCom"). The initial Statement on Schedule 13D, previously filed jointly by Eco Telecom Limited ("Eco Telecom"), Eco Holdings Limited, CTF Holdings Limited ("CTF Holdings") and Crown Finance Foundation ("Crown Finance") on June 11, 2001 (as amended and supplemented by Amendment Nos. 1 through 29, the "Statement"), is hereby amended and supplemented with respect to the items set forth in this Amendment. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Statement.

**Item 2.    Identity and Background.**

This Amendment is being filed on behalf of each of the following persons (each, a "Reporting Person" and, collectively, the "Reporting Persons"):

(i)    Eco Telecom;

(ii)    Altimo Holdings & Investments Limited (formerly known as Alfa Telecom Limited) ("Altimo");

(iii)    CTF Holdings; and

(iv)    Crown Finance.

The Statement, as amended hereby, relates to the shares of Common Stock held for the account of Eco Telecom.

### The Reporting Persons

Eco Telecom is a Gibraltar company, with its principal business address at 10/8 International Commercial Centre, Casemates Square, Gibraltar. The principal business of Eco Telecom is to function as a holding company. Current information concerning the identity and background of the directors and officers of Eco Telecom is set forth in Annex A hereto, which is incorporated by reference in response to this Item 2.

Altimo is a British Virgin Islands company, with its principal address at P.O. Box 3339, Geneva Place, Second Floor, 333 Waterfront Drive, Road Town, Tortola, British Virgin Islands. The principal business of Altimo is to function as a holding company. Altimo is the sole shareholder of Eco Telecom and, in such capacity, may be deemed to be the beneficial owner of the shares of Common Stock held for the account of Eco Telecom. Current information concerning the identity and background of the directors and officers of Altimo is set forth in Annex A hereto, which is incorporated by reference in response to this Item 2.

CTF Holdings is a Gibraltar limited liability company, with its principal address at Suite 2, 4 Irish Place, Gibraltar. The principal business of CTF Holdings is to function as a holding company. CTF Holdings indirectly owns a majority of the shares of Altimo and, in such capacity, may be deemed to be the beneficial owner of the shares of Common Stock held for the account of Eco Telecom. Current information concerning the identity and background of the directors and officers of CTF Holdings is set forth in Annex A hereto, which is incorporated by reference in response to this Item 2.

Crown Finance is a Liechtenstein foundation, with its principal address at Am Schragen Weg 14, P.O. Box 1618, FL–9490, Vaduz, Liechtenstein. The principal business of Crown Finance is investment and management of the assets and capital of the foundation. Crown Finance is the sole shareholder of CTF Holdings and, in such capacity, may be deemed to be the beneficial owner of the shares of Common Stock held for the account of Eco Telecom. Current information concerning the identity and background of the directors and officers of Crown Finance is set forth in Annex A hereto, which is incorporated by reference in response to this Item 2.

The "Supervisory Board" coordinates the strategic development of a group of affiliated entities, often referred to as the "Alfa Group Consortium," which group includes the Reporting Persons. In certain instances, the Supervisory Board issues recommendations regarding strategic business decisions to the entities that are members of the Alfa Group Consortium. Current information regarding the identity and background of the members of the Supervisory Board is set forth in Annex A hereto, which is incorporated by reference in response to this Item 2.

During the past five years, none of the Reporting Persons and, to the best of the Reporting Persons' knowledge, no other person identified in response to this Item 2, has been (a) convicted in a criminal proceeding or (b) a party to any civil proceeding or a judicial or administrative body of competent jurisdiction as a result of which such person was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws, or finding any violation with respect to such laws.

Item 3.    Source and Amount of Funds or Other Consideration.

    No material change.

Item 4.    Purpose of Transaction.

    Item 4 is hereby supplemented as follows:

    On December 24, 2004, Eco Telecom notified VimpelCom and Telenor East Invest AS of Eco Telecom's intention to pledge a certain number of the shares of Common Stock owned by Eco Telecom in connection with the transaction described below.

    Eco Telecom agreed to issue $1,500,000,000 Series A Floating Rate Bonds due March 16, 2009 (the "Bonds") on March 14, 2007, pursuant to an Indenture, dated as of March 9, 2007 (the "Indenture"), by and among Eco Telecom, Altimo, as Guarantor, Deutsche Bank AG London Branch, as Calculation Agent, and Deutsche International Corporate Services Limited, as Trustee. The Bonds are to be sold to Deutsche Bank AG London Branch as purchaser in an offshore transaction in accordance with Regulation S under the Securities Act of 1933, as amended. Eco Telecom's obligations under the Bonds and the Indenture is guaranteed by Altimo Holdings & Investments Limited. Pursuant to a Collateral Agreement, dated as of March 9, 2007 (the "Collateral Agreement"), by and among Eco Telecom, The Bank of New York, as Securities Intermediary (the "Securities Intermediary") and Depositary under the ADR program, Deutsche Bank AG London Branch, as Collateral Agent (the "Collateral Agent"), and Deutsche International Corporate Services Limited, as Trustee, Eco Telecom granted to the Collateral Agent a security interest in 9,349,999 shares of Common Stock or security entitlements in respect thereof (the "Pledged Shares") to secure the performance of its obligations under the Bonds and the Indenture. During the term of the Collateral Agreement, the Pledged Shares will be held by the Securities Intermediary. Eco Telecom has also delivered 6,426,600 shares of VimpelCom Preferred Stock, 15,209,134 American depositary shares representing Common Stock and an additional 3,213,783 shares of Common Stock (together, the "Escrowed Shares") to The Bank of New York as escrow agent to be held in escrow, except as set forth below, during the term of the Collateral Agreement, pursuant to an Escrow Agreement, dated as of March 9, 2007 (the "Escrow Agreement"), by and among Eco Telecom, the Collateral Agent, Altimo and The Bank of New York, as Escrow Agent.

    Pursuant to the Collateral Agreement, on March 14, 2007, Eco Telecom will deliver the Pledged Shares to the Collateral Agent, and the Pledged Shares will be held during the term of the Collateral Agreement by the Securities Intermediary through a nominee. Upon the occurrence of an LTV Ratio Triggered Early Maturity or an Event of Default, each as defined in the Collateral Agreement, the Collateral Agent may exercise on behalf of the Trustee all the rights of a secured party under the New York Uniform Commercial Code and may sell the collateral at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery. The Collateral Agreement will terminate upon fulfilment of all of the obligations of Eco Telecom under the Indenture, the Bonds and the Collateral Agreement.

    Pursuant to the Escrow Agreement, Eco Telecom is pledging, assigning and granting to the Escrow Agent a continuing security interest in, and a lien on, the Escrowed Shares as security for the due and punctual performance of Eco Telecom's obligations to the Escrow Agent under the Escrow Agreement. The Escrowed Shares will be released upon the earlier to occur of (i) the time when the Indenture and all securities issued thereunder have been discharged in accordance with their terms or (ii) a court of competent jurisdiction finally disposing of the rights and obligations of the parties pursuant to the provisions of the Escrow Agreement.

    Eco Telecom will be entitled to exercise all voting and other rights attaching to the Escrowed Shares and, unless an LTV Ratio Triggered Early Maturity has occurred or Event of Default (each as defined in the Collateral Agreement) has occurred and is continuing, the Pledged Shares.

    The description of the Indenture, Collateral Agreement and Escrow Agreement contained in this Item 4 is qualified in its entirety by reference to the complete text of these agreements filed as Exhibits hereto.

    As part of the transaction described herein, the bond offer described in Item 4 of the Reporting Person's Amendment No. 9 to Schedule 13D, dated April 28, 2005, was unwound.

Item 5.    Interest in Securities of the Issuer.

    Item 5 is hereby supplemented as follows:

    (a)   No material change.

    (b)   No material change.

    (c)   No material change.

    (d)   No material change.

    (e)   Not applicable.

**Item 6.        Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer.**

Item 6 is hereby supplemented with the information reported in response to Item 4 hereto, which is incorporated by reference in response to this Item 6.

**Item 7.        Material to be Filed as Exhibits.**

The Index of Exhibits is incorporated herein by reference.

## SIGNATURES

After reasonable inquiry and to the best of his or her knowledge and belief, each of the undersigned certifies that the information in this Amendment is true, complete and correct.

Date: March 12, 2007                    ECO TELECOM LIMITED

                                        By:    /s/ Marina Kushnareva
                                        Name:  Marina Kushnareva
                                        Title: Director

Date: March 12, 2007                    ALTIMO HOLDINGS & INVESTMENTS LIMITED

                                        By:    /s/ Franz Wolf
                                        Name:  Franz Wolf
                                        Title: Director

Date: March 12, 2007                    CTF HOLDINGS LIMITED

                                        By:    /s/ Franz Wolf
                                        Name:  Franz Wolf
                                        Title: Director

Date: March 12, 2007                    CROWN HOLDINGS LIMITED

                                        By:    /s/ Franz Wolf
                                        Name:  Franz Wolf
                                        Title: Attorney—in—Fact

## ANNEX A

### Directors and Officers of Eco Telecom Limited

| Name/Citizenship | Principal Occupation | Business Address |
|---|---|---|
| Marina Kushnareva, Director (Russia) | Manager, CTF Holdings Limited | Suite 2 4 Irish Place, Gibraltar |

### Directors and Officers of Altimo Holdings & Investments Limited

| Name/Citizenship | Principal Occupation | Business Address |
|---|---|---|
| Geoffrey Piers Hemy, Director (United Kingdom) | Director, Grand Financial Holding S.A. | 11 Boulevard Royale L–2449 Luxembourg |
| Georgia Karydes, Director (Cyprus) | Director, Feldmans Management (Overseas) Ltd. | 6 Nikou Georgiou Street Block C, Office 704 Nicosia 1098, Cyprus |
| Olga Kichatova, Director (Russia) | Senior Financial Advisor, CTF Holdings Limited | 3rd Floor, building 3, 6 Sechenovskiy per. Moscow Russia 109 034 |
| Alexey Reznikovich, Chief Executive Officer (Russia) | Chief Executive Officer, OOO ALTIMO Limited | Str. Novy Arbat, build. 21 GSP–2 119992 Moscow, Russia |
| Marina Kushnareva, Director (Russia) | Director, CTF Holdings Limited | Suite 2 4 Irish Place, Gibraltar |
| Franz Wolf, Director (Germany) | Director, CTF Holdings Limited | Suite 2 4 Irish Place, Gibraltar |

### Directors and Officers of CTF Holdings Limited

| Name/Citizenship | Principal Occupation | Business Address |
|---|---|---|
| Marina Kushnareva, Director (Russia) | Director, CTF Holdings Limited | Suite 2 4 Irish Place, Gibraltar |
| Franz Wolf, Director (Germany) | Director, CTF Holdings Limited | Suite 2 4 Irish Place, Gibraltar |

### Directors and Officers of Crown Finance Foundation

| Name/Citizenship | Principal Occupation | Business Address |
|---|---|---|
| Christian Rosenow, Director (Switzerland) | Financial Adviser | Talacker 35, 8001 Zurich, Switzerland |
| Dr. Norbert Seeger, Director (Liechtenstein) | Attorney, Arcomm Trust Company | Am Schragen Weg 14 P.O. Box 1618 FL–9490 Vaduz, Liechtenstein |
| Dr. Christian Zangerle, Director (Austria) | Attorney, Law Office of Dr. Norbert Seeger | Am Schragen Weg 14 P.O. Box 1618 FL–9490 Vaduz, Liechtenstein |

### Members of the Supervisory Board of Alfa Group Consortium

| Name/Citizenship | Principal Occupation | Business Address |
| --- | --- | --- |
| Peter Aven, Director (Russia) | President, OJSC Alfa Bank | 11 Mashy Poryvaevoy Street 107078 Moscow, Russia |
| Alexandr Fain, Director (Russia) | Chief Executive Officer, Alfa Eco LLC | 21 Novy Arbat Street 121019 Moscow, Russia |
| Mikhail Fridman, Director (Russia) | Chairman of the Board of Directors, OJSC Alfa Bank | 9 Mashy Poryvayevoy Street 107078 Moscow, Russia |
| Michail Gamzin, Director (Russia) | Director General, OAO Russian Technologies | 3 rd Golutvinsky Pereulok 10 Building 6 109180 Moscow, Russia |
| German Khan, Director (Russia) | Executive Director, TNK–BP Management | 18/2, Schipok Street 115093 Moscow, Russia |
| Lev Khasis, Director (Russia) | Chief Executive Officer, X 5 Retail Group N.V. | Kapranova Pereulok 3 123242 Moscow, Russia |
| Alexander Kosiyanenko, Director (Russia) | Member of the Supervisory Board of X 5 Retail Group N.V. | Apt. 421 Mozhayskoye shosse 2, B 121356 Moscow, Russia |
| Andrei Kosogov, Director (Russia) | Chairman of the Board of Directors of Alfa Asset Management | 12 Prospect Academic Sakharov 107078 Moscow, Russia |
| Alexey Kuzmichev, Director (Russia) | Chairman of Board of Directors, Alfa Eco LLC | 21 Novy Arbat Street 121019 Moscow, Russia |
| Nigel John Robinson, Director (United Kingdom) | Director of Corporate Development, Finance and Control, Alfa Group Consortium | 6 Sechenovskiy Pereulok Building 3, Floor 3 119034 Moscow, Russia |
| Alexey Reznikovich, Director (Russia) | Chief Executive Officer, OOO ALTIMO Limited | Str. Novy Arbat, build. 21 GSP–2 119992 Moscow, Russia |
| Alexander Savin, Director (Russia) | Managing Director, A1 LLC | 12 Krasnopresenskaya Nab. International Trade Center 2, Entrance 7 123610 Moscow, Russia |

To the best of the Reporting Persons' knowledge:

(a)    None of the above persons holds any shares of Common Stock.

(b)    None of the above persons has any contracts, arrangements, understandings or relationships with respect to any shares of Common Stock.

**Index to Exhibits**

Exhibit 99.1   Indenture, dated as of March 9, 2007, by and among Eco Telecom Limited, Altimo Holdings & Investments Limited, Deutsche Bank AG London Branch and Deutsche International Corporate Services Limited.

Exhibit 99.2   Collateral Agreement, dated as of March 9, 2007, by and among Eco Telecom Limited, The Bank of New York, Deutsche Bank AG London Branch and Deutsche International Corporate Services Limited.

Exhibit 99.3   Escrow Agreement, dated as of March 9, 2007, by and among Eco Telecom Limited, Deutsche Bank AG London Branch, Altimo Holdings & Investments and The Bank of New York.

Exhibit 99.1

**INDENTURE**

relating to

**$1,500,000,000**

**Series A Floating Rate Bonds**

**Eco Telecom Limited,**
as Issuer

**Altimo Holdings & Investments Limited,**
as Guarantor

**Deutsche Bank AG London Branch,**
as Calculation Agent

and

**Deutsche International Corporate Services Limited,**
as Trustee

Dated as of

March 9, 2007

THIS INDENTURE, dated as of March 9, 2007 among Eco Telecom Limited, a Gibraltar company (the "**Issuer**"), Altimo Holdings & Investments Limited, a British Virgin Islands company (the "**Guarantor**"), Deutsche Bank AG London Branch, as the calculation agent hereunder (the "**Calculation Agent**") and Deutsche International Corporate Services Limited, a Jersey limited liability company acting as trustee hereunder (the "**Trustee**"),

## W I T N E S S E T H :

WHEREAS, the Issuer has duly authorized issuances of its Series A Floating Rate Bonds from time to time (the "**Securities**") to be issued in one or more tranches as provided herein and the Guarantor has duly authorized the guarantee of payments by the Issuer under the Securities (the "**Parent Guarantee**") and, to provide, among other things, for the authentication, delivery and administration thereof, each of the Issuer and the Guarantor has duly authorized the execution and delivery of this Indenture;

WHEREAS, the Securities of each tranche will be evidenced by a Global Security, in registered form, deposited on the closing date for the Securities of such tranche with a common depositary for Euroclear and Clearstream and registered in the name of Deutsche Bank AG London Branch, as common depositary of Euroclear and Clearstream, and the Securities evidenced by a Global Security may not be exchanged for Definitive Securities except in the circumstances specified in the Indenture; and

WHEREAS, the Securities (in the form of Definitive Securities or Global Security, as applicable), the Parent Guarantee and the Trustee's certificate of authentication shall be in substantially the following form:

### [FORM OF FACE OF DEFINITIVE SECURITY]

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") NOR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION WITHIN THE UNITED STATES AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD OR DELIVERED, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES OR TO ANY US PERSON (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) EXCEPT PURSUANT TO THE TERMS OF AN EXEMPTION FROM OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. THE SECURITIES ARE BEING OFFERED FOR SALE OUTSIDE THE UNITED STATES IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT.

**Eco Telecom Limited**

Tranche No. _____

Definitive Security No. _____

$_____

Common Code: 028877668
ISIN No.: XS028877684

**Series A Floating Rate Bond**
due _____, 200__

Eco Telecom Limited, a Gibraltar company (the "Issuer"), for value received hereby promises to pay to the registered holder hereof or registered assigns the principal sum of $ _____ at the Issuer's office or agency for said purpose in Jersey on _____, 200 __(the "Maturity Date") or at such earlier time as provided in the Indenture, in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts, and to pay interest, quarterly in arrears on the following dates [•], [•], [•], [•], [•], [•], [•], and [•], commencing on [•], 200__ and occurring no later than the Maturity Date (each, an "Interest Payment Date"), on said principal sum in like coin or currency at a floating rate determined in the manner set forth in the Indenture referred to on the reverse hereof. Such interest will accrue on the principal amount hereof from [•], 200__ and shall be payable to the Person in whose name this Security is registered at the close of business on the Interest Record Date for such Interest Payment Date. Interest and principal on the Securities will be payable at the office of the Trustee in Jersey, by wire transfer of immediately available funds, or, at the option of the Holder, by check mailed to the address of the Person entitled thereto as such address appears on the Register.

Reference is made to the further provisions set forth on the reverse hereof. All capitalized terms used herein which are defined in the Indenture referred to on the reverse hereof have the meaning set forth therein.

Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Security shall not be valid or obligatory until the certificate of authentication hereon shall have been duly signed by the Trustee acting under the Indenture.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed under its corporate seal.

Dated: _____, 20__

ECO TELECOM LIMITED

[Seal]

The Common Seal of the Eco Telecom Limited was affixed hereto in the presence of:

By: _____

Name:

Title:    Authorized Director

By: _____

Name:

Title:    Company Secretary

### [FORM OF FACE OF GLOBAL SECURITY]

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") NOR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION WITHIN THE UNITED STATES AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD OR DELIVERED, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES OR TO ANY US PERSON (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) EXCEPT PURSUANT TO THE TERMS OF AN EXEMPTION FROM OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. THE SECURITIES ARE BEING OFFERED FOR SALE OUTSIDE THE UNITED STATES IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT.

**Eco Telecom Limited**

Tranche No. _____

Global Security No. _____                                                              $_____

Common Code: 028877668
ISIN No.: XS028877684

**Series A Floating Rate Bond**
due _____ __, 200__

Eco Telecom Limited, a Gibraltar company (the "Issuer"), for value received hereby promises to pay to Deutsche Bank AG London Branch, as Common Depositary, or registered assigns the principal sum of $1,500,000,000 at the Issuer's office or agency for said purpose in Jersey on _____ 200__ (the "Maturity Date") or at such earlier time as provided in the Indenture, in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts, and to pay interest, quarterly in arrears on the following dates [•], [•], [•], [•], [•], [•], [•], and [•], commencing on [•], 200__ and occurring no later than the Maturity Date (each, an "Interest Payment Date"), on said principal sum in like coin or currency at a floating rate determined in the manner set forth in the Indenture referred to on the reverse hereof. Such interest will accrue on the principal amount hereof from [•], 200__ and shall be payable to the Person in whose name this Security is registered at the close of business on the Interest Record Date for such Interest Payment Date. Interest and principal on the Securities evidenced by this Security will be payable to the Common Depositary at the office of the Trustee in Jersey, by wire transfer of immediately available funds.

Except as provided in the Indenture and, subject to certain limitations therein set forth, a Security evidenced by this Security will not be exchangeable for Definitive Securities.

Reference is made to the further provisions set forth on the reverse hereof. All capitalized terms used herein which are defined in the Indenture referred to on the reverse hereof have the meaning set forth therein.

Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Security shall not be valid or obligatory until the certificate of authentication hereon shall have been duly signed by the Trustee acting under the Indenture.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed under its corporate seal.

Dated: _____, 20__

ECO TELECOM LIMITED

[Seal]

The Common Seal of the Eco Telecom Limited was affixed hereto in the presence of:

By: _____

Name:
Title:    Authorized Director

By: _____

Name:
Title:    Company Secretary

### [FORM OF REVERSE OF GLOBAL SECURITY AND DEFINITIVE SECURITY]

This Security is one of a duly authorized issue of a tranche of debt securities of the Issuer, limited to the aggregate principal amount of United States dollars $1,500,000,000, issued or to be issued pursuant to an indenture dated as of March 9, 2007 (as amended or supplemented, the "**Indenture**"), duly executed and delivered by the Issuer and Altimo Holdings & Investments Limited, a British Virgin Islands company, acting as guarantor thereunder (herein called the "**Guarantor**") to Deutsche International Corporate Services Limited, a Jersey limited liability company acting as trustee thereunder (herein called the "**Trustee**"), and Deutsche Bank AG London Branch, as Calculation Agent. Reference is hereby made to the Indenture and all indentures supplemental thereto for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Trustee, the Issuer and the holders (the words "**holders**" or "**holder**" meaning the registered holders or registered holder) of the Securities.

On any Business Day after the date that is six months prior to the Maturity Date, the Issuer may at its option redeem all but not less than all the outstanding Securities, upon not less than 30 nor more than 60 days' notice, at a redemption price equal to 100.5% of the aggregate principal amount of the Securities being redeemed plus any accrued but unpaid interest, any Additional Amounts and Break Funding Costs as shall be set forth in the Indenture.

In case an Event of Default, as defined in the Indenture, shall have occurred and be continuing, the principal of all the Securities (together with interest accrued thereon, any Additional Amounts, Break Funding Costs and Default Costs) may be declared due and payable, in the manner and with the

effect, and subject to the conditions, provided in the Indenture. The Indenture provides that in certain events such declaration and its consequences may be waived by the holders of greater than 50% in aggregate principal amount of the Securities then outstanding and that, prior to any such declaration, such holders may waive any past default under the Indenture and its consequences except a default in the payment of principal of or interest on any of the Securities. Any such consent or waiver by the holder of this Security (unless revoked as provided in the Indenture) shall be conclusive and binding upon such holder and upon all future holders and owners of this Security and any Securities which may be issued in exchange or substitution herefor, whether or not any notation thereof is made upon this Security or such other Securities.

The Indenture permits the Issuer and the Trustee, with the consent of the holders of not less than the majority in aggregate principal amount of the Securities of this tranche at the time outstanding, evidenced as in the Indenture provided, to execute supplemental indentures adding any provisions to or changing in any manner or eliminating any of the provisions of the Indenture or of any supplemental indenture or modifying in any manner the rights of the holders of the Securities of this tranche; *provided* that no such supplemental indenture shall (a) extend the final maturity of any Securities of this tranche, or reduce the principal amount thereof, or reduce or change the manner of calculating the rate or extend the time of payment of interest thereon, or impair or affect the rights of any Securityholder to institute suit for the payment thereof without the consent of the holder of each Security of this tranche so affected; or (b) reduce the aforesaid percentage of Securities of this tranche, the consent of the holders of which is required for any such supplemental indenture, without the consent of the holders of all Securities of this tranche then outstanding.

No reference herein to the Indenture and no provision of this Security or of the Indenture shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Security at the place, times, and rate, and in the currency, herein prescribed.

The Securities are issuable only in fully registered form without coupons in denominations of $1,000 and any multiple of $1,000.

If a Security is a Definitive Security, at the office or agency of the Issuer referred to on the face hereof and in the manner and subject to the limitations provided in the Indenture, Definitive Securities of this tranche may be exchanged for a like aggregate principal amount of Definitive Securities of this tranche of other authorized denominations.

Upon due presentment for registration of transfer of this Security at the above-mentioned office or agency of the Issuer, a new Security or Securities of this tranche of authorized denominations, for a like aggregate principal amount, will be issued to the transferee as provided in the Indenture. No service charge shall be made for any such transfer, but the Issuer may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

The Issuer, the Guarantor, the Trustee, and any authorized agent of the Issuer, the Guarantor, or the Trustee, may deem and treat the registered holder hereof as the absolute owner of this Security (whether or not this Security shall be overdue and notwithstanding any notation of ownership or other writing hereon made by anyone other than the Issuer, the Guarantor, or the Trustee or any authorized agent of the Issuer, the Guarantor, or the Trustee), for the purpose of receiving payment of, or on account of, the principal hereof and interest hereon and for all other purposes, and neither the Issuer, the Guarantor, nor the Trustee nor any authorized agent of the Issuer, the Guarantor, or the Trustee shall be affected by any notice to the contrary.

This Security shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without giving effect to the conflicts of laws provisions thereof (other than Section 5–1401 of the General Obligations Law of the State of New York, which is expressly made applicable hereto).

[FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION
FOR GLOBAL SECURITY AND DEFINITIVE SECURITIES]

This is one of the Securities referred to in the within mentioned Indenture.

DEUTSCHE INTERNATIONAL CORPORATE SERVICES
LIMITED, as Trustee

By: _____
Name:
Title:

[FORM OF PARENT GUARANTEE FOR GLOBAL SECURITY AND DEFINITIVE SECURITIES]

The Guarantor (as defined in the Indenture referred to in the Security upon which this notation is endorsed (the "Securities")), upon the terms and subject to the conditions set forth in the Indenture, hereby unconditionally guarantees the due and punctual performance of all obligations of the Issuer to the Securityholders or the Trustee and its successors and assigns all in accordance with the terms set forth in Article 9 of the Indenture.

The Guarantor hereby agrees that its obligations hereunder shall be absolute and unconditional, irrespective of the validity, regularity or enforceability of the Securities or the Indenture, the absence of any action to

enforce the same, any waiver or consent by any Securityholder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor. The Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenants that this Parent Guarantee will not be discharged except by complete performance of the obligations contained in the Securities, the Indenture and this Parent Guarantee.

The obligations of the Guarantor to the Securityholders and to the Trustee pursuant to this Parent Guarantee and the Indenture are expressly set forth in the Indenture and reference is hereby made to the Indenture for the precise terms of this Parent Guarantee and all of the other provisions of the Indenture to which this Parent Guarantee relates.

This Parent Guarantee shall not be valid or obligatory for any purpose until the certificate of authentication on the Securities shall be duly executed by the Trustee under the Indenture.

This Parent Guarantee shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without giving effect to the conflicts of laws provisions thereof (other than Section 5–1401 of the General Obligations Law of the State of New York, which is expressly made applicable hereto).

This Parent Guarantee is subject to release upon the terms set forth in the Indenture.

IN WITNESS WHEREOF, the Guarantor has caused this instrument to be duly executed.

ALTIMO HOLDINGS & INVESTMENTS LIMITED

By: _____

Name:
Title:    Authorized Director

DATED: _____

[Seal]

The Common Seal of Altimo Holdings & Investments Limited was affixed in the presence of: [name][title]

AND WHEREAS, all things necessary to make the Securities and the Parent Guarantee, when executed by the Issuer and the Guarantor, respectively, and, in the case of the Securities, authenticated and delivered by the Trustee as in this Indenture provided, the valid, binding and legal obligations of the Issuer and the Guarantor, as the case may be, and to constitute these presents a valid indenture and agreement according to its terms, have been done;

NOW, THEREFORE:

In consideration of the premises and the purchases of the Securities by the holders thereof, the Issuer, the Guarantor and the Trustee mutually covenant and agree for the equal and proportionate benefit of the respective holders from time to time of the Securities as follows:

**ARTICLE 1**
DEFINITIONS

Section 1.01. *Certain Terms Defined.* The following terms (except as otherwise expressly provided or unless the context otherwise clearly requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified in this Section. The words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision. The terms defined in this Article include the plural as well as the singular.

"**Additional Amounts**" has the meaning set forth in Section 3.14.

"**Additional Collateral**" means any VIP Shares delivered pursuant to Section 1(d) of the Collateral Agreement and any cash delivered pursuant to Section 1(c) of the Collateral Agreement.

"**ADR Program**" means the program established by the Deposit Agreement among VIP, The Bank of New York as depositary and owners and beneficial owners of VIP ADRs, dated as of November 20, 1996, as amended or supplemented from time to time.

"**Affiliate**" has the meaning given in Rule 501(b) under the Securities Act.

"**ADR Program Custodian**" means the Moscow, Russian Federation, office of ING Bank (Eurasia), as agent of the Depositary in respect of the ADR Program, or any other firm or corporation appointed by the Depositary as substitute or additional custodian pursuant to the Deposit Agreement.

"**Authorized Director**" means (i) with respect to the Issuer, any director of the Issuer who has been authorized by the Issuer to execute documents and take action on behalf of the Issuer in connection with this Indenture, the Collateral Agreement and the Securities of any tranche and (ii) with respect to the Guarantor, any director of the Guarantor who has been authorized by the Guarantor to execute documents and take action on behalf of the Guarantor in connection with this Indenture, the Securities of any tranche and the Parent Guarantee in respect of the Securities of any tranche.

"**Board of Directors**" means either the Board of Directors of the Issuer or any committee of such Board duly authorized to act hereunder.

"**Board Resolution**" means a copy of a resolution certified by a director or secretary of the Issuer to have been duly adopted by the Board of Directors or a duly authorized committee thereof and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"**Break Funding Costs**" means, in relation to a payment of principal or interest in respect of the Securities of any tranche on a date other than the Stated Maturity Date for such tranche or an Interest Payment Date for such tranche, the present value, calculated by discounting to the date of such payment at a rate equal to LIBID with designated maturity (rounded to the nearest month) corresponding to the period from and including the date of such payment to but excluding the next Interest Payment Date for such tranche, of the product of (i) the interest rate that is equal to the LIBO Rate for the Interest Period for such tranche during which such payment occurs *minus* the LIBO Rate with designated maturity (rounded to the nearest month) corresponding to the period from and including the date of such payment to but excluding the next Interest Payment Date for such tranche, *times* (ii) a fraction that has the number of days from and including the date of such payment to but excluding the next Interest Payment Date for such tranche as the numerator and 360 as the denominator, *times* (iii) the Outstanding aggregate principal amount of the Securities of such tranche held by the relevant Holder as of the date of such payment.

"**Business Day**" means a day which in London and The City of New York is neither a legal holiday nor a day on which banking institutions are authorized by law or regulation to close.

"**Calculation Agent**" means Deutsche Bank AG London Branch, and its successors and assigns.

"**Cash Collateral**" has the meaning set forth in the Cash Collateral Assignment.

"**Cash Collateral Agent**" has the meaning set forth in the Cash Collateral Assignment.

"**Cash Collateral Assignment**" means the cash collateral assignment dated as of the date hereof between the Issuer and Deutsche International Corporate Services Limited as Cash Collateral Agent.

"**Cash Margin**" means, at a given time, the amount of cash delivered to the Cash Collateral Agent pursuant to Section 1(c) of the Collateral Agreement and held by the Cash Collateral Agent pursuant to the Cash Collateral Assignment.

"**Clearstream**" means Clearstream Banking, *société anonyme*, Luxembourg.

"**Closing Date**" has the meaning set forth in the Purchase Agreement.

"**Collateral**" has the meaning set forth in the Collateral Agreement.

"**Collateral Agent**" has the meaning set forth in the Collateral Agreement.

"**Collateral Agreement**" means the collateral agreement relating to the Securities of all tranches issued hereunder, dated as of the date hereof, among the Issuer, the Securities Intermediary, the Collateral Agent, the Trustee and the Depositary.

"**Collateral Event of Default**" has the meaning set forth in the Collateral Agreement.

"**Common Depositary**" means a depositary common to Euroclear and Clearstream, being initially Deutsche Bank AG London Branch, until a successor Common Depositary, if any, shall have been so appointed, and thereafter Common Depositary shall mean or include each Person who is then a Common Depositary hereunder.

"**Corporate Trust Office**" means the office of the Trustee at which the corporate trust business of the Trustee shall, at any particular time, be principally administered, which office is, at the date as of which this Indenture is dated, located at St. Paul's Gate, New Street, St. Helier, Jersey JE4 8ZB.

"**Custodian**" means the Moscow, Russian Federation, office of ING Bank (Eurasia), as nominee of and custodian for the Securities Intermediary, or any other firm or corporation appointed by the Securities Intermediary as substitute or additional nominee of and custodian for the Securities Intermediary.

"**Date of Occurrence**" has the meaning specified in Section 3.15(e).

"**Default Costs**" means, in relation to a payment of principal and interest in respect of the Securities of any tranche on a date other than the Stated Maturity Date for such tranche, (a) the present value, calculated by discounting to the date of such payment at a rate equal to LIBID with designated maturity (rounded to the nearest month) corresponding to the period from and including the date of such payment to but excluding the date that is 18 months after the date of issuance for such tranche, of the product of (i) the Spread for such tranche, *times* (ii) a fraction that has the number of days from and including the date of such payment to but excluding the date that is 18 months after the date of issuance for such tranche as the numerator and 360 as the denominator, *times* (iii) the Outstanding aggregate principal amount of the Securities of such tranche held by the relevant Holder as of the date of such payment, *plus* (b) the Outstanding aggregate principal amount of the Securities of such tranche held by the relevant Holder as of the date of such payment, *times* 0.5%.

"**Definitive Securities**" means securities evidencing definitive Securities issued in fully registered form with no coupons attached in exchange for the Global Security under the circumstances provided for herein.

"**Delisting**" means that the Exchange announces that pursuant to the rules of such Exchange, the VIP ADSs cease (or will cease) to be listed, traded or publicly quoted on the Exchange for any reason (other than a merger or Tender Offer) and are not immediately re-listed, re-traded or re-quoted on an national securities exchange located in the United States.

"**Deposit Agreement**" means that certain Deposit Agreement among VIP, The Bank of New York, as depositary, and owners and beneficial owners of VIP ADRs, dated as of November 20, 1996, as amended or supplemented from time to time.

"**Depositary**" means The Bank of New York in its capacity as depositary in respect of the ADR Program, and its successors in such capacity.

"**Dispute**" has the meaning set forth in Section 11.08(a).

"**Dollars**", "**U.S. Dollars**" or "**$**" each means freely transferable lawful money of the United States or any successor currency.

"**Early Maturity Event**" means any event or condition specified as such in Section 3.15(a).

"**Early Maturity Time**" means the time specified in Section 3.15(a).

"**Euroclear**" means Euroclear Bank SA/NV, as operator of the Euroclear system.

"**Escrowed Account**" means the account established by the Issuer with the Escrow Agent pursuant to the Escrow Agreement.

"**Escrow Agent**" means The Bank of New York in its capacity as escrow agent under the Escrow Agreement, and its successors and assigns in such capacity.

"**Escrow Agreement**" means the account agreement by and among the Issuer, the Escrow Agent, the Guarantor and the Collateral Agent, acting for the benefit of the Securityholders, dated as of the date hereof.

"**Event of Default**" means any event or condition specified as such in Section 4.01 which shall have continued for the period of time, if any, therein designated.

"**Exchange**" means the New York Stock Exchange.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended.

"**Global Security**" means a global security evidencing the Securities of a tranche of Securities issued hereunder that will be deposited on the closing date for such tranche of Securities with, and registered in the name of, a Common Depositary representing the full aggregate principal amount of the Securities of such tranche, as adjusted from time to time in accordance with the terms hereof, or issued in accordance with Article 2 hereof.

"**Guarantor**" means Altimo Holdings & Investments Limited, a British Virgin Islands company, and, subject to Article 8, its successors and assigns.

"**Holder**", "**holder of Securities**", "**Securityholder**" or other similar terms means the registered holder of any Securities (other than the Issuer or any of its Affiliates).

"**ICC**" has the meaning set forth in Section 11.08(a).

"**ICC Rules**" has the meaning set forth in Section 11.08(a).

"**Indebtedness**" means, with respect to any Person, (i) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (ii) all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments; (iii) obligations of such Person under any Swap Contract; (iv) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business) or securities; (v) indebtedness (excluding prepaid interest thereon) secured by a lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; (vi) capital leases and synthetic lease obligations; and (vii) all guarantees of such Person in respect of any of the foregoing. For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non−recourse to such Person.

"**Indenture**" means this instrument as originally executed and delivered or, if amended or supplemented as herein provided, as so amended or supplemented.

"**Interest Payment Date**" means, with respect to any tranche of Securities, the dates specified on such Securities of that tranche as well as in the Officers' Certificate establishing the terms of such tranche as dates on which interest shall be paid, *provided* that the Stated Maturity Date for such tranche shall be an Interest Payment Date for such tranche.

"**Interest Period**" means, with respect to any tranche of Securities, each period commencing on an Interest Payment Date for such tranche (or in the case of the first such period for such tranche, the date of issue of that tranche) and ending on the next following Interest Payment Date for such tranche.

"**Interest Record Date**" means, with respect to any interest payable on any Interest Payment Date for any tranche of Securities, the date one Business Day immediately preceding the relevant Interest Payment Date for such tranche.

"**Issuer**" means Eco Telecom Limited, a Gibraltar company.

"**Judgment Currency**" has the meaning set forth in Section 11.10(a)(i).

"**Knowledge**" means, in respect of the Issuer or the Guarantor: (i) actual awareness by any VIP Investment Responsible Person after reasonable inquiry (including consultation with counsel in the case of any legal or regulatory developments); (ii) constructive knowledge of the contents of any filings made

with the United States Securities and Exchange Commission by or in respect of VIP; and (iii) any advice from counsel received by any VIP Investment Responsible Person; *provided* that the Issuer and the Guarantor shall seek advice from counsel promptly after any VIP Investment Responsible Person receives any information that any fact, condition or circumstance that may cause an Early Maturity Event or Event of Default may have occurred or may occur prior to the payment in full of all obligations of the Issuer under the Principal Documents.

"**Legend**" has the meaning set forth in Section 2.05.

"**LIBID**" means, with respect to a time of determination, the London based interbank bid rate bid by three major London based banks at such time, on USD call money loans traded by London based banks at such time as determined by the Calculation Agent.

"**LIBO Rate**" means, with respect to any Interest Period for any tranche of Securities, the rate for deposits in U.S. Dollars having maturity of three months that appears on Telerate Page 3750 as of 11:00 A.M., London time, on the second Business Day (the "**Determination Date**") next preceding the Interest Payment Date for such tranche on which such Interest Period commences (or, in the case of the first Interest Period for tranche, the date of issuance of such tranche of Securities). If no such rate appears on Telerate Page 3750 on such Determination Date, the Calculation Agent will determine such rate to be the rate for such Determination Date as appears on such other generally recognized electronic source used for the purposes of displaying such rate; provided that if no other generally recognized electronic source used for displaying such rate and selected by the Calculation Agent is providing such rate for such Determination Date in the manner described by this sentence, LIBO Rate for such Interest Period shall be determined by the Calculation Agent in a commercially reasonable manner.

"**LTV Ratio**" means, as of any time of determination, which shall be a Business Day (or, if such date is not a Business Day, the next Business Day), (i) the aggregate principal amount of the Securities of all tranches then outstanding less the amount of Cash Margin pledged in favor of the Collateral Agent for the benefit of the Securityholders pursuant to the Collateral Agreement *divided by* (ii) the Market Value of the Pledged Collateral at such time, expressed as a percentage (as determined by the Calculation Agent).

"**LTV Margin Level**" means an LTV Ratio of 60%.

"**LTV Reset Level**" means an LTV Ratio of 55%.

"**LTV Initial Ratio**" means an LTV Ratio of 55%.

"**LTV Trigger Level**" means an LTV Ratio of 65%.

"**LTV Ratio Early Unwind**" has the meaning set forth in Section 3.15(a)(ix).

"**Market Value**" means, with respect to any Pledged Collateral comprising publicly traded securities at any time of determination, the most recently publicly quoted sale price of such securities, or, with respect to any other Pledged Collateral, the cash equivalent, expressed in U.S. dollars, for the Pledged Collateral as of the date of determination as determined by the Calculation Agent. For the purposes of this definition (i) the Market Value of VIP Shares shall be equal to the most recently publicly quoted sale price of the VIP ADSs multiplied by the exchange ratio for converting VIP Shares into ADSs as set forth in the Deposit Agreement and (ii) if any cash dividend is declared on any securities that form part of the Pledged Collateral in respect of which the ex–dividend date would fall after the payment date of such dividend, on each Business Day during the period from and including the date of declaration of such dividend through and including the date of payment of such dividend, the price of such a security shall be, subject to clause (i) of this sentence, the most recent publicly quoted sale price of such security less the per security amount of such declared dividend.

"**Master Agreement**" means any form of master agreement published by the International Swaps and Derivatives Association, Inc., The Bond Market Association, International Securities Market Association, any International Foreign Exchange Master Agreement, or any other master agreement, together with any related schedules.

"**Maturity Date**" means, for any tranche of the Securities, the Stated Maturity Date or the Early Maturity Time for such tranche.

"**Nationalization**" means that all the VIP Shares or VIP ADSs or all or substantially all the assets of VIP are nationalized, expropriated or are otherwise required to be transferred to any governmental agency, authority, entity or instrumentality thereof;

"**Notice of Default**" has the meaning set forth in Section 4.01.

"**Officers' Certificate**" means a certificate signed by the Director of the Issuer and delivered to the Trustee. Each such certificate shall include the statements provided for in Section 11.04.

"**Opinion of Counsel**" means an opinion in writing signed by legal counsel who may be an employee of or counsel to the Issuer or who may be other counsel reasonably satisfactory to the Trustee. Each such opinion shall include the statements provided for in Section 11.04, if and to the extent required hereby.

"**Outstanding**", when used with reference to Securities of any tranche, shall mean, as of any particular time, all Securities of such tranche authenticated and delivered by the Trustee under this Indenture but not redeemed or accelerated, except

(a) Securities theretofor cancelled by the Trustee or delivered to the Trustee for cancellation;

(b) Securities, or portions thereof, for the payment or redemption of which moneys in the necessary amount shall have been deposited in trust with the Trustee or with any paying agent (other than the Issuer) or shall have been set aside, segregated and held in trust by the Issuer (if the Issuer shall act as its own paying agent);

(c) Securities in substitution for which other Securities shall have been authenticated and delivered, or which shall have been paid, pursuant to the terms of Section 2.08 (unless proof satisfactory to the Trustee is presented that any of such Securities is held by a person in whose hands such Security is a legal, valid and binding obligation of the Issuer).

"**Paying Agent**" has the meaning set forth in Section 3.03.

"**Payment Business Day**" means a day which in London, Moscow and The City of New York is neither a legal holiday nor a day on which banking institutions are authorized by law or regulation to close.

"**Parent Guarantee**" shall have the meaning set forth in Section 9.01.

"**Permitted Financing Transaction**" shall have the meaning set forth in Section 3.10.

"**Permitted Subordinated Indebtedness**" means, with respect to the Issuer, any Indebtedness owed by the Issuer to the Guarantor or any Affiliate of the Issuer or the Guarantor; *provided* that (i) the claims in respect of such Indebtedness have been contractually subordinated to the claims in respect of the Securities to the reasonable satisfaction of the Calculation Agent, and (ii) at any time, the aggregate principal amount of such Indebtedness does not exceed the sum of (1) the Cash Margin at such time, (2) the aggregate amount of all the payments that have become due under the Securities by such time, (3) $1,000,000 (which shall be used for the reasonable ongoing administration and maintenance of the Issuer) and (4) an amount of Indebtedness of up to $825,000,000 existing as of March 8, 2007 that was incurred in connection with acquisition by the Issuer of 10,293,934 VIP ADSs that were the subject of transactions under a 2002 master agreement and schedule thereto published by the International Swaps and Derivatives Association, Inc. together with a master confirmation dated August 30, 2006 between Rightmarch Limited, a wholly-owned subsidiary of the Guarantor, and a counterparty relating to certain share forward transactions in respect of VIP ADSs (such Indebtedness, the "Intra-Group ADS Acquisition Loan").

"**Person**" means a legal person, including any individual, corporation, estate, partnership, joint venture, association, joint–stock company, limited liability company, trust, unincorporated organization or government or any agency or political subdivision thereof or any other entity of whatever nature.

"**Pledged Collateral**" has the meaning set forth in the Collateral Agreement.

"**Preferred VIP Shares**" means preferred shares of VIP with a nominal value of 0.005 rubles each.

"**Principal Documents**" means the Indenture, the Securities of each tranche issued hereunder, the Parent Guarantee, the Collateral Agreement, the Cash Collateral Assignment, the Escrow Agreement and the Transaction Side Letter.

"**Purchase Agreement**" means the purchase agreement dated as of the date hereof among the Issuer, the Guarantor and Deutsche Bank AG London Branch and agreed and acknowledged in certain respects by the Trustee and the Calculation Agent.

"**Redemption Date**" has the meaning set forth in Section 10.01.

"**Register**" means the register maintained by the registrar that evidences ownership of the Bonds.

"**Registrar**" has the meaning set forth in Section 3.03.

"**Registration Rights Agreement**" means the Registration Rights Agreement dated as of May 30, 2001 between and among Telenor East Invest AS, a Norwegian company, the Issuer and VIP, as amended or supplemented from time to time.

"**Required Currency**" has the meaning set forth in Section 11.10(a)(i).

"**Responsible Officer**" when used with respect to the Trustee means the chairman of the board of directors, any vice chairman of the board of directors, the chairman of the trust committee, the chairman of the executive committee, any vice chairman of the executive committee, the president, any vice president (whether or not designated by numbers or words added before or after the title "vice president"), the cashier, the secretary, the treasurer, any trust officer, any assistant trust officer, any assistant vice president, any assistant cashier, any assistant secretary, any assistant treasurer, or any other officer or assistant officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of his knowledge of and familiarity with the particular subject.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the United States Securities Act of 1933, as amended.

"**Securities Intermediary**" means the financial institution identified as such in the preliminary paragraph of the Collateral Agreement, or any appointed successor thereof.

"**Security**" or "**Securities**" means any bond, as the case may be, authenticated and delivered under this Indenture.

"**Spread**" means the percentage per annum set forth in the Purchase Agreement.

"**Stated Maturity Date**" means, with respect to any tranche of Securities, the maturity date stated on the Securities of that tranche as well as on the Officers' Certificate establishing the terms of such tranche.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, forward equity, forward equity price or forward equity index transactions, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross–currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, (b) any agreements to purchase securities or other property which arise out of or in connection with the sale of the same or substantially similar securities or properties, whether or not any such transaction is governed by or subject to any master agreement, and (c) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any Master Agreement, including any obligations or liabilities under any Master Agreement.

"**Taxes**" has the meaning set forth in Section 3.14.

"**Taxing Jurisdiction**" has the meaning set forth in Section 3.14.

"**Telenor**" means Telenor Invest SA.

"**Telerate Page 3750**" means the display designated as "Page 3750" on Bridge Telerate, Inc., or any successor service, for the purpose of displaying the London interbank rates for major banks for U.S. Dollars.

"**Tender Offer**" means a takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person that results in such entity or person purchasing, or otherwise obtaining or having the right to obtain, by conversion or other means, greater than 10% and less than 100% of the outstanding voting shares of VIP, as determined by the Calculation Agent, based upon the making of filings with governmental or self–regulatory agencies or such other information as the Calculation Agent deems relevant.

"**Third Party Pledgee**" shall have the meaning specified in Section 3.10(a).

"**Trading Day**" means a day during which trading in securities generally occurs on the New York Stock Exchange or, if the VIP ADSs are not then listed on the New York Stock Exchange, on the principal U.S. national securities exchange on which the VIP ADSs are then listed.

"**Trading Volume Determination Date**" has the meaning specified in Section 3.15(a).

"**Transaction Side Letter**" means the side letter agreement dated as of the date hereof between the Issuer, the Guarantor and Deutsche Bank AG London Branch, as the initial purchaser of the Securities, relating to certain transactions of Deutsche Bank AG London Branch and certain representations made by the Guarantor.

"**Trustee**" means the entity identified as "Trustee" in the first paragraph hereof and, subject to the provisions of Article 5, shall also include any successor trustee.

"**VIP**" means the Open Joint Stock Company "Vimpel–Communications" organized under the laws of the Russian Federation.

"**VIP ADRs**" means the American depository receipts issued under the ADR Program evidencing VIP ADSs.

"**VIP ADSs**" means the American depository shares issued under the ADR Program, each representing one–quarter (0.25) of a VIP Share or such other proportion as may be determined from time to time.

"**VIP Collateral Account**" has the meaning set forth in the Collateral Agreement.

"**VIP Investment Responsible Person**" means any director or officer of the Issuer, the Guarantor or any of their Affiliates (including, without limitation, any direct or indirect shareholder of the Issuer or the Guarantor or any other beneficiary of the VIP Shares held by the Issuer).

"**VIP Principal Agreements**" means the agreements listed on Schedule I hereto.

"**VIP Securities**" means any security issued by VIP, or depositary securities representing the same, including, without limitation, VIP Shares, Preferred VIP Shares and VIP ADSs.

"**VIP Shares**" means the common stock of VIP, 0.005 rubles nominal value per share or security entitlements with respect thereto.

## ARTICLE 2
### FORMS OF SECURITIES, ISSUE, EXECUTION, FORM AND REGISTRATION OF SECURITIES

Section 2.01. *Forms Generally.* The Global Security and the Definitive Securities evidencing the registration of ownership in the Register and the Trustee's certificates of authentication shall be in substantially the forms set forth in the preamble hereto. The Securities shall use the form of Definitive Securities or Global Security, as applicable. The Global Security and the Definitive Securities shall bear the restrictive legend on the face thereof substantially in the form set forth in the preamble hereto.

The Securities may be issued with appropriate insertions, omissions, substitutions and variations, and shall have imprinted thereon the Parent Guarantee.

The Global Securities representing the Securities shall be exchangeable for Definitive Securities only upon the occurrence of the events specified in Section 2.07(c) below.

Subject to the provisions of applicable law, the Securities shall be printed, lithographed or engraved or produced by any combination of these methods on steel engraved borders or may be produced in any other manner permitted by the rules of any securities exchange on which the Securities may be listed, all as determined by the Officers executing such Securities, as evidenced by their execution of such Securities.

Upon their original issuance, the Securities of each tranche is issued hereunder shall be issued in fully registered form and evidenced by a Global Security, the form set forth in the preamble hereto.

The Securities shall be initially offered and sold in reliance on Regulation S and shall be held through Euroclear and Clearstream and shall be deposited with the Common Depositary and registered in the name of Deutsche Bank AG, London Branch, as Common Depositary and the Trustee shall thereafter deliver the Global Security evidencing such Securities for deposit with the Common Depositary.

Section 2.02. *Authentication and Delivery of Securities.* The aggregate principal amount of Securities that may be authenticated and delivered under this Indenture is $1,500,000,000. The Securities may be issued in one or more tranches. Upon the execution and delivery of this Indenture and until March 9, 2008, from time to time one or more tranches of Securities may be issued hereunder *provided* that no tranche of Securities may be issued hereunder on a date that is within two months of (i) the date of issuance of the previous tranche of Securities issued hereunder, if any, or (ii) the receipt of any proceeds by the Issuer pursuant to a Permitted Financing Transaction.

The Securities of each tranche will be evidenced by a Global Security for that tranche executed by the Issuer and delivered to the Trustee for authentication, and the Trustee shall thereupon authenticate, on behalf of the holders of beneficial interests in the Securities represented thereby, the said Securities upon the written order of the Issuer, signed by an Authorized Director of the Issuer without any further action by the Issuer and the Trustee shall thereafter deliver the Global Security evidencing such Securities for deposit with the Common Depositary.

There shall be established in or pursuant to authorization provided in a Board Resolution and, subject to Section 2.03, Section 2.04 and Section 2.05, set forth in an Officers' Certificate of the Issuer or established in one or more indentures supplemental hereto, prior to the issuance of Securities of any tranche,

(i) the title of the Securities of such tranche (which shall distinguish the Securities of such tranche from all other Securities);

(ii) the amount of aggregate principal amount of the Securities of such tranche that may be authenticated and delivered under this Indenture, which shall be at least $100,000,000 and in multiples of $50,000,000 thereafter;

(iii) the date on which the principal of any Securities of such tranche is payable, which shall be the date that is two years after the date the Securities of such tranche are authenticated;

(iv) the Interest Payment Dates on which interest on Securities of such tranche shall be payable, which shall be quarterly with the first Interest Payment Date following approximately 90 days after the date the Securities of such tranche are authenticated;

All Securities of the same tranche shall be identical except as to denominations.

If any of the terms of the tranche are established by action taken pursuant to authorization provided by a Board Resolution, a copy of an appropriate record of such action shall be delivered to the Trustee at or prior to the delivery of the Officers' Certificate setting forth the terms of the tranche.

The Trustee shall have the right to decline to authenticate and deliver any Securities under this Indenture if the Trustee determines in good faith that such action may not lawfully be taken by the Issuer or if the Trustee in good faith by its Board of Directors or board of trustee, executive committee, or a trust committee of directors or trustees or Responsible Officers shall reasonably determine that such action would expose the Trustee to personal liability to existing holders.

No tranche of Securities may be issued, unless, after giving full effect to such issuance, the LTV Ratio is equal to or less than the LTV Initial Ratio.

The Global Security representing the Securities shall be exchangeable for Definitive Securities only upon the occurrence of the events specified in Section 2.07(c) below.

Section 2.03. *Execution of Securities.* The Securities shall be executed on behalf of the Issuer by an Authorized Director of the Issuer, under its corporate seal. Such signatures may be the manual or facsimile signatures of the present or any future such officers. The seal of the Issuer may be in the form of a facsimile thereof and may be impressed, affixed, imprinted or otherwise reproduced on the Securities. Typographical and other minor errors or defects in any such reproduction of the seal or any such signature shall not affect the validity or enforceability of any Securities which has been duly authenticated and delivered by the Trustee.

In case any Authorized Director of the Issuer who shall have signed any of the Securities shall cease to be such Authorized Director before the Securities so signed shall be authenticated and delivered by the Trustee or disposed of by the Issuer, such Securities nevertheless may be authenticated and delivered or disposed of as though the person who signed such Securities had not ceased to be such Authorized Director of the Issuer; and any Securities may be signed on behalf of the Issuer by such person as, at the actual date of the execution of such Securities, shall be the proper Authorized Director of the Issuer, although at the date of the execution and delivery of this Indenture any such person was not such Authorized Director.

Section 2.04. *Certificate of Authentication.* Only such Securities as shall bear thereon a certificate of authentication substantially in the form hereinbefore recited, executed by the Trustee by manual signature of one of its authorized officers, shall be entitled to the benefits of this Indenture or be valid or obligatory for any purpose. Such certificate by the Trustee upon any Securities executed by the Issuer shall be conclusive evidence that such Securities so authenticated have been duly authenticated and delivered hereunder and that the holder is entitled to the benefits of this Indenture.

Section 2.05. *Denomination and Date of Securities; Payments of Interest.* The Securities shall be issued in fully registered form without coupons and in denominations of $1,000 and multiples thereof.

Each Security shall be dated as of the date of original issuance of such Securities except that each Definitive Security shall be dated the date of its authentication. Each Security shall bear interest from such date and shall be payable on the dates specified on the face of the Security.

The person in whose name any Security of any tranche is registered in the Register at the close of business on any Interest Record Date with respect to any Interest Payment Date for such tranche shall be entitled to receive the interest, if any, payable on such Interest Payment Date notwithstanding any transfer or

exchange of such Securities subsequent to the Interest Record Date and prior to such Interest Payment Date, except if and to the extent the Issuer shall default in the payment of the interest due on such Interest Payment Date, in which case such defaulted interest shall be paid to the persons in whose names outstanding Securities of such tranche are so registered at the close of business on a subsequent record date (which shall be not less than five Business Days prior to the date of payment of such defaulted interest) established by notice given by mail by or on behalf of the Issuer to the holders of Securities of such tranche not less than 15 days preceding such subsequent record date.

Section 2.06. *Registration.* The Issuer will keep at each office or agency to be maintained for the purpose as provided in Section 3.03 a Register showing the aggregate principal amount of Securities registered in the same of each Holder of as the date of issue of each tranche of Securities issued hereunder. Subject to such reasonable regulations as it may prescribe, the Registrar will register all subsequent transfers and changes as registered ownership in respect of the Securities issued hereunder and the names and addresses of the registered Holders. Such Register shall be in written form in the English language or in any other form capable of being converted into such form within a reasonable time. At all reasonable times such Register shall be open for inspection by the Trustee. The Registrar will carry out such other acts as may be necessary to give effect to the provisions of this Indenture.

Section 2.07. *Transfer and Exchange.* (a) The Trustee shall retain copies of all certificates, opinions and other documents received in connection with the transfer or exchange of a Security (or a beneficial interest therein) of which the registration of ownership is evidenced by the Global Security and of any Definitive Security, and the Issuer will have the right to inspect and make copies thereof at any reasonable time upon written notice to the Trustee.

All Securities presented for registration of transfer, exchange or payment shall (if so required by the Issuer or the Trustee) be duly endorsed by, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Issuer and the Trustee duly executed by, the holder or his attorney duly authorized in writing.

(b) *Transfers of Definitive Securities.* Upon due presentation for registration of transfer of any Definitive Security at each such office or agency, the Issuer shall execute and the Trustee shall authenticate and deliver in the name of the transferee or transferees a new Definitive Security or Securities in authorized denominations for a like aggregate principal amount.

Any Definitive Security or Securities of any tranche may be exchanged for a Definitive Security or Securities of the same tranche in other authorized denominations, in an equal aggregate principal amount. Definitive Securities to be exchanged shall be surrendered at each office or agency to be maintained by the Issuer for the purpose as provided in Section 3.03, and the Issuer shall execute

and the Trustee shall authenticate and deliver in exchange therefor the Definitive Security or Securities which the Securityholder making the exchange shall be entitled to receive, bearing numbers not contemporaneously outstanding.

In the case of a transfer of only part of a Definitive Security, a new Definitive Security shall be issued to the transferee in respect of the part transferred and a further new Definitive Security in respect of the balance of the holding not transferred shall be issued to the transferor.

All Definitive Securities issued upon any registration of transfer or exchange of the Securities under the terms of this Indenture shall be valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Securities surrendered upon such registration or transfer or exchange.

(c) *Exchange of a Global Security for Definitive Securities.* A Global Security will only be exchangeable in whole but not in part for Definitive Securities if:

(i) the Securities become ineligible for clearance and settlement through Euroclear and Clearstream or the Common Depositary is unwilling or unable to hold the Securities and the Issuer is not able, after using its best efforts, to arrange for clearance and settlement of the Securities through a successor clearing system to the satisfaction of the Trustee; or

(ii) an Event of Default has occurred and is continuing.

The beneficial owners of interests in the Global Security shall have no rights under this Indenture with respect to any Global Security held on their behalf by the Common Depositary and the Common Depositary shall be treated by the Issuer, the Guarantor, the Trustee, and any agent of the foregoing Persons as the absolute owner of such Global Security for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Guarantor, the Trustee or Calculation Agent or any agent of the foregoing Persons, from giving effect to any written certification, proxy or other authorization furnished by the Common Depositary or impair, as between the Common Depositary or other clearance service and the beneficial owner, the operation of customary practices and applicable law governing the exercise of the rights of a beneficial owner of any security held in a securities clearing system, including without limitation the granting of proxies or other authorization of participants to give or take any request, demand, authorization, reaction, notice, consent, waiver or other action which a Holder is entitled to give or take under this Indenture.

In connection with any exchange of interests in a Global Security for Definitive Securities of another authorized form, as provided in this Section

2.07(c), then without unnecessary delay but in any event not later than the earliest date on which such interests may be so exchanged, the Issuer shall deliver to the Trustee Definitive Securities in an aggregate principal amount equal to the principal amount of such Global Security. On or after the earliest date on which such interests may be so exchanged, the Trustee shall authenticate and deliver, in and against exchange for such Global Security, through the Issuer to the holder of such Global Security an equal aggregate principal amount of Definitive Securities of authorized denominations as the principal amount of such Global Security. Definitive Securities issued pursuant to this Section 2.07(c) shall be in fully registered form without coupons and registered in such names, and delivered, as Euroclear or Clearstream, as the case may be, shall instruct the Trustee.

Any Global Security that is exchangeable pursuant to this Section 2.07(c) shall be exchangeable for Definitive Securities issuable in minimum denominations of $1,000 and in multiples thereof. The cost of preparing, printing, packaging and delivering any Definitive Securities shall be borne by the Issuer.

No service charge shall be made for any transfer or exchange of Definitive Securities or the delivery of Definitive Securities, but the Issuer may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange or registration of transfer of Definitive Securities.

Section 2.08. *Mutilated, Defaced, Destroyed, Lost and Stolen Securities.* In case any Security shall become mutilated, defaced or be apparently destroyed, lost or stolen, the Issuer in its discretion may execute, and upon the written request of any officer of the Issuer, the Trustee shall authenticate and deliver, subject to the final paragraph of Section 2.07 a new Security, bearing a number not contemporaneously outstanding, in exchange and substitution for the mutilated or defaced Security, or in lieu of and substitution for the Security so apparently destroyed, lost or stolen. Any Security surrendered to the Trustee for a new Security shall be cancelled by the Trustee in accordance with Section 2.07. In every case the applicant for a substitute Security shall furnish to the Issuer and to the Trustee and any agent of the Issuer or the Trustee such Security or indemnity as may be required by them to indemnify and defend and to save each of them harmless and, in every case of destruction, loss or theft evidence to their satisfaction of the apparent destruction, loss or theft of such Security and of the ownership thereof.

Upon the issuance of any substitute Security, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith. In case any Security which has matured or is about to mature, shall become mutilated or defaced or be apparently destroyed, lost or stolen, the Issuer may, instead of issuing a substitute Security, pay or authorize the payment of the same (without surrender thereof except in the case of a mutilated or defaced Security), if the applicant for such payment shall

furnish to the Issuer and to the Trustee and any agent of the Issuer or the Trustee such security or indemnity as any of them may require to save each of them harmless from all risks, however remote, and, in every case of apparent destruction, loss or theft, the applicant shall also furnish to the Issuer and the Trustee and any agent of the Issuer or the Trustee evidence to their satisfaction of the apparent destruction, loss or theft of such Securities and of the ownership thereof.

Every substitute Security issued pursuant to the provisions of this section by virtue of the fact that any Security is apparently destroyed, lost or stolen shall constitute an additional contractual obligation of the Issuer, whether or not the apparently destroyed, lost or stolen Security shall be at any time enforceable by anyone and shall be entitled to all the benefits of (but shall be subject to all the limitations of rights set forth in) this Indenture equally and proportionately with any and all other Securities duly authenticated and delivered hereunder. All Securities shall be held and owned upon the express condition that, to the extent permitted by law, the foregoing provisions are exclusive with respect to the replacement or payment of mutilated, defaced, or apparently destroyed, lost or stolen Securities and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the replacement or payment of negotiable instruments or other Securities without their surrender.

Section 2.09. *Cancellation of Securities; Destruction Thereof.* All Securities surrendered for payment, registration of transfer or exchange by any Holder, if surrendered to the Issuer or any agent of the Issuer or the Trustee, shall be delivered to the Trustee for cancellation or, if surrendered to the Trustee, shall be cancelled by it; and no Security shall be issued in lieu thereof except as expressly permitted by any of the provisions of this Indenture. The Trustee shall destroy cancelled Securities held by it and deliver a certificate of destruction to the Issuer.

Section 2.10. *Temporary Securities.* Pending the preparation of Definitive Securities of any tranche, the Issuer may execute and the Trustee shall authenticate and deliver temporary Securities of that tranche (printed, lithographed, typewritten or otherwise reproduced, in each case in form satisfactory to the Trustee). Temporary Securities shall be issued in fully registered form without coupons, of any authorized denomination, and substantially in the form of the Definitive Securities of any tranche but with such omissions, insertions and variations as may be appropriate for temporary Securities, all as may be determined by the Issuer with the concurrence of the Trustee. Temporary Securities may contain such reference to any provisions of this Indenture as may be appropriate. Every temporary Security shall be executed by the Issuer and be authenticated by the Trustee upon the same conditions and in substantially the same manner, and with like effect, as the Definitive Securities. Without unreasonable delay the Issuer shall execute and shall furnish Definitive Securities and thereupon temporary Securities may be surrendered in exchange

therefor without charge at each office or agency to be maintained by the Issuer for the purpose pursuant to Section 3.03, and the Trustee shall authenticate and deliver in exchange for such temporary Securities a like aggregate principal amount of Definitive Securities of authorized denominations. Until so exchanged the temporary Securities shall be entitled to the same benefits under this Indenture as definitive Securities.

Section 2.11. *Legal Holidays*. In any case where any Interest Payment Date shall not be a Payment Business Day, notwithstanding any other provision of this Indenture or any of the Securities, interest shall not be paid on such date, but it shall be paid on the next succeeding Payment Business Day with the same force and effect as if made on such Interest Payment Date, provided that no interest shall accrue or be payable by the Issuer or to any Holder with respect to such payments for the period from and after any such Interest Payment Date, except that, if such next succeeding Payment Business Day is in the next succeeding calendar year, such payment shall be made on the immediately preceding Payment Business Day with the same force and effect as if made on such Interest Payment Date.

If the Maturity Date for any tranche of Securities is not a Payment Business Day, notwithstanding any other provision of this Indenture or any of the Securities, principal on such tranche of Securities shall not be paid on such date, but it shall be paid on the next succeeding Payment Business Day with the same force and effect as if made on such Maturity Date, provided that no interest shall accrue or be payable by the Issuer or to any Holder for the period from and after such Maturity Date, except that, if such next succeeding Payment Business Day is in the next succeeding calendar year, such payment shall be made on the immediately preceding Payment Business Day with the same force and effect as if made on such Maturity Date.

Section 2.12. *Acquisition of Securities By the Issuer*. Neither the Issuer nor any of its Affiliates may acquire, directly or indirectly, any Securities.

### ARTICLE 3
COVENANTS OF THE ISSUER AND THE TRUSTEE; REPRESENTATIONS AND
WARRANTIES OF THE ISSUER AND THE GUARANTOR

Section 3.01. *Payment of Principal and Interest*. The Issuer covenants and agrees that it will duly and punctually pay or cause to be paid the principal of, and interest on the Securities of each tranche at the place or places, at the respective times and in the manner provided in the Securities of such tranche and in this Indenture. Each installment of interest on Securities of any tranche may be paid, in the case of Securities evidenced by a Global Security, to the Common Depositary by a wire transfer in immediately available funds or as otherwise requested by the Common Depositary in writing, or in the case of Definitive Securities, by mailing checks for such interest payable to or upon the written

order of the holders of Securities of such tranche, entitled thereto as they shall appear in the Register provided that upon a written notice of the holder of Securities of such tranche entitled thereto, it shall be paid by a wire transfer in immediately available funds to or upon a written order of such holder. All references to payments of interest on the Securities of any tranche made in the Indenture or in the Securities of such tranche shall be deemed to include references to Additional Amounts payable pursuant to Section 3.14, if any.

Section 3.02. *Determination of Interest Rate.* (a) The Securities of any tranche at any time outstanding shall bear interest in respect of the principal amount thereof during each Interest Period for such tranche at a rate equal to the LIBO Rate determined by the Calculation Agent (and as notified to the Issuer by the Trustee) in respect of such Interest Period plus the Spread.

(b) Notwithstanding the foregoing, if any principal of or any interest on any Security or any fee or other amount payable by the Issuer hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to 2% plus the rate otherwise applicable to such Security as provided in the preceding paragraph of this Section.

(c) Accrued interest on each Security of any tranche shall be payable in arrears on each Interest Payment Date for such tranche.

(d) All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The LIBO Rate shall be determined by the Calculation Agent, and such determination shall be conclusive absent manifest error.

Section 3.03. *Offices for Payments, etc.* So long as any of the Securities of any tranche remain outstanding, the Issuer will maintain, the following:

(a) an office or agency in Jersey where Securities may be presented for payment (the Person performing such functions at such office or agency, the "**Paying Agent**"),

(b) an office or agency in Jersey where Securities may be presented for registration of transfer and for exchange as in this Indenture provided (the Person performing such functions at such office or agency, the "**Registrar**") and

(c) an office or agency where notices and demands to or upon the Issuer in respect of Securities or of this Indenture may be served. The Issuer will give to the Trustee written notice of the location of any such office or agency and of any change of location thereof. The Issuer hereby initially designates the Corporate Trust Office of the Trustee as the office or agency for each such purpose and the Trustee as the Paying Agent and the Registrar. In case the Issuer shall fail to

maintain any such office or agency or shall fail to give such notice of the location or of any change in the location thereof, presentations and demands may be made and notices may be served at the Corporate Trust Office.

Section 3.04. *Initial Collateral for the Securities.* The Issuer shall initially pledge, pursuant to the Collateral Agreement, the VIP Collateral Account containing at least 9,349,999 VIP Shares to the Collateral Agent for the benefit of the Securityholders of all tranches and grant to the Collateral Agent for the benefit of the Securityholders of all tranches a first priority, perfected security interest in the right, title and interest of the Issuer in the VIP Collateral Account and such VIP Shares to secure the obligations of the Issuer under the Securities of all tranches and this Indenture. Additional Collateral shall be pledged pursuant to and in accordance with the Collateral Agreement, including an additional 300,000 VIP Shares that the Issuer may elect to deliver pursuant to Section 1(d) of the Collateral Agreement.

Section 3.05. *Appointment to Fill a Vacancy in Office of Trustee.* The Issuer, whenever necessary to avoid or fill a vacancy in the office of Trustee, will appoint, in the manner provided in Section 5.09, a Trustee, so that there shall at all times be a Trustee hereunder.

Section 3.06. *Paying Agents.* Whenever the Issuer shall appoint a paying agent other than the Trustee for any tranche of Securities, it will cause such paying agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section,

(a) that it will hold all sums received by it as such agent for the payment of the principal of or interest on the relevant Securities (whether such sums have been paid to it by the Issuer or by any other obligor on such Securities) in trust for the benefit of the holders of such Securities or of the Trustee,

(b) that it will give the Trustee notice of any failure by the Issuer (or by any other obligor on the Securities) to make any payment of the principal of or interest on any of the Securities for which it acts as paying agent when the same shall be due and payable under any Security or this Indenture, and

(c) pay any such sums so held in trust by it to the Trustee upon the Trustee's written request at any time during the continuance of the failure referred to in Section 3.06(b) above.

The Issuer will, prior to each due date of the principal of or interest on the Securities of any tranche, deposit with the Paying Agent a sum sufficient to pay such principal or interest, and (unless such Paying Agent is the Trustee) the Issuer will promptly notify the Trustee of any failure to take such action.

If the Issuer shall act as its own Paying Agent, it will, on or before each due date of the principal of or interest on any tranche of the Securities, set aside, segregate and hold in trust for the benefit of the holders of Securities of such tranche a sum sufficient to pay such principal or interest so becoming due. The Issuer will promptly notify the Trustee of any failure to take such action.

Anything in this section to the contrary notwithstanding, the Issuer may at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture or for any other reason, pay or cause to be paid to the Trustee all sums held in trust by the Issuer or any Paying Agent hereunder, as required by this Section, such sums to be held by the Trustee upon the trusts herein contained.

Anything in this section to the contrary notwithstanding, the agreement to hold sums in trust as provided in this section are subject to the provisions of Sections 10.05 and 10.06.

Section 3.07. *Certificate to Trustee.* The Issuer will furnish to the Trustee on or before April 30 in each year (beginning with April 30, 2007) a brief certificate from the principal executive, financial or accounting officer of the Issuer as to his or her knowledge of the Issuer's compliance with all conditions and covenants under the Indenture (such compliance to be determined without regard to any period of grace or requirement of notice provided under the Indenture).

Section 3.08. *Securityholders' Lists.* If and so long as the Trustee shall not be the Registrar, the Issuer will furnish or cause to be furnished to the Trustee, for each tranche of Securities, a list in such form as the Trustee may reasonably require of the names and addresses of the holders of Securities of such tranche (a) quarterly not more than one day after each Interest Record Date for such tranche, as of such Interest Record Date, and (b) at such other times as the Trustee may reasonably request in writing, within thirty days after receipt by the Issuer of any such request as of a date not more than 15 days prior to the time such information is furnished.

Section 3.09. *VIP Not to Merge.* The Issuer shall not permit VIP to engage in a merger, combination, consolidation, reclassification, sale or transfer of substantially all of its assets or any other transaction pursuant to which VIP Shares are converted into other securities.

Section 3.10. *Other Financing.* The Issuer has established the Escrowed Account with the Escrow Agent pursuant to the Escrow Agreement.

The Issuer has deposited or caused to be deposited 3,213,783 VIP Shares, 6,426,600 Preferred VIP Shares and 15,209,134 VIP ADSs in the Escrowed Account. Neither the Issuer nor the Guarantor nor any Affiliates thereof own any shares of capital stock of VIP, except for the shares deposited into the VIP Collateral Account and the Escrowed Account and except for (A) VIP Shares held

by Affiliates of the Issuer or the Guarantor that hold VIP Shares for the account or benefit of a third party as an asset manager where neither the Issuer nor the Guarantor nor any Affiliates thereof exercise any control over such VIP Shares or (B) VIP Shares held by Affiliates of the Guarantor as part of their day–to–day short–term trading activities. The Issuer shall deliver or cause to be delivered any VIP Securities that the Issuer or any Affiliate thereof acquires after the date hereof within ten Business Days of such acquisition in accordance with Clause 1 of the Escrow Agreement.

The Issuer shall not terminate (except in accordance with Section 14 of the Collateral Agreement) or breach the Escrow Agreement or otherwise, directly or indirectly, sell, pledge, loan or otherwise transfer title to, the voting rights with respect to or economics in the VIP Shares, the Preferred VIP Shares and VIP ADSs held in the Escrowed Account, without obtaining the prior written consent of Holders of a majority of the aggregate principal amount of the Securities then outstanding, except that (x) the Issuer may deliver up to 300,000 VIP Shares held in the Escrowed Account to the Collateral Agent for deposit in the Collateral Account in accordance with Section 1(d) of the Collateral Agreement and (y) the Issuer shall be allowed to pledge the VIP Shares, the Preferred VIP Shares and VIP ADSs held in the Escrowed Account for the benefit of a third party (together with any collateral agent for, and any other Person acting on behalf of, such third party, the "**Third Party Pledgee**") if each of the following conditions shall have been satisfied (any such transaction, a "**Permitted Financing Transaction**"):

(a) the Third Party Pledgee shall have agreed

(i) not to foreclose upon or otherwise dispose of any VIP Shares, the Preferred VIP Shares and VIP ADSs so pledged to such Third Party Pledgee, except for the sale of the VIP Shares, the Preferred VIP Shares and VIP ADSs so pledged to any person so long as such a sale is initiated not earlier than 30 days after an occurrence of any event that ultimately leads to acceleration of such Permitted Financing Transaction and that results, upon its occurrence, in an Event of Default hereunder; *provided* that the VIP Shares, the Preferred VIP Shares and VIP ADSs may not be sold for so long as the Collateral Agent is prevented from being able to exercise its remedies under Section 8 of the Collateral Agreement as a result of a legal action being brought in any jurisdiction and each relevant period shall be tolled for as long as the Collateral Agent is prevented from being able to exercise such remedies, and

(ii) not to convert the VIP Shares so pledged into VIP ADSs, in each case, until the earlier of

(A) the time when all amounts owing under the Securities of all tranches, this Indenture and the Collateral Agreement shall have been paid in full or

(B) the later of (1) the 31st day after an initial sale of any Pledged Collateral by the Collateral Agent or (2) if the Collateral Agent is prevented from being able to exercise its remedies under Section 8 of the Collateral Agreement as a result of legal proceedings having been brought in any jurisdiction, then on the 11th Business Day after the day as of which the Collateral Agent is no longer so prevented from being able to exercise its remedies under Section 8 of the Collateral Agreement,

(b) Deutsche Bank AG London Branch agrees to become the calculation agent under such Permitted Financing Transaction, and

(c) the Trustee shall be made a party, for the benefit of the Securityholders, to the arrangements with the Third Party Pledgee creating the security interest on such VIP Shares, the Preferred VIP Shares and VIP ADSs for the sole reason of enforcement of restrictions related to the VIP Shares, the Preferred VIP Shares and VIP ADSs as contemplated in this Section 3.10.

The Issuer may not engage in any financing activities relating to or involving VIP Securities except as permitted by this Indenture. The Issuer may not engage in any Permitted Financing Transaction until the date that is within two months of the date of issuance of the most recent tranche of Securities issued hereunder.

The aggregate principal amount of any Permitted Financing Transaction shall not exceed $500 million.

Section 3.11. *Compliance with the Reporting Obligations Under the Exchange Act.* The Issuer shall promptly comply with its reporting obligations under the Exchange Act, including, without limitation, Section 13 of the Exchange Act; *provided* that it shall provide a draft amendment to its Schedule 13D that it proposes to file with the Securities and Exchange Commission in respect of its issuance of the Securities of any tranche to the Trustee prior to filing. For the avoidance of doubt, the Issuer may file its Schedule 13D without the consent of the Trustee.

Section 3.12. *Tax Compliance.* The Issuer shall comply in all material respects with all applicable certification, information reporting and withholding (including "backup" withholding) requirements imposed by applicable tax laws, regulations or administrative practice with respect to any payments made with respect to the Securities. Such compliance shall include, without limitation, the preparation and timely filing of required returns and any required filing with the Gibraltar Finance Centre Director and the timely payment of the annual exempt company fee payable in Gibraltar and all amounts required to be withheld to the appropriate taxing authority or its designated agent. The Issuer shall not change its "ownership" or "activity," as these terms are defined and interpreted for purposes of the Companies (Taxation and Concessions) Ordinance of Gibraltar.

Section 3.13. *Maintenance of Operations in Gibraltar.* The Issuer conducts as of the date hereof and shall conduct its business and affairs such that, at all times, its centre of main interests shall be and remain in Gibraltar and, excepted as required by Section 3.03, it does not and shall not have any office or establishment other than in Gibraltar. The sole director of the Issuer is as of the date hereof and shall be at all times a resident of Gibraltar.

Section 3.14. *Payments of Additional Amounts.* All payments made by the Issuer under the Securities of any tranche and this Indenture and all payments made by the Guarantor under the Parent Guarantee and this Indenture will be made free and clear of and without withholding or deduction at source for, or on account of, any present or future taxes, fees, duties, assessments or other charges of whatever nature imposed or levied by or on behalf of any governmental authority or any political subdivision or taxing authority ("**Taxes**") in any jurisdiction in which the Issuer or the Guarantor, as the case may be, is incorporated or resident for the tax purposes, the Russian Federation or any jurisdiction through which payment on the Securities is made (each such jurisdiction, or the jurisdiction of any of their respective successors, a "**Taxing Jurisdiction**") unless such Taxes are required to be withheld or deducted by the laws (including any regulations or rulings promulgated thereunder) of a Taxing Jurisdiction or an official position regarding the application, administration, interpretation or enforcement of any such laws (including, without limitation, a holding by a court of competent jurisdiction or by a taxing authority in a Taxing Jurisdiction).

In the event Taxes or withholding taxes of a Taxing Jurisdiction are deducted or withheld from payments made by the Issuer or the Guarantor, as the case may be, on or with respect to any Securities of any tranche or the Parent Guarantee, the Issuer or the Guarantor, as the case may be, shall pay to the Securityholder such additional amounts ("**Additional Amounts**") as may be necessary so that the net amounts received by such Securityholder after any such withholding or deduction will equal the amounts that would have been received on Securities of such tranche or the Parent Guarantee, as the case may be, if there were no such withholding or deduction.

Section 3.15. *Early Maturity Events; Early Maturity Time.* (a) Each of the following events shall constitute an "**Early Maturity Event**":

(i) the announcement of the adoption of, or any change in, any applicable law, and with respect to the laws of the Russian Federation an announcement of the adoption of a change in applicable law shall be deemed to occur at the earlier of (i) the first Business Day after the third reading in the State Duma of the Russian Federation and (ii) a publication of a change in law in the official distribution vehicle in accordance with the applicable provision of Russian law after the date hereof, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law

after the date hereof due to which, (1) it becomes or will become unlawful for the Issuer to perform any absolute or contingent obligation to make payment hereunder or under any of the Securities or to comply with any other provision of this Indenture, any of the Securities, the Escrow Agreement, the Collateral Agreement, the Cash Collateral Assignment or (2) any condition or restriction (other than conditions set forth in clauses (i) through (iv) of Section 11(c) of the Collateral Agreement) is imposed or will be imposed on the Collateral Agent's ability to convert the VIP Shares pledged by the Issuer pursuant to the Collateral Agreement into VIP ADSs in connection with the foreclosure by the Collateral Agent on such VIP Shares thereunder and on its ability to freely sell such VIP ADSs under Rule 144(k) under the Securities Act (or successor thereto), including, without limitation, any requirement to deliver a legal opinion under the U.S., Russian or any other law, any certificate, evidence or any other document or opinion, whether such a requirement is articulated by the depositary under the ADR Program or by VIP or otherwise becomes apparent, except (i) where the Holder for whose account such sale is being conducted is an "affiliate" (as defined in Rule 144 under the United States Securities Act of 1933, as amended) of VIP, and (ii) for the Issuer's obligation to give notice to VIP upon an actual transfer of VIP Shares as required under the Shareholders Agreement dated May 30, 2001 among the Issuer, Telenor East Invest AS and other parties (as amended from time to time);

(ii) as of any Trading Day (the "**Trading Volume Determination Date**") on or after the date hereof, the average USD daily trading volume of VIP ADSs (as shown on Bloomberg page "VIP US HP") over the immediately preceding 20 Trading Days (without considering solely for the purpose of this Section 3.15(a)(ii) any Trading Days from December 24 to, and including, January 7, and each equivalent period in subsequent years) is less than $25,000,000, as determined by the Calculation Agent;

(iii) the number of VIP Shares that can immediately be converted at any time into VIP ADSs under the ADR Program shall be less than the number of VIP Shares in the VIP Collateral Account at such time or the ADR Program is not or it has been determined in accordance with Section 3.15(e)(iii) that it is not going to be at any time open for deposit of VIP Shares;

(iv) at any time, the Issuer's representatives on the Board of Directors of VIP shall fail to represent at least 33.33% of all members of the Board of Directors of VIP, *provided* that, if one of the Issuer's representatives dies or becomes incapacitated, the Issuer shall cause its substitute representative to be elected to the Board of Directors of VIP within 90 days of the date of such representative's death, or resignation or removal due to incapacity;

(v) failure at any time of VIP Shares constituting Pledged Collateral under the Collateral Agreement to appear on the shareholders register of VIP as being held of record by a Custodian that is the same legal entity as is then acting as ADR Program Custodian;

(vi) the receipt of notice by the Issuer, the Trustee or the Collateral Agent, or the Issuer's obtaining Knowledge, of the decision of VIP to remove the Depositary as depositary in respect of the ADR Program or a public announcement of such a decision by VIP;

(vii) the receipt of notice by the Issuer, the Trustee or the Collateral Agent, or the Issuer's obtaining Knowledge, of the decision of the Depositary to resign as depositary in respect of the ADR Program or a public announcement of such a decision by the Depositary;

(viii) the receipt of notice by the Issuer, the Trustee or the Collateral Agent, or the Issuer's obtaining Knowledge, of the decision of the Custodian or the ADR Program Custodian to resign, or the decision of the Depositary to remove the ADR Program Custodian, or a public announcement of such a decision by the Custodian, the ADR Program Custodian or the Depositary;

(ix) at any time, the LTV Ratio is equal to or greater than the LTV Trigger Level (an "LTV Ratio Early Unwind");

(x) the arithmetic average of the market capitalization of VIP for five consecutive Business Days, as determined by the Calculation Agent, is less than 50% of the market capitalization of VIP on the date Securities are first issued hereunder;

(xi) the occurrence of a Nationalization;

(xii) the occurrence of a Delisting;

(xiii) the receipt of notice from the Depositary pursuant to Section 11(d)(vii) of the Collateral Agreement by the Issuer or the Collateral Agent to the effect that the Depositary is unable to accept for deposit under the ADR Program, at one time, VIP Shares representing more than 45 million VIP ADSs (or, in case of any stock splits or combinations, such greater or lesser number as results therefrom); and

(xiv) at any time, (A) the VIP Shares held in the VIP Collateral Account represent more than 17.0% of the voting power of all outstanding VIP capital stock (as would be determined for SEC reporting purposes and including, for the avoidance of any doubt, any VIP Preference Shares owned by the Issuer or its Affiliates) or (B) VIP announces a transaction or transactions, including, without limitation, a repurchase transaction, which could reasonably be expected to cause the condition described in subsection (A) hereof.

(b) Upon the occurrence of an Early Maturity Event, the Issuer shall:

(i) in each case set forth in clauses (i), (iii), (iv), (v) and (xiii) of Section 3.15(a), cure any such Early Maturity Event within 20 Business Days of the Date of Occurrence (as defined below) of such Early Maturity Event (except that (x) in the case of an Early Maturity Event described in Section 3.15(a)(i) relating to the laws of the Russian Federation, the Issuer shall cure such Early Maturity Event within 5 Business Days or (y) in the case of an Early Maturity Event described in Section 3.15(a)(iii) with the Date of Occurrence specified in Section 3.15(e)(iii)(B), the Issuer shall cure such Early Maturity Event prior to the ADR Program being closed); *provided* that in the case of an Early Maturity Event set forth in clause (i) the Issuer, in lieu of curing such Early Maturity Event, may elect to complete the restructuring of the financing obtained pursuant to the Principal Documents with the consent of the Trustee acting upon instructions from Holders of not less than a majority in aggregate principal amount of the Securities then outstanding within 20 Business Days of the Date of Occurrence (as defined below) of such Early Maturity Event (or five Business Days from the Date of Occurrence of an Early Maturity Event described in Section 3.15(a)(i) relating to the laws of the Russian Federation);

(ii) in the case set forth in clause (a)(ii) of Section 3.15(a), cure any such Early Maturity Event within 40 Business Days of the Date of Occurrence of such Early Maturity Event;

(iii) in each case set forth in clauses (vi), (vii) and (viii) of Section 3.15(a), cure any such Early Maturity Event before the time of effectiveness of the removal or resignation of the Depositary, the Custodian or ADR Program Custodian, as the case may be, *provided* that in the case of an Early Maturity Event set forth in clauses (vi) and (vii) such Early Maturity Event shall be deemed to be cured if a successor Depositary has been appointed and such successor Depositary has accepted its appointment as set forth in the Deposit Agreement and, prior to the effective date of such appointment, such successor Depositary shall have entered into arrangements in respect of the Pledged Collateral that the Collateral Agent, in its sole discretion but acting reasonably, considers satisfactory, *provided further* that in the case of an Early Maturity Event set forth in clause (viii) such Early Maturity Event shall be deemed to be cured if, in connection therewith, the requirements of Section 9(c) of the Collateral Agreement shall have been complied with;

*provided* that, for the avoidance of doubt, the Issuer shall not have an opportunity to cure the Early Maturity Event set forth in clauses (ix), (x), (xi), (xii) and (xiv)(A) of Section 3.15(a).

(c) If any Early Maturity Event set forth in clauses (i), (iii), (iv), (v) or (xiii) of Section 3.15(a) shall not have been cured before 10:00 a.m. (New York City time) on the date that is 21 Business Days after the first Date of Occurrence of such Early Maturity Event (or (1) six Business Days after the first Date of Occurrence of such Early Maturity Event described in Section 3.15(a)(i) relating to the laws of the Russian Federation, (2) prior to the ADR Program being closed in the case of an Early Maturity Event described in Section 3.15(a)(iii) with the Date of Occurrence specified in Section 3.15(e)(iii)(B), (3) the earlier of (x) five Business Days prior to the repurchase transactions described in Section 3.15(a)(xiv)(B) resulting in the condition described in Section 3.15(a)(xiv)(A) or (y) 21 Business Days after the first Date of Occurrence of such Early Maturity Event described in Section 3.15(e)(iii)(B), or (4) 41 Business Days after the first Date of Occurrence of such Early Maturity Event described in Section 3.15(a)(ii)), any Early Maturity Event set forth in clauses (vi) (vii) or (viii) of Section 3.15(a) shall not have been cured before the time of effectiveness of the removal or resignation of the Depositary, the Custodian or ADR Program Custodian, as the case may be, or the Early Maturity Event set forth in clause (a)(ix), (x), (xi), (xii) or (xiv)(A) of Section 3.15(a) shall have occurred at any time (such time, the "**Early Maturity Time**"), the entire principal of all the Securities of all tranches then outstanding and the interest accrued thereon, plus Additional Amounts and Break Funding Costs, shall automatically become due and payable immediately at such Early Maturity Time.

(d) At the Early Maturity Time, the Issuer shall pay to the Trustee for the benefit of the holders of the Securities of each tranche the whole amount that then shall have become due and payable on all Securities of such tranche for principal and accrued and unpaid interest to but excluding the date of payment, any Additional Amounts and Break Funding Costs of each Holder of Securities of such tranche as of the Early Maturity Time. The Issuer acknowledges and agrees that, if the Trustee shall not have received at the Early Maturity Time payment in full of all amounts that shall have become due and payable or SWIFT confirmations MT 202, 103 or 200 of such payment, the Trustee and the Securityholders shall be entitled to immediately pursue any remedies available to the Trustee and the Securityholders under such Securities, this Indenture and the Collateral Agreement, without being required to give any notice or make demand for payment.

(e) The Date of Occurrence shall be:

(i) in respect of any Early Maturity Event set forth in Section 3.15(a)(i), the date when any VIP Investment Responsible Person obtains Knowledge or receives notice from the Trustee of the adoption of, or change in, any applicable law or of the promulgation of, or change in, the

interpretation of any applicable law or provided that the Early Maturity Event set out in Section 3.15(a)(i) has actually occurred, the date when the Collateral Agent receives notice from the Depositary pursuant to clause (vi) of Section 11(d) of the Collateral Agreement;

(ii) in respect of any Early Maturity Event provided for in Section 3.15(a)(ii), the Trading Volume Determination Date;

(iii) in respect of any Early Maturity Event provided for in Section 3.15(a)(iii), the date when any VIP Investment Responsible Person obtains Knowledge or receives notice from the Trustee that (A) such Early Maturity Event has occurred, or (B) such Early Maturity Event is likely to occur because (1) VIP has announced a distribution on the VIP Shares and has not provided the Depositary with a prior 15 Business Days' notice of such a distribution, (2) VIP has announced an SEC–registered offering of the VIP Shares and, in connection with that offering, it has requested the Depositary to close the ADR Program for deposits, (3) VIP has announced a shareholders meeting and it has requested the Depositary to close the ADR Program for deposits following the record date on which the VIP shareholders entitled to vote at that meeting have been determined, or (4) VIP has requested the Depositary to close the ADR Program for any other reason, or (C) the date when the Collateral Agent receives notice from the Depositary pursuant to clause (v) of Section 11(d) of the Collateral Agreement;

(iv) in respect of any Early Maturity Event provided for in Section 3.15(a)(iv), the time when the Issuer's representation on the Board of Directors of VIP shall have fallen below 33.33% and, in case of death or incapacity, immediately after the expiration of the 90 days' period set forth in the proviso to Section 3.15(a)(iv);

(v) in respect of any Early Maturity Event provided for in Section 3.15(a)(v), the earlier of (1) the first day on which the VIP Shares constituting Pledged Collateral under the Collateral Agreement or underlying the VIP ADSs shall fail to be so registered or (2) the receipt of notice by the Collateral Agent pursuant to Section 9(c) of the Collateral Agreement; and

(vi) in respect of any Early Maturity Event provided for in Section 3.15(a)(xiv), the earlier of (1) the condition specified in Section 3.15(a)(xiv)(A), (2) the date on which VIP publicly announces a transaction or transactions resulting in an event described in Section 3.15(a)(xiv)(B) or (3) the date on which any VIP Investment Responsible Person obtains Knowledge that an event described in Section 3.15(a)(xiv)(B) has occurred (*provided* that the Issuer's failure to confirm to the Calculation Agent, upon a one Business Day's prior notice, based on whatever sources of information the Issuer deems to be reliable the

total number of VIP Shares outstanding at such time and the total number of VIP Shares held by VIP as treasury shares at such time shall be deemed to constitute Knowledge of such an event having occurred and shall result in the Date of Occurrence at such time).

Section 3.16. *Representations and Warranties of the Issuer and the Guarantor.* Each of the Issuer and the Guarantor hereby represents and warrants, jointly and severally, to the Trustee for the benefit of the Securityholders on the date hereof and as of each Closing Date on which a tranche of Securities is issued hereunder, in each case with respect to a tranche of Securities issued on such a Closing Date, and as of the Additional Pledge Date that:

(i) it has all the requisite corporate power and is duly authorized to execute and deliver the Principal Agreements to which it is a party, to enter into the transaction contemplated hereunder and thereunder, and to perform its obligations hereunder and thereunder and has taken all necessary action to authorize such execution, delivery and performance;

(ii) it is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction in which it has been established and is duly qualified to transact business as a foreign corporation in each jurisdiction in which such qualification is required;

(iii) the person or persons signing on its behalf the Principal Documents to which it is a party is duly authorized to do so on its behalf;

(iv) each of the Principal Documents to which it is a party has been duly executed and delivered by it and constitutes its valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement thereof may be limited by bankruptcy;

(v) no filing with, or approval, authorization, consent, license, registration, qualification, order or decree of, any court or governmental authority or agency in any jurisdiction or any other person is necessary or required for the execution, delivery or performance by it, or enforcement against it, of its obligations under the Principal Documents to which it is a party or for the consummation of the transactions contemplated hereunder or thereunder;

(vi) the execution, delivery and performance by it of the Principal Documents to which it is a party will not violate or contravene any law, ordinance, order, writ, injunction, judgment or decree of any court or governmental body, authority, agency or official by which it, or any of its properties is bound or affected, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected;