# EXHIBIT BB

(vii) neither it, nor any of its Affiliates, nor any person acting on its or their behalf has taken or will take any action that would require registration of any of the Securities under the Securities Act;

(viii) there is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, government body, agency or official or any arbitrator that may affect the legality, validity or enforceability against it of any Principal Document to which it is a party or its ability to perform their obligations hereunder or thereunder;

(ix) it is not insolvent and it will not be rendered insolvent by entering into the Principal Documents to which it is a party or by consummating the transactions contemplated hereunder or thereunder;

(x) it has provided on December 27, 2004 to Telenor East Invest SA a notice required under Section 2.01(b) of the Registration Rights Agreement in respect of a potential "Transfer" (as defined therein) of the VIP Shares pledged as collateral for the Securities pursuant to Section 1(b) of the Collateral Agreement and an additional notice in respect of a potential "Transfer" of the VIP Shares pledged as collateral pursuant to Section 1(d) of the Collateral Agreement, if any, and a copy of each such notice has been provided to the Trustee;

(xi) Schedule I hereto contains a list of the Principal Agreements (as such term is defined in the Primary Agreement between the Issuer, Telenor East Invest AS and VIP dated as of May 30, 2001); except as disclosed in Schedule I, there have been no amendments to the VIP Principal Agreements; the VIP Principal Agreements remain in full force and effect, or have been terminated, in accordance with their respective terms in the form disclosed by the Issuer;

(xii) it is and its Affiliates are in compliance with all of their respective obligations under the VIP Principal Agreements and none of them has received any notice, written or otherwise, of any default under or other breach of, or alleged default under or other breach of, the Principal Agreements except as disclosed in the Transaction Side Letter; and

(xiii) as of December 31, 2006, (A) the total number of VIP Shares outstanding was 51,281,022, and (B) the total number of VIP Shares held by VIP as treasury shares was 404,296, and to the best of the Issuer's knowledge and after reasonable inquiry, such numbers of VIP Shares have not changed between December 31,2006 and the date hereof, and (C) as of the date hereof, to the best of the Issuer's knowledge and after reasonable inquiry, VIP is not currently engaged in any repurchase programme with respect to any class of VIP Securities.

Section 3.17. *Aggregate Indebtedness.* The aggregate outstanding principal amount of Indebtedness of the Issuer shall not exceed $2,075 million at any time (except for any Permitted Subordinated Indebtedness). The terms and conditions of any Permitted Subordinated Indebtedness shall not be altered, amended, varied, revoked or otherwise changed without the consent of the Calculation Agent (such consent not to be unreasonably withheld). All Permitted Subordinated Indebtedness arrangements shall be documented.

Section 3.18. *Use of Proceeds.* The Issuer shall use the funds received from any sale of the Securities issued hereunder to (i) repay its Indebtedness, (ii) make loans to companies under common control with the Guarantor that are to be used to acquire assets to be held by such companies and (iii) acquire assets in the telecommunications sector.

Section 3.19. *Contact Details.* The Issuer shall provide written notice of any change to the contact details specified in Section 11.03 hereof within five Business Days of such details in Section 11.03 becoming incorrect.

## ARTICLE 4
### REMEDIES OF THE TRUSTEE AND SECURITYHOLDERS ON EVENT OF DEFAULT

Section 4.01. *Event of Default Defined; Acceleration of Maturity; Waiver of Default.* In case one or more of the following Events of Default (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court requiring the making of any payment (including the posting of a bond) in respect thereof or any order, rule or regulation of any administrative or governmental body) shall have occurred and be continuing, that is to say:

(a) default in the payment of any installment of interest upon any of the Securities of any tranche as and when the same shall become due and payable, and continuance of such default for a period of one Business Day;

(b) default in the payment of all or any part of the principal on any of the Securities of any tranche as and when the same shall become due and payable either at maturity, by declaration or otherwise;

(c) failure on the part of the Issuer duly to observe or perform the covenants set forth in Sections 3.09 through Section 3.13 and Section 3.17 and Section 3.18;

(d) failure on the part of the Issuer duly to observe or perform any other of the covenants or agreements on the part of the Issuer in any of the Securities, in the Collateral Agreement, in this Indenture or in any other Principal Document for a period of 90 days after the date on which

written notice specifying such failure, stating that such notice is a "**Notice of Default**" hereunder and demanding that the Issuer remedy the same, shall have been given by registered or certified mail, return receipt requested, to the Issuer by the Trustee, or to the Issuer and the Trustee by the holders of at least 50% in aggregate principal amount of all the Securities then outstanding;

(e) except as permitted by this Indenture, the Parent Guarantee shall be held in a judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect or either the Guarantor, or any person or entity acting on behalf of the Guarantor, shall deny or disaffirm its obligations under the Parent Guarantee;

(f) the occurrence of a Collateral Event of Default;

(g) any legal proceeding shall have been instituted or any other event shall have occurred or condition shall exist that calls into question the validity or binding effect of any agreement of the Issuer or the Guarantor hereunder, under any of the Securities or under the Collateral Agreement (which shall include, without limitation, any repudiation by Issuer or the Guarantor of any Securities, this Indenture or any Principal Document);

(h) any representation or warranty made by the Issuer or the Guarantor under this Indenture, the Collateral Agreement or in any other Principal Document, whether made as of the date hereof, as of any Closing Date, as of the Additional Pledge Date or in connection with an issuance of an additional tranche of Securities after the date hereof, or in any certificate delivered pursuant hereto turns out to be incorrect or misleading in any material respect as of the date when made;

(i) one or more final judgments or orders (for the avoidance of doubt, a "final" judgment or order means one that requires payment or posting of a bond) shall be rendered against the Issuer or the Guarantor and such final judgments or orders shall continue unsatisfied and unstayed for a period of 45 days; *provided* that, with respect to the Guarantor only, if all judgments or orders pending against the Guarantor at any one time require payment in an aggregate amount of less than $15,000,000 (or equivalent thereof in other currencies) an Event of Default shall not have occurred unless any such final judgments or orders remain unsatisfied and unstayed at the end of the additional 20 Business Days' period immediately following the 45 days' period mentioned in the preceding clause of this sentence;

(j)(i) the Issuer or the Guarantor (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other

than Indebtedness hereunder), or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or cash collateral in respect thereof to be demanded, *provided* that, with respect to the Guarantor only, if any of the above default events in respect of the Guarantor requires payment in an aggregate amount of less than $15,000,000 (or equivalent thereof in other currencies) an Event of Default shall not have occurred unless any such default remains unsatisfied or fails to be rectified following a 20 Business Days' period immediately following the occurrence of such default event; except that if the Indebtedness relates to or arises under a Swap Contract then none of the preceding shall constitute an Event of Default unless it also constitutes and event of default under the relevant Swap Contract; or (ii) there occurs under any Swap Contract an early termination event resulting from any event of default under such Swap Contract as to which the Issuer or the Guarantor is the Defaulting Party (as defined in such Swap Contract);

(k) Proceedings (as defined in the Escrow Agreement) shall have resulted in a final judgment or order to dispose of the Escrowed Assets (as defined in the Escrow Agreement) (for the avoidance of doubt, for purposes of this sentence, a "final" judgment or order means one that requires the sale or other disposition of the Escrowed Assets);

(l) the Issuer incurs or suffers to exist any Indebtedness (except (i) an amount equal to $75,000,000, (ii) in connection with the issuances contemplated hereunder or pursuant to any Permitted Financing Transaction, (iii) any Indebtedness under Swap Contracts entered into with Deutsche Bank AG in connection with the acquisition by the Issuer of assets in the telecommunications sector or (iv) any Permitted Subordinated Indebtedness);

(m) the Collateral Agent shall have received from the Escrow Agent notice (i) that the Escrow Agent's fees, expenses or costs have not been paid by the Issuer or the Guarantor as required under the Escrow Agreement, but only if on or before the sixteenth Business Day from the date of such notice, the Trustee has not received evidence from the Issuer that such fees, expenses or costs have been paid, or (ii) of the resignation of the Escrow Agent, but only if on or before the 90th day from the date of the Escrow Agent's resignation notice a successor Escrow Agent has not accepted its appointment as Escrow Agent;

(n) the Third Party Pledgee shall exercise its rights under or otherwise early terminate any Permitted Financing Transaction;

(o) a court having jurisdiction in the premises shall enter a decree or order for relief in respect of the Issuer or the Guarantor in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Issuer or the Guarantor or for any substantial part of their respective property or ordering the winding up or liquidation of their respective affairs;

(p) the Issuer or the Guarantor shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to the entry of an order for relief in an involuntary case under any such law, or consent to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Issuer or the Guarantor or for any substantial part of their respective property, or make any general assignment for the benefit of their respective creditors;

(q) either the Issuer or the Guarantor shall change the state of their respective corporate domiciles;

(r) failure to comply with Section 1(c)(ii) or Section 1(c)(v) of the Collateral Agreement;

(s) the occurrence of any event or condition that, with the passage of time or giving of notice or both, may result in acceleration of any Permitted Financing Transaction; or

(t)(i) either the Securities Intermediary or the Collateral Agent shall resign or be removed, or be dissolved or shall be in the course of dissolution or liquidation or otherwise become incapable of action under the Collateral Agreement, or if either of them shall be taken under the control of any public officer or officers or of a receiver appointed by a court and no successor is immediately appointed pursuant to Section 9(f) or Section 10(f), as applicable, of the Collateral Agreement or (ii) the Cash Collateral Agent shall resign or be removed, or be dissolved or shall be in the course of dissolution or liquidation or otherwise become incapable of action under the Cash Collateral Assignment, or if it shall be taken under the control of any public officer or officers or of a receiver appointed by a court and no successor is immediately appointed pursuant to Section 13.5 of the Cash Collateral Assignment;

then, and in each and every such case described in clauses (a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k) and (l) of Section 4.01, unless the principal of all of the Securities then outstanding shall have already become due and payable, either the

Trustee or the holders of not less than 50% in aggregate principal amount of the Securities then outstanding hereunder, by notice to the Issuer in accordance with Section 11.03 (and to the Trustee if given by Securityholders), may declare the entire principal of all the Securities then outstanding and the interest accrued thereon, to be due and payable immediately, and upon any such declaration the same, together with any Additional Amounts, Break Funding Costs and Default Costs, shall become immediately due and payable; *provided* that if any event described in clauses (a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k) or (l) of Section 4.01 is the consequence of a frivolous or vexatious judgment, the entire principal of all the Securities then outstanding (together with any Additional Amounts, Break Funding Costs and Default Costs), and the interest accrued thereon may be declared to be immediately due and payable only if such judgment shall not have been stayed, discharged or overturned within 45 days of the occurrence of such event. In cases described in clauses (m), (n), (o), (p), (q), (r), (s) and (t) of Section 4.01, the entire principal of all the Securities then outstanding and the interest accrued thereon together with any Additional Amounts, Break Funding Costs and Default Costs shall automatically become due and payable immediately. This provision, however, is subject to the condition that if, at any time after the principal of the Securities then outstanding shall have been so declared, or shall have so become, due and payable, and before any judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided, the Issuer shall pay or shall deposit with the Trustee a sum sufficient to pay all matured installments of interest upon all the Securities then outstanding and the principal of any and all Securities which shall have become due otherwise than by acceleration (with interest upon such principal and, to the extent that payment of such interest is enforceable under applicable law, on overdue installments of interest, at the same rate as the rate of interest specified in the Securities of any tranche, to the date of such payment or deposit) and such amount as shall be sufficient to cover reasonable compensation to the Trustee and each predecessor Trustee, their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of gross negligence or bad faith, and if any and all Events of Default under the Indenture, other than the non payment of the principal of Securities which shall have become due by acceleration, shall have been cured, waived or otherwise remedied as provided herein—then and in every such case the holders of greater than 50% in aggregate principal amount of the Securities then outstanding, by written notice to the Issuer and to the Trustee, may waive all defaults and rescind and annul such declaration and its consequences, but no such waiver or rescission and annulment shall extend to or shall affect any subsequent default or shall impair any right consequent thereon.

Section 4.02. *Collection of Indebtedness by Trustee; Trustee May Prove Debt.* The Issuer covenants that (a) in case default shall be made in the payment of any installment of interest on any of the Securities of any tranche when such interest shall have become due and payable, and such default shall have continued for a period of one Business Day or (b) in case default shall be made in the

payment of all or any part of the principal of any of the Securities of any tranche when the same shall have become due and payable, whether upon maturity or by declaration or otherwise—then upon demand of the Trustee, the Issuer shall pay to the Trustee for the benefit of the holders of the Securities of such tranche the whole amount that then shall have become due and payable on all such Securities for principal or interest, as the case may be (with interest to the date of such payment upon the overdue principal and, to the extent that payment of such interest is enforceable under applicable law, on overdue installments of interest at the same rate as the rate of interest specified in the Securities of such tranche and in this Indenture); and in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including reasonable compensation to the Trustee and each predecessor Trustee, their respective agents, attorneys and counsel, and any documented expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of its gross negligence or bad faith.

Until such demand is made by the Trustee, the Issuer may pay the principal of and interest on the Securities of any tranche to the registered holders (directly in the case of holders of Definitive Securities or to the Common Depositary for the benefit of the registered holders in the case of Securities evidenced by a Global Security), whether or not the Securities of such tranche be overdue.

In case the Issuer shall fail forthwith to pay such amounts upon such demand, the Trustee, in its own name and as trustee of an express trust, shall be entitled and empowered to institute any action or proceedings at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceedings to judgment or final decree, and may enforce any such judgment or final decree against the Issuer or other obligor upon the Securities and collect in the manner provided by law out of the property of the Issuer or other obligor upon the Securities, wherever situated the moneys adjudged or decreed to be payable.

In case there shall be pending proceedings relative to the Issuer or any other obligor upon the Securities under any applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer or its property or such other obligor, or in case of any other comparable judicial proceedings relative to the Issuer or other obligor upon the Securities, or to the creditors or property of the Issuer or such other obligor, the Trustee, irrespective of whether the principal of the Securities shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section, shall be entitled and empowered, by intervention in such proceedings or otherwise:

(i) to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Securities of any tranche, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of negligence or bad faith) and of the Securityholders allowed in any judicial proceedings relative to the Issuer or other obligor upon the Securities, or to the creditors or property of the Issuer or such other obligor,

(ii) unless prohibited by applicable law and regulations, to vote on behalf of the holders of the Securities of any tranche in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency proceedings or person performing similar functions in comparable proceedings, and

(iii) to collect and receive any moneys or other property payable or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Securityholders and of the Trustee on their behalf; and any trustee, receiver, or liquidator, custodian or other similar official is hereby authorized by each of the Securityholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Securityholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Securityholder any plan or reorganization, arrangement, adjustment or composition affecting any Securities of any tranche or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Securityholder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person.

All rights of action and of asserting claims under this Indenture, or under any of the Securities, may be enforced by the Trustee without the possession of any of the Securities or the production thereof on any trial or other proceedings relative thereto, and any such action or proceedings instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Trustee, each predecessor Trustee and their respective agents and attorneys, shall be for the ratable benefit of the holders of the Securities.

In any proceedings brought by the Trustee (and also any proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the holders of the Securities, and it shall not be necessary to make any holders of the Securities parties to any such proceedings.

Section 4.03. *Application of Proceeds.* Any moneys collected by the Trustee pursuant to this Article shall be applied in the following order at the date or dates fixed by the Trustee and, in case of the distribution of such moneys on account of principal or interest, upon presentation of the several Securities of all tranches and stamping (or otherwise noting) thereon the payment, or issuing Security of any tranche in reduced principal amounts in exchange for the presented Security of such tranche if only partially paid, or upon surrender thereof if fully paid:

FIRST: To the payment of costs and expenses, including reasonable compensation to the Trustee and each predecessor Trustee and their respective agents and attorneys and of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith;

SECOND: In case the principal of the Securities of any tranche shall not have become and be then due and payable, to the payment of interest in default in the order of the maturity of the installments of such interest, with interest (to the extent that such interest has been collected by the Trustee) upon the overdue installments of interest at the same rate as the rate of interest specified in the Securities of such tranche, such payments to be made ratably to the persons entitled thereto, without discrimination or preference;

THIRD: In case the principal of the Securities of any tranche shall have become and shall be then due and payable, to the payment of the whole amount then owing and unpaid upon all the Securities of such tranche for principal and interest, with interest upon the overdue principal, and (to the extent that such interest has not been collected by the Trustee) upon overdue installments of interest at the same rate as the rate of interest specified in the Securities of such tranche; and in case such moneys shall be insufficient to pay in full the whole amount so due and unpaid upon the Securities of such tranche, then to the payment of such principal and interest, without preference or priority of principal over interest, or of interest over principal, or of any installment of interest over any other installment of interest, or of any Securities of any tranche over any other Securities of the same or any other tranche, ratably as among all the tranches then outstanding based on the aggregate of such principal and accrued and unpaid interest; and

FOURTH: To the payment of the remainder, if any, to the Issuer or any other person lawfully entitled thereto.

Section 4.04. *Suits for Enforcement.* In case an Event of Default has occurred, has not been waived and is continuing, the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either at law or in equity or in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law.

Section 4.05. *Limitations on Suits by Securityholder.* No holder of any Securities shall have any right by virtue of or by availing itself of any provision of this Indenture to institute any action or proceeding at law or in equity or in bankruptcy or otherwise upon or under or with respect to this Indenture, or for the appointment of a trustee, receiver, liquidator, custodian or other similar official or for any other remedy hereunder, unless such holder previously shall have given to the Trustee written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the holders of not less than 50% in aggregate principal amount of the Securities of all tranches then outstanding shall have made written request upon the Trustee to institute such action or proceedings in its own name as trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby and the Trustee for 60 days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such action or proceedings and no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 4.07; it being understood and intended, and being expressly covenanted by the taker and holder of every Security with every other taker and holder and the Trustee, that no one or more holders of Securities shall have any right in any manner whatsoever by virtue or by availing of any provision of this Indenture to affect, disturb or prejudice the rights of any other holder of Securities, or to obtain or seek to obtain priority over or preference to any other such holder or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all holders of Securities of all tranches. For the protection and enforcement of the provisions of this Section, each and every Securityholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Section 4.06. *Powers and Remedies Cumulative; Delay or Omission Not Waiver of Default.* Except as provided in Section 2.08, no right or remedy herein conferred upon or reserved to the Trustee or to the Securityholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or

otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

No delay or omission of the Trustee or of any holder of any of the Securities to exercise any right or power accruing upon any Event of Default occurring and continuing as aforesaid shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein; and, subject to Section 4.05, every power and remedy given by this Indenture or by law to the Trustee or to the Securityholders may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Securityholders.

Section 4.07. *Control by Securityholders.* The holders of a majority in aggregate principal amount of the Securities of all tranches at the time outstanding shall have the right to direct the time, method, and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee by this Indenture; *provided* that such direction shall not be otherwise than in accordance with law and the provisions of this Indenture and *provided further* that (subject to the provisions of Section 5.01) the Trustee shall have the right to decline to follow any such direction if the Trustee, being advised by counsel, shall determine that the action or proceeding so directed may not lawfully be taken or if the Trustee in good faith by its board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee shall determine that the action or proceedings so directed would involve the Trustee in personal liability or if the Trustee in good faith shall so determine that the actions or forbearances specified in or pursuant to such direction shall be unduly prejudicial to the interests of holders of the Securities not joining in the giving of said direction, it being understood that (subject to Section 5.01) the Trustee shall have no duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such holders.

Nothing in this Indenture shall impair the right of the Trustee in its discretion to take any action deemed proper by the Trustee and which is not inconsistent with such direction by Securityholders.

Section 4.08. *Waiver of Past Defaults.* Prior to the declaration of the maturity of the Securities as provided in Section 4.01, the holders of greater than 50% in aggregate principal amount of the Securities of all tranches at the time outstanding may on behalf of the holders of all the Securities of all tranches waive any past default or Event of Default hereunder and its consequences, except a default (a) in the payment of principal of or interest on any of the Securities or (b) in respect of a covenant or provision hereof which cannot be modified or amended without the consent of the holder of each Security affected. In the case of any such waiver, the Issuer, the Trustee and the holders of the Securities shall be restored to their former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

Upon any such waiver, such default shall cease to exist and be deemed to have been cured and not to have occurred, and any Event of Default arising therefrom shall be deemed to have been cured, and not to have occurred for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other default or Event of Default or impair any right consequent thereon.

**ARTICLE 5**
CONCERNING THE TRUSTEE

Section 5.01. *Duties and Responsibilities of the Trustee; During Default Prior to Default.* The Trustee, prior to the occurrence of an Event of Default and after the curing or waiving of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture. In case an Event of Default has occurred (which has not been cured or waived) the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that

(a) prior to the occurrence of an Event of Default and after the curing or waiving of all such Events of Default which may have occurred:

(i) the duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture, and the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii) in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any statements, certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such statements, certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture;

(b) the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts; and

(c) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than a majority in principal amount of the Securities at the time outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there shall be reasonable ground for believing that the repayment of such funds or adequate indemnity against such liability is not reasonably assured to it.

Section 5.02. *Certain Rights of the Trustee.* Subject to Section 5.01:

(a) the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, security, coupon, Securities or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

· (b) any request, direction, order or demand of the Issuer mentioned herein shall be sufficiently evidenced by an Officers' Certificate (unless other evidence in respect thereof be herein specifically prescribed); and any resolution of the Board of Directors may be evidenced to the Trustee by a copy thereof certified by an Authorized Director of the Issuer;

(c) the Trustee may consult with counsel and any advice or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted to be taken by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(d) the Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Indenture at the request, order or direction of any of the Securityholders pursuant to the provisions of this Indenture, unless such Securityholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred therein or thereby;

(e) the Trustee shall not be liable for any action taken or omitted by it in good faith and believed by it to be authorized or within the discretion, rights or powers conferred upon it by this Indenture;

(f) prior to the occurrence of an Event of Default hereunder and after the curing or waiving of all Events of Default, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, appraisal, bond, debenture, security, coupon, Securities, or other paper or document unless requested in writing so to do by the holders of not less than a majority in aggregate principal amount of the Securities then outstanding; *provided* that, if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Indenture, the Trustee may require reasonable indemnity against such expenses or liabilities as a condition to proceeding; the reasonable expenses of every such examination shall be paid by the Issuer or, if paid by the Trustee or any predecessor trustee, shall be repaid by the Issuer upon demand; and

(g) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys not regularly in its employ and the Trustee shall not be responsible for any misconduct or negligence on the part of any such agent or attorney appointed with due care by it hereunder.

Section 5.03. *Trustee Not Responsible for Recitals, Disposition of Securities or Application of Proceeds Thereof.* The recitals contained herein and in the Securities, except the Trustee's certificates of authentication, shall be taken as the statements of the Issuer, and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representation as to the validity or sufficiency of this Indenture or of the Securities. The Trustee shall not be accountable for the use or application by the Issuer of any of the Securities or of the proceeds thereof.

Section 5.04. *Trustee and Agents May Hold Securities; Collections, etc.* The Trustee or any agent or Affiliate of the Issuer or the Trustee, in its individual or any other capacity, may become the owner or pledge of Securities with the same rights it would have if it were not the Trustee or such an Affiliate or agent and may otherwise deal with the Issuer and receive, collect, hold and retain collections from the Issuer with the same rights it would have if it were not the Trustee or such an Affiliate or agent.

Section 5.05. *Moneys Held by Trustee.* Subject to the provisions of Section 10.06 hereof, all moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated from other funds except to the extent required by mandatory provisions of law. Neither the Trustee nor any agent of the Issuer or the Trustee shall be under any liability for interest on any moneys received by it hereunder.

Section 5.06. *Compensation and Indemnification of Trustee and its Prior Claim.* The Issuer covenants and agrees to pay to the Trustee from time to time, and the Trustee shall be entitled to, reasonable compensation (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) and the Issuer covenants and agrees to pay or reimburse the Trustee and each predecessor Trustee upon its request for all reasonable documented expenses, disbursements and advances incurred or made by or on behalf of it in accordance with any of the provisions of this Indenture (including the reasonable compensation and the expenses and disbursements of its counsel and of all agents and other persons not regularly in its employ) except any such expense, disbursement or advance as may arise from its gross negligence or bad faith. The Issuer also covenants to indemnify the Trustee and each predecessor Trustee for, and to hold it harmless against, any documented loss, liability or expense incurred without gross negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of this Indenture or the trusts hereunder and its duties hereunder, including the costs and expenses of defending itself against or investigating any claim of liability in the premises, *provided* that the Trustee shall not settle any claim without the consent of the Issuer, which consent shall not be unreasonably withheld. The obligations of the Issuer under this section to compensate and indemnify the Trustee and each predecessor Trustee and to pay or reimburse the Trustee and each predecessor Trustee for expenses, disbursements and advances shall constitute additional indebtedness hereunder and shall survive the satisfaction and discharge of this Indenture. Such additional indebtedness shall be a senior claim to that of the Securities upon all property and funds held or collected by the Trustee as such, except funds held in trust for the benefit of the holders of particular Securities, and the Securities are hereby subordinated to such senior claim.

Section 5.07. *Right of Trustee to Rely on Officers' Certificate, etc.* Subject to Sections 5.01 and 5.02, whenever in the administration of the trusts of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of negligence or bad faith on the part of the Trustee, be deemed to be conclusively proved and established by an Officers' Certificate delivered to the Trustee, and such certificate, in the absence of negligence or bad faith on the part of the Trustee, shall be full warrant to the Trustee for any action taken, suffered or omitted by it under the provisions of this Indenture upon the faith thereof.

Section 5.08. *Persons Eligible for Appointment as Trustee.* The Trustee hereunder shall at all times be a corporation having a combined capital and surplus of at least $1,000,000 (or equivalent thereof). If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.

Section 5.09. *Resignation and Removal; Appointment of Successor Trustee.* (a) The Trustee may at any time resign by giving written notice of resignation to the Issuer and by mailing notice thereof by first-class mail to holders of Securities at their last addresses as they shall appear on the Register. Upon receiving such notice of resignation, the Issuer shall promptly appoint a successor trustee by written instrument in duplicate, executed by authority of the Board of Directors, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 30 days after the mailing of such notice of resignation, the resigning trustee may petition any court of competent jurisdiction for the appointment of a successor trustee, or any Securityholder who has been a bona fide holder of a Securities or Securities for at least six months may, on behalf of himself and all others similarly situated, petition any such court for the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor trustee.

(b) In case at any time any of the following shall occur:

(i) the Trustee shall cease to be eligible in accordance with the provisions of Section 5.08 and shall fail to resign after written request therefor by the Issuer or by any such Securityholder; or

(ii) the Trustee shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver or liquidator of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation;

then, in any such case, the Issuer may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors of the Issuer, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee, or any Securityholder who has been a bona fide holder of a Security or Securities for at least six months may on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, remove the Trustee and appoint a successor trustee.

(c) The holders of a majority in aggregate principal amount of the Securities at the time outstanding may at any time remove the Trustee and appoint a successor trustee by delivering to the Trustee so removed, to the successor trustee so appointed and to the Issuer the evidence provided for in Section 6.01 of the action in that regard taken by the Securityholders.

(d) Any resignation or removal of the Trustee and any appointment of a successor trustee pursuant to any of the provisions of this Section 5.09 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 5.10.

Section 5.10. *Acceptance of Appointment by Successor Trustee.* Any successor trustee appointed as provided in Section 5.09 shall execute and deliver to the Issuer and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as trustee herein; but, nevertheless, on the written request of the Issuer or of the successor trustee, upon payment of its charges then unpaid, the trustee ceasing to act shall, subject to Section 10.06, pay over to the successor trustee all moneys at the time held by it hereunder and shall execute and deliver an instrument transferring to such successor trustee all such rights, powers, duties and obligations. Upon request of any such successor trustee, the Issuer shall execute any and all instruments in writing for more fully and certainly vesting in and confirming to such successor trustee all such rights and powers. Any trustee ceasing to act shall, nevertheless, retain a prior claim upon all property or funds held or collected by such trustee to secure any amounts then due it pursuant to the provisions of Section 5.06.

Upon acceptance of appointment by a successor trustee as provided in this Section 5.10, the Issuer shall mail notice thereof by first class mail to the holders of Securities at their last addresses as they shall appear in the Register. If the acceptance of appointment is substantially contemporaneous with the resignation, then the notice called for by the preceding sentence may be combined with the notice called for by Section 5.09. If the Issuer fails to mail such notice within 10 days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Issuer.

Section 5.11. *Merger, Conversion, Consolidation or Succession to Business of Trustee.* Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, *provided* that such corporation shall be eligible under the provisions of Section 5.08, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture any of the Securities of any tranche shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor Trustee and deliver such Securities so authenticated; and, in case at that time any of the Securities shall not have been authenticated, any successor to the Trustee may authenticate such Securities either in the name of any predecessor hereunder or in the name of the successor Trustee; and in all such cases such certificate shall have the full force that the certificate of the Trustee shall have; *provided* that the right to adopt the certificate of authentication of any predecessor Trustee or to authenticate Securities in the name of any predecessor Trustee shall apply only to its successor or successors by merger, conversion or consolidation.

**ARTICLE 6**
CONCERNING THE SECURITYHOLDERS

Section 6.01. *Evidence of Action Taken by Securityholders.* Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Securityholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Securityholders in person or by agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee. Proof of execution of any instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Sections 5.01 and 5.02) conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Article.

Section 6.02. *Proof of Execution of Instruments and of Holding of Securities; Record Date.* Subject to Sections 5.01 and 5.02, the execution of any instrument by a Securityholder or his agent or proxy may be proved in accordance with such reasonable rules and regulations as may be prescribed by the Trustee or in such manner as shall be satisfactory to the Trustee. The holding of Securities shall be proved by the Register or by a certificate of the Registrar. The Issuer may set a record date for purposes of determining the identity of holders of Securities entitled to vote or consent to any action referred to in Section 6.01, which record date may be set at any time or from time to time by notice to the Trustee, for any date or dates (in the case of any adjournment or resolicitation) not more than 60 days nor less than five days prior to the proposed date of such vote or consent, and thereafter, notwithstanding any other provisions hereof, only holders of Securities of record on such record date shall be entitled to so vote or give such consent or to withdraw such vote or consent.

Section 6.03. *Holders to be Treated as Owners.* The Issuer, the Trustee and any agent of the Issuer or the Trustee may deem and treat the person in whose name any Securities shall be registered upon the Register as the absolute owner of such Securities (whether or not such Securities shall be overdue and notwithstanding any notation of ownership or other writing thereon) for the purpose of receiving payment of or on account of the principal of and, subject to the provisions of this Indenture, interest on such Securities and for all other purposes; and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by any notice to the contrary. All such payments so made to any such person, or upon his order, shall be valid, and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable upon any such Securities. So long as any Securities are registered in the name of the Common Depositary, the beneficial ownership of such Securities shall be proved by the records of Euroclear or Clearsteam, as the case may be.

In the case of a Global Security, its holder shall be entitled to take any relevant action with respect to all or only a portion of the aggregate principal amount represented by such Global Security in accordance with procedures agreed with the Trustee.

Section 6.04. *Right of Revocation of Action Taken.* At any time prior to (but not after) the evidencing to the Trustee, as provided in 5.01 and 5.02, of the taking of any action by the holders of the percentage in aggregate principal amount of the Securities specified in this Indenture in connection with such action, any holder of a Securities the serial number of which is shown by the evidence to be included among the serial numbers of the Securities the Holders of which have consented to such action may, by filing written notice at the Corporate Trust Office and upon proof of holding as provided in this Article, revoke such action so far as concerns such Securities. Except as aforesaid any such action taken by the holder of any Securities shall be conclusive and binding upon such holder and upon all future holders and owners of Securities and of any Securities issued in exchange or substitution therefor, irrespective of whether or not any notation in regard thereto is made upon any such Securities. Any action taken by the holders of the percentage in aggregate principal amount of the Securities specified in this Indenture in connection with such action shall be conclusively binding upon the Issuer, the Trustee and the holders of all the Securities.

### ARTICLE 7
SUPPLEMENTAL INDENTURES

Section 7.01. *Supplemental Indentures Without Consent of Securityholders.* The Issuer, when authorized by a resolution of its Board of Directors, and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto for one or more of the following purposes:

(a) to convey, transfer, assign, mortgage or pledge to the Trustee as security for the Securities any property or assets;

(b) to evidence the succession of another corporation to the Guarantor, or successive successions, and the assumption by the successor corporation of the covenants, agreements and obligations of the Guarantor pursuant to Article 8;

(c) to add to the covenants of the Issuer such further covenants, restrictions, conditions or provisions as its Board of Directors and the Trustee shall reasonably consider to be for the protection of the holders of Securities, and to make the occurrence, or the occurrence and continuance, of a default in any such additional covenants, restrictions, conditions or provisions an Event of Default permitting the enforcement of all or any of the several remedies provided in this Indenture and in the Collateral Agreement as herein and therein set forth; *provided* that in respect of any such additional covenant, restriction, condition or provision such supplemental indenture may provide for a particular period of grace after default (which period may be shorter or longer than that allowed in the case of other defaults) or may provide for an immediate enforcement upon such an Event of Default or may limit the remedies available to the Trustee upon such an Event of Default or may limit the right of the holders of a majority in aggregate principal amount of the Securities to waive such an Event of Default (for the avoidance of doubt, the Issuer shall not be under any obligation to execute any Supplemental Indenture);

(d) to cure any ambiguity or to correct or supplement any provision contained herein or in any supplemental indenture which may be defective or inconsistent with any other provision contained herein or in any supplemental indenture; or to make such other provisions in regard to matters or questions arising under this Indenture or under any supplemental indenture as the Board of Directors may deem necessary or desirable and which shall not adversely affect the interests of the holders of the Securities; and

(e) to issue additional tranches of Securities in accordance with Section 2.02.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture, to make any further appropriate agreements and stipulations which may be therein contained and to accept the conveyance, transfer, assignment, mortgage or pledge of any property thereunder, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Any supplemental indenture authorized by the provisions of this section may be executed without the consent of the holders of any of the Securities at the time outstanding, notwithstanding any of the provisions of Section 7.02.

Section 7.02. *Supplemental Indentures with Consent of Securityholders*. With the consent (evidenced as provided in Article 6) of the holders of not less than the majority in aggregate principal amount of the Securities of all tranches then outstanding, the Issuer, when authorized by a resolution of its Board of Directors, and the Trustee may, from time to time and at any time, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indenture or of modifying in any manner the rights of the holders of the Securities; *provided*, that no such supplemental indenture shall (a) extend the final maturity of the Securities of any tranche, or reduce the principal amount thereof, or amend the manner of calculating the rate or extend the time of payment of interest thereon, or impair or affect the right of any Securityholder to institute suit for the payment thereof without the consent of the holder of each Security so affected, or (b) reduce the aforesaid percentage of Securities, the consent of the holders of which is required for any such supplemental indenture, without the consent of the holders of all Securities then outstanding.

Upon the request of the Issuer, accompanied by a copy of a resolution of the Board of Directors certified by an Authorized Director of the Issuer authorizing the execution of any such supplemental indenture, and upon the filing with the Trustee of evidence of the consent of Securityholders and other documents, if any, required by Section 6.01 the Trustee shall join with the Issuer in the execution of such supplemental indenture unless such supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such supplemental indenture.

It shall not be necessary for the consent of the Securityholders under this section to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

Promptly after the execution by the Issuer and the Trustee of any supplemental indenture pursuant to the provisions of this Section, the Issuer shall mail a notice thereof by first-class mail to the holders of Securities whose holdings will be governed or affected by such supplemental indenture at their addresses as they shall appear on the Register, setting forth in general terms the substance of such supplemental indenture. Any failure of the Issuer to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 7.03. *Effect of Supplemental Indenture*. Upon the execution of any supplemental indenture pursuant to the provisions hereof, this Indenture shall

be and be deemed to be modified and amended in accordance therewith and the respective rights, limitations of rights, obligations, duties and immunities under this Indenture of the Trustee, the Issuer and the holders of Securities shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Section 7.04. *Documents to Be Given to Trustee.* The Trustee, subject to the provisions of Sections 5.01 and 5.02, may receive an Officers' Certificate and an Opinion of Counsel as conclusive evidence that any such supplemental indenture complies with the applicable provisions of this Indenture.

Section 7.05. *Notation on Securities in Respect of Supplemental Indentures.* Securities authenticated and delivered after the execution of any supplemental indenture pursuant to the provisions of this Article may bear a notation in form approved by the Trustee as to any matter provided for by such supplemental indenture or as to any action taken at any such meeting. If the Issuer or the Trustee shall so determine, new Securities so modified as to conform, in the opinion of the Trustee and the Board of Directors, to any modification of this Indenture contained in any such supplemental indenture may be prepared by the Issuer, authenticated by the Trustee and delivered in exchange for the Securities then outstanding.

### ARTICLE 8
#### CONSOLIDATION, MERGER, SALE OR CONVEYANCE

Section 8.01. *Consolidation, Merger, Sale or Conveyance.* (a) So long as any Securities remain outstanding, the Issuer may not consolidate with or merge into any other corporation or corporations (whether or not affiliated with the Issuer) or sell, lease or convey its properties and assets as an entirety or substantially as an entirety.

(b) Nothing contained in this Indenture or in any of the Securities shall prevent any consolidation of the Guarantor with, or merger of the Guarantor into, any other corporation or corporations (whether or not affiliated with the Guarantor), or successive consolidations or mergers to which the Guarantor or its respective successors shall be a party, or shall prevent any sale, lease or conveyance of the property of the Guarantor as an entirety or substantially as an entirety; *provided* that, and the Guarantor hereby covenants and agrees, upon any such consolidation, merger, sale, lease or conveyance, the due and punctual payment of the principal of and interest on the Securities of all tranches under the Parent Guarantee, and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed or observed by the Guarantor shall be expressly assumed, by supplemental indenture satisfactory in form to the Trustee, executed and delivered to the Trustee, by the corporation formed by such consolidation, or into which the Guarantor shall have been merged, or which shall have acquired such property.

Section 8.02. *Successor Corporation Substituted.* In case of any such consolidation, merger, sale or conveyance, and following such an assumption by the successor corporation, such successor corporation shall succeed to and be substituted for the Guarantor with the same effect as if it had been named herein.

Such successor corporation may cause to be signed, and may, subject to the limits of this Indenture, issue either in its own name or in the name of the Guarantor prior to such succession the Parent Guarantee issuable hereunder which theretofore shall not have been signed by the Guarantor and delivered to the Trustee; and, upon the order of such successor corporation, instead of the Guarantor and subject to all the terms, conditions and limitations in this Indenture prescribed, the Trustee shall authenticate and shall deliver any such Securities which previously shall have been signed and delivered by the officers of the Issuer to the Trustee for authentication. The Parent Guarantee so issued shall in all respects have the same legal rank and benefit under this Indenture as the Parent Guarantee theretofore or thereafter issued in accordance with the terms of this Indenture as though all of such Parent Guarantee had been issued at the date of the execution hereof.

In case of any such consolidation, merger, sale, lease or conveyance such changes in phraseology and form (but not in substance) may be made in the Parent Guarantee thereafter to be issued as may be appropriate.

In the event of any such sale or conveyance (other than a conveyance by way of lease) the Guarantor or any successor corporation which shall theretofore have become such in the manner described in this Article shall be discharged from all obligations and covenants under this Indenture and the Parent Guarantee and may be liquidated and dissolved.

Section 8.03. *Opinion of Counsel to Trustee.* The Trustee, subject to the provisions of Sections 5.01 and 5.02, may receive an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale, lease or conveyance, and any such assumption, and any such liquidation or dissolution, complies with the applicable provisions of this Indenture.

## ARTICLE 9
### PARENT GUARANTEE

Section 9.01. *Unconditional Guarantee.* The Guarantor hereby unconditionally guarantees (a "**Parent Guarantee**") to each holder of a Security authenticated by the Trustee and to the Trustee and its successors and assigns that: all payments on the Securities of each tranche issued hereunder will be promptly paid in full when due, subject to any applicable grace period, whether at maturity,

by acceleration or otherwise, and all other obligations of the Issuer to the Securityholders or the Trustee hereunder or under any of the Securities will be promptly paid in full or performed all in accordance with the terms hereof and thereof. The Guarantor hereby agrees that its obligations hereunder shall be absolute and unconditional, irrespective of the validity, regularity or enforceability of any of the Securities or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Securityholder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. The Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenants that the Parent Guarantee will not be discharged except by complete performance of the obligations contained in all of the Securities, this Indenture and the Parent Guarantee. If any Securityholder or the Trustee is required by any court or otherwise to return to the Issuer, Guarantor, or any custodian, trustee, liquidator or other similar official acting in relation to the Issuer or Guarantor, as the case may be, any amount paid by the Issuer or Guarantor to the Trustee or such Securities holder, the Parent Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

Section 9.02. *Severability.* In case any provision of the Parent Guarantee shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 9.03. *Execution of Parent Guarantee.* To further evidence the Parent Guarantee to the Securityholders, the Guarantor hereby agrees to execute a Parent Guarantee to be endorsed on each Security of each tranche ordered to be authenticated and delivered by the Trustee. The Guarantor hereby agrees that its Parent Guarantee set forth in Section 9.01 shall remain in full force and effect notwithstanding any failure to endorse on any Security a Parent Guarantee. The Parent Guarantee shall be signed on behalf of the Guarantor by its Authorized Director prior to the authentication of the particular Securities on which it is endorsed, and the delivery of such Securities by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of such Parent Guarantee on behalf of the Guarantor. Such signature upon the Parent Guarantee may be manual or facsimile signature of such Authorized Director of the Guarantor and may be imprinted or otherwise reproduced on the Parent Guarantee, and in case such Authorized Director who shall have signed the Parent Guarantee shall cease to be such Authorized Director before the Securities on which such Parent Guarantee is endorsed shall have been authenticated and delivered by the Trustee or disposed of by the Issuer, such Securities nevertheless may be authenticated and delivered or disposed of as though the Person who signed the Parent Guarantee had not ceased to be such Authorized Director.

Section 9.04. *Subordination of Subrogation and Other Rights*. The Guarantor hereby agrees that any claim against the Issuer that arises from the payment, performance or enforcement of the Guarantor's obligations under the Parent Guarantee or this Indenture, including, without limitation, any right of subrogation, shall be subject and subordinate to, and no payment with respect to any such claim of the Guarantor shall be made before, the payment in full in cash of all outstanding Securities of all tranches in accordance with the provisions provided therefor in this Indenture.

**ARTICLE 10**
SATISFACTION AND DISCHARGE OF INDENTURE; UNCLAIMED MONEYS

Section 10.01. *Optional Redemption*. With respect to any tranche of Securities, on any Business Day after the date that is six months prior to that tranche's Maturity Date, the Issuer may at its option redeem all but not less than all the Securities outstanding in that tranche upon not less than 30 nor more than 60 days' notice before the date set forth in the notice as the date set for redemption (the "**Redemption Date**") at a redemption price equal to 100.5% of the aggregate principal amount of the Securities being redeemed plus any accrued but unpaid interest, any Additional Amounts and any Break Funding Costs as of the Redemption Date. Upon redemption or other repayment in full of the Securities of all tranches issued hereunder, this Indenture shall cease to be of further effect, except in respect of obligations of the Issuer to compensate and indemnify the Trustee and each predecessor Trustee and to pay or reimburse the Trustee and each predecessor Trustee for expenses, disbursements and advances as provided in Section 5.06.

Section 10.02. *Notice of Redemption*. Notice of redemption will be mailed by first-class mail at least 30 but not more than 60 days before any Redemption Date to each Holder of Securities to be redeemed (a) in the case of Securities evidenced by a Global Security, to the Common Depositary for communication by it to its participants (without any additional publication required if such Global Security evidences the Securities of all tranches issued hereunder in their entirety), with any such notice deemed to have been given to the Holders of such Securities on the seventh day after the day on which such notice was given to the clearing systems or (b) in the case of Definitive Securities, at such Holder's address appearing on the Register.

Section 10.03. *Satisfaction and Discharge of Indenture*. If at any time (a) the Issuer shall have paid or caused to be paid the principal of and interest on all the Securities of all tranches outstanding hereunder, as and when the same shall have become due and payable, or (b) the Issuer shall have delivered to the Trustee for cancellation all Securities theretofore authenticated (other than any Securities which shall have been destroyed, lost or stolen and which shall have been replaced or paid as provided in Section 2.08) or (c) the Issuer shall have irrevocably deposited or caused to be deposited with the Trustee as trust funds the

entire amount in cash (other than moneys repaid by the Trustee or any paying agent to the Issuer in accordance with Section 10.06) sufficient to pay at maturity of each tranche of Securities not theretofore delivered to the Trustee for cancellation, including principal and interest due or to become due to such date of maturity as the case may be, and if, in any such case, the Issuer shall also pay or cause to be paid all other sums payable hereunder by the Issuer, then this Indenture shall cease to be of further effect (except as to (i) rights of registration of transfer and exchange, (ii) substitution of apparently mutilated, defaced, destroyed, lost or stolen Securities, (iii) rights of holders to receive payments of principal thereof and interest thereon, (iv) the rights, obligations and immunities of the Trustee hereunder and (v) the rights of the Securityholders as beneficiaries hereof with respect to the property so deposited with the Trustee payable to all or any of them), and the Trustee, on demand of the Issuer accompanied by an Officers' Certificate and an Opinion of Counsel and at the cost and expense of the Issuer, shall execute proper instruments acknowledging such satisfaction of and discharging this Indenture. The Issuer agrees to reimburse the Trustee for any costs or expenses thereafter reasonably and properly incurred and to compensate the Trustee for any services thereafter reasonably and properly rendered by the Trustee in connection with this Indenture or the Securities.

Section 10.04. *Application by Trustee of Funds Deposited for Payment of Securities.* Subject to Section 10.06, all moneys deposited with the Trustee pursuant to Section 10.03 shall be held in trust and applied by it to the payment, either directly or through any paying agent (including the Issuer acting as its own paying agent), to the holders of the particular Securities for the payment or redemption of which such moneys have been deposited with the Trustee, of all sums due and to become due thereon for principal and interest; but such money need not be segregated from other funds except to the extent required by law.

Section 10.05. *Repayment of Moneys Held by Paying Agent.* In connection with the satisfaction and discharge of this Indenture all moneys then held by any paying agent under the provisions of this Indenture shall, upon demand of the Issuer, be repaid to it or paid to the Trustee and thereupon such paying agent shall be released from all further liability with respect to such moneys.

Section 10.06. *Return of Moneys Held by Trustee and Paying Agent Unclaimed for Three Years.* Any moneys deposited with or paid to the Trustee or any paying agent for the payment of the principal of or interest on any Securities and not applied but remaining unclaimed for three years after the date upon which such principal or interest shall have become due and payable, shall, upon the written request of the Issuer and unless otherwise required by mandatory provisions of applicable escheat or abandoned or unclaimed property law, be repaid to the Issuer by the Trustee or such paying agent, and the holder of such Securities shall, unless otherwise required by mandatory provisions of applicable escheat or abandoned or unclaimed property laws, thereafter look only to the Issuer for any payment which such holder may be entitled to collect, and all liability of the Trustee or any paying agent with respect to such moneys shall thereupon cease.

## ARTICLE 11
### MISCELLANEOUS PROVISIONS

Section 11.01. *Provisions of Indenture for the Sole Benefit of Parties and Securityholders.* Nothing in this Indenture or in any of the Securities, expressed or implied, shall give or be construed to give to any Person other than the parties hereto and their successors and the holders of any of the Securities, any legal or equitable right, remedy or claim under this Indenture or under any covenant or provision herein contained, all such covenants and provisions being for the sole benefit of the parties hereto and their successors and of the holders of the Securities.

Section 11.02. *Successors and Assigns of Issuer and the Guarantor Bound by Indenture.* All the covenants, stipulations, promises and agreements in this Indenture contained by or on behalf of the Issuer and the Guarantor shall bind their respective successors and assigns, whether so expressed or not.

Section 11.03. *Notices and Demands on Issuer, the Guarantor, Trustee and Securityholders.* Any notice or demand which by any provision of this Indenture is required or permitted to be given or served by the Trustee or by the holders of Securities to or on the Issuer or the Guarantor may be given or served by courier, telex, facsimile transmission, certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested) or electronic messaging system

to the Issuer at:
    Eco Telecom Limited
    Suite 2, 4 Irish Place
    Gibraltar
    Attention: Franz Wolf
    Fax number: +350 41988
    email: ctfh@ctfh.gi, or

to the Guarantor at:
    Altimo Holdings & Investments Limited
    Suite 2, 4 Irish Palace
    Gibraltar
    Attention: Franz Wolf
    Fax number: +350 41988
    email: ctfh@ctfh.gi,

and in each case with a copy to fax number: +7495 981−4448,

and shall be effective upon satisfaction of the effectiveness requirements for such notice set forth in the last sentence of this paragraph with respect to the Issuer or the Guarantor, as the case may be. Any notice, direction, request or demand by the Issuer, the Guarantor, or any Securityholder to or upon the Trustee shall be deemed to have been sufficiently given or made, for all purposes, if given or made at the Corporate Trust Office. Any such notice or other communication shall be effective (i) if in writing and delivered in person or by courier, at the time when it is delivered; (ii) if sent by telex, at the time when the recipient's answerback is received; (iii) if sent by facsimile transmission, at the time when the transmission is received by a responsible employee of the recipient in legible form; (iv) if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), at the time when that mail is delivered or its delivery is attempted; and (v) if sent by electronic messaging system, at the time that receipt of such electronic message is confirmed by telephone; except that any notice or communication which is received, or delivery of which is attempted, after close of business on the date of receipt or attempted delivery on a day which is not a Business Day shall be treated as given at the opening of business on the next following Business Day.

Where this Indenture provides for notice to holders, such notice shall be sufficiently given (unless otherwise herein expressly provided) (a) in the case of Securities evidenced by a Global Security, if such notice for Holders of such Securities is given to the Common Depositary for communication by it to its participants (without any additional publication required if such Global Security evidences the Securities of all tranches issued hereunder in their entirety), with any such notice deemed to have been given to the Holders of such Securities on the seventh day after the day on which such notice was given to the clearing systems or (b) in the case of Definitive Securities, if such notice is given if in writing and mailed, first-class postage prepaid, to each holder entitled thereto, at his last address as it appears in the Register. In any case where notice to holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular holder shall affect the sufficiency of such notice with respect to other holders. Where this Indenture provides for notice in any manner, such notice may be waived in writing by the person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

Section 11.04. *Officers' Certificates and Opinions of Counsel; Statements to Be Contained Therein.* Upon any application or demand by the Issuer to the Trustee to take any action under any of the provisions of this Indenture, the Issuer shall furnish to the Trustee an Officers' Certificate stating that all conditions precedent provided for in this Indenture relating to the proposed action have been complied with and, if required by the Trustee in its sole discretion, an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent have been complied with, except that in the case of any such application or

demand as to which the furnishing of such documents is specifically required by any provision of this Indenture relating to such particular application or demand, no additional certificate or opinion need be furnished.

Each certificate or opinion provided for in this Indenture and delivered to the Trustee with respect to compliance with a condition or covenant provided for in this Indenture shall include (a) a statement that the person making such certificate or opinion has read such covenant or condition, (b) a statement that, in the opinion of such person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with and (c) a statement as to whether or not, in the opinion of such person, such condition or covenant has been complied with.

Any certificate, statement or opinion of an officer of the Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of or representations by counsel, unless such officer knows that the certificate or opinion or representations with respect to the matters upon which his certificate, statement or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should know that the same are erroneous. Any certificate, statement or opinion of counsel may be based, insofar as it relates to factual matters information with respect to which is in the possession of the Issuer, upon the certificate, statement or opinion of or representations by an officer or officers of the Issuer, unless such counsel knows that the certificate, statement or opinion or representations with respect to the matters upon which his certificate, statement or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should know that the same are erroneous.

Section 11.05. *New York Law to Govern.* This Indenture and each Security shall be deemed to be a contract under the laws of the State of New York, and for all purposes shall be construed in accordance with the laws of said State (without giving effect to the conflicts of laws provisions thereof other than Section 5-1401 of the General Obligations Law of the State of New York, which is expressly made applicable hereto), except as may otherwise be required by mandatory provisions of law.

Section 11.06. *Counterparts.* This Indenture may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument.

Section 11.07. *Effect of Headings.* The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 11.08. *Arbitration and Judicial Proceedings.* (a) All disputes arising out of or in connection with this Indenture, the Securities or the Parent Guarantee (each such dispute, a "**Dispute**") shall be referred to and finally settled

by arbitration under the Rules of Arbitration (the "ICC Rules") of the International Chamber of Commerce ("ICC"), which Rules are deemed to be incorporated by reference into this clause. The language of the arbitration shall be English. The parties hereby expressly agree that any dispute which arises out of or in connection with this Indenture, the Securities or the Parent Guarantee will necessarily require resolution as a matter of exceptional urgency. The arbitration proceedings shall be conducted in New York, by a tribunal of three arbitrators and New York shall be the seat of the arbitration. Each party is to appoint one arbitrator. The chairman shall be an arbitrator selected by agreement of the two party appointed arbitrators. If the two party appointed arbitrators are unable to agree upon a chairman, the chairman shall be appointed by the Court of Arbitration of the ICC in accordance with Article 9 of the ICC Rules. The arbitration tribunal shall determine any Dispute in accordance with the laws of the State of New York. The parties to this Indenture agree that any decision of the arbitration tribunal shall be conclusive, binding and enforceable in any court of competent jurisdiction.

(b) The parties to this Indenture hereby waive any right to refer any such Dispute to any other forum or tribunal, with the exception of the jurisdiction of a competent court in New York County to grant equitable relief necessary to preserve any party's rights and remedies under this Indenture, the Securities or the Parent Guarantee, as the case may be, until such time as an arbitral tribunal has been selected and arbitration proceedings before such tribunal can commence. No court other than a court of competent jurisdiction in New York shall have jurisdiction to hear any Dispute among any of the parties to this Indenture. The arbitral tribunal shall be entitled to grant injunctive or other equitable relief to prevent breaches of this Indenture, the Securities or the Parent Guarantee or to enforce specifically the performance or the terms and provisions hereof or thereof, as the case may be. To the fullest extent it may effectively do so under applicable law, each party hereto irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(c) TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO HEREBY WAIVE AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR TORT OR OTHERWISE. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTY HERETO THAT THE PROVISIONS OF THIS SECTION CONSTITUTE A MATERIAL INDUCEMENT UPON

WHICH SUCH OTHER PARTY HERETO HAS RELIED, IS RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT AND ANY DOCUMENT RELATED THERETO. EACH PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTY HERETO TO THE WAIVER OF ITS RIGHTS TO TRIAL BY JURY.

Nothing in this Section shall affect the right of any party hereto to serve process in accordance with Section 11.09 below or in any manner permitted by law.

Section 11.09. *Agent for Service; Waiver of Immunities.* (a) By the execution and delivery of this Indenture, each of the Issuer and the Guarantor (i) acknowledges that it has irrevocably designated and appointed CT Corporation System, with offices at 111 Eighth Avenue, 13th floor, New York, New York, 10011, as its authorized agent upon which process may be served in any suit or proceeding arising out of or relating to the Securities, the Parent Guarantee, this Indenture or the Collateral Agreement that may be instituted in any United States federal or New York state court in the Borough of Manhattan, The City of New York or brought by the Trustee (whether in its individual capacity or in its capacity as Trustee hereunder) and (ii) agrees that service of process upon CT Corporation System and written notice of said service to the Issuer or the Guarantor, as the case may be, shall be deemed in every respect effective service of process upon the Issuer or the Guarantor, as the case may be, in any such suit or proceeding. Each of the Issuer and the Guarantor further agrees to take any and all action, including the execution and filing of any and all such documents and instruments, as may be necessary to continue such designation and appointment of CT Corporation System in full force and effect so long as any of the Securities shall be outstanding.

(b) Each of the Issuer and the Guarantor irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to laying of venue of any such action, suit or proceeding in any such court or any appellate court with respect thereto and irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of any such action, suit or proceeding in any such court.

(c) To the extent that the Issuer or the Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, each of the Issuer and the Guarantor hereby irrevocably waives such immunity in respect of its obligations under this Indenture, the Collateral Agreement, the Parent Guarantee and the Securities, to the extent permitted by law.

Section 11.10. *Conversion of Currency.* (a) Each of the Issuer and the Guarantor covenants and agrees that the following provisions and the provisions of paragraph (b) below shall apply to conversion of currency in the case of the Securities, the Parent Guarantee, the Collateral Agreement and this Indenture to the fullest extent permitted by applicable law:

(i) If for the purposes of obtaining judgment in, or enforcing the judgment of, any court in any country, it becomes necessary to convert into any other currency (the "**Judgment Currency**") an amount due or contingently due under the Securities, the Parent Guarantee and this Indenture (the "**Required Currency**"), then the conversion shall be made at the rate of exchange prevailing on the Business Day before the day on which the judgment is given or the order of enforcement is made, as the case may be (unless a court shall otherwise determine).

(ii) If there is a change in the rate of exchange prevailing between the Business Day before the day on which the judgment is given or an order of enforcement is made, as the case may be (or such other date as a court shall determine), and the date of receipt of the amount due, the Issuer or the Guarantor, as the case may be, shall pay such additional (or, as the case may be, such lesser) amount, if any, as may be necessary so that the amount paid in the Judgment Currency when converted at the rate of exchange prevailing on the date of receipt will produce the amount in the Required Currency originally due.

(b) In the event of the winding-up of the Issuer or the Guarantor at any time while any amount or damages owing under the Securities, the Parent Guarantees, the Collateral Agreement and this Indenture, or any judgment or order rendered in respect thereof, shall remain outstanding, the Issuer and the Guarantor shall indemnify and hold the Holders of Securities and the Indenture Trustee harmless against any deficiency arising or resulting from any variation in rates of exchange between (i) the date as of which the equivalent of the amount in the Required Currency (other than under this Subsection) is calculated for the purposes of such winding-up and (ii) the final date for the filing of proofs of claim in such winding-up. For the purpose of this Subsection, the final date for the filing of proofs of claim in the winding-up of the Issuer or the Guarantor shall be the date fixed by the liquidator or otherwise in accordance with the relevant provisions of applicable law as being the latest practicable date as at which liabilities of the Issuer or the Guarantor may be ascertained for such winding-up prior to payment by the liquidator or otherwise in respect thereto.

The obligations contained in Subsections (a) and (b) of this Section shall constitute separate and independent obligations of the Issuer and the Guarantor from their other obligations under the Securities, the Parent Guarantee and this Indenture, shall give rise to separate and independent causes of action against the Issuer and the Guarantor, shall apply irrespective of any waiver or extension granted by any Holder or Trustee from time to time and shall continue in full

force and effect notwithstanding any judgment or order or the filing of any proof of claim in the winding-up of the Issuer or the Guarantor for a liquidated sum in respect of amounts due hereunder or under any such judgment or order. Any such deficiency as aforesaid shall be deemed to constitute a loss suffered by the Holders or the Trustee, as the case may be, and no proof or evidence of any actual loss shall be required by the Issuer, the Guarantor or the applicable liquidator.

Section 11.11. *Calculation Agent.* The determinations and calculations of the Calculation Agent shall be made in good faith and in a commercially reasonable manner, and shall be binding in the absence of manifest error. The Calculation Agent shall immediately notify the Issuer and the Trustee of all of its determinations and calculations hereunder.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed, and their respective corporate seals to be hereunto affixed and attested, all as of the date first above written.

ECO TELECOM LIMITED

[Seal]

The Common Seal of the Eco Telecom Limited was affixed hereto in the presence of:

By:      /s/ Marina Kushnareva
Name:  Marina Kushnareva
Title:    Authorized Director

By:      /s/ Church Lane Trustee Limited
Name:
Title:    Company Secretary

ALTIMO HOLDINGS & INVESTMENTS LIMITED, as Guarantor

By:      /s/ Franz Wolf
Name:  Franz Wolf
Title:    Authorized Director

[Seal]

The Common Seal of Altimo Holdings & Investments Limited was affixed in the presence of:

Name:  Franz Wolf
Title:    Authorized Director

Church Lane Trustees Limited
Secretary

DEUTSCHE INTERNATIONAL CORPORATE SERVICES
LIMITED, as Trustee

By:     /s/ Mark A. Rumbold
Name:   Mark A. Rumbold
Title:  Authorized Signatory

By:     /s/ James Saout
Name:   James Saout
Title:  Authorized Signatory

DEUTSCHE BANK AG LONDON BRANCH,
as Calculation Agent

By:     /s/ Andrew Dixon-Smith
Name:   Andrew Dixon-Smith
Title:  Legal Counsel

By:     /s/ Colin Greene
Name:   Colin Greene
Title:  Managing Director

[SCHEDULE INTENTIONALLY OMITTED]

Exhibit 99.2

**COLLATERAL AGREEMENT**

relating to

Series A Floating Rate Bonds

Among

**Eco Telecom Limited,**
as Pledgor

**The Bank of New York,**
as Securities Intermediary

**The Bank of New York,**
as Depositary under the ADR Program

and

**Deutsche Bank AG London Branch,**
as Collateral Agent

**Deutsche International Corporate Services Limited,**
as Trustee

Dated as of

March 9, 2007

THIS COLLATERAL AGREEMENT relating to Series A Floating Rate Bonds (the "Collateral Agreement"), dated as of March 9, 2007, among Eco Telecom Limited, a company organized under the laws of Gibraltar (the "Pledgor"), Deutsche Bank AG London Branch, as Collateral Agent (in such capacity, together with its successors in such capacity, the "Collateral Agent") for the benefit of Deutsche International Corporate Services Limited, as trustee under the Indenture referred to below (in such capacity, together with its successors in such capacity, the "Trustee"), the Trustee, The Bank of New York, in its capacity as Securities Intermediary in respect of the VIP Collateral Account (as defined herein) (the "Securities Intermediary") and, solely with respect to Section 11 of this Collateral Agreement, The Bank of New York, in its capacity as depositary under the ADR Program (as defined below) (in such capacity, together with its successors in such capacity, the "Depositary").

## W I T N E S S E T H :

WHEREAS, pursuant to the Indenture relating to Series A Floating Rate Bonds (the "Indenture"), dated as of the date hereof, between the Pledgor, the Trustee, Altimo Holdings & Investments Limited, as guarantor (the "Guarantor") and Deutsche Bank AG London Branch, as Calculation Agent, the Pledgor can issue bonds in an aggregate principal amount of up to $1,500,000,000 in one or more tranches (the "Securities") that will be fully and unconditionally guaranteed by the Guarantor;

NOW, THEREFORE, to secure the performance by the Pledgor of its obligations under the Securities and the Indenture and to secure the observance and performance of the covenants and agreements contained herein and in the Indenture, the parties hereto agree as follows:

1.     The Security Interests

In order to secure the observance and performance of the covenants, agreements and obligations contained herein and in the Indenture and the Securities (collectively, the "Secured Obligations"):

(a)(i) *The Security Interests under the UCC.* The Pledgor hereby grants and pledges unto the Collateral Agent, as agent of and for the benefit of the Collateral Agent and the Trustee, as trustee for the Holders from time to time of the Securities, as security for the Secured Obligations, a security interest in and to, and a lien upon and right of set-off against, all of the Pledgor's right, title and interest in and to (i) the Pledged Items described in Section 1(b) and Section 1(d), if any; (ii) all additions to such Pledged Items (for the avoidance of doubt, in the case of any stock splits or combinations, such greater or lesser number of VIP Shares that result from such stock split or combination); (iii) the VIP Collateral Account, all securities, cash and other financial assets (each as defined in Section 8–102 of the UCC) and other funds, property or assets from time to time held therein or credited thereto and all security entitlements in respect thereof; (iv) all powers and rights now owned or hereafter acquired under or with respect to the Pledged Items described in this paragraph; and (v) all income (including interest), proceeds and collections received or to be received, or derived or to be derived, now or any time hereafter from or in connection with the Pledged Items described in this paragraph

(whether such proceeds arise before or after the commencement of any proceeding under any applicable bankruptcy, insolvency or other similar law, by or against the Pledgor with respect to the Pledgor) (the "**Proceeds**")(such Pledged Items, additions, substitutions, income, collections, powers, rights and Proceeds described in clauses (i) through (v) above being herein collectively called the "**Pledged Collateral**"). The Collateral Agent shall have all of the rights, remedies and recourses with respect to the Pledged Collateral afforded a secured party by the UCC, in addition to, and not in limitation of, the other rights, remedies and recourses afforded to the Collateral Agent by this Collateral Agreement.

(ii) *Security Interests under the Cash Collateral Assignment.* Pursuant to the Cash Collateral Assignment between the Pledgor and the Deutsche International Corporate Services Limited, as cash collateral agent, dated as of the date hereof (the "**Cash Collateral Assignment**"), attached hereto as Exhibit A, the Pledgor shall procure that any cash delivered pursuant to Section 1(c) below be deposited in the Cash Collateral Account.

(b) *Initial Pledge Date.* On the first Closing Date (as defined in the Purchase Agreement), the Pledgor shall deliver to the Collateral Agent in pledge hereunder 9,349,999 VIP Shares, in the manner provided in Section 6(b).

(c) *Cash Margining.* (i) The Calculation Agent shall on each Valuation Day determine the LTV Ratio. The Calculation Agent shall, upon a written request of the Trustee or the Pledgor, notify the Trustee or the Pledgor, as appropriate, in writing of the result of such determination for such Valuation Date promptly following the completion of the same.

(ii) If the Calculation Agent determines that as of any time the LTV Ratio is equal to or exceeds the LTV Margin Level, it shall give written notice to the Pledgor of such determination promptly following completion of the same. If such notice is delivered to the Pledgor prior to 2:00 pm (London time) on any Valuation Day (or after 2:00 pm (London time) on the Valuation Day immediately preceding such Valuation Day), the Pledgor shall by 5:00 pm (New York City time) on the immediately succeeding Payment Business Day deliver to the Cash Collateral Account pursuant to Section 6(b) to be assigned under the Cash Collateral Assignment an amount of cash in U.S. dollars that causes the LTV Ratio following such delivery to be equal to or less than the LTV Reset Level (which amount shall be set forth in such notice); *provided* that this provision shall only be effective if the amount of cash required to cause the LTV Ratio to be equal to or less than the LTV Reset Level is greater than or equal to $500,000; *provided further* that the Pledgor shall be deemed to satisfy the requirements of this Section 1(c)(ii) if (x) any failure to deliver cash by the deadline specified above is caused by administrative or technical error or difficulties within the banking system and not within the control of, the Pledgor, and (y) the Pledgor provides a SWIFT confirmation from its correspondent bank

for U.S. dollars to the Collateral Agent confirming, to the satisfaction of the Collateral Agent, that the Pledgor has sent the cash required pursuant to this Section 1(c)(ii) and (z) such cash is credited to the Cash Collateral Account within three Payment Business Days following the Valuation Day on which the LTV Ratio has become equal to or exceeded the LTV Margin Level.

(iii) If the Pledgor reasonably believes that a Valuation Day is a Release Request Day, it shall be entitled to give written notice to the Calculation Agent and the Trustee (which notice shall include Pledgor's account information) prior to 2:00 pm (London time) on such Valuation Day requesting a release of cash. Upon receipt of such written notice, the Calculation Agent shall determine whether such Valuation Day is a Release Request Day. The Calculation Agent shall give notice to the Pledgor of such determination promptly following completion of the same and in any event prior to 5:30 pm (London time) on such Valuation Day. If the Calculation Agent notifies the Pledgor that such Valuation Day is a Release Request Day in accordance with the immediately preceding sentence then on the immediately succeeding Valuation Day (the "**Proposed Release Day**") the Calculation Agent shall determine whether such Proposed Release Day is also a Release Request Day and, if it is, it shall also determine the Release Amount and give written notice thereof to the Pledgor promptly following completion of the same and in any event prior to 2:00 pm (London time) on such Proposed Release Day. If the Calculation Agent provides such notice to the effect that the Release Amount is greater than zero and no Event of Default or an Early Maturity Event has occurred and is continuing on such Proposed Release Day (as determined by the Calculation Agent and notified to the Trustee and the Cash Collateral Agent in writing on such Proposed Release Day), then the Trustee shall promptly following receipt of such notice give written instructions to the Cash Collateral Agent to transfer the Release Amount (plus any accrued but not previously distributed interest as of such date) from the Cash Collateral Account to the Pledgor's account (as specified in Pledgor's notice) by 5:00 pm (New York City time) on such Proposed Release Day. For the avoidance of doubt, only cash delivered pursuant to Section 1(c)(ii) plus any interest accrued thereon pursuant to the Cash Collateral Assignment may be released under this Section 1(c)(iii).

(iv) Notices delivered pursuant to this Section 1(c) shall be delivered by (A) facsimile transmission (in which case delivery shall be deemed to have occurred at the time when the transmission has been sent in its entirety and the sender's facsimile machine shall have generated a successful transmission report) or (B) email electronic messaging (in which case delivery shall be deemed to have occurred at the time that the email electronic message is sent and the sender's email electronic messaging system shall not have immediately thereafter generated an unsuccessful transmission report). Such notices shall be given to a party at the electronic mail address or facsimile number, as applicable, set forth opposite such party's name on the signature page hereto or at such other address or number as may be designated by a notice duly given in accordance with Section 13(c) to each other party hereto.

3

(v) The Pledgor shall give the Collateral Agent notice in the manner set forth in Section 1(c)(iv) of any change to the electronic mail address or facsimile number set forth opposite its name on the signature page hereto or of the discontinuance, or anticipated discontinuance, of use of such electronic mail address or facsimile number by it, within two Business Days of any such change or discontinuance or anticipated discontinuance, and such notice shall specify the correct and valid substitute electronic mail address of facsimile number, as applicable.

(vi) Any payments made pursuant to this Section 1(c) shall be made by wire transfer of immediately available funds using the payment particulars set forth in Schedule II hereof unless the Cash Collateral Agent or the Pledgor provides notice of alternative payment particulars.

(d) *Additional Pledge.* On any single Business Day within three months of the date hereof (the "**Additional Pledge Date**") upon ten Business Days' prior written notice to all the other parties hereto and subject to all the conditions hereinafter stated, the Pledgor may deliver to the Collateral Agent in pledge hereunder up to 300,000 VIP Shares (such VIP Shares, the "**Additional Pledge Shares**") then held in the Escrowed Account, in the manner provided in Section 6(b). The ability to pledge Additional Pledge Shares shall be subject to the satisfaction, in the sole discretion of the Collateral Agent, of the following conditions precedent as of the Additional Pledge Date: (i) the conditions set forth in Sections 4.01, 4.02 (without reference to any pricing agreement and as if the representations and warranties were made on the Additional Pledge Date and with respect the Additional Pledge Shares), 4.03, 4.04, 4.05, 4.06, 4.07(b) and (c), 4.09, 4.11, 4.12, 4.13, 4.14, 4.17, 4.18 and 4.19 of the Purchase Agreement and (ii) the reimbursement by Pledgor of the Collateral Agent's reasonable out of pocket expenses (including the legal fees) related to such additional pledge.

The parties hereto expressly agree that all rights, assets and property (including, without limitation, cash) at any time held in or credited to the VIP Collateral Account shall be treated as financial assets (as defined in Section 8−102 of the UCC).

2.    Definitions

Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Indenture. In addition, the following capitalized terms as used herein shall have the following meanings:

"**Business Day**" means a day which in London and in The City of New York is neither a legal holiday nor a day on which banking institutions are authorized by law or regulation to close.

4

"**Cash Collateral**" has the meaning given to it in the Cash Collateral Assignment.

"**Cash Collateral Account**" has the meaning given to it in the Cash Collateral Assignment.

"**Cash Collateral Agent**" has the meaning given to it in the Cash Collateral Assignment.

"**Cash Collateral Assignment**" has the meaning given to it in Section 1(a)(ii).

"**Closing Date**" has the meaning given to it in the Purchase Agreement.

"**Collateral**" means the Pledged Collateral and the Cash Collateral.

"**Collateral Agent**" means the financial institution identified as such in the preliminary paragraph hereof, or any successor appointed in accordance with Section 10.

"**Collateral Event of Default**" has the meaning specified in Section 6(c).

"**Control**" means "control" as defined in Section 8–106 and Section 9–106 of the UCC.

"**Depositary**" has the meaning set forth in the preliminary paragraph hereof.

"**Dispute**" has the meaning set forth in Section 13(f)(i).

"**DTC**" means The Depository Trust Company.

"**Guarantor**" has the meaning set forth in the preliminary paragraph hereof.

"**Holder**", "**holder of Securities**", "**Securityholder**" have the meanings set forth in the Indenture.

"**ICC**" has the meaning set forth in Section 13(f)(i).

"**ICC Rules**" has the meaning set forth in Section 13(f)(i).

"**Indenture**" has the meaning set forth in the preliminary paragraph hereof.

"**Investment Property**" means "investment property" as defined in Section 9–102(a)(49) of the UCC.

"**Lien**" means any lien, mortgage, security interest, pledge, charge or encumbrance of any kind.

"**Location**" means, with respect to any party, the place such party is "located" within the meaning of Section 9–307 of the Uniform Commercial Code as in effect in each jurisdiction that may be deemed applicable to such party.

5

with the particular subject; when used with respect to the Securities Intermediary, any managing director, vice president, assistant vice president, assistant treasurer, assistant secretary or trust officer located in the division or department of the Securities Intermediary responsible for performing the obligations of the Securities Intermediary under this Collateral Agreement, and also means, with respect to any matter relating to this Collateral Agreement or the Pledged Collateral, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"**Securities**" has the meaning set forth in the preliminary paragraph hereof.

"**Securities Intermediary**" means the financial institution identified as such in the preliminary paragraph hereof, or any successor appointed in accordance with Section 9.

"**Transfer Restriction**" means, with respect to any item of Pledged Collateral, any condition to or restriction on the ability of the holder thereof to sell, assign or otherwise transfer such item of Pledged Collateral or to enforce the provisions thereof or of any document related thereto, whether set forth in such item of Pledged Collateral itself or in any document related thereto, including, without limitation, (i) any requirement that any sale, assignment or other transfer or enforcement of such item of Pledged Collateral be consented to or approved by any Person, including, without limitation, the issuer thereof or any other obligor thereon, (ii) any limitations on the type or status, financial or otherwise, of any purchaser, pledgee, assignee or transferee of such item of Pledged Collateral, (iii) any requirement of the delivery of any certificate, consent, agreement, opinion of counsel, notice or any other document of any Person to the issuer of, any other obligor on or any registrar or transfer agent for, such item of Pledged Collateral, prior to the sale, pledge, assignment or other transfer or enforcement of such item of Pledged Collateral and (iv) any registration or qualification requirement for such item of Pledged Collateral pursuant to any federal or state securities law; *provided* that (i) the required delivery of any assignment from the seller, pledgor, assignor or transferor of such item of Pledged Collateral, together with any evidence of the corporate or other authority of such Person, (ii) any condition or restriction imposed by DTC generally in respect of securities held by it and (iii) any condition or restriction imposed hereunder or under the Indenture, shall not constitute a "Transfer Restriction."

"**Trustee**" has the meaning set forth in the preliminary paragraph hereof.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York.

"**Valuation Day**" means any Business Day from (and including) the date Securities are first issued pursuant to the Indenture to (but excluding) the date upon which the principal amount of Securities outstanding is zero.

"**VIP Collateral Account**" has the meaning specified in Section 6(b).

"**VIP Principal Securities Exchange**" means the New York Stock Exchange or, following the VIP ADSs being listed or traded on any other national securities exchange located in the United States, the U.S. national securities exchange with the greatest number of VIP ADSs traded during the preceding 30 trading days on such exchange.

7

3.   Representations and Warranties of the Pledgor

(a) The Pledgor hereby represents and warrants to the Collateral Agent and the Trustee that:

(i) *Corporate Existence and Power*. The Pledgor is a company validly existing and in good standing under the laws of Gibraltar, and has all powers and all material governmental licenses, authorizations, consents and approvals required to enter into, and perform its obligations under, this Collateral Agreement.

(ii) *Authorization and Non—Contravention*. The execution, delivery and performance by the Pledgor of this Collateral Agreement have been duly authorized by all necessary corporate action on the part of the Pledgor and do not and will not violate, contravene or constitute a default under any provision of applicable law or regulation or of the charter or by—laws or similar constitutive documents of the Pledgor or of any material agreement, judgment, injunction, order, decree or other instrument binding upon the Pledgor.

(iii) *Binding Effect*. This Collateral Agreement constitutes a valid and binding agreement of the Pledgor enforceable against the Pledgor in accordance with its terms except as such enforceability may be limited by applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and by general equitable principles.

(iv) *Solvency*. The Pledgor is presently solvent and able to pay, and paying its debts as they become due, and anticipates that it will continue to be able to pay its debts as they become due for the foreseeable future.

(v) *No Transfer Restrictions*. Except for the requirement that a written legal opinion substantially in the form of Annex I hereto be delivered by Davis Polk & Wardwell to the Depositary (such restriction, the "**Permitted Transfer Restrictions**"), no Transfer Restrictions exist with respect to or otherwise apply to the assignment of, or transfer by the Pledgor of possession of, any items of Pledged Collateral (including, without limitation, any Additional Pledge Shares) to the Collateral Agent hereunder, or the subsequent sale or transfer of such items of Pledged Collateral (including, without limitation, any Additional Pledge Shares) by the Collateral Agent pursuant to the terms hereof except where the Holder for whose account such sale is being conducted is an "affiliate" (as defined in Rule 144 under the United States Securities Act of 1933, as amended) of VIP and save for the Pledgor's obligation to give notice to VIP upon an actual transfer of VIP Shares as required under the Shareholders Agreement dated May 30, 2001 between the Pledgor, Telenor East Invest AS and other parties (as amended from time to time).

8

(vi) *Title to Pledged Collateral; Perfected Security Interest.* The Pledgor (i) has paid full purchase price (within the meaning of Rule 144(d)(1) under the Securities Act) for the VIP Shares pledged in accordance with Section 1(b) and Section 1(d), if any, more than two years prior to the date hereof (provided that Rule 144(d)(3)(i) under the Securities Act shall apply to such determination) and has good and marketable title to the Pledged Items, free of all Liens (other than the Lien created by this Collateral Agreement) and Transfer Restrictions (except for Permitted Transfer Restrictions) and (ii) is not and will not become a party to or be otherwise bound by any agreement, other than this Collateral Agreement, that (x) restricts in any manner the rights of any present or future owner of the Pledged Collateral with respect thereto or (y) provides any Person other than the Pledgor, the Collateral Agent or the Securities Intermediary with Control with respect to any Pledged Collateral. Upon re-registration of the VIP Shares constituting Pledged Collateral (including, without limitation, any Additional Pledge Shares hereunder on the shareholders register of VIP in the name of the Custodian acting as nominee for the Securities Intermediary, unless such VIP Shares are already so registered, and the crediting by the Securities Intermediary of such VIP Shares to the VIP Collateral Account, the Collateral Agent will have obtained, for the benefit of the Trustee, a valid and first priority perfected security interest in a security entitlement in respect of such VIP Shares, in respect of which the Collateral Agent will have Control, subject to no other Lien. Upon the crediting by the Securities Intermediary of any other financial assets to the VIP Collateral Account, the Collateral Agent will have obtained, for the benefit of the Trustee, a valid and first priority perfected security interest in a security entitlement in respect of such financial assets, in respect of which the Collateral Agent will have Control, subject to no other Lien. None of the Pledged Collateral is or shall be pledged by the Pledgor as collateral for any other purpose.

(vii) *No Financing Statements.* No financing statement, security agreement or similar or equivalent document or instrument covering all or any part of the Pledged Collateral is on file or of record in any jurisdiction in which such filing or recording would be effective to perfect a lien, security interest or other encumbrance of any kind on such Pledged Collateral other than in favor of the Collateral Agent or any of its affiliates.

(viii) *No Filing Required.* No registration, recordation or filing with any governmental body, agency or official is required in connection with the execution and delivery of this Collateral Agreement or necessary for the validity or enforceability hereof or for the perfection or enforcement of the security interests granted hereunder.

9

(ix) *Enforcement.* The Pledgor has not performed and will not perform any acts that could reasonably be expected to prevent the Collateral Agent from enforcing any of the terms of this Collateral Agreement or that could reasonably be expected to limit the Collateral Agent in any such enforcement.

(x) *Location.* The only possible Location of the Pledgor is the District of Columbia or Gibraltar.

(b) The Pledgor shall be deemed to repeat the representations and warranties in Section 3(a) (i) on each Closing Date, (ii) on the Additional Pledge Date and (iii) at each time any Pledged Item is added pursuant to Section 1(c)(ii) to, or released pursuant to Section 1(c)(iii) from, the Cash Collateral Account.

4.    Representations, Warranties and Agreements of the Collateral Agent and the Securities Intermediary

(a) Each of the Collateral Agent and the Securities Intermediary represents, warrants to and agrees with the Pledgor and the Trustee with respect to itself that:

(i) *Corporate Existence and Power.* It is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was incorporated, and has all powers and all material governmental licenses, authorizations, consents and approvals required to enter into, and perform its obligations under, this Collateral Agreement.

(ii) *Authorization and Non–Contravention.* The execution, delivery and performance by it of this Collateral Agreement have been duly authorized by all necessary action on its part, if any (no action by its shareholders being required), and do not and will not violate, contravene or constitute a default under any provision of applicable law or regulation or of its charter or by–laws or of any material agreement, judgment, injunction, order, decree or other instrument binding upon it.

(iii) *Binding Effect.* This Collateral Agreement constitutes its valid and binding agreement enforceable against it in accordance with its terms except as such enforceability may be limited by applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and by general equitable principles.

(b) The Securities Intermediary represents, warrants and agrees with the Collateral Agent, the Trustee and the Pledgor that:

(i) *Other Agreements.* It has not entered and, unless otherwise instructed by the Collateral Agent, will not enter into any agreement pursuant to which any Person other than the Pledgor, the Collateral Agent, the Trustee, or the Securities Intermediary has or will have Control with respect to any Pledged Collateral.

10

(ii) *Other Liens*. It hereby agrees that all Liens held by it (other than Liens arising hereunder) in any of the Pledged Collateral securing any obligation to it (in any capacity) (collectively, "**Other Liens**") shall be subordinate and junior to the liens, pledges and security interests in the Pledged Collateral arising hereunder and that it will take no action to enforce any Other Liens so long as any obligation under the Indenture or hereunder (whether or not then due) shall remain unsatisfied.

(iii) *Securities Intermediary*. It is a "securities intermediary" within the meaning of Section 8–102(a)(14) of the UCC and in maintaining the VIP Collateral Account hereunder is acting in such capacity. The VIP Collateral Account is a "securities account" within the meaning of Section 8–501(a) of the UCC.

(iv) *Deposit of VIP Shares with the Depositary*. If, in connection with its exercise of any remedies under Section 8 hereof, the Collateral Agent requests that any Pledged Collateral consisting of VIP Shares be deposited with the Depositary, the Securities Intermediary will as promptly as practicable cause such VIP Shares to be so deposited in accordance with the Deposit Agreement in respect of the ADR Program and instruct the Depositary to execute and deliver VIP ADRs in respect thereof.

(v) *Entitlement Orders*. The Securities Intermediary agrees to comply with any "entitlement order" (as defined in Section 8–102 of the UCC) originated by the Collateral Agent and relating to the VIP Collateral Account or any financial asset credited thereto without further consent by the Pledgor or any other person. The Pledgor consents to the foregoing agreement by the Securities Intermediary.

(vi) *Pledgor Entitlement Orders*. In addition to, and not in lieu of, the obligation of the Securities Intermediary to honor entitlement orders as agreed in Section 4(b)(v) hereof, the Securities Intermediary agrees that except as provided in Sections 7(a) or (b) hereof, the Securities Intermediary shall not comply with any entitlement order of the Pledgor or any agent of the Pledgor with respect to the VIP Collateral Account or any financial asset credited thereto without the prior written consent of the Collateral Agent.

(c) The Collateral Agent and Securities Intermediary shall be deemed to repeat the representations and warranties in Section 4(a) and (b), as applicable, (i) on each Closing Date, (ii) on the Additional Pledge Date and (iii) at each time any Pledged Item is added pursuant to Section 1(c)(ii) to, or released pursuant to Section 1(c)(iii) from, the Cash Collateral Account.

11