# EXHIBIT BB

5.    Certain Covenants of the Pledgor

The Pledgor agrees that, so long as any of its obligations under any Securities or the Indenture remain outstanding:

(a) *Title to Pledged Collateral.* The Pledgor shall, subject to the terms of this Collateral Agreement, at all times hereafter have good title to the Pledged Collateral pledged hereunder, free of all Liens (other than the Liens created by this Collateral Agreement) and Transfer Restrictions (except for the Permitted Transfer Restrictions), and, subject to the terms of this Collateral Agreement, will at all times hereafter have good, right and lawful authority to assign, transfer and pledge such Pledged Collateral and all additions thereto under this Collateral Agreement. The Pledgor shall warrant and defend the Pledgor's title to the Pledged Collateral, subject to the rights of the Collateral Agent, against the claims and demands of all Persons.

(b) *Pledged Collateral Requirement.* The Pledgor shall cause the Pledged Collateral to include, at all times, at least the number of VIP Shares required to be delivered pursuant to Section 1(b) plus any Additional Pledge Shares delivered pursuant to Section 1(d) (or, in case of any stock splits or combinations, such greater or lesser number as results therefrom) and the Cash Collateral to include any such funds required to be delivered under Section 1(c)(ii).

(c) *Further Assurances.* The Pledgor shall, at its expense and in such manner and form as the Collateral Agent may reasonably request, give, execute, deliver, file and record any financing statement, notice, instrument, document, agreement or other papers that may be necessary in order to create, preserve, perfect, substantiate or validate any security interest granted pursuant hereto, create or maintain Control with respect to any such security interest in the Pledged Collateral or to enable the Collateral Agent to exercise and enforce its rights and the rights of the Trustee hereunder with respect to such security interest. Without limiting the generality of the foregoing obligation, the Pledgor shall (i) within 15 days after the date of this Collateral Agreement register or cause to be registered at the Companies Registry of Gibraltar the prescribed particulars of this Collateral Agreement and the Lien created by this Collateral Agreement as required by the Gibraltar Companies Ordinance, in the prescribed form, duly completed and executed, together with an original fully executed counterpart of this Collateral Agreement and (ii) immediately upon the execution of the Collateral Agreement, register the Lien created by this Collateral Agreement in the Statutory Books and register of charges of the Pledgor, and (iii) pay all applicable filing fees in full, including, without limitation, those payable under the Gibraltar Stamp Duties Ordinance and deliver to the Collateral Agent (A) the original Certificate of Registration issued by the Gibraltar Companies Registrar with respect to this Collateral Agreement and (B) copies of the pages of its Statutory Books and register of charges evidencing the registration therein of the Lien created by this Collateral Agreement, duly certified by the Pledgor's corporate officers thereunto duly authorized. To the extent permitted by applicable law, the Pledgor hereby authorizes the Collateral Agent to execute and file, in the name and at the

12

expense of the Pledgor or otherwise, UCC financing or continuation statements (which may be carbon, photographic, photostatic or other reproductions of this Collateral Agreement or of a financing statement relating to this Collateral Agreement) which the Collateral Agent may reasonably deem necessary or appropriate to further perfect, or maintain the perfection, of the security interests granted hereby. Upon receipt by the Collateral Agent and the Securities Intermediary of a written notice from the Pledgor to the effect that VIP has consented to (i) the deposit of the VIP Shares constituting Pledged Collateral hereunder in accordance with the Deposit Agreement in respect of the ADR Program, (ii) the issuance of VIP ADSs in respect of such deposit and (iii) the holding of such VIP ADSs or VIP ADRs as Pledged Collateral hereunder, each party hereto shall use its reasonable best efforts to amend the provisions of this Agreement and the Indenture, if required, in order to permit holding of such VIP ADSs or VIP ADRs instead of VIP Shares as Pledged Collateral hereunder. For the avoidance of doubt, any such amendment may not impair the first priority security interest granted to the Collateral Agent hereunder.

(d) *Consolidation/Merger.* The Pledgor shall not consolidate with or merge with or into, or transfer all or substantially all of its assets to, any other Person.

(e) *Change of Name or Location.* The Pledgor agrees that it shall not change its name or Location, unless (x) the Pledgor shall have given the Collateral Agent not less than 30 days' prior notice thereof and (y) such change shall not cause any of the security interests granted hereunder to become unperfected, cause the Collateral Agent to cease to Control any of the Pledged Collateral consisting of securities or security entitlements or subject any Pledged Collateral to any other Lien.

(f) *Other Liens.* The Pledgor agrees that it shall not (i) create or permit to exist any Lien (other than the Liens created by this Collateral Agreement) or any Transfer Restriction (other than the Permitted Transfer Restrictions) upon or with respect to the Pledged Collateral, (ii) sell or otherwise dispose of, or grant any option with respect to, any of the Pledged Collateral or (iii) enter into or consent to any agreement pursuant to which any Person other than the Pledgor, the Collateral Agent, and the Securities Intermediary has or will have Control in respect of any Pledged Collateral.

(g) *Notice to VIP.* The Pledgor shall give notice to VIP upon an actual transfer of VIP Shares as required under the Shareholders Agreement dated May 30, 2001 between the Pledgor, Telenor East Invest AS and other parties (as amended from time to time).

6.    Administration of the Collateral and Valuation of the Securities

(a) *Valuation of Collateral.* Based on the receipt of notices from the Securities Intermediary pursuant to Section 9(e) and information available to it in respect of the Cash Collateral Account, the Collateral Agent shall determine on each Business Day whether a Collateral Event of Default shall have occurred.

13

(b) *Delivery of Collateral.* Any delivery of any securities or security entitlements (each as defined in Section 8–102 of the UCC) as Pledged Collateral to the Collateral Agent or of cash as Cash Collateral to the Cash Collateral Agent by or on behalf of the Pledgor shall be effected (i) in the case of Collateral consisting of certificated securities registered in the name of the Pledgor, by delivery of certificates representing such securities to the Collateral Agent, accompanied by any required transfer tax stamps, and in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank (including any related documentation required by the transfer agent for such securities in connection with effecting or registering transfer), with signatures appropriately guaranteed, all in form and substance satisfactory to the Collateral Agent, (ii) in the case of Collateral consisting of uncertificated securities registered in the name of the Pledgor, by transmission by the Pledgor of an instruction to the issuer of such securities instructing such issuer to register such securities in the name of the Collateral Agent or its nominee, accompanied by any required transfer tax stamps, and the issuer's compliance with such instructions, *provided* that in the case of VIP Shares the Pledgor shall instruct the registrar of VIP to register such VIP Shares in the name of the Custodian, unless such VIP Shares are already so registered, and the Securities Intermediary shall credit such VIP Shares to the VIP Collateral Account (which shall give rise pursuant to Section 8–501 of the UCC to a security entitlement in respect thereof), (iii) in the case of securities in respect of which security entitlements are held by the Pledgor through the Securities Intermediary, by the crediting of such securities, accompanied by any required transfer tax stamps, to the VIP Collateral Account, (iv) in the case of cash delivered pursuant to Section 1(c), by wire transfer in immediately available funds to the Cash Collateral Account, and in the event of any other cash, by wire transfer in immediately available funds to the VIP Collateral Account, or (v) in any case, by complying with such reasonable alternative delivery instructions as the Collateral Agent shall provide to the Pledgor in writing.

Upon delivery of any Pledged Item under this Collateral Agreement, the Collateral Agent or its agents shall examine such Pledged Item and any certificates or instruments delivered pursuant to this Section 6(b), or otherwise pursuant to the terms hereof in connection therewith to determine that they appear to comply as to form with the requirements for the Collateral. The Collateral Agent shall cause all Pledged Collateral held hereunder to be credited to the securities account (as defined in Section 8–501(a) of the UCC) listed on Schedule I hereto established in the name of the Pledgor at the offices of the Securities Intermediary (the "**VIP Collateral Account**") and the Pledgor shall cause any cash delivered pursuant to Section 1(c) to be credited to the Cash Collateral Account.

(c) A "**Collateral Event of Default**" shall mean, at any time, the occurrence of any of the following: (i) failure of the Collateral to include at least (1) the number of VIP Shares required to be delivered pursuant to Section 1(b) plus any VIP Shares delivered pursuant to Section 1(d) (or, in case of any stock splits or combinations, such greater or lesser number as results therefrom) and (2) the amount of cash required to be transferred to the Cash Collateral Account pursuant to Section 1(c)(ii) at such time, (ii)

14

failure at any time of the security interests granted hereunder to constitute valid and perfected security interests under the laws of the State of New York in all of the Pledged Collateral, subject to no prior or equal Lien and to no Transfer Restrictions (other than Permitted Transfer Restrictions), and, with respect to any Pledged Collateral consisting of securities or security entitlements, as to which the Collateral Agent has Control, or in each case, assertion of such by the Pledgor in writing or (iii) failure at any time of the security interests granted under the Cash Collateral Assignment to constitute valid and perfected security interests in all respects of the Cash Collateral.

7.     Income and Voting Rights on Collateral

(a) Unless an LTV Ratio Triggered Early Maturity has occurred or an Event of Default has occurred and is continuing, the Pledgor shall be entitled to receive for the Pledgor's own account all cash dividends relating to the VIP Shares held as Pledged Collateral hereunder. The Collateral Agent agrees that, unless an LTV Ratio Triggered Early Maturity shall have occurred or an Event of Default shall have occurred and be continuing, it shall not give any instruction to the Securities Intermediary that would prevent the Securities Intermediary from paying over to the Pledgor any cash dividends received from VIP in relation to the VIP Shares held as Pledged Collateral hereunder. Upon receipt of any such cash dividend, the Securities Intermediary shall, subject to applicable law, remit to the Pledgor on the Business Day received or the first Payment Business Day thereafter all such cash dividends received by it except that (i) if the Securities Intermediary or its agent is required to withhold and does withhold from such cash dividend or such other cash distribution an amount on account of taxes, the amount distributed to the Pledgor shall be reduced accordingly and (ii) the Securities Intermediary is not required to make that payment until the Securities Intermediary has received from the Pledgor a notice containing details of an account that can receive that payment in the currency in which the Securities Intermediary received it. For the avoidance of doubt, any non-cash distributions in respect of the VIP Shares constituting Pledged Collateral under this Collateral Agreement shall be retained by the Securities Intermediary as Pledged Collateral in the VIP Collateral Account. Notwithstanding the second preceding sentence, if the Securities Intermediary (i) has received a notice from the Collateral Agent stating that an LTV Ratio Triggered Early Maturity has occurred or that an Event of Default has occurred and is continuing and the Collateral Agent has decided to exercise its remedies under Section 8 hereof, and (ii) has not received subsequent instructions from the Collateral Agent to the contrary, the Securities Intermediary shall not pay any cash distribution it receives in respect of VIP Shares constituting Pledged Collateral to the Pledgor and, subject to the exceptions set forth in that sentence (including having received appropriate account details from the Collateral Agent), such distributions shall be retained as Pledged Collateral in the VIP Collateral Account. If the Pledgor has received any cash distribution in respect of VIP Shares constituting Pledged Collateral that became payable after an LTV Ratio Triggered Early Maturity or Event of Default occurs, the Pledgor agrees that it will, in trust for the benefit of the Trustee, segregate those distributions from other funds of the Pledgor and forthwith pay those distributions over to the Collateral Agent. Any such payments so retained by,

15

or paid over to, the Collateral Agent shall be held by the Collateral Agent as Pledged Collateral hereunder. If any such Event of Default is no longer continuing, then the Collateral Agent shall remit, or shall instruct the Securities Intermediary to remit, to the Pledgor any such payments that are so retained by, or paid to it, on the first Payment Business Day after the Collateral Agent shall have received notice from the Trustee that such Event of Default is no longer continuing.

(b) Unless an LTV Ratio Triggered Early Maturity has occurred or an Event of Default has occurred and is continuing and the Collateral Agent has decided to exercise its remedies under Section 8 below, the Pledgor shall have the right, from time to time, to vote and to give all approvals, consents, ratifications, waivers and to do all actions other than actions prohibited herein with respect to the Pledged Collateral (including all VIP Shares). Unless the Securities Intermediary has received notice from the Collateral Agent that the Collateral Agent has decided to exercise its remedies under Section 8, (i) upon receipt from the issuer of VIP Shares or other securities constituting Pledged Collateral of notice of any meeting or solicitation of proxies or consents of holders of those securities, the Securities Intermediary shall, as soon as practicable thereafter, mail to the Pledgor a notice, the form of which notice shall be in the sole discretion of the Securities Intermediary, which shall contain (a) such information as is contained in such notice of meeting received by the Securities Intermediary, (b) a statement that the Pledgor will be entitled, subject to any applicable provision of law and of the articles of association or similar document of the issuer of those securities, to instruct the Securities Intermediary as to the exercise of the voting rights, if any, pertaining to those securities constituting Pledged Collateral and (c) a statement as to the manner in which such instructions may be given and (ii) upon the written request of the Pledgor, received on or before the date established by the Securities Intermediary for such purpose, the Securities Intermediary shall endeavor, in so far as practicable and permitted under applicable law, to vote or cause to be voted those securities constituting Pledged Collateral in accordance with the instructions set forth in such request (*provided* that such right to vote or cause to be voted such securities is not subject to a power of attorney in the form, and subject to the conditions stated, herein). If the Securities Intermediary has received notice from the Collateral Agent that an LTV Ratio Triggered Early Maturity has occurred or an Event of Default has occurred and is continuing and the Collateral Agent has decided to exercise its remedies under Section 8 hereof, the Collateral Agent shall have the rights otherwise given to the Pledgor under the preceding sentence with respect to voting of securities constituting Pledged Collateral (including all VIP Shares). In such circumstances, the Securities Intermediary shall not vote or attempt to exercise the right to vote that attaches to those securities other than in accordance with such instructions. The Securities Intermediary shall within three Business Days (A) of the first Closing Date issue a revocable power of attorney relating to 9,349,999 VIP Shares and in the form of Annex II hereto and (B) of the Additional Pledge Date issue a revocable power of attorney relating to the Additional Pledge Shares and in the form of Annex II hereto, that, in each case, shall not be revoked unless the Securities Intermediary has received notice from the Collateral Agent that the Collateral Agent has decided to exercise its remedies under Section 8 hereof. As promptly as practicable after

16

receipt of an instruction from the Collateral Agent to the effect that any Pledged Collateral consisting of VIP Shares be deposited with the Depositary pursuant to Section 4(b)(iv) hereof, and no later than at the time of the delivery of Davis Polk & Wardwell's legal opinion to the Depositary pursuant to Section 11(c) hereof, the Securities Intermediary shall give, or cause its nominee to give, notice to VIP of the revocation of such power of attorney in accordance with the terms of such power of attorney.

(c) The Collateral Agent agrees with the Pledgor that it will not: (A) originate any entitlement orders directing the Securities Intermediary not to pay over to the Pledgor cash dividends relating to the Pledged Collateral or any other entitlement order or similar instruction relating to Cash constituting Pledged Collateral, (B) direct the Securities Intermediary with respect to the voting of any financial assets credited to the VIP Collateral Account, or (C) originate any other entitlement orders in respect of any financial assets in the VIP Collateral Account or otherwise in respect of the Pledged Collateral (including entitlement orders directing disposition of any financial assets in the VIP Collateral Account) or give any approval, consent, ratification, waiver or do any other action with respect to the Pledged Collateral, in each case, unless an LTV Ratio Triggered Early Maturity shall have occurred or an Event of Default shall have occurred and be continuing and the Collateral Agent has decided to exercise its remedies under Section 8 hereof. The parties hereto agree that the agreement contained in the foregoing sentence is solely an agreement between the Collateral Agent and the Pledgor and shall not affect the obligations of the Securities Intermediary under Section 4(b).

8.    Remedies upon LTV Ratio Triggered Early Maturity or Events of Default

(a) If an LTV Ratio Triggered Early Maturity has occurred or any Event of Default shall have occurred and be continuing, the Collateral Agent may exercise on behalf of the Trustee, as agent of the Holders of the Securities, all the rights of a secured party under the UCC (whether or not in effect in the jurisdiction where such rights are exercised) and, in addition, without being required to give any notice, except as herein provided or as provided in the Indenture or as may be required by mandatory provisions of law, may sell all of the Pledged Collateral at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery, and at such price or prices as the Collateral Agent may deem satisfactory, and/or may instruct the Cash Collateral Agent to deliver any or all of the funds in the Cash Collateral Account to it towards the satisfaction of Secured Obligations. The Pledgor covenants and agrees, at the request of the Collateral Agent, to execute and deliver such documents and take such other action as the Collateral Agent deems necessary or advisable in order that any such sale may be made in compliance with law. Upon any such sale the Collateral Agent shall have the right to deliver, assign and transfer to the purchaser thereof the Pledged Collateral so sold. Each purchaser at any such sale shall hold the Pledged Collateral so sold absolutely free from any claim or right of whatsoever kind, including any equity or right of redemption of the Pledgor which may be waived, and the Pledgor, to the extent permitted by law, hereby specifically waives all rights of redemption, stay or appraisal which the Pledgor has or may have under any law now existing or hereafter

17

adopted. The notice (if any) of such sale required by Article 9 of the UCC shall (1) in case of a public sale, state the time and place fixed for such sale, (2) in case of sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Pledged Collateral, or the portion thereof so being sold, will first be offered for sale at such board or exchange, and (3) in the case of a private sale, state the day after which such sale may be consummated. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix in the notice of such sale. At any such sale the Pledged Collateral may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may determine. The Collateral Agent shall not be obligated to make any such sale pursuant to any such notice. The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned. The Pledgor acknowledges and agrees that the Collateral Agent may deposit the VIP Shares constituting Pledged Collateral hereunder with the Depositary for creation of VIP ADSs representing such VIP Shares in connection with the Collateral Agent's exercise of rights hereunder and that such deposit of VIP Shares constituting Pledged Collateral hereunder into the ADR Program shall be a commercially reasonable preparation for sale of such Pledged Collateral. In case of any sale of all or any part of the Pledged Collateral on credit or for future delivery, the Pledged Collateral so sold may be retained by the Collateral Agent until the selling price is paid by the purchaser thereof, but the Collateral Agent shall not incur any liability in case of the failure of such purchaser to take up and pay for the Pledged Collateral so sold and, in case of any such failure, such Pledged Collateral may again be sold upon like notice. The Collateral Agent, instead of exercising the power of sale herein conferred upon it, may proceed by a suit or suits at law or in equity to foreclose the security interests hereunder and sell the Pledged Collateral, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction.

(b) *Power of Attorney*. The Collateral Agent is hereby irrevocably appointed the true and lawful attorney of the Pledgor with full power and authority, in the name and stead of the Pledgor, to do all of the following: (i) upon any sale of all or any part of any Pledged Collateral made either under the power of sale given hereunder or under judgment or decree in any judicial proceedings for foreclosure or otherwise for the enforcement of this Collateral Agreement, to make all necessary deeds, bills of sale and instruments of assignment, transfer or conveyance of the property thus delivered or sold; (ii) to the extent permitted by law, to exercise, at any time upon or after the LTV Ratio Triggered Early Maturity and from time to time while an Event of Default has occurred and is continuing, all or any of the following powers with respect to all or any of the Pledged Collateral: (1) to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due upon or by virtue thereof, (2) to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto, (3) to sell, transfer, assign or otherwise deal in or with the same or the proceeds or avails thereof, as fully and effectually as if the Collateral Agent were the absolute owner thereof

18

(including, without limitation, the giving of instructions and entitlement orders in respect thereof) and (4) to extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference thereto; *provided* that the Collateral Agent shall give the Pledgor not less than one day's prior written notice of the time and place of any sale or other intended disposition of any of the Pledged Collateral, except any Pledged Collateral that threatens to decline speedily in value, including, without limitation, equity securities, or is of a type customarily sold on a recognized market. The Collateral Agent and the Pledgor agree that such notice constitutes "reasonable authenticated notification" within the meaning of Section 9–611 of the UCC. The grant of the foregoing power of attorney shall not be deemed to be a grant of a power of attorney to vote or grant proxies with respect to any VIP Shares. For such purposes the Collateral Agent may execute all necessary documents and instruments and may instruct the Securities Intermediary in the name and on behalf of the Pledgor. This power of attorney shall be deemed coupled with an interest, and the Pledgor hereby ratifies and confirms all that its attorneys acting under such power, or such attorneys' successors or agents, shall lawfully do so by virtue of this Collateral Agreement. If so requested by the Collateral Agent, by the Trustee or by any purchaser of the Pledged Collateral or a portion thereof, the Pledgor shall further ratify and confirm any such sale by executing and delivering to the Collateral Agent, to the Trustee or to such purchaser or purchasers at the expense of the Pledgor all proper deeds, bills of sale, instruments of assignment, conveyance of transfer and releases as may be designated in any such request. The Pledgor's obligations and authorizations hereunder shall not be terminated by operation of law or the occurrence of any event whatsoever, including the death or disability of the Pledgor, or the occurrence of any other event.

(c) *Application of Collateral and Proceeds*. Upon or after the LTV Ratio Triggered Early Maturity or in case an Event of Default shall have occurred and be continuing, the Collateral Agent may proceed to realize upon the security interest under this agreement or the Cash Collateral Assignment in the Collateral against any one or more of the types of Collateral, at any one or more times, as the Collateral Agent shall determine in its sole discretion subject to the foregoing provisions of this Section 8. The proceeds of any sale of, or other realization upon, or other receipt from, any of the Pledged Collateral remaining after delivery to the Trustee pursuant to this Section 8 and any funds delivered to the Collateral Agent by the Cash Collateral Agent pursuant to Clause 10 of the Cash Collateral Assignment shall be applied by the Collateral Agent in the following order of priorities:

(i) first, to the payment to the Collateral Agent, the Cash Collateral Agent and the Securities Intermediary of the expenses of such sale or other realization, including reasonable compensation to each of the Collateral Agent, the Cash Collateral Agent and the Securities Intermediary and its agents and counsel, and all expenses, liabilities and advances incurred or made by the Collateral Agent, the Cash Collateral Agent and the Securities Intermediary in connection therewith, including brokerage fees in connection with the sale by the Collateral Agent of any Pledged Item (other than Break Funding Costs) and fees relating to the issuance of VIP ADSs representing VIP Shares, if any;

19

(ii) second, to the payment to the Trustee of any expenses incurred in connection with the LTV Ratio Triggered Early Maturity or Event of Default and such sale or other realization, including reasonable compensation to the Trustee and its agents and counsel, and all documented expenses, liabilities and advances incurred or made by the Trustee in connection therewith;

(iii) third, to the payment to the Trustee for pro rata distribution to the Holders of Securities of all tranches of an amount equal to the principal and interest due and payable under the Securities of all tranches;

(iv) fourth, to the payment of any other obligations of the Pledgor under the outstanding Securities, the Indenture, this Collateral Agreement and the Cash Collateral Assignment; and

(v) finally, if all of the obligations of the Pledgor under the outstanding Securities, the Indenture and this Collateral Agreement, including, without limitation, the obligation with respect to the fees, costs and expenses of the Collateral Agent, the Cash Collateral Agent and the Trustee, have been fully discharged or sufficient funds have been set aside by the Collateral Agent at the request of the Pledgor for the discharge thereof, any remaining proceeds shall be released to the Pledgor.

After the LTV Triggered Early Maturity Event has occurred or an Event of Default has occurred and is continuing, the Collateral Agent shall give a written notice to the Securityholders promptly upon the earlier of (i) obtaining sufficient net proceeds from the realization on the Collateral to pay in full all amounts due to the Securityholders under the Securities, the Indenture, this Collateral Agreement and the Cash Collateral Assignment or (ii) 11:00 am (UK time) on the fourteenth day (or, if such day is not a Business Day, then on the next following Business Day) following the date of occurrence of the LTV Triggered Early Maturity Event or such Event of Default setting forth the net proceeds per $1,000 principal amount of the Securities outstanding obtained by it by the date of such notice from the realization on the Collateral.

(d) *Agreement to Pay Attorneys' Fees and Expenses.* The Pledgor agrees that, upon the occurrence of an LTV Ratio Triggered Early Maturity or an Event of Default, it will pay or reimburse the Collateral Agent, the Securities Intermediary and the Trustee on demand for the reasonable expenses for the enforcement of performance or observance of any obligation or agreement on the part of the Pledgor herein contained, including the reasonable fees of attorneys employed by them. All such costs and expenses, together with all costs and expenses payable to or reimbursable to the Cash Collateral Agent under the Cash Collateral Assignment, shall be deducted from the proceeds of any sale of the Collateral in accordance with Section 8(c) hereof, and, if there is no sale of the Collateral, or such proceeds are insufficient therefor, shall be paid promptly from the Pledgor's own funds.

20

9.    The Securities Intermediary

The Securities Intermediary accepts its duties and responsibilities hereunder as agent of the Trustee on and subject to the following terms and conditions:

(a) *Performance of Duties; Force Majeure*. The Securities Intermediary undertakes to perform such duties and only such duties as are expressly set forth herein and, beyond the performance of such duties without gross negligence or willful misconduct, no implied covenants or obligations shall be read into this Collateral Agreement against the Securities Intermediary. No provision hereof shall be construed to relieve the Securities Intermediary from liability for its own grossly negligent action, grossly negligent failure to act, or its own willful misconduct, subject to the following:

(i) The Securities Intermediary may consult with counsel, and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of an action taken or suffered hereunder in good faith and in accordance with such advice or opinion of counsel.

(ii) The Securities Intermediary and its nominees shall not be liable with respect to any action taken, suffered or omitted by the Securities Intermediary in good faith (A) reasonably believed by the Securities Intermediary to be authorized or within the discretion or rights or powers conferred on it by this Collateral Agreement or (B) in accordance with any direction or request of the Collateral Agent.

(iii) The Securities Intermediary and its nominees shall not be liable for any error of judgment made in good faith by any of the officers of the Securities Intermediary or its nominees, unless the Securities Intermediary was grossly negligent in ascertaining the pertinent facts.

(iv) The Securities Intermediary and its nominees shall not be liable for any claims, losses, liabilities, damages or expenses (including attorneys' fees and expenses) due to forces beyond the reasonable control of the Securities Intermediary, including without limitation strikes, work stoppages, acts of war or terrorism, insurrection, revolution, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; *provided* that this provision shall not protect the Securities Intermediary against any liability to which it would otherwise be subject by reason of its willful misfeasance or gross negligence in the performance of its duties or by reason of its reckless disregard of its obligations and duties hereunder. In no event will the Securities Intermediary be liable for any consequential or punitive damages.

21

(v) In the absence of bad faith on its part, the Securities Intermediary may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon, and shall be protected in acting in good faith in reliance upon, any note, notice, resolution, consent, certificate, affidavit, letter, telegram, teletype message, statement, order or other document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons.

(vi) No provision of this Collateral Agreement shall require the Securities Intermediary to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(vii) In no event shall the Securities Intermediary or its nominees be personally liable for any taxes or other governmental charges imposed upon or in respect of (x) the Pledged Collateral or (y) the income or other distributions thereon.

(viii) The Securities Intermediary shall be regarded as making no representations and having no duties, responsibilities or obligations with respect to determining the validity or value of any VIP Shares, VIP ADRs or VIP ADSs evidenced thereby, or genuineness or sufficiency of other documents deposited with or delivered to it or the genuineness or sufficiency of any signature or endorsement set forth on or in connection with such documents.

(ix) The Securities Intermediary and its nominees shall not be obligated or required to commence, or voluntarily participate in, any suit, action or proceeding arising under or related to this Collateral Agreement that in the Securities Intermediary's judgment might involve any expense or liability unless the Securities Intermediary shall have been furnished with indemnity reasonably satisfactory to the Securities Intermediary and, for the avoidance of doubt, the Securities Intermediary shall provide notice of such proceedings to the Pledgor.

(x) Except as otherwise provided in this Collateral Agreement, the Securities Intermediary may perform any duties under this Collateral Agreement either directly or by or through (i) agents or subagents and the Securities Intermediary shall not be responsible for the performance, non-performance or other acts or omissions on the part of those agents or subagents except to the extent that the Securities Intermediary would be responsible under this Collateral Agreement if it had performed its duties directly, or (ii) nominees, correspondents, designees, custodians, subcustodians or other contracts or service providers and the Securities Intermediary shall not be responsible for the performance, non-performance or other acts or omissions on the part of those

nominees, correspondents, designees, depositories, custodians, subcustodians or other contractors or service providers appointed or otherwise engaged with due care by it, *provided* that the Securities Intermediary shall account to the Pledgor for any recoveries or compensation it obtains from such service providers in compensation for any losses suffered by the Pledgor as a result of the acts or omissions of such service providers;

(xi) The Securities Intermediary is hereby authorized and directed to accept instructions with respect to the performance of its duties hereunder from the Collateral Agent or the Trustee, and to apply to the Collateral Agent or the Trustee, for advice or instructions in connection with its duties hereunder, and the Securities Intermediary shall not be liable for any delay in acting while waiting for those instructions, *provided* that the Collateral Agent and Trustee may only provide such instructions as are permitted by this Agreement and the Indenture. Any applications by the Securities Intermediary for written instructions from the Collateral Agent or the Trustee may, at its option, set forth in writing any action proposed to be taken or omitted by it under this Collateral Agreement and the date on or after which such action shall be taken or such omission shall be effective. The Securities Intermediary and its nominees shall not be liable for any action taken by, or omission of, the Securities Intermediary in accordance with a proposal included in such application on or after the date specified in such application (which date shall not be less than two Business Days after the date such application is sent to the Collateral Agent or the Trustee, unless the Collateral Agent or the Trustee shall have consented in writing to any earlier date) unless, prior to taking any such action, it shall have received written instructions in response to such application specifying the action to be taken or omitted.

(xii) The Securities Intermediary may perform any duties hereunder either directly or by or through its nominees, correspondents, designees, agents, subagents or subcustodians or other service providers, and the Securities Intermediary shall not be responsible for any misconduct or negligence on the part of any nominee, correspondent, designee, agent, subagent or subcustodian or other service provider appointed or engaged with due care by it.

(xiii) *Indemnification.* The Pledgor shall indemnify the Securities Intermediary, its officers, employees, agents and nominees for, and hold the Securities Intermediary and its officers, employees, agents and nominees harmless against, any loss, liability or expense (including the reasonable costs and expenses of defending against any claims of liability) arising out of or in connection with the Securities Intermediary's acting as the Securities Intermediary hereunder, except such loss, liability or expense with respect to which the Securities Intermediary (or such officer, employee or agent, as the case may be) would not be relieved of liability under Section 9(a)(iv) hereof, *provided* that the Securities Intermediary shall not settle any lawsuit or claim without the

23

consent of the Pledgor, which consent shall not be unreasonably withheld. The obligation of the Pledgor under this Section 9(a)(xiii) shall survive the termination of this Collateral Agreement and the resignation or removal of the Securities Intermediary.

(b) *Merger*. Any corporation or association into which the Securities Intermediary may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer its corporate trust and agency business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which it is a party, shall, subject to the prior written consent of the Trustee, be and become a successor Securities Intermediary hereunder and vested with all of the powers, discretions, immunities, privileges and other matters as was its predecessor without, except as provided above, the execution or filing of any instrument or any further act, deed or conveyance on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

(c) *Holder of Record of VIP Shares Constituting Pledged Collateral*. The Securities Intermediary shall, at all times, use its reasonable best efforts to hold the VIP Shares constituting Pledged Collateral hereunder such that the record holder of those VIP Shares shall be at all the times the same legal entity as is then acting as ADR Program Custodian (including, without limitation, upon receipt of notice from the Depositary pursuant to Section 11(b) of a change of the ADR Program Custodian, in which case the Securities Intermediary shall use its reasonable best efforts so that the re–registration on the shareholders register of VIP of the VIP Shares underlying the VIP ADRs and the VIP Shares constituting Pledged Collateral occurs simultaneously). The Securities Intermediary shall not remove any legal entity as is then acting as Custodian hereunder unless, prior to such removal, the Securities Intermediary shall have used its reasonable best efforts to make arrangements for the simultaneous re–registration on the shareholders register of VIP of, respectively, the VIP Shares underlying the ADR Program and the VIP Shares constituting Pledged Collateral hereunder in the name of the same legal entity that shall be the new Custodian and the new ADR Program Custodian. In case the Securities Intermediary receives notice of the resignation of any legal entity as is then acting as Custodian hereunder, the Securities Intermediary shall use its reasonable best efforts to make arrangements for the simultaneous re–registration on the shareholders register of VIP of, respectively, the VIP Shares underlying the ADR Program and the VIP Shares constituting Pledged Collateral hereunder in the name of the same legal entity that shall be the new Custodian and the new ADR Program Custodian. If, notwithstanding its reasonable best efforts, the Securities Intermediary is unable to hold VIP Shares constituting Pledged Collateral hereunder such that the record holder of those VIP Shares shall be at all the times the same legal entity as is then acting as ADR Program Custodian, the Securities Intermediary shall provide the Collateral Agent with notice of that development as soon as practicable.

(d) *Removal*. The Securities Intermediary may be removed if The Bank of New York ceases to be the Depositary by an instrument or concurrent instruments in

24

writing delivered to the Securities Intermediary, the Collateral Agent and the Pledgor and signed by the Trustee. Such removal shall take effect upon the appointment of a successor Securities Intermediary by the Trustee which shall be the same entity that acts as the Depositary and that institution's acceptance of that appointment. The removal of the Securities Intermediary or any successor Securities Intermediary shall not affect its rights hereunder, including without limitation, the rights under Sections 9(a)(xiii) and 9(h) hereof.

(e) *Notices.* The Securities Intermediary shall give notice to the Pledgor and the Collateral Agent as soon as practicable after it becomes aware of the occurrence of any of the following events: (i) the failure at any time of VIP Shares constituting Pledged Collateral hereunder to appear on the shareholders register of VIP as being held of record by the same legal entity as is then acting as Custodian hereunder and as ADR Program Custodian, (ii) its decision to resign as Securities Intermediary hereunder, which notice shall be given not less than 90 days prior to the effective date of such resignation, (iii) its decision to remove any legal entity as is then acting as Custodian hereunder, (vi) its receipt of notice from any legal entity as is then acting as Custodian of its resignation as Custodian hereunder, (v) the failure of the Pledged Collateral to include at any time at least the number of VIP Shares required to be delivered pursuant to Section 1(b) plus any Additional Pledge Shares delivered pursuant to Section 1(d) (or, in case of any stock splits or combinations, such greater or lesser number as results therefrom), and (vi) any action taken or to be taken by it in compliance with the requirements of Section 9(c) or 9(d), as the case may be.

(f) *Appointment of Successor.* (1) If the Securities Intermediary hereunder shall resign or be removed, or be dissolved or shall be in the course of dissolution or liquidation or otherwise become incapable of action hereunder, or if it shall be taken under the control of any public officer or officers or of a receiver appointed by a court, a successor may be appointed by the Trustee (with the consent of the Pledgor (which shall not be unreasonably withheld) provided that no LTV Triggered Early Maturity Event has occurred and no Event of Default has occurred and is continuing) by an instrument or concurrent instruments in writing signed by the Trustee or by its attorneys in fact fully authorized. A copy of such instrument or concurrent instruments shall be sent by registered mail to the Pledgor, the Collateral Agent and the Securities Intermediary; (2) Every such temporary or permanent successor Securities Intermediary appointed pursuant to the provisions hereof shall be the same entity that acts as the Depositary.

(g) *Acceptance by Successor.* Every successor Securities Intermediary appointed hereunder shall execute, acknowledge and deliver to its predecessor and also to the Pledgor an instrument in writing accepting such appointment hereunder, whereupon such successor, without any further act, deed or conveyance, shall become fully vested with all the estates, properties, rights, powers, duties and obligations of its predecessors. Such predecessor shall, nevertheless, on the written request of its successor or the Pledgor, execute and deliver an instrument transferring to such successor all the estates, properties, rights and powers of such predecessor hereunder. Every predecessor

25

Securities Intermediary shall deliver all Pledged Collateral held by it as the Securities Intermediary hereunder to its successor. Should any instrument in writing from the Pledgor be reasonably required by a successor Securities Intermediary for more fully and certainly vesting in such successor the estates, properties, rights, powers, duties and obligations hereby vested or intended to be vested in the predecessor, any and all such instruments in writing shall, at the request of the successor Securities Intermediary, be forthwith executed, acknowledged and delivered by the Pledgor at its sole cost and expense.

(h) *Compensation and Reimbursement*. The Pledgor agrees: (i) to pay to the Securities Intermediary from time to time compensation for all services rendered by it hereunder in accordance with agreements in writing between the Pledgor and the Securities Intermediary (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust); and (ii) to reimburse the Securities Intermediary upon its request for all reasonable expenses, disbursements and advances reasonably incurred or made by Securities Intermediary in accordance with any provision of this Collateral Agreement (including the reasonable compensation, fees, expenses and disbursements of its agents, accountants and counsel), except any expense, disbursement or advances with respect to which the Securities Intermediary would not be relieved of liability under Section 9(a)(iv) hereof.

10.   The Collateral Agent

The Collateral Agent accepts its duties and responsibilities hereunder as agent for the Trustee, on and subject to the following terms and conditions:

(a) *Performance of Duties; Force Majeure*. The Collateral Agent undertakes to perform such duties and only such duties as are expressly set forth herein and, beyond the exercise of reasonable care in the performance of such duties, no implied covenants or obligations shall be read into this Collateral Agreement against the Collateral Agent. No provision hereof shall be construed to relieve the Collateral Agent from liability for its own grossly negligent action, grossly negligent failure to act, recklessness or its own willful misconduct, subject to the following:

(i) The Collateral Agent may consult with counsel, and the advice or opinion of such counsel that it is acting in accordance with this Indenture or this Collateral Agreement shall be full and complete authorization and protection in respect of an action taken or suffered hereunder in good faith and in accordance with such advice or opinion of counsel.

(ii) The Collateral Agent shall not be liable with respect to any action taken, suffered or omitted by it in good faith (A) reasonably believed by it to be authorized or within the discretion or rights or powers conferred on it by this Collateral Agreement or (B) in accordance with any direction or request of the Trustee provided that the Collateral Agent reasonably believes that the Trustee is acting in accordance with the Indenture.

26

(iii) The Collateral Agent shall not be liable for any error of judgment made in good faith by any of its officers, unless the Collateral Agent was grossly negligent in ascertaining the pertinent facts.

(iv) The Collateral Agent shall not be liable for any claims, losses, liabilities, damages or expenses (including attorneys' fees and expenses) due to forces beyond the reasonable control of the Collateral Agent, including without limitation strikes, work stoppages, acts of war or terrorism, insurrection, revolution, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; *provided* that this provision shall not protect the Collateral Agent against any liability to which it would otherwise be subject by reason of its willful misfeasance, bad faith or gross negligence in the performance of its duties or by reason of its reckless disregard of its obligations and duties hereunder.

(v) In the absence of bad faith on its part, the Collateral Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any note, notice, resolution, consent, certificate, affidavit, letter, telegram, teletype message, statement, order or other document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons.

(vi) No provision of this Collateral Agreement shall require the Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(vii) The Collateral Agent may perform any duties hereunder either directly or by or through agents or attorneys, and the Collateral Agent shall not be responsible for any willful misconduct or gross negligence on the part of any agent or attorney that is not a subsidiary or affiliate of the Collateral Agent and that is appointed with due care by it hereunder. In furtherance thereof, any subsidiary owned or controlled by the Collateral Agent, or its successors, as agent for the Collateral Agent, may perform any or all of the duties of the Collateral Agent relating to the valuation of securities and other instruments constituting Collateral hereunder.

(viii) In no event shall the Collateral Agent be personally liable for any taxes or other governmental charges imposed upon or in respect of (x) the Collateral or (y) the income or other distributions thereon.

(ix) *Indemnification*. The Pledgor shall indemnify the Collateral Agent, its officers, employees and agents for, and hold the Collateral Agent and its officers, employees and agents harmless against, any loss, liability or expense

27

(including the reasonable costs and expenses of defending against any claims of liability) arising out of or in connection with the Collateral Agent's acting as the Collateral Agent hereunder, except such loss, liability or expense with respect to which the Collateral Agent (or such officer, employee or agent, as the case may be) would not be relieved of liability under Section 10(a)(iv) hereof provided that the Collateral Agent shall not settle any lawsuit or claim without the consent of the Pledgor. The obligation of the Pledgor under this Section 10(a)(ix) shall survive the termination of this Collateral Agreement and the resignation or removal of the Collateral Agent. The Collateral Agent shall be under no obligation to exercise any of the rights, powers, duties or obligations vested in or placed upon it by this Collateral Agreement at the request or direction of the Pledgor, unless the Pledgor shall have provided to the Collateral Agent security and/or indemnity, reasonably satisfactory to the Collateral Agent, against the costs, expenses and liabilities which it may reasonably expect to incur and liabilities which it may reasonably expect to incur in compliance with such request or direction.

The Collateral Agent shall not be responsible for the correctness of the recitals and statements herein which are made by the Pledgor or for any statement or certificate delivered by the Pledgor pursuant hereto. Except as specifically provided herein, the Collateral Agent shall not be responsible for the validity, sufficiency, collectibility or marketability of any Pledged Collateral given to or held by it hereunder or for the validity or sufficiency of the Indenture, the Securities or the Lien on the Pledged Collateral purported to be created hereby.

(b) *Knowledge*. The Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until a Responsible Officer of the Collateral Agent shall have actual knowledge thereof or shall have received written notice thereof.

(c) *Merger*. Any corporation or association into which the Collateral Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer its agency business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which it is a party, shall, subject to the prior written consent of the Trustee, be and become a successor Collateral Agent hereunder and vested with all of the title to the Pledged Collateral and all of the powers, discretions, immunities, privileges and other matters as was its predecessor without, except as provided above, the execution or filing of any instrument or any further act, deed or conveyance on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

(d) *Resignation*. The Collateral Agent and any successor Collateral Agent may at any time resign by giving 30 days' written notice by registered or certified mail to the Pledgor and notice to the Trustee and the Securities Intermediary in accordance with the provisions of Section 13(c) hereof. Such resignation shall take effect upon the appointment of a successor Collateral Agent by the Trustee. Resignation by the Collateral Agent or any successor Collateral Agent shall not affect its rights hereunder, including without limitation, the rights under Sections 10(a)(ix) and 10(h) hereof.

28

(e) *Removal*. The Collateral Agent may be removed at any time by an instrument or concurrent instruments in writing delivered to the Collateral Agent and to the Pledgor and signed by the Trustee and notice to the Securities Intermediary in accordance with the provisions of Section 13(c) hereof. Such removal shall take effect upon the appointment of a successor Collateral Agent by the Trustee. The removal of the Collateral Agent or any successor Collateral Agent shall not affect its rights hereunder, including without limitation, the rights under Sections 10(a)(ix) and 10(h) hereof.

(f) *Appointment of Successor*. (i) If the Collateral Agent hereunder shall resign or be removed, or be dissolved or shall be in the course of dissolution or liquidation or otherwise become incapable of action hereunder, or if it shall be taken under the control of any public officer or officers or of a receiver appointed by a court, a successor may be appointed by the Trustee (with the consent of the Pledgor (which shall not be unreasonably withheld) provided that no LTV Triggered Early Maturity Event has occurred and no Event of Default has occurred and is continuing) by an instrument or concurrent instruments in writing signed by the Trustee or by its attorneys in fact fully authorized. A copy of such instrument or concurrent instruments shall be sent by registered mail to the Pledgor and the Securities Intermediary; (ii) Every such temporary or permanent successor Collateral Agent appointed pursuant to the provisions hereof shall be a trust company or bank in good standing, having a reported capital and surplus of not less than $100,000,000 and capable of holding the Pledged Collateral in the State of New York, if there be such an institution willing, qualified and able to accept the duties of the Collateral Agent hereunder upon customary terms.

(g) *Acceptance by Successor*. Every temporary or permanent successor Collateral Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and also to the Pledgor an instrument in writing accepting such appointment hereunder, whereupon such successor, without any further act, deed or conveyance, shall become fully vested with all the estates, properties, rights, powers, duties and obligations of its predecessors. Such successor Collateral Agent shall give notice of its acceptance of the appointment to the Securities Intermediary in accordance with the provisions of Section 13(c) hereof. Such predecessor shall, nevertheless, on the written request of its successor or the Pledgor, execute and deliver an instrument transferring to such successor all the estates, properties, rights and powers of such predecessor hereunder. Every predecessor Collateral Agent shall deliver all Pledged Collateral held by it as the Collateral Agent hereunder to its successor. Should any instrument in writing from the Pledgor be reasonably required by a successor Collateral Agent for more fully and certainly vesting in such successor the estates, properties, rights, powers, duties and obligations hereby vested or intended to be vested in the predecessor, any and all such instruments in writing shall, at the request of the temporary or permanent successor Collateral Agent, be forthwith executed, acknowledged and delivered by the Pledgor.

29

(h) *Compensation and Reimbursement.* The Pledgor agrees: (i) to pay to the Collateral Agent from time to time reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust); and (ii) to reimburse the Collateral Agent upon its request for all reasonable expenses, disbursements and advances reasonably incurred or made by the Collateral Agent in accordance with any provision of this Collateral Agreement (including the reasonable compensation, fees, expenses and disbursements of its agents, accountants and counsel), except any expense, disbursement or advances with respect to which the Collateral Agent would not be relieved of liability under Section 10(a)(iv) hereof.

11.    The Depositary

(a) *Representations and Warranties of the Depositary.* The Depositary hereby represents and warrants to the Collateral Agent and the Trustee that:

(i) The Deposit Agreement in respect of the ADR Program is in effect as of the date of this Collateral Agreement, and until the date hereof the Depositary has not received any direction from VIP to terminate the Deposit Agreement.

(ii) To the best of the Depositary's knowledge, no permits, licenses, consents or authorizations were obtained with respect to the establishment of the ADR Program or the organization of circulation of VIP Shares (including in the form of securities of foreign issuers under foreign law certifying rights to Russian securities) from the securities market regulator of the Russian Federation.

(b) *Custodian under the ADR Program.* If the Depositary determines to remove any legal entity as is then acting as ADR Program Custodian, it shall notify the Securities Intermediary as promptly as practicable of that fact and as to the alternative custodial arrangements it intends to make for the ADR Program and the anticipated timing of that change. In case the Depositary receives notice of the resignation of any legal entity as is then acting as ADR Program Custodian, the Depositary shall notify the Securities Intermediary as promptly as practicable of that fact and as to the alternative custodial arrangements it intends to make for the ADR Program and the anticipated timing of that change.

(c) *Deposit of VIP Shares Constituting Pledged Collateral under ADR Program.* Upon receipt of (i) VIP Shares constituting Pledged Collateral hereunder from the Securities Intermediary for deposit in accordance with the Deposit Agreement in respect of the ADR Program pursuant to Section 4(b)(iv) hereof, (ii) Davis Polk & Wardwell's written legal opinion substantially in the form attached as Annex I hereto, (iii) a certificate executed by each Holder at that time of the Securities to the effect that such Holder is not, and has not been within the preceding three months, an "affiliate" (within the meaning of Rule 144 under the Securities Act of 1933, as amended) of VIP,

30

(iv) the fees and expenses of the Depositary and payment of any applicable taxes and governmental charges as provided in the Deposit Agreement, the Depositary shall, as promptly as practicable, accept those VIP Shares for such deposit and deliver VIP ADRs in respect of that deposit or to the order of the Collateral Agent unless (x) the ADR Program is not at the time open for deposits of VIP Shares or (y) the Depositary has reason to believe that deposit of such VIP Shares or issuance of VIP ADSs in respect of such VIP Shares would violate any law or governmental regulation.

(d) *Notices.* The Depositary shall give notice to the Pledgor and the Collateral Agent as promptly as practicable upon the occurrence of any of the following events: (i) its receipt of notice from VIP of its removal as Depositary under the ADR Program, (ii) its decision to resign as Depositary in respect of the ADR Program, (iii) its decision to remove any legal entity as is then acting as ADR Program Custodian, (iv) its receipt of notice from any legal entity as is then acting as ADR Program Custodian of its resignation as ADR Program Custodian, (v) the ADR Program not being open for deposits of VIP Shares; *provided* that such notice shall not be required if the closure is due to legal holidays; and *provided further* that such notice will be provided at the time when it is provided generally to ADR market participants, (vi) the Depositary having reason to believe that deposit of the VIP Shares constituting Pledged Collateral hereunder or issuance of VIP ADSs in respect of those VIP Shares to or to the order of the Collateral Agent would violate any law or governmental regulation; *provided* that the Depositary is under no obligation to investigate any laws or governmental regulations that might be applicable or (vii) the inability to accept for deposit under the ADR Program, at one time, VIP Shares representing more than 45 million VIP ADSs (such number to be adjusted for any stock splits or combinations or adjustments to the current exchange ratio of one VIP Share to four VIP ADS).

12.   Amendment

(a) *Amendment Without Consent of Holders.* Without the consent of any Holders, the Pledgor, the Collateral Agent, the Securities Intermediary, the Depositary and the Trustee may, at any time and from time to time, amend this Collateral Agreement, in form satisfactory to the Pledgor, the Collateral Agent, the Securities Intermediary and the Trustee, to:

(i) evidence the succession of another Person to the Pledgor and the assumption by any such successor of the covenants of the Pledgor;

(ii) evidence and provide for the acceptance of appointment hereunder by a successor Collateral Agent, Securities Intermediary or Trustee;

(iii) add to the covenants of the Pledgor for the benefit of the Holders, or surrender any right or power herein conferred upon the Pledgor, *provided* such covenants or such surrender do not adversely affect the validity, perfection or priority of the Lien created hereunder; or

31

(iv) cure any ambiguity (or formal defect), correct or supplement any provisions herein which may be inconsistent with any other such provisions herein, or make any other provisions with respect to such matters or questions arising under this Collateral Agreement, *provided* such action shall not adversely affect the interests of the Holders in any material respect.

(b) *Amendment With Consent of Holders.* With the consent of the Holders of not less than a majority in aggregate principal amount of the Securities at the time outstanding, the Pledgor, the Trustee, the Collateral Agent, the Depositary and the Securities Intermediary may amend this Collateral Agreement for the purpose of modifying in any manner the provisions of this Collateral Agreement; *provided, however,* that no such amendment shall, without the unanimous consent of the Holders of each outstanding Security:

(i) change the amount or type of Pledged Collateral required to be pledged or cash required to be transferred to the Cash Collateral Account subject to Section 1(a) to secure the Pledgor's performance under the Securities, unless such change is not adverse to the Holders; or

(ii) otherwise effect any action that would require the consent of the Holder of each outstanding Security affected thereby pursuant to the Indenture if such action were effected by a modification or amendment of the provisions of the Indenture; or

(iii) reduce the aggregate principal amount of Securities the consent of whose Holders is required for the modification or amendment of the provisions of this Collateral Agreement;

It shall not be necessary for the Holders under this Section to approve the particular form of any proposed amendment, but it shall be sufficient if the Holders shall approve the substance thereof.

(c) *Execution of Amendments.* In executing any amendment permitted by this Section, the Collateral Agent and the Trustee shall be entitled to receive and (subject to Section 5.01 of the Indenture with respect to the Trustee) shall be fully authorized and protected in relying upon, an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Collateral Agreement and that all conditions precedent, if any, to the execution and delivery of such amendment have been satisfied. The Collateral Agent, the Trustee, the Depositary and the Securities Intermediary may, but shall not be obligated to, enter into any such amendment which affects their own respective rights, duties or immunities under this Collateral Agreement or otherwise.

(d) *Effect of Amendments.* Upon the execution of any amendment under this Section, this Collateral Agreement shall be modified in accordance therewith, and such amendment shall form a part of this Collateral Agreement for all purposes; and every Holder of Securities theretofore or thereafter authenticated, executed on behalf of the Holders and delivered under the Indenture shall be bound thereby.

32

13.  <u>Miscellaneous</u>

(a) *Benefit of Agreement; Successors and Assigns*. Whenever any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party. All the covenants and agreements herein contained by or on behalf of the Pledgor and the Collateral Agent shall bind, and inure to the benefit of, their respective successors and assigns whether so expressed or not, and shall be enforceable by and inure to the benefit of the Trustee and its successors and assigns.

(b) *Separability*. To the extent permitted by law, the unenforceability or invalidity of any provision or provisions of this Collateral Agreement shall not render any other provision or provisions herein contained unenforceable or invalid.

(c) *Notices.*

(i) Any notice provided for herein, unless otherwise specified, shall be in writing (including transmittals by telex or telecopier) and shall be given to a party at the address or addresses, as applicable, set forth opposite such party's name on the signature pages hereto or at such other address as may be designated by notice duly given in accordance with this Section (c) to each other party hereto.

(ii) Each such notice given pursuant to paragraph (i) shall be effective (A) if sent by certified mail (return receipt requested), 72 hours after being deposited in the mail, postage prepaid; (B) if given by telex or telecopier, when such telex or telecopied notice is transmitted; or (C) if given by any other means, when delivered at the address specified in this Section (c).

(iii) Notwithstanding the foregoing, notices delivered pursuant to Section 1(c) shall be delivered in the manner set out in Section 1(c)(iv).

(d) *Governing Law*. This Collateral Agreement shall in all respects be construed in accordance with and governed by the laws of the State of New York, without giving effect to the conflicts of law provisions thereof (other than Section 5–1401 of the General Obligations Law of the State of New York, which is expressly made applicable hereto); *provided* that as to Pledged Items located in any jurisdiction other than the State of New York, the Collateral Agent on behalf of the Trustee, shall have all of the rights to which a secured party is entitled under the laws of such other jurisdiction. The parties hereto hereby agree that the securities intermediary's jurisdiction (within the meaning of Section 8–110(e) of the UCC) in respect of the VIP Collateral Account is the State of New York.

33

(e) *Counterparts.* This Collateral Agreement may be executed, acknowledged and delivered in any number of counterparts and such counterparts taken together shall constitute one and the same instrument.

(f) *Jurisdiction and Arbitration.*

(i) All disputes arising out of or in connection with this Collateral Agreement (each such dispute, a "Dispute") shall be referred to and finally settled by arbitration under the Rules of Arbitration (the "ICC Rules") of the International Chamber of Commerce ("ICC"), which Rules are deemed to be incorporated by reference into this clause. The language of the arbitration shall be English. The parties hereby expressly agree that any dispute which arises out of or in connection with this Collateral Agreement will necessarily require resolution as a matter of exceptional urgency. The arbitration proceedings shall be conducted in New York, by a tribunal of three arbitrators and New York shall be the seat of the arbitration. Each party is to appoint one arbitrator. The chairman shall be an arbitrator selected by agreement of the two party appointed arbitrators. If the two party appointed arbitrators are unable to agree upon a chairman, the chairman shall be appointed by the Court of Arbitration of the ICC in accordance with Article 9 of the ICC Rules. If there are more than two parties to the dispute, the arbitrators shall be selected in accordance with Article 10 of the ICC Rules. The arbitration tribunal shall determine any Dispute in accordance with the laws of the State of New York. The parties to this Collateral Agreement agree that any decision of the arbitral tribunal shall be conclusive, binding and enforceable in any court of competent jurisdiction.

(ii) The parties to this Collateral Agreement hereby waive any right to refer such dispute or controversy to any other forum or tribunal, with the exception of the jurisdiction of a competent court in New York to grant equitable relief necessary to preserve any party's rights and remedies under this Collateral Agreement, until such time as an arbitral tribunal has been selected and arbitration proceedings before such tribunal can commence. No court other than a court of competent jurisdiction in New York shall have jurisdiction to hear any Dispute among any of the parties to this Collateral Agreement. The arbitral tribunal shall be entitled to grant injunctive or other equitable relief to prevent breaches of this Collateral Agreement or to enforce specifically the performance or the terms and provisions hereof. To the fullest extent it may effectively do so under applicable law, each party hereto irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

34

(g) *WAIVER OF JURY TRIAL.* TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO HEREBY WAIVE AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS COLLATERAL AGREEMENT OR THE SUBJECT MATTER HEREOF, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR TORT OR OTHERWISE. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTY HERETO THAT THE PROVISIONS OF THIS SECTION CONSTITUTE A MATERIAL INDUCEMENT UPON WHICH SUCH OTHER PARTY HERETO HAS RELIED, IS RELYING AND WILL RELY IN ENTERING INTO THIS COLLATERAL AGREEMENT AND ANY DOCUMENT RELATED THERETO. EACH PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTY HERETO TO THE WAIVER OF ITS RIGHTS TO TRIAL BY JURY.

(h) The Trustee hereby instructs the Collateral Agent to release the Escrowed Assets (as defined in the Escrow Agreement) in accordance with the Escrow Agreement whenever such a release is permitted under Section 3.10 of the Indenture.

14.    Termination of Collateral Agreement

This Collateral Agreement and the rights hereby granted by the Pledgor in the Pledged Collateral shall cease and terminate upon fulfillment of all of the obligations of the Pledgor under all outstanding Securities, and under the Indenture and this Collateral Agreement and the Pledgor shall have no further liability or obligation hereunder upon such termination. Any Pledged Collateral remaining at the time of such termination shall be fully released and discharged from the Lien hereof and delivered to the Pledgor by the Collateral Agent, accompanied by such documents of termination and release as the Pledgor may reasonably request, all at the expense of the Pledgor. If at any time any payment under the Securities, the Indenture or this Collateral Agreement is rescinded or must be otherwise restored or returned upon the insolvency or receivership of the Issuer, the security interest in the Pledged Collateral shall be reinstated with respect thereto as though such payment had been due but not made at such time. Upon the earlier of (i) the termination of this Collateral Agreement or (ii) the later of (A) the 31st day after an initial sale of any Pledged Collateral by the Collateral Agent pursuant to Section 8 hereof or (B) if the Collateral Agent is prevented from being able to exercise its remedies under Section 8 hereof as a result of legal proceedings having been brought in any jurisdiction, then the Collateral Agent shall on the 11th Business Day after the day as of which the Collateral Agent is no longer so prevented from being able to exercise its remedies under Section 8 hereof, or within three Business Days after the date of the occurrence of either (i) or (ii)(A) hereunder provide a written instruction to The Bank of New York in its capacity as escrow agent under the Escrow Agreement to release the Escrowed Assets (as defined in the Escrow Agreement) in accordance with the instructions of the Pledgor or to apprise the collateral agent in any Permitted Financing Transaction thereof, as the case may be.

35

IN WITNESS WHEREOF, each of the Pledgor, the Collateral Agent and the Trustee has caused this Collateral Agreement to be duly executed on its behalf as of the date first above written.

ECO TELECOM LIMITED,
as Pledgor

By:    /s/ Marina Kushnareva
Name: Marina Kushnareva
Title:   Authorized Director

Address for Notices:

Suite 2
4 Irish Palace
Gibraltar
Attention: Franz Wolf
Telephone: +350 41981
Facsimile: +350 41988
Email: ctfh@ctfh.gi

*With a copy to:*
Facsimile: +7495 981 4448

DEUTSCHE BANK AG LONDON BRANCH,
as Collateral Agent

By:     /s/ Andrew Dixon–Smith
Name: Andrew Dixon–Smith
Title:  Legal Counsel


By:     /s/ Colin Greene
Name: Colin Greene
Title:  Managing Director


Address for Notices:
Deutsche Bank AG London Branch
Winchester House
1 Great Winchester Street
London EC2N 2DB


Fax: +44 207 547 0953
Attention: Colin Greene or Head of Global Markets Equities –
Structuring – Strategic Transactions
Email: Colin.Greene@db.com


With a copy to:
Deutsche Bank AG London Branch
Winchester House
1 Great Winchester Street
London
EC2N 2DB
Fax: +44 207 545 4437
Attention: Head of Equities Legal Team

DEUTSCHE INTERNATIONAL CORPORATE SERVICES
LIMITED,
as Trustee

By:    /s/ Mark A. Rumbold
Name: Mark A. Rumbold
Title:  Authorized Signatory

By:    /s/ James Saout
Name: James Saout
Title:  Authorized Signatory

Address for Notices:
Deutsche International Corporate Services Limited
St. Paul's Gate
New Street
St. Helier
Jersey
JE4 8ZB

Fax: +44 (0) 1534 889 884
Attention: Louise Holmes or Senior Transaction Manager

THE BANK OF NEW YORK,
as Securities Intermediary

By:    /s/ Dario Parente
Name: Dario Parente
Title:  Vice President

Address for Notices:
The Securities Intermediary
The Bank of New York
One Canada Square
London E14 5AL
Attention: Corporate Trust Administration
Telephone +44 20 7964 6402
Fax: +44 20 7964 6399

IN WITNESS solely of the provisions of Section 11 of this Collateral Agreement, the Depositary has caused this Collateral Agreement to be duly executed on its behalf as of the date first above written.

THE BANK OF NEW YORK,
as Depositary

By:    /s/ Michael Finck
Name: Michael Finck
Title:  Managing Director

Address for Notices:
The Bank of New York
101 Barclay Street
New York
New York 10286
Attention: ADR Administration
Facsimile: 1–212–571–3050

[SCHEDULES, ANNEXES AND EXHIBITS INTENTIONALLY OMITTED]

Exhibit 99.3

**ESCROW AGREEMENT**

**Eco Telecom Limited,** as Issuer

and

**Deutsche Bank AG London Branch,**
as Collateral Agent in connection with the Series A Floating Rate Bonds

and

**Altimo Holdings & Investments Limited,** as Guarantor

and

**The Bank of New York,** as Escrow Agent

Dated as of

March 9, 2007

THIS ASSET ESCROW AGREEMENT dated as of March 9, 2007 (the "Escrow Agreement"), is entered into by and among Eco Telecom Limited, a Gibraltar Company (the "Issuer"), Deutsche Bank AG London Branch, as collateral agent in connection with the Series A Floating Rate Bonds (the "Series A Collateral Agent"), Altimo Holdings & Investments Limited, a British Virgin Islands company (the "Guarantor"), and The Bank of New York, as escrow agent (in such capacity, together with its successors in such capacity, the "Escrow Agent").

WITNESSETH:

WHEREAS, the Issuer has agreed to issue Tranche 1 of its Series A Floating Rate Bonds in an aggregate principal amount of $1,500,000,000 pursuant to the indenture dated as of the date hereof (the "Series A Indenture") between the Issuer, as issuer, Deutsche International Corporate Services Limited, as trustee, the Guarantor, as guarantor, and Deutsche Bank AG London Branch, as calculation agent;

WHEREAS, the Issuer has granted a security interest on certain shares of common stock, 0.005 rubles nominal value per share of Open Joint Stock Company "Vimpel-Communications" ("VIP") or security entitlements in respect thereof ("VIP Common Shares") pursuant to a Collateral Agreement dated as of the date hereof (the "Series A Collateral Agreement"), between the Issuer, as pledgor, Deutsche Bank AG London Branch, as Collateral Agent (the "Series A Collateral Agent"), The Bank of New York, as securities intermediary and depositary in respect of VIP's ADR Program (as defined in the Series A Indenture);

WHEREAS, the Issuer is contemplating entering into an indenture under which Deutsche Bank AG London Branch will agree to act as calculation agent (the "Series B Indenture") pursuant to which it can issue from time to time securities collateralized by VIP Common Shares, preferred shares of VIP with a nominal value of 0.005 rubles each or Security entitlements in respect thereof ("Preferred VIP Shares") and American Depositary Receipts evidencing American Depositary Shares representing VIP Common Shares under the Deposit Agreement (as defined in the Series A Indenture) (the "VIP ADSs" and, together with VIP Common Shares and Preferred VIP Shares, the "VIP Securities") pursuant to a collateral agreement (the "Series B Collateral Agreement");

WHEREAS, pursuant to Section 3.10 of the Series A Indenture, the Issuer has agreed to deposit 3,213,783 VIP Common Shares, 6,426,600 Preferred VIP Shares and 15,209,134 VIP ADSs and has undertaken to deposit any VIP Securities that it or its affiliates may acquire in the future in accordance with this Agreement;

WHEREAS, the parties wish the Escrow Agent to hold the Escrowed Assets (as defined below) in accordance with and subject to the following Instructions and Terms and Conditions.

NOW, THEREFORE, the parties hereto agree as follows:

## INSTRUCTIONS

1. **Delivery of Escrowed Assets**. On March 14, 2007 the Issuer shall deliver or cause to be delivered the Initial VIP Escrow Shares (as defined below) to the account number 172848 established with The Bank of New York in the name of the Issuer (the "**Escrowed Account**"). The Issuer shall deliver or cause to be delivered to the Escrowed Account any VIP Common Shares, Preferred VIP Shares, VIP ADSs or any other securities issued by VIP, or depositary securities representing the same, that the Issuer or any affiliate thereof acquires (except for (A) VIP Shares held by Affiliates (as defined in the Series A Indenture) of the Issuer or the Guarantor that hold such VIP Shares for the account or benefit of a third party as an asset manager where neither the Issuer nor the Guarantor nor any Affiliates thereof exercise any control over such VIP Shares or (B) VIP Shares held by Affiliates of the Guarantor as part of their day–to–day short–term trading activities) after the date hereof for the duration of this Escrow Agreement (the "**Additional Escrow Shares**") within ten Business Days of such acquisition; *provided* that if, at the time of such acquisition any securities are outstanding under the Series B Indenture, then the Additional Escrow Shares shall be governed by Clause 3 hereof. For the avoidance of doubt, without prejudice to other clauses hereof, nothing in this Clause 1 shall be interpreted as creating any pledge, lien or security interest of any type.

2. **Escrowed Assets Defined**. The following property and or/funds, plus all interest, dividends and other distributions thereon (collectively, the "**Distributions**") are collectively referred to herein as the "**Escrowed Assets**": 3,213,783 VIP Common Shares; 6,426,600 Preferred VIP Shares; and 15,209,134 VIP ADSs (such VIP Common Shares, Preferred VIP Shares and VIP ADSs, the "**Initial VIP Escrow Shares**"), and any Additional Escrow Shares (the Additional Escrow Shares together with the Initial VIP Escrow Shares, the "**VIP Escrow Shares**").

3. **Notice of Issuances of Series B Securities**. This Clause 3 shall become effective only if the Series B Indenture becomes effective. (a) If the Issuer decides to issue securities pursuant to the Series B Indenture, the Issuer shall provide at least ten Business Days' prior written notice to the Escrow Agent and the Series A Collateral Agent (with a copy to the Series B Collateral Agent and the trustee under the Series B Indenture) setting forth the date upon which it intends to issue securities pursuant to the Series B Indenture (the "**Series B Issuance Notice**"). Upon receipt of the Series B Issuance Notice, the Escrow

2

Agent shall release and transfer up to the number of VIP Escrow Shares then held in the Escrowed Account to the Series B Collateral Agent for deposit in the collateral account subject to the Series B Collateral Agreement (the "Series B Collateral Account") in accordance with the joint written instructions of the Series B Collateral Agent and the Issuer within four Business Days of receiving such joint written instructions. Upon such transfer, the VIP Escrow Shares so transferred shall cease to be Escrowed Assets hereunder.

(b) Within two Business Days of receipt of the Series B Issuance Notice, the Escrow Agent shall give a notice to the Series B Collateral Agent (with a copy to the Issuer) setting forth the number and type of securities constituting the VIP Escrow Shares held as of that date and the date such securities were deposited with it.

(c) On the date of the discharge of the Series B Indenture and all the securities issued thereunder according to their terms, the Series B Collateral Agent shall be required under the Series B Collateral Agreement (if and only if at such time any securities remain outstanding under the Series A Indenture) to transfer the VIP Securities held in the Series B Collateral Account as of that time to the Escrow Agent for deposit in the Escrowed Account (*provided* that if the Series B Collateral Agent does not so transfer such VIP Securities and such VIP Securities are controlled by the Issuer or an agent or affiliate thereof, the Issuer shall deliver or cause to be delivered such VIP Securities to the Escrow Agent for deposit in the Escrowed Account) and, upon such transfer, such VIP Securities shall become the Escrowed Assets hereunder.

(d) Except as provided in this Clause 3, the Escrow Agent shall release and transfer the Escrowed Assets only in accordance with the written instructions of the Issuer and the Series A Collateral Agent.

4. **Creation of Escrow.** The Issuer and the Series A Collateral Agent hereby authorize the Escrow Agent to hold the Escrowed Assets in the Escrowed Account in accordance with this Escrow Agreement, pay any amounts due to the Issuer from the Escrowed Account in accordance with Clause 9 below and act with respect to the VIP Escrow Shares in accordance with Clause 9 below. The parties hereto agree that the Escrow Agent may act through its nominees and accordingly references to the "Escrow Agent" shall be references to the Escrow Agent and/or its nominees, as the case may be.

5. **Duration of Escrow Agreement.** This Escrow Agreement shall remain in full force and effect until the earlier to occur of (i) the time when the Series A Indenture and all the securities issued thereunder have been discharged in accordance with their terms (at which time the Escrow Agent shall deliver any Escrowed Assets held in the Escrowed Account to the Issuer) and (ii) a court of

3

competent jurisdiction finally disposing of the rights and obligations of the parties pursuant to the provisions hereof (in which case the Escrowed Assets held in the Escrowed Account shall be distributed in accordance with the order of such court).

6. **Fees of Escrow Agent.** (a) At the time of execution of this Escrow Agreement, and thereafter on each anniversary date of this Escrow Agreement the Issuer shall pay the Escrow Agent a fee as agreed between the Escrow Agent and the Issuer from time to time.

(b) The Issuer, failing whom the Guarantor, shall be responsible for and shall reimburse the Escrow Agent upon demand for all documented expenses, disbursements and advances incurred or made by the Escrow Agent in connection with this Escrow Agreement.

7. **Delivery of Notices.** All notices and other communications under this Escrow Agreement shall be in writing and shall be deemed given when delivered personally or transmitted by telecopy and receipt acknowledged or five days after being mailed by registered mail, return receipt requested, to the parties at the following addresses (or to such other address as a party may have specified by written notice given to the other parties pursuant to this provision):

**The Issuer**
Eco Telecom Limited
Suite 2, 4 Irish Place
Gibraltar

*With a copy to* +7495 981 4448

| | |
|---|---|
| Attention: | Franz Wolf |
| Telephone: | +350 41981 |
| Fax Number: | +350 41988 |
| email: | ctfh@ctfh.gi |

**Series A Collateral Agent**
Deutsche Bank AG London Branch
Winchester House
1 Great Winchester Street
London EC2N 2DB

*with a copy to:* Legal Department
Deutsche Bank AG London Branch
Winchester House
1 Great Winchester Street
London EC2N 2DB

| | | | |
|---|---|---|---|
| Attention: | Colin Greene or Head of Global Markets Equities –Structuring – Strategic Transactions | Attention: | Head of Equities Legal Team |
| Telephone: | +44 207 545 8000 | | |
| Fax Number: | +44 207 547 0953 | Fax Number: | +44 207 545 4437 |
| email: | Colin.Greene@db.com | | |

4

**Guarantor**
Altimo Holdings & Investments Limited
Suite 2, 4 Irish Place
Gibraltar

*With a copy to*  +7495 981 4448

| | |
|---|---|
| Attention: | Franz Wolf |
| Telephone: | +350 41981 |
| Fax Number: | +350 41988 |
| email: | ctfh@ctfh.gi |

**Escrow Agent**
The Bank of New York
One Canada Square
London E14 5AL

*With a copy to*  **The Bank of New York**
101 Barclay Street
New York
New York 10286

| | |
|---|---|
| Attention (London/NY) : | Corporate Trust Administration |
| Telephone (London/NY) : | +44 20 7964 6402 |
| Fax Number (London/NY) : | +44 20 7964 6399 |

5

**TERMS AND CONDITIONS**

**8. Obligations of Escrow Agent.** The duties, responsibilities and obligations of the Escrow Agent shall be limited to those expressly set forth herein and no duties, responsibilities or obligations shall be inferred or implied. The Escrow Agent (in its capacity as Escrow Agent hereunder) shall not be subject to, nor required to comply with, any other agreement between or among any or all of the other parties hereto or to which any party hereto is also a party, even though reference thereto may be made herein, or to comply with any direction or instruction (other than those contained herein or delivered in accordance with this Escrow Agreement) from any such party or any entity acting on its behalf. The Escrow Agent shall not be required to, and shall not, expend or risk any of its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder.

**9. Income and Voting.** Income and Voting Rights in respect of the Escrowed Assets:

(a) Unless the Escrow Agent is otherwise instructed in writing by the Issuer and the Series A Collateral Agent, the Issuer shall be entitled to receive for the Issuer's own account into its account number 9001–800724–001 held with Amsterdam Trade Bank N.V. (located at Herengracht 475, 1017 BS Amsterdam, The Netherlands; SWIFT – STOLNL2A) all cash dividends (in the currency in which the Escrow Agent receives them) relating to the VIP Escrow Shares (except that if the Escrow Agent is required to withhold and an amount on account of taxes is withheld from such cash dividend, the amount distributed to the Issuer shall be reduced accordingly) and the Escrow Agent shall remit to the Issuer on the Business Day received or the first Business Day thereafter all such cash dividends received by it.

(b) Subject to Clause 12 below, the Issuer shall have the right, from time to time, to vote and give all approvals, consents, ratifications and waivers with respect to the Escrowed Assets and it shall not transfer such right to any person. Upon receipt by the Escrow Agent of notice of any meeting or solicitation of proxies or consents of holders of the VIP Escrow Shares, the Escrow Agent shall as soon as practicable thereafter mail to the Issuer a notice which shall contain (i) such information as is contained in any notice of meeting received by the Escrow Agent, (ii) a statement that the Issuer shall be entitled, subject to any applicable provision of law and of the articles of association or similar document, of the Issuer, to instruct the Escrow Agent as to the exercise of the voting rights, if any, pertaining to the VIP Escrow Shares and (iii) a statement as to the manner in which such instructions may be given.

6

(c) Upon the written request of the Issuer, received on or before the date established by the Escrow Agent for such purpose (which shall not be less than 10 days prior to the date of the relevant vote), the Escrow Agent shall endeavor, insofar as practicable and permitted under applicable law, to vote or cause to be voted the VIP Escrow Shares in accordance with the instructions set forth in such request. The Escrow Agent shall not vote or attempt to exercise the right to vote that attaches to the VIP Escrow Shares other than in accordance with such instructions.

(d) The Escrow Agent shall within three Business Days after the date hereof issue in favour of the Issuer a power of attorney in the form of Annex 1 (or such other power of attorney as required under applicable law and mutually acceptable to the Issuer and the Escrow Agent) for so long as any VIP Securities constitute Escrowed Assets hereunder. Such powers of attorney shall relate to the number of VIP Securities that constitute Escrowed Assets and should such number of VIP Securities increase or decrease, the Escrow Agent shall within three Business Days of such increase or decrease issue in favor of the Issuer such a power of attorney relating to the number of VIP Securities then constituting the Escrowed Assets. Such powers of attorney may not be issued in favor of any person other than the Issuer.

10. **Benefit of Agreement.** This Escrow Agreement is for the exclusive benefit of the parties hereto and their respective successors hereunder, and shall not be deemed to give, either express or implied, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.

11. **Proceedings.** If at any time the Escrow Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process which in any way affects the Escrowed Assets (including but not limited to orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of the Escrowed Assets) (each "Proceedings"), the Escrow Agent shall notify the Issuer and the Series A Collateral Agent in writing thereof. If the Escrow Agent is obligated by law to comply with any Proceedings, it shall not be liable in respect thereof to any of the parties hereto or to any other person or entity even though such Proceedings may be subsequently modified or vacated. Where the Escrow Agent is or is advised in writing by its legal counsel that it is obligated by law to comply with any Proceedings it is authorized to comply therewith in any reasonable manner as it or its legal counsel deem appropriate. The Issuer shall have the right to elect (an "Election"), except where an Election is impermissible, to participate in and assume the defense of any such Proceedings, with counsel reasonably satisfactory to the Escrow Agent. The Issuer shall notify the Escrow Agent in writing of any Election. The Escrow Agent shall in respect of any Proceedings and notwithstanding an Election, be entitled to retain its own counsel, the fees in

7

respect of which shall be paid by the Issuer. If the Issuer does not notify the Escrow Agent of an Election within thirty days (or such shorter period within which a timely answer or response must be filed) after the receipt of the notice of the commencement of any Proceedings, then the Escrow Agent shall have the right to contest the Proceedings or (with the prior written consent of the Issuer, which consent shall not be withheld unreasonably and for the avoidance of doubt if such consent is withheld the Issuer shall be liable for any final judicial determination as well as the Escrow Agent's legal fees) settle or compromise the claim arising through the Proceedings and the Issuer shall indemnify the Escrow Agent in accordance with Clause 17 hereof.

12. **Liability of Escrow Agent.** (a) The Escrow Agent shall not be liable for any action taken or omitted or for any loss or injury resulting from the Escrow Agent's actions or its performance or lack of performance of its duties hereunder in the absence of gross negligence or willful misconduct on its part. In addition, in no event shall the Escrow Agent be liable (i) for acting in accordance with or relying upon any instruction, notice, demand, certificate or document from any party hereto delivered in respect of this Escrow Agreement or any entity acting on behalf of such party, (ii) for any consequential, punitive or special damages, (iii) for the acts or omissions of its nominees, correspondents, designees, subagents or subcustodians, provided that the Escrow Agent shall account to the Issuer for any recoveries or compensation it obtains from such service providers in compensation for any losses suffered by the Issuer as a result of the acts or omissions of such service providers (for the avoidance of doubt, the Escrow Agent shall be under no obligation to seek such recoveries or compensation), (iv) for an amount in excess of the value of the Escrowed Assets, valued as of the date of deposit and (v) for any taxes or governmental charges imposed upon or in respect of the Escrowed Assets.

(b) If any fees, expenses, or costs incurred by or imposed upon, or any obligations owed to, the Escrow Agent hereunder are not promptly paid when due, the Escrow Agent may reimburse itself therefor from the Escrowed Assets and may sell, convey or otherwise dispose of any Escrowed Assets for such purpose (with reasonable notice thereof provided to the Issuer and the Collateral Agent); provided that the Escrow Agent shall notify the Issuer and the Series A Collateral Agent of any failure to pay any such sums referred to above and for a period of thirty days following such notification the Escrow Agent may not reimburse itself from the Escrowed Assets.

(c) As security for the due and punctual performance of any and all of the Issuers' obligations to the Escrow Agent hereunder, now or hereafter arising, the Issuer hereby pledges, assigns and grants to the Escrow Agent a continuing security interest in, and a lien on, the Escrowed Assets and all Distributions. The security interest of the Escrow

8

Agent shall at all times be valid, perfected and enforceable by the Escrow Agent against the Issuer and the Series A Collateral Agent and all third parties in accordance with the terms of this Escrow Agreement. The security interest created by this clause 12(c) shall be deemed released without the need for any action by any person upon the release of any Escrowed Assets from the Escrowed Account with respect to such Escrowed Assets.

(d) The Escrow Agent may consult with legal counsel at the expense of the Issuer as to any matter relating to this Escrow Agreement, and the Escrow Agent shall not incur any liability in acting in good faith in accordance with any written advice from such counsel.

(e) The Escrow Agent shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Escrow Agent (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility).

13. **Collection.** Unless otherwise specifically set forth herein, the Escrow Agent shall proceed as soon as practicable to collect any checks or other collection items at any time deposited hereunder. All such collections shall be subject to the Escrow Agent's usual collection practices or terms regarding items received by the Escrow Agent for deposit or collection. The Escrow Agent shall not be required, or have any duty, to notify anyone of any payment or maturity under the terms of any instrument deposited hereunder, nor to take any legal action to enforce payment of any check, note or security deposited hereunder, or to exercise any right or privilege which may be afforded to the holder of any such security.

14. **Monthly Statements.** The Escrow Agent shall provide the Issuer with a monthly statement identifying transactions, transfers or holdings of Escrowed Assets and each such statement shall be deemed to be correct and final upon receipt thereof by the Issuer unless the Escrow Agent is notified in writing to the contrary within thirty Business Days of the date of such statement.

15. **Responsibility for Validity etc.** The Escrow Agent shall not be responsible in any respect for the form, execution, validity, value or genuineness of documents or securities deposited hereunder, or for any description therein, or for the identity, authority or rights of persons executing or delivering or purporting to execute or deliver any such document, security or endorsement.

9

16. **Notices.** Notices, instructions or other communications shall be in writing and shall be given to the addresses set forth in Clause 7 hereof (or to such other address as may be substituted therefor by written notification thereof to the parties hereto). Notices to the Escrow Agent shall be deemed to be given when actually received by the Escrow Agent's Corporate Trust Department. The Escrow Agent is authorized to comply with and rely upon any notices, instructions or other communications believed by it to have been sent or given by a party hereto or by a person or persons authorized by such party. Whenever under the terms hereof the time for giving a notice or performing an act falls upon a Saturday, Sunday, or banking holiday, such time shall be extended to the next day on which the Escrow Agent is open for business.

17. **Indemnity.** The Issuer and the Guarantor, jointly and severally, shall be liable for and shall reimburse and indemnify the Escrow Agent and hold the Escrow Agent harmless from and against any and all documented claims, losses, liabilities, costs, damages or expenses (including reasonable attorneys' fees and expenses) (collectively, "Losses") arising from or in connection with or related to this Escrow Agreement or being the Escrow Agent hereunder (including but not limited to Losses incurred by the Escrow Agent in connection with its successful defense, in whole or in part, of any claim of gross negligence or willful misconduct on its part), provided, however, that nothing contained herein shall require the Escrow Agent to be indemnified for Losses caused by its gross negligence or willful misconduct. The Escrow Agent will not without the prior written consent of the Issuer (such consent not to be unreasonably withheld) settle any claim of a value of US$100,000 (or the equivalent) or more, within the scope of this paragraph. For the avoidance of doubt if such consent is withheld the Issuer shall be liable for any final judicial determination and any Losses in respect thereof.

18. **Removal of Escrow Agent.** (a) The Issuer and the Series A Collateral Agent (acting jointly) may remove the Escrow Agent at any time, with or without cause, by giving to the Escrow Agent thirty calendar days' prior notice in writing. The Escrow Agent may resign at any time by giving to the Issuer and the Series A Collateral Agent thirty calendar days' prior written notice thereof; provided that such resignation shall not be effective until a successor is appointed pursuant to sub–Clause (b) below.

(b) Within thirty calendar days after giving the foregoing notice of removal to Escrow Agent or receiving the foregoing notice of resignation from the Escrow Agent, the Issuer and the Series A Collateral Agent shall jointly agree on and appoint a successor Escrow Agent. The Issuer and the Series A Collateral Agent shall seek a successor Escrow Agent in good faith and shall make good faith efforts to procure the acceptance of such appointment by the successor Escrow Agent (and the Series A Collateral Agent shall not unreasonably withhold from the Issuer

10

its agreement in respect of this). A failure by the Issuer and the Series A Collateral Agent to procure the acceptance by a successor Escrow Agent of such appointment within such thirty calendar days shall constitute a "dispute" for the purposes of Clause 19(b) below. If a successor Escrow Agent has not accepted such appointment one hundred and twenty calendar days after the giving or receipt, as the case may be, of either of the above notices, the Issuer and the Series A Collateral Agent hereby instruct the Escrow Agent to deliver the Escrowed Assets to the Issuer at the address set forth in Clause 7 above; *provided* that if, at the expiration of such 120 day period, an LTV Ratio Triggered Early Maturity (as defined in the Series A Collateral Agreement) shall have occurred or an Event of Default (as defined in the Series A Indenture) shall have occurred and be continuing and the Series A Collateral Agent is prevented at such time from being able to exercise its remedies under Section 8 of the Series A Collateral Agreement (whether such question is uncontested or is the matter of a dispute between the Issuer and the Series A Collateral Agent), the Issuer and the Series A Collateral Agent hereby instruct the Escrow Agent to deliver the Escrowed Assets to Deutsche Bank AG London, Winchester House, 1 Great Winchester Street, London EC2N 2DB (attention: Trust and Securities Services, re: Eco Telecom Limited—Escrow Agreement). Deutsche Bank AG London (which may act through its nominees) shall be a "successor Escrow Agent" for the purposes of this Escrow Agreement.

(c) Upon acceptance by the successor Escrow Agent of its appointment as successor Escrow Agent, the Issuer and the Collateral Agent hereby instruct the Escrow Agent to deliver the Escrowed Assets then held hereunder to the successor Escrow Agent, less the fees, costs and expenses or other obligations owed to the outgoing Escrow Agent (for the avoidance of doubt the Escrow Agent is permitted to hold such Escrowed Assets (or any portion thereof), pending delivery to the successor Escrow Agent, until all such fees, costs and expenses or other obligations are paid).

(d) Upon delivery of the Escrowed Assets to the successor Escrow Agent or the Issuer, as the case may be, the outgoing Escrow Agent shall have no further duties, responsibilities or obligations hereunder.

19. **Escrow Agent Action in circumstances of ambiguity or conflicting claims.** (a) In the event of any ambiguity or uncertainty hereunder or in any notice, instruction or other communication received by the Escrow Agent hereunder, the Escrow Agent shall inform the Issuer and the Series A Collateral Agent of such ambiguity or uncertainty and may in its sole discretion, until it receives written instructions, signed by the Issuer and the Series A Collateral Agent, which eliminates such ambiguity or uncertainty, refrain from taking any action in respect of the Escrowed Assets.

11

(b) In the event of any dispute between or conflicting claims by or among the Issuer and the Series A Collateral Agent and/or any other person or entity with respect to any Escrowed Assets, the Escrow Agent shall be entitled to refuse to comply with any and all claims, demands or instructions with respect to such Escrowed Assets so long as such dispute or conflict shall continue, and the Escrow Agent shall not be or become liable in any way to the Issuer and the Series A Collateral Agent for failure or refusal to comply with such conflicting claims, demands or instructions (except in relation to voting or causing to be voted the VIP Escrow Shares pursuant to Clause 9 above). The Escrow Agent shall be entitled to refuse to act until, in its sole discretion, either (i) such conflicting or adverse claims or demands shall have been determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or settled by agreement between the conflicting parties as evidenced in a writing satisfactory to the Escrow Agent or (ii) the Escrow Agent shall have received security or an indemnity satisfactory to it sufficient to hold it harmless from and against any and all Losses which it may incur by reason of so acting. The Escrow Agent may, in addition, elect, in its sole discretion, to commence an interpleader action or seek other judicial relief or orders as it may deem, in its sole discretion, necessary. The costs and expenses (including reasonable attorneys' fees and expenses) incurred in connection with such proceeding shall be paid by, and shall be deemed an obligation of the Issuer, failing whom, the Guarantor.

20. **Governing Law.** This Escrow Agreement shall be interpreted, construed, enforced and administered in accordance with the internal substantive laws of the State of New York (without giving effect to the conflicts of laws provisions thereof other than Section 5–1401 of the General Obligations Law of the State of New York, which is expressly made applicable hereto). The Issuer and the Series A Collateral Agent hereby submits to the personal jurisdiction of and each agrees that all proceedings relating hereto shall be brought in courts located within the City and State of New York. The Issuer and the Series A Collateral Agent hereby waive the right to trial by jury in any such proceedings. To the extent that in any jurisdiction the Issuer and the Series A Collateral Agent may be entitled to claim, for itself or its assets, immunity from suit, execution, attachment (whether before or after judgment) or other legal process, each hereby irrevocably agrees not to claim, and hereby waives, such immunity. The Issuer and the Series A Collateral Agent waive personal service of process and consents to service of process by certified or registered mail, return receipt requested, directed to it at the address last specified for notices hereunder, and such service shall be deemed completed ten calendar days after the same is so mailed.

12

**21. Amendments.** Except as otherwise permitted herein, this Escrow Agreement may be modified only by a written amendment signed by all the parties hereto, and no waiver of any provision hereof shall be effective unless expressed in a writing signed by the party to be charged.

**22. Rights and Remedies.** The rights and remedies conferred upon the parties hereto shall be cumulative, and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of any additional rights or remedies. The waiver of any right or remedy hereunder shall not preclude the subsequent exercise of such right or remedy.

**23. Representations and Warranties.** The Issuer and the Series A Collateral Agent hereby represent and warrant (a) that this Escrow Agreement has been duly authorized, executed and delivered on its behalf and constitutes its legal, valid and binding obligation and (b) that the execution, delivery and performance of this Escrow Agreement by the Issuer and the Series A Collateral Agent does not and will not violate any applicable law or regulation.

**24. Invalidity Etc.** The invalidity, illegality or unenforceability of any provision of this Escrow Agreement shall in no way affect the validity, legality or enforceability of any other provision; and if any provision is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

**25. Entire Agreement.** This Escrow Agreement shall constitute the entire agreement of the parties with respect to the subject matter and supersedes all prior oral or written agreements in regard thereto.

**26. Termination.** This Escrow Agreement shall terminate upon the transfer of all the Escrowed Assets in accordance with the written instructions of the Issuer and the Series A Collateral Agent. The Terms and Conditions hereof shall survive termination of this Escrow Agreement and/or the resignation or removal of the Escrow Agent.

**27. Use of "The Bank of New York".** No printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "The Bank of New York" by name or the rights, powers, or duties of the Escrow Agent under this Escrow Agreement shall be issued by any of the other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

**28. Headings.** The headings contained in this Escrow Agreement are for convenience of reference only and shall have no effect on the interpretation or operation hereof.

13

29. **Execution in Duplication.** This Escrow Agreement may be executed by each of the parties hereto in any number of counterparts, each of which counterpart, when so executed and delivered, shall be deemed to be an original and all such counterparts shall together constitute one and the same agreement.

30. **Instructions.** For purposes of this Escrow Agreement, the Escrow Agent shall be required to follow instructions only from those persons who are identified in an incumbency certificate delivered to the Escrow Agent by the Issuer or the Series A Collateral Agent, as the case may be.

14

IN WITNESS WHEREOF, each of the parties have caused this Escrow Agreement to be executed by a duly authorized officer as of the day and year first written above.

Eco Telecom Limited

By:     /s/ Marina Kushnareva
Name: Marina Kushnareva
Title:  Authorized Director

Deutsche Bank AG London Branch, as Series A Collateral
    Agent

By:     /s/ Andrew Dixon-Smith
Name: Andrew Dixon-Smith
Title:  Legal Counsel

By:     /s/ Colin Greene
Name: Colin Greene
Title:  Managing Director

Altimo Holdings & Investments Limited

By:     /s/ Franz Wolf
Name: Franz Wolf
Title:  Authorized Director

The Bank of New York

By:     /s/ Dario Parente
Name: Dario Parente
Title:  Vice President

15

Deutsche Bank AG London Branch hereby acknowledges and
  agrees to the provisions of Clause 18(b) of this Escrow
  Agreement

By:     /s/ Andrew Dixon-Smith
Name: Andrew Dixon-Smith
Title:  Legal Counsel


By:     /s/ Colin Greene
Name: Colin Greene
Title:  Managing Director

16

[ANNEX INTENTIONALLY OMITTED]