```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:    3/25/08
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

TELENOR EAST INVEST AS,                    :

             Plaintiff,          :

       - against -                       :          **OPINION**

ALTIMO HOLDINGS & INVESTMENTS     :          07 Civ. 4829 (DC)
LIMITED, ECO TELECOM LIMITED, CTF
HOLDINGS LIMITED, CROWN FINANCE   :
FOUNDATION, and RIGHTMARCH
LIMITED,                          :

           Defendants.     :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**    (See last page)

**CHIN, District Judge**

        In this securities case, plaintiff Telenor East Invest
AS ("Telenor East") alleges that defendants committed insider
trading, conducted an illegal tender offer, and filed misleading
disclosure statements in connection with their purchase of shares
in Open Joint Stock Company Vimpel-Communications ("VimpelCom"),
a Russian telecommunications company traded on the New York Stock
Exchange.  The complaint charges five counts under the Securities
Exchange Act of 1934 (the "Exchange Act")

        Defendants move to dismiss the amended complaint
pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) and the Private
Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C.
§§ 78u-4(b)(1)-(3).  In the alternative, they move to stay this
action and to compel arbitration.  For the reasons set forth
below, the motion to stay and compel arbitration is denied and
the motion to dismiss is granted in part and denied in part.

**BACKGROUND**

A.    **The Facts**

        The following facts are drawn from the amended complaint and the documents incorporated by reference.  For purposes of the motion to dismiss, the facts alleged in the amended complaint are assumed to be true.

    1.    **The Parties**

        Telenor East is a wholly-owned subsidiary of Telenor ASA, Norway's largest telecommunications provider and a corporation that invests in mobile telecommunication companies around the world.  (Am. Compl. ¶¶ 8-9).

        Defendants are Altimo Holdings & Investments Limited ("Altimo"), Eco Telecom Limited ("Eco Telcom"), CTF Holdings Limited ("CTF"), Crown Finance Foundation ("Crown"), and Rightmarch Limited ("Rightmarch").  Together, they comprise the Alfa Group Consortium (the "Alfa Group"), one of Russia's largest privately owned financial-industrial groups.[1]    (Id. ¶¶ 10-15).

    2.    **The Shareholders Agreement**

        Telenor East and Eco Telecom are VimpelCom shareholders.  On May 30, 2001, they entered into an agreement (the "Shareholders Agreement") governing their nominating of

_____

        [1]    Altimo is a holding company for the Alfa Group's telecommunication assets; Eco Telecom is a holding company for Altimo's shares of VimpelCom; CTF is a corporation with a controlling interest in Altimo; Crown is the sole shareholder of CTF; Rightmarch is a wholly owned subsidiary of Altimo.  (Id. ¶¶ 11-15).

candidates to VimpelCom's Board of Directors (the "Board").  (Id. ¶ 21).  The Shareholders Agreement gave Telenor East and Eco Telecom each the right to nominate four candidates to the nine-member Board, provided that each named an independent as one of their nominees.  (Id.; Sills Decl. Ex. C at § 4.01).  The Shareholders Agreement specified, however, that if either party acquired between 44% and 50% of VimpleCom's voting capital stock, that party became a "Plurality Shareholder" and was not required to name an independent as one of its nominees.  (Am. Compl. ¶ 21; Sills Decl. Ex. C at § 4.01).  The Shareholders Agreement further provided that it would terminate if either party's ownership of voting capital stock rose above 50% or fell below 25%.  (Sills Decl. Ex. C at Art. V(b)-(c)).

Section 6.13 of the Shareholders Agreement contained an arbitration clause, which provided:

> Any and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration by a panel of three (3) arbitrators under the United Nations Commission on International Trade law (UNCITRAL) Arbitration Rules then in force.

(Id. at § 6.13).

### 3.    **The Parties' Ownership of VimpelCom Stock**

In December 1998, Telenor East acquired approximately 25.7% of the voting capital stock of VimpelCom.  (Am. Compl. ¶ 20).  As of the filing of the amended complaint, Telenor East owned approximately 29.9% of VimpelCom's capital stock.  (Id.).  On or about November 5, 2001, Eco Telecom purchased approximately

- 3 -

5 million shares of VimpelCom stock.  (Id. ¶ 22).  Thereafter,
Eco Telecom continued to increase its shares of VimpelCom stock
so that as of August 29, 2006, it owned approximately 32.9% of
VimpelCom's voting stock.  (Id.).  As of the date of the amended
complaint, Eco Telecom's beneficial ownership of VimpelCom voting
stock had increased to approximately 44.00001%.  (Id. ¶ 12).
Hence, from August 2006 to July 2007, Eco Telecom increased its
ownership of VimpelCom's voting shares from 32.9% to 44.0001%.

### 4.    Request for Approval to Acquire 60%

On May 26, 2005, Eco Telecom, Altimo, CTF, and Crown
Finance (the "Alfa Reporting Persons") filed an amendment to
their Securities and Exchange Commission ("SEC") 13D filing[2] that
disclosed that Eco Telecom had requested approval from the
Russian Federal Anti-Monopoly Service (the "FAS") to acquire 60%
plus one share of VimpelCom.  (Id. ¶ 39).  The following month,
they clarified that this request represented a defensive move and
that they would only pursue majority control of VimpelCom if
Telenor attempted to do so.  (Id. ¶ 68).

### 5.    The Rightmarch Transaction

On August 15, 2006, VimpelCom emailed its second
quarter 2006 financial results to the Board's Finance Committee,
of which Altimo Senior Vice President Oleg Malis was a member.
(Id. ¶ 24).  One week later, it emailed those results to the rest

---

[2]     Parties acquiring beneficial ownership of greater than
5% of an issuer's equities must make certain disclosures in a
"Schedule 13D."  15 U.S.C. § 78m(d).  Amendments to these
disclosures are referred to hereinafter as "13D/As."

of the Board, whose members included Mikhail Fridman, Chairman of Altimo's Supervisory Group, and Alexey Reznikovich, Alitmo's CEO and a member of the Alfa Group's Supervisory Board.  (Id.).

On September 1, 2006, VimpelCom released to the public its second quarter financial results, which showed substantial increases in subscribers, revenues, and net income.  (Id. ¶ 34). Members of the VimpelCom Board who were controlled by defendants were in possession of this favorable, material information before it was made public.  (Id.).

During the eight trading days between August 29, 2006 and September 8, 2006, VimpelCom ADSs traded very heavily, far above its average trading volume, and its closing price increased from $50.26 to $59.90.  (Id. ¶ 25).

On September 6, the Alfa Reporting Persons filed a 13D/A that disclosed a transaction between Rightmarch and Jam Holding Asset Management Ltd. ("Jam"),[3] memorialized in a "Master Confirmation" dated August 30, 2006 (the "Rightmarch Transaction").  (Id. ¶ 27).  Neither Rightmarch nor Jam joined in the filing.  (Id. ¶ 31).  The September 6 13D/A indicated that Jam had previously agreed to sell VimpelCom American Depositary Shares ("ADSs") in its possession to Rightmarch on any date between October 26, 2006 and January 1, 2007.  (Id. ¶ 30).  It did not disclose the price or number of ADSs Rightmarch intended to purchase from Jams.  (Id.).

---

[3]    The amended complaint purports that Jam is an affiliate of Deutsche Bank AG.  (Id. ¶ 27).

6. __2006 Russian Anti-Monopoly Law__

On October 26, 2006, a Russian anti-monopoly law came into effect that would allow the Alfa Group to acquire up to 50% of VimpelCom's voting shares without the approval of the FAS. (Id. ¶ 33).  In advance of that date, the Alfa Reporting Persons filed an October 10 13D/A explaining that they had entered the Rightmarch Transaction "through a wholly owned affiliate to attempt to assure the availability of additional Common Shares in VimpelCom should the Reporting Person[s] seek to acquire such shares as a result of the effectiveness of the new Anti-monopoly law."  (Id. ¶ 35).  In a November 22 13D/A, they reported that Eco Telecom had received 6,597,900 VimpelCom ADSs purchased by Jam.  (Id. ¶ 37).  They did not disclose the prices that either Eco Telecom or Jams had paid for those ADSs.  (Id.).

7. __The Eco Telecom-Deutsche Bank Transactions__

In March 2007, the Alfa Reporting Persons filed  a series of 13D/As that disclosed that Eco Telecom had entered into purchase agreements with Deutsche Bank to purchase VimpelCom ADSs.  (Id. ¶¶ 41-47).  Among them, a March 13 13D/A disclosed that Eco Telecom had issued $1.5 billion in bonds to Deutsche Bank, guaranteed by Altimo and secured by 9,349,999 shares of VimpelCom stock.  (Id. ¶ 47).  The next day, Altimo issued a press release stating that it intended to use the proceeds of the Deutsche Bank loan "to develop its investment projects in emerging mobile communications markets in Eurasia," particularly "in South and South East Asia."  (Id. ¶ 51).  A June 30, 2007

- 6 -

FOXNews.com article quoted a Deutsche Bank spokesperson as stating, however, that $350 million of the loan was to refinance Altimo's debt, with "the rest" going to buy more shares in VimpelCom.  (Id. ¶ 52).

On March 16, 2007, VimpelCom emailed its Board members, including Fridman, Rezinikovich, and Malis, its proposals and financial results for the fourth quarter and full year of 2006. (Id.).  Five days later, before the information became public, the Alfa Reporting Persons filed a 13D/A indicating that Eco Telecom had acquired 4,915,200 VimpelCom ADSs through previously disclosed transactions with Deutsche Bank.  (Id. ¶ 54).  It also indicated that Eco Telecom had acquired additional shares through brokered transactions with other "significant shareholders" and open market purchases between March 15 and March 20, increasing its voting stock to 42.4%.[4]  (Id.).

On June 13, 2007, after this action was commenced, the Alfa Reporting Persons filed a 13D/A disclosing the prices they had paid for ADSs referenced in earlier amendments.  (Id. ¶ 59).  Two weeks later, they reported that Rightmarch had acquired additional ADSs on June 25 and transferred them to Eco Telecom, bringing Eco Telecom's holdings of voting shares to slightly over 44%.  (Id.  ¶ 60).

---

[4]    The amended complaint alleges that between February 28, 2007 and March 20, 2007, Deutsche Bank also made offers on behalf of the Alfa Reporting Persons to hedge funds and other holders of large blocks of VimpelCom shares and ADSs, at premiums ranging from $0.50 to $10.00.  (Id. ¶ 56).

B.    **Procedural History**

        Plaintiff filed a complaint in this Court on June 6,
2007, asserting that defendants had violated (1) Section 13(d) of
the Exchange Act by filing false and misleading disclosure
statements; (2) Section 13(e) by engaging in fraud in connection
with a "going private" transaction; and (3) Section 14(d) by
conducting a tender offer without making the necessary
disclosures.  In particular, it alleged that defendants had
insufficiently disclosed the financial details of their
transactions and their intent to acquire control of VimpelCom.

        Telenor East filed an amended complaint on July 12,
2007, repeating its prior allegations, and charging also that
defendants had violated Section 10(b) and Rule 10b-5 by buying
shares while in possession of material non-public information,
and Section 14(e) and Rule 14e-3 by doing so in connection with a
tender offer.  Defendants filed the instant motions to dismiss or
compel arbitration on August 27, 2007.[5]

## DISCUSSION

        I first consider the motion to compel arbitration.  As
plaintiff's claims fall outside the scope of the arbitration
agreement, I next consider the motion to dismiss.

---

        [5]    Altimo, Crown, and Rightmarch submit one motion that
advances both arguments but focuses primarily on the grounds for
dismissal.  They join in a correlating motion submitted by Eco
Telecom and CTF that focuses primarily on the argument, in the
alternative, that the Court should stay the action and compel
arbitration.  Eco Telecom and CTF likewise join in the motion
submitted by Altimo, Crown, and Rightmarch.

- 8 -

A.    **The Motion to Compel Arbitration**

1.    **Applicable Law**

The Federal Arbitration Act (the "FAA") reflects Congress's strong preference for arbitration.  The FAA, codified at 9 U.S.C. §§ 1-14, provides that written provisions to arbitrate controversies in any contract involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  Id. § 2.  "There is a strong federal policy favoring arbitration as an alternative means of dispute resolution."  Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001).  The Supreme Court has observed that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).

In deciding a motion to compel arbitration under the FAA, a court must:  (1) determine whether the parties agreed to arbitrate; (2) ascertain the scope of the agreement to see if the claims raised in the lawsuit fall within its terms; (3) if federal statutory claims are asserted, decide whether Congress has deemed those claims to be nonarbitrable; and (4) if some but not all claims are to be arbitrated, determine whether to stay

the balance of the proceedings pending arbitration.  See Oldroyd
v. Elmira Sav. Bank, 134 F.3d 72, 75-76 (2d Cir. 1998).

    **2.**    **Application**

        **a.**    **Court Decides the Question of Arbitrability**

        As a preliminary matter, I hold that the issue of
arbitrability is for the Court.  Under the FAA, as interpreted by
the Supreme Court, the general presumption is that the issue of
arbitrability should be resolved by the courts.  See First
Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995);
AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649
(1986); see also Contec Corp. v. Remote Solution Co., 398 F.3d
205, 208 (2d Cir. 2005).  Consequently, the issue of whether the
parties agreed to arbitrate a matter is to be decided by the
courts and not the arbitrators, "[u]nless the parties clearly and
unmistakably provide otherwise."  AT&T Techs., 475 U.S. at 649.

        In their briefs, neither side raises the issue of
whether this Court or the arbitrator should decide arbitrability.
By focusing their arguments on the merits of the motion to compel
arbitration, the parties apparently agree that the question of
arbitrability is for this Court.  Nor is there any language in
the Shareholders Agreement to suggest that the parties clearly
and unmistakably intended otherwise.  Accordingly, the Court will
decide the arbitrability question.

        **b.**    **Scope of the Arbitration Agreement**

        Telenor East's claims fall outside the scope of
the Shareholders Agreement.  The Shareholders Agreement specifies

the number of directors Eco Telecom and Telenor East may nominate
to the Board but places no restriction on their ability to
purchase shares.  In fact, it expressly contemplates that one of
the parties may acquire more than 50% of VimpelCom's shares, as
it explicitly provides for terminating the Shareholders Agreement
altogether in that event.  (See Sills Decl. Ex. C at Art. V(b)-
(c)).  The amended complaint makes no assertion that defendants'
purchases violate the Shareholders Agreement; it instead charges
defendants with making those purchases without meeting their SEC
disclosure requirements.  The terms of the Shareholders Agreement
have no impact on whether defendants met those requirements.

        Defendants insist that the Shareholders Agreement's
arbitration clause is sufficiently broad to cover this dispute.
The claims asserted in the amended complaint fall within its
scope, they assert, because those claims accuse them of
attempting to seize control of VimpelCom and seek relief that
would push Eco Telecom back below the 44% threshold,
circumscribing its right to nominate non-independent directors to
the Board.  This argument misconstrues the scope of the
arbitration clause and the nature of the amended complaint.

        The arbitration clause may be broad, but only as to
disputes that implicate the terms of the Shareholders Agreement.
It provides for the arbitration of "[a]ny and all disputes . . .
arising under, relating to or in connection with" the
Shareholders Agreement.  The dispute here does not arise under or
relate to the Shareholders' Agreement, nor is it in connection

with the Shareholder's Agreement, as the dispute has nothing to do with the process for nominating directors to the Board.

Defendants appropriately note that in deciding this issue, the Court should "focus on the factual allegations in the [amended] complaint rather than . . . the legal labels attached to them." (See Eco Mem. 14 (quoting Genesco, Inc. v. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987)). Here, the amended complaint does not allege that defendants are prohibited from acquiring above 44% of VimpelCom's shares and the Shareholders Agreement places no restriction on their right to do so. That the amended complaint challenges defendants' failure to disclose the intent of their purchases en route to the 44% threshold does not suffice. If defendants' position were correct, the arbitration clause would govern virtually every dispute involving share purchases, as all such disputes would theoretically bring the purchaser closer to some benchmark referenced in the Shareholders Agreement. Given the narrow nominating restrictions described in the Shareholders Agreement, the suggestion that the parties intended such a sweeping effect is unreasonable. See Leadertex, Inc. v. Morganton Dyeing & Finishing Corp., 67 F.3d 20, 28 (2d Cir. 1995) ("[O]ur main concern in deciding the scope of arbitration agreements is to 'faithfully reflect[] the reasonable expectations of those who commit themselves to be bound by [them].'" (citation omitted)). Hence, the motion to stay and compel arbitration is denied.

B.    **The Motion to Dismiss**

1.    **Applicable Law**

a.    **12(b)(6) Standard**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the pleading as true and draw all reasonable inferences in favor of the party opposing the motion.  Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); see Erickson v. Pardus, 127 S. Ct. 2197, 2199 (2007) (per curiam); Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).

In Bell Atlantic Corp., the Supreme Court announced the "retirement" of the oft-quoted "no set of facts" language from Conley v. Gibson, 355 U.S. 41, 45-47 (1957), adopting in its place a "plausibility" requirement.  Bell Atl. Corp., 127 S. Ct. at 1969.  Bell Atlantic Corp. did not announce a "universal standard of heightened fact pleading, but . . . instead requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). The question is whether the pleading alleges "'enough facts to state a claim for relief that is plausible on its face.'"  Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007) (quoting Bell Atl. Corp., 127 S. Ct. at 1974).

In deciding a motion to dismiss, a court may consider the pleadings and attached exhibits, documents incorporated by reference, and matters subject to judicial notice.  See Prentice v. Apfel, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) (citing Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)). "'[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations'" and will not defeat the motion.  Gavish v. Revlon, Inc., No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *10 (S.D.N.Y. Sept. 30, 2004) (quoting Citibank, N.A. v. Itochu Int'l, Inc., No. 01 Civ. 6007 (GBD), 2003 WL 1797847, at *1 (S.D.N.Y. Apr. 4, 2003)).

### b.    Pleading Standard for Securities Actions

Securities fraud allegations are subject to the heightened pleading requirements of the PSLRA.  The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  While the PSLRA does not require plaintiffs to plead "every single fact upon which their beliefs concerning false or misleading statements are based," it does require the facts alleged to be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  Novak v. Kasaks, 216 F.3d 300, 313-14 & n.1 (2d Cir. 2000).

Securities fraud claims must also meet the requirements of Fed. R. Civ. P. 9(b).  Rule 9(b) requires that, whenever a complaint contains allegations of fraud, "the circumstances constituting fraud . . . shall be stated with particularity."  See Fed. R. Civ. P. 9(b); see also Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996) (noting that "the actual fraudulent statements or conduct and the fraud alleged must be stated with particularity") (internal citations omitted).  "[A] complaint making such allegations must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  Shields v. Citytrust Bancorp, 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).  "In short, a plaintiff must 'set forth the who, what, when, where and how of the alleged fraud.'"  United States ex rel. Woods v. Empire Blue Cross & Blue Shield., No. 99 Civ. 4968 (DC), 2002 WL 1905899, at *4 (S.D.N.Y. Aug. 19, 2002) (quoting United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1997)).

To satisfy the Rule 9(b) and PSLRA pleading requirements with respect to scienter, plaintiffs must allege facts giving rise to a strong inference of fraudulent intent.  Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); see Goplen v. 51job, Inc., 453 F. Supp. 2d 759, 770-71 (S.D.N.Y. 2006).  Intent may be established either by alleging facts (1) showing

that defendants had both motive and opportunity to commit fraud
or (2) constituting strong circumstantial evidence of conscious
misbehavior or recklessness.  Acito v. IMCERA Group, Inc., 47
F.3d 47, 52 (2d Cir. 1995).  For the inference of fraudulent
intent to qualify as "strong," it "must be more than merely
plausible or reasonable -- it must be cogent and at least as
compelling as any opposing inference of nonfraudulent intent."
Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499,
2504-05 (2007).

### c.    Section 13 Disclosure Requirements

Section 13(d) of the Exchange Act is a reporting
provision that requires a party acquiring beneficial ownership of
more than 5% of the equity securities of an issuer to file an SEC
disclosure, known as a Schedule 13D, within ten days of the
acquisition.  15 U.S.C. § 78m(d).  The filer must disclose
agreements relating to the securities and any "purpose to acquire
control" of the issuer.  Id.; 17 C.F.R. § 240.13d-101; see
Chromalloy American Corp. v. Sun Chemical Corp., 611 F.2d 240,
246 (2d Cir. 1979).  This disclosure is "intended to alert
investors to potential changes in corporate control."  E.ON AG v.
Acciona, SA, 468 F. Supp. 2d 537, 549 (S.D.N.Y. 2006) ("E.ON AG
I") (quoting GAF Corp v. Milstein, 453 F.2d 709, 720 (2d Cir.
1971)).  Section 13(d) is not specifically an anti-fraud
provision and courts have found that it does not require a
showing of scienter to establish liability.  See SEC v. McNulty,
No. 94 Civ. 7114 (MBM), 1996 WL 422259, at *7 (S.D.N.Y. July 29,

1996) (citing <u>SEC v. Savoy Indus.</u>, 587 F.2d 1149, 1167 (C.A.D.C. 1978).

Section 13(e) prohibits fraud in transactions that have a "reasonable likelihood" or "purpose" of causing any covered class of equity securities of the issuer to be held by fewer than 300 persons (thereby terminating the registrant's SEC reporting obligations). <u>See</u> 15 U.S.C. § 78m(e); 17 C.F.R. § 240.13e-3; <u>see also</u> <u>In re Initial Pub. Offering Sec. Litig.</u>, 241 F. Supp. 2d 281, 299 n.13 (S.D.N.Y. 2003). It requires "issuers or affiliates" engaged in such "going private" transactions to file a 13E-3 Schedule disclosing their "purpose." <u>See</u> 15 U.S.C. § 78m(e); 17 C.F.R. § 240.13e-100.

### d. <u>Section 14 Disclosure Requirements</u>

Section 14(d)(1) requires those making a "tender offer" to disclose information related to the offer in a filing known as a Schedule TO. <u>See</u> 15 U.S.C. § 78n(d)(1); 17 C.F.R. § 240.14d-100; <u>see also</u> <u>E.ON AG v. Acciona, SA</u>, 468 F. Supp. 2d 559, 575 (S.D.N.Y. 2007) ("<u>E.ON AG II</u>"). A tender offer typically involves a "public offering" consisting of "a general, publicized bid by an individual or group to buy shares of a publicly-owned company, the shares of which [are] traded on a national securities exchange, at a price substantially above the current market price." <u>Hanson Trust PLC v. SCM Corp.</u>, 774 F.2d 47, 54 (2d Cir. 1985).[6] In determining whether a purchaser has made a

---

[6]    In now oft-cited language, the district court in <u>Wellman v. Dickinson</u>, 475 F. Supp. 783, 823-24 (S.D.N.Y. 1979),

tender offer, courts consider "whether the particular class of persons affected need the protection of the Act.  An offering to those who are shown to be able to fend for themselves is a transaction not involving any public offering."  Id. at 57. Courts have generally ruled that privately negotiated transactions with sophisticated investors do not constitute tender offers.  See id. at 56; Brascan Ltd. v. Edper Equities Ltd., 477 F. Supp. 773, 790 (S.D.N.Y. 1979).  The Second Circuit has cautioned against the application of a "litmus test," however, and courts have recognized that a buying program may constitute an unconventional tender offer even where no formal tender offer has been announced.  See Hanson Trust, 774 F.2d at 57; E.ON AG II, 468 F. Supp. 2d at 581-82.  Section 14(d) is not specifically an anti-fraud provision; fraud is not an element of a 14(d) claim and need not be alleged or proved.  See 15 U.S.C. § 78n(d).

Section 14(e) "is a broad antifraud provision aimed specifically at tender offers for securities."  Polar Intern Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 235 (S.D.N.Y.

---

distilled the attributes of a typical tender offer into eight factors: (1) active and widespread solicitation of public shareholders for the shares of an issuer; (2) solicitation made for a substantial percentage of the issuer's stock; (3) offer to purchase made at a premium over the prevailing market price; (4) terms of the offer are firm rather than negotiable; (5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased; (6) offer open only for a limited period of time; (7) offeree subjected to pressure to sell stock; and (8) public announcements of a purchasing program concerning the target company that precede or accompany rapid accumulation of large amounts of the target company's securities.

2000) (quoting <u>Skydell v. Ares-Serono S.A.</u>, 892 F. Supp. 498, 500
(S.D.N.Y.1995)).  Largely modeled after section 10(b), it
prohibits material misstatements, omissions, and fraudulent
practices in connection with a tender offer.  See <u>Schreiber v.
Burlington N., Inc.</u>, 472 U.S. 1, 10-11 (1985); See 15 U.S.C. §
78n(e).

### e.    Section 10(b) Requirements

To state a cause of action for securities fraud under §
10(b) and Rule 10b-5, plaintiff must allege that defendants:  (1)
in connection with a purchase or sale of securities; (2) with
scienter; (3) made a material false representation or omitted to
disclose material information; (4) upon which plaintiff relied;
(5) proximately causing plaintiff to suffer injury.  <u>Lentell v.
Merrill Lynch & Co.</u>, 396 F.3d 161, 172 (2d Cir. 2005); <u>see also
Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 341-42 (2005).

A plaintiff seeking damages must have purchased or sold
securities in reliance on the defendants' alleged fraud.  <u>Blue
Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 731-33 (1975).
The Second Circuit has reserved judgment on whether a plaintiff
who is neither a purchaser nor seller with respect to the
challenged transactions has standing to seek injunctive relief.
See <u>Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.</u>,
186 F.3d 157, 170-71 (2d Cir. 1999).  District courts have held,
however, that plaintiffs need not satisfy the purchaser-seller
requirement to seek injunctive relief, so long as they
demonstrate "that the continuation of [the challenged] past and

present practices will in fact hurt" them.  Langner v. Brown, 913
F. Supp. 260, 270 (S.D.N.Y. 1996); see also Fuchs v. Swanton
Corp., 482 F. Supp. 83, 90 (S.D.N.Y. 1979).

### 2.  Application

I review each of the complaint's five counts in turn.
As the claims pertaining to §§ 13(e), 14(e), and 10(b)
specifically invoke anti-fraud provisions of the Exchange Act, I
subject them to the heightened standard of the PSLRA and Fed. R.
Civ. P. 9(b).  As it does not appear from the allegations of the
amended complaint or the parties' motion papers that the §§ 13(d)
and 14(d) claims sound in fraud,[7] I do not subject them to the
heightened pleading standards for fraud.

### a.  13(d) claim

The issue is whether Telenor East has pled facts to
support a plausible inference that defendants (1) intended to
acquire control of VimpelCom and (2) failed to adequately
disclose that intent in their 13D filings.  It has.

First, as to defendants' "intent to control," the
amended complaint outlines the Alfa Reporting Persons' march

---

[7]    Telenor East does not invoke the word "fraud" in its
13(d) count, but merely alleges that the filings contained "false
and misleading" statements.  The essence of its 14(d) claim
appears to be that defendants engaged in a tender offer without
filing a Schedule TO (whereas the 14(e) claim specifically
alleges that defendants committed fraud, in the form of insider
trading, in connection with a tender offer).  Defendants do not
assert that Telenor East must satisfy heightened pleading
standards for its 13(d) or 14(d) claims, as they do with respect
to the 10(b) and 14(e) claims.  See E.ON AG I, 468 F. Supp. 2d at
554; E.ON AG II, 468 F. Supp. 2d at 585.

towards and over the 44% threshold.  Defendants concede that as a
Plurality Shareholder, Eco Telecom could nominate four non-
independent candidates.  It is plausible that in working to cross
this threshold, defendants intended to gain "control" of
VimpelCom.  Control in the securities context refers to "the
power to direct or cause the direction of the management or
policies of a person, whether through ownership of voting
securities, through contract or otherwise."  17 C.F.R. § 240.12b-
2; see also E.ON AG v. Acciona, S.A., No. 06 Civ. 8720 (DLC),
2007 WL 316874, at *8 (S.D.N.Y. Feb. 5, 2007) (E.ON AG III) ("A
'desire to influence substantially the policies, management and
actions' of the issuer amounts to a purpose to control the
company." (quoting Chromalloy, 611 F.2d at 246)).  It is
plausible that by positioning Eco Telecom to nominate four
representatives to the Board, the Alfa Reporting Persons intended
to acquire that power and influence, and gaining control over
four of the nine board positions could certainly be seen as a
step in that direction.

         As to whether defendants harbored such intent prior to
June 13 2007, when they disclosed that they "intend[ed] to
acquire more than 44% but less than 50% of VimpelCom' s voting
shares" (see Rolfe Decl. Ex. 14), the amended complaint cites
numerous indications that they did, including: the Alfa Reporting
Persons' 2005 application to the FAS requesting permission to
acquire 60% of VimpelCom's shares; Eco Telecom's March 2007
letter to the UNICTRAL tribunal stating that it was "likely" to

acquire a 44% interest in VimpelCom prior to that year's Board elections; and Malis's testimony the following month that Eco Telecom had realized in February 2007 that it could reach the 44% threshold and had stepped up its purchasing efforts accordingly.[8]

Second, as to the sufficiency of defendants' 13(d) disclosures, Telenor East alleges that many of the Alfa Reporting Persons' 13D/As were vague and misleading with respect to their intent to gain control of the Board.  It alleges, among other things, that:

> (1)  The September 6, 2006 13D/A failed to disclose the number, or cost, of the shares Rightmarch intended to purchase from Jam as part of the Rightmarch Transaction (or, as reported by Russian press at the time, that the transaction was part of the Alfa Reporting Persons' "coordinated campaign" to gain control of VimpelCom).[9]

> (2)  The October 10, 2006 13D/A did not adequately disclose the Alfa Reporting Persons' concrete intent to acquire, through Rightmarch, the shares in Jams possession (instead implying that the transaction was merely a precautionary measure to assure the availability of shares "should" the Alfa Reporting Persons later intend to acquire them).

> (3)  The March 13, 2007 13D/A failed to disclose that a purpose of the Alfa Reporting Persons' bonds transaction with Deutsche Bank was to acquire funds to purchase VimpelCom shares.

---

[8]     The parties had previously appeared before UNICTRAL to arbitrate disputes over their respective nominees to the Board.

[9]     They also assert that Rightmarch, as a member of  Alfa Reporting Persons' "group" operation to purchase VimpelCom shares, should have either joined that 13D/A or filed one of its own.  (See Am. Compl. ¶ 31).

> (4)  All of the March 2007 13D/As
> misleadingly suggested that the Alfa
> Reporting persons were seeking to "increase
> their influence" without outright stating
> that they intended to cross the 44%
> threshold, thereby positioning itself to
> control VimpelCom.

(See Am. Compl. ¶¶ 30-31, 35-36, 51, 73, 81).

Telenor East's assertions, on their own, do not prove that the Alfa Reporting Persons' 13D/As are false or misleading (or that Rightmarch was part of the Alfa Reporting Persons' "group" and thereby required to sign on to their 13D/As), but at this early stage of the litigation, the amended complaint alleges sufficient facts to render its claims about the accuracy and completeness of defendants' disclosures plausible.  See Kaufman & Broad, Inc. v. Belzberg, 522 F. Supp. 35, 44-45 (S.D.N.Y. 1981); Dan River, Inc. v. Unitex Ltd., 624 F.2d 1216, 1228 (4th Cir. 1980) ("If [plaintiff] is not allowed to obtain from defendants through discovery the facts vital to prosecuting this action, the defendants are effectively freed from the obligation of filing a complete and accurate Schedule 13D for only they can publish their motives and intent as the law requires them.").

Defendants object that (1) they were not required to disclose any specific intent to acquire between 44% and 50% because becoming a Plurality Shareholder did not give them "control" of VimpelCom and (2) in any event, their June 2007 disclosure that they intended to cross the 44% threshold rendered

Telenor East's 13(d) claim moot.[10]  (See Altimo Mem. 5; Repl. 1-2).  These objections do not warrant dismissal.

First, whether a purchase of shares reflects an intention to seek control of a corporation requires a fact-intensive inquiry.  E.ON AG III, 2007 WL 316874, at *8.  Defendants need not have intended to acquire a "majority" of the seats on Board to satisfy the control element.  See id. ("The acquisition of only a twenty-percent stake in a company has been sufficient to find that the shareholder had a purpose to control the company." (citing Chromalloy, 611 F.2d at 246)).  Indeed, the amended complaint alleges that Altimo Vice-President Kirill Babaev told Russian media in March 2007 that attaining at least 42% would enable it to "obtain structural control over VimpelCom."  (Am. Compl. ¶¶ 75-76).

Second, I am unconvinced by defendants' suggestion that the Alfa Reporting Persons' June 13 2007 13D/A, submitted just before Eco Telecom crossed the 44% threshold, moots Telenor East's objections as a matter of law.  If the facts alleged by

---

[10]    They also contend that Telenor East has not shown the Rightmarch was part of the Alfa Reporting Persons "group." (Altimo Repl. 5).  The key inquiry in making this determination is whether they "agree[d] to act together for the purpose of acquiring, holding, voting or disposing of" securities.  See Morales v. Quintel Entertainment, Inc, 249 F.3d 115, 123-24 (2d Cir. 2001).  Telenor East alleges that Rightmarch is a wholly-owned subsidiary of Altimo and a part of a series of shell corporations through which the Alfa Group holds its VimpelCom shares.  (Am. Compl. ¶¶ 10-15).  It also alleges, in great detail, Rightmarch's participation in Eco Telecom's purchase of VimpelCom shares.  These facts support an inference that Rightmarch acted as part of a "group" to acquire VimpelCom shares.  See Roth v. Jennings, 489 F.3d 499, 507-08 (2d Cir. 2007).

Telenor East are true, it may be able to prove that the Alfa
Reporting Persons' belated disclosure afforded VimpelCom
shareholders little time to react and respond accordingly.
Unlike in <u>Treadway Cos. v. Care Corp.</u>, 638 F.2d 357, 380 (2d Cir.
1980), cited by defendants, this was not a case in which
shareholders were given ample opportunity to digest defendants'
"curative" disclosure.[11]   To the contrary, by the time the Alfa
Reporting Persons issued their June 13 13D/A, Eco Telecom was
poised to cross the 44% threshold and did so within twelve days.
Given this brief period of time, the Alfa Reporting Persons' June
disclosures arguably do not render Telenor East's claims moot.

**b.   13(e) claim**

As to Telenor East's 13(e) claim, the first issue is
whether the amended complaint alleges facts to support an
inference that defendants were engaged in a "going private"
transaction.  It does not.  While Telenor East states a claim
that defendants intended to acquire a 44% stake in VimpelCom, it
does not allege their involvement in any transaction that had a
"purpose" or "reasonable likelihood" of causing a class of
VimpelCom securities to held by fewer than 300 shareholders.
Accordingly, the amended complaint does not plausibly allege that

---

[11]    Defendants cite <u>Treadway</u> to support the proposition
that they "cured" whatever deficiencies existed in the prior
filings.  (Altimo Mem. 6).  In that case, however, the court
noted that shareholders had "four months to ponder" the curative
disclosure and that it "was not one in which a takeover attempt
'followed on the heels' of a belated curative filing."  <u>Treadway</u>,
638 F.2d at 380.

defendants were required to file a 13E-3 Schedule, and engaged in "fraudulent" conduct by failing to do so.  In fact, the amended complaint contains no allegation as to the number of VimpelCom shareholders overall.

Telenor East contends that it met its pleading requirements by (1) stating that the Alfa Reporting Persons had filed a May 2005 application with the FAS requesting permission to purchase 60% of VimpelCom's shares and (2) noting that "new Russian tender offer rules," effective as of July 2006, would require an "an acquirer of more than 50%" of a company's voting shares to "make a tender offer for 100% of the shares."  (Am. Compl. ¶¶ 39-40; see Pl. Opp. 24).  The complaint suggests that if defendants were to cross the 50% threshold, "they would be required to make a tender offer for 100% of the voting shares of VimpelCom," thereby triggering the 13(e) reporting requirements. (Am. Compl. at ¶ 40).

This does not suffice.  The amended complaint does not allege that defendants intended to initiate a going private transaction when they filed their 2005 application or that they knew that Russia's tender offer rules would be changed a year later to require a party purchasing more than 50% of a company's voting shares to make a tender offer for the rest of the shares. Because Telenor East fails to plead the requisite elements of a "going private transaction," its 13(e) claim is dismissed.

c.   **14(d) claim**

The issue is whether Telenor East has pled facts that
support an inference that defendants engaged in an unconventional
tender offer.  It has.  The complaint alleges that between
February 28, 2007 and June 25, 2007, Deutsche Bank "'swept the
street' . . . seeking to purchase as many VimpelCom ADSs as
possible for the account of the Alfa Reporting Persons, from
holders based in the United States and Europe."  (Am. Compl. ¶
55).  To support its claim that these purchases amounted to
undisclosed tender offers, Telenor East asserts that (1) the
offers "were made on a 'take it or leave it basis'"; (2) holders
were given "generally less than 24 hours" to accept; (3) Eco
Telecom offered to pay a premium ranging from $0.50 to $10.00;
and (4) defendants managed to increase their voting stock 8.2%
after they initiated this approach.  (Id. ¶¶ 55-56).

Defendants contend that Telenor East has failed to
sufficiently allege that they were engaged in a tender offer and
thus required to file a Schedule TO.  (See Altimo Mem. 19).
First, they argue that courts have "rejected efforts to confer
tender offer status on privately negotiated block trading with
sophisticated investors."  (Id.).  The "hedge funds and other
holders of large blocks of VimpelCom shares" cited in the amended
complaint, they contend, qualify as the very "sophisticated
investors" who do not warrant the protection of 14(d).  (Id.).
Second, they assert that the Eco Telecom-Deutsche Bank purchases
fail to exhibit the other tender offer attributes identified in

Wellman.  (Id. at 20-22).  They contend, among other things, that:

> (1)  The fact the Eco Telecom only increased its voting shares by 8.2% over the four months of the alleged tender offer suggests that they had not solicited a "substantial percentage" of VimpelCom's stock.
>
> (2)  The variation between the premiums cited in the complaint ($0.50 to $10.00) suggest that they were negotiable rather than offered on a "take it or leave it basis."
>
> (3)  There was no allegation that any of the offers were "conditioned on the tender of a fixed number of shares."
>
> (4)  There was no allegation of a "public announcement of a purchasing program in the manner typical of a tender offer."

(See id.).

These may be fair arguments, but not at this juncture of the case, as they would require the Court to weigh competing factual arguments and to consider matters outside the amended complaint.  Defendants' factual arguments are more appropriately decided at a later stage of the litigation.  See E.ON AG II, 468 F. Supp. 2d at 585-86.  While Telenor East has not proved the existence an unconventional tender offer, it has pled sufficient facts to make its claim of one plausible.  Accordingly, the motion to dismiss the 14(d) claim is denied.

### d.  **10(b) Claim**

The issue is whether Telenor East has satisfied the heightened pleading requirements of Rule 9(b) and the PSLRA with respect to its allegation that defendants purchased VimpelCom

shares while in possession of non-public material information. It has not.[12]

The amended complaint alleges that three of Eco Telecom's nominees to the Board, all of whom held upper-level positions at Altimo, received non-public information when VimpelCom emailed the Board its quarterly results on August 15, 2006 and March 16, 2007.  (Am. Compl. ¶¶ 24, 52).  It does not allege, however, that they disclosed that information to anyone else, let alone the individuals responsible for making the VimpelCom purchases at issue.  Nor does it allege that they made or directed those purchases themselves.  Instead, it generally asserts that "because the Board meeting agenda and materials were distributed" to three members, "all of the Alfa Reporting Persons, including Eco Telecom were in possession of such information."  (Id. ¶ 52).

The amended complaint assumes but does not allege that the information passed from the three Board members to those who instructed Rightmarch and Eco Telecom to make their respective VimpelCom purchases.  The bare assertion that "all of the

_____

[12]    Defendants also raise the issue of whether Telenor East has standing to raise 10(b) claims.  (See Altimo Mem. 13).  The Second Circuit has noted that this is an open question of law. Simon DeBartolo Group, 186 F.3d at 170-71.  Telenor East cites decisions, however, holding that plaintiffs seeking injunctive relief need not fulfill the seller-purchaser requirement to have standing.  See Langner v. Brown, 913 F. Supp. at 207 (referring to "well established Second Circuit precedent that, in seeking injunctive relief under a § 10(b) claim, a plaintiff does not have to show damages in connection with the purchase or sale of any security.").  In any event, it is unnecessary to determine whether plaintiff has failed to state a claim for lack of standing, because it fails to state a claim on other grounds.

Reporting Persons" knew what the three Board members knew does not suffice.  See Kolbeck v. LIT America, Inc., 923 F. Supp. 557, 569 (S.D.N.Y 1996) ("Broad allegations that several defendants participated in a scheme, or conclusory assertions that one defendant controlled another, or that some defendants are guilty because of their association with others . . . do not satisfy Rule 9(b)."), aff'd, 152 F.3d 918 (2d Cir. 1998).  As defendants point out, Telenor East's theory would suggest that any entity with shares in a company and a representative on the board would be "ipso facto precluded from buying or selling shares in the company without disclosing confidential information known to its representative."  (See Altimo Mem. 16).

Telenor East contends that the Rightmarch Transaction and March 2007 purchases were "suspiciously-timed," and give rise to "a strong inference of scienter."  (Pl. Opp. 20).  It states that "the price of VimpelCom shares and ADSs steadily rose" after the public disclosure of the company's quarterly results and suggests that defendants would have paid more had they made their purchases after those disclosures.  (Am. Compl. ¶¶ 34, 65).

These contentions, however, are contradicted by Telenor East's assertion that these purchases were part of Eco Telecom's attempt to reach the 44% threshold.  The amended complaint itself characterizes the transactions as part of defendants' ongoing pursuit of VimpelCom shares.  While it isolates the Rightmarch and March 2007 transactions for particular scrutiny, it does not allege that the volume or price of the shares Eco Telecom

acquired during those transactions were "unusual" within the context of its other acquisitions.  It instead asserts that the Board received positive information within the period of time Eco Telecom made its purchases and asks the Court to infer that those purchases were made while defendants "were in possession of such information."  This falls short of the necessary showing.  <u>See Acito</u>, 47 F.3d at 54 (to show scienter, plaintiff must allege "unusual" trading out of line with prior trading practices).  Telenor East has not met its heightened pleading requirements.  Accordingly, the 10(b) insider trading claim is dismissed.

        **e.**   **<u>14(e) Claim</u>**

      The issue is whether Telenor East has satisfied the heightened pleading standards of 9(b) and the PSLRA with respect to its allegations that defendants engaged in insider trading while conducting a tender offer.  Telenor East's 14(e) claim essentially repeats its 10(b) claim, only within the context of a tender offer.  The 14(e) claim fails for the same reasons as the 10(b) claim and is dismissed accordingly.

<strong><u>CONCLUSION</u></strong>

      For the foregoing reasons, defendants' motion to stay the action and compel arbitration is denied, and the motion to dismiss the complaint is granted in part and denied in part.  Accordingly, counts three, four, and five of the amended

complaint are dismissed.  Counsel shall appear for a pretrial
conference on April 25, 2008, at 10 a.m.

      SO ORDERED.

Dated:    New York, New York
          March 24, 2008

                                      DENNY CHIN
                                    United States District Judge

### APPEARANCES:


For Plaintiff Telenor East Invest AS:

       ORRICK, HERRINGTON & SUTCLIFFE LLP
           By:  Robert L. Sills, Esq.
               Jay K. Musoff, Esq.
               666 Fifth Avenue
               New York, NY  10103

                  - and -

               Peter O'Driscoll, Esq.
               Tower 42, Level 35
               25 Old Broad Street
               London EC2N 1HQ
               DX: 557 London/City
               United Kingdom


For Defendants Altimo Holdings & Investments Limited,
    Crown Finance Foundation, and Rightmarch Limited:

       CRAVATH, SWAINE & MOORE LLP
           By:  Ronald S. Rolfe, Esq.
               Worldwide Plaza
               825 Eighth Avenue
               New York, NY  10019-7475


For Defendants Eco Telecom Limited and CTF Holdings Limited:

       LOVELLS LLP
           By:  Hillel I. Parness, Esq.
               Edward T. Schorr, Esq.
               Gonzalo S. Zeballos, Esq.
               590 Madison Avenue
               New York, NY  10022